1   Larry K. Hutcher (Admitted *Pro Hac Vice*)
    Michael Wexelbaum (Admitted *Pro Hac Vice*)
2   **DAVIDOFF HUTCHER & CITRON LLP**
    605 Third Avenue, 34th Floor
3   New York, New York 10158
    Telephone:    212.557.7200
4   Facsimile:    212.286.1884
    lkh@dhclegal.com
5   mw@dhclegal.com

6   Aram Ordubegian (SBN 185142)
    Annie Y. Stoops (SBN 286325)
7   **ARENTFOX SCHIFF LLP**
    555 West Fifth Street, 48th Floor
8   Los Angeles, CA 90013-1065
    Telephone:    213.629.7400
9   Facsimile:    213.629.7401
    aram.ordubegian@afslaw.com
10  annie.stoops@afslaw.com

11  *Attorneys for Defendants Counsel Financial Services,*
    *LLC and California Attorney Lending II, Inc.*

12

13                  **UNITED STATES BANKRUPTCY COURT**

14          **CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

15

| | |
|---|---|
| 16 In re | Case No. 2:20-bk-21022-BR |
| **GIRARDI KEESE**, | Chapter 7 |
| 17 Debtor. | Adversary No: 2:22-ap-01169-BR |
| 18 | **DECLARATION OF PAUL CODY IN** |
| 19 **ELISSA D. MILLER**, Chapter 7 Trustee, | **SUPPORT OF DEFENDANTS COUNSEL FINANCIAL SERVICES, LLC'S AND** |
| 20 Plaintiff, | **CALIFORNIA ATTORNEY LENDING II, INC.'S MOTION TO DISMISS** |
| 21 v. | **COMPLAINT** |
| 22 **COUNSEL FINANCIAL SERVICES, LLC**, a Delaware limited liability company, | *[Motion to Dismiss Complaint and Memorandum of Points and Authorities;* |
| 23 **CALIFORNIA ATTORNEY LENDING II, INC.**, a New York Corporation, **JOSEPH D.** | *Declaration of Megan Payne; and Request for Judicial Notice Filed Concurrently Herewith]* |
| 24 **DiNARDO**, an individual, | Hearing: |
| 25 Defendants. | Date:        December 6, 2022 |
| 26 | Time:        10:00 a.m. PPT Place:        Courtroom 1668 |
| 27 | 255 E. Temple Street Los Angeles, CA 90012 |

28

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

# DECLARATION OF PAUL CODY

I, Paul Cody, hereby declare under penalty of perjury pursuant to 28 USC 1746, as follows:

1.       I am the Director, President and CEO of the defendant California Attorney Lending II, Inc. ("CAL II"), and am fully familiar with the facts and circumstances hereafter set forth herein.

2.       I make this Declaration in support of *Defendants Counsel Financial Services, LLC's and California Attorney Lending II, Inc.'s Motion to Dismiss Complaint* (the "Motion"),  pursuant to the Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Bankruptcy Procedure 7012(b), for failure to state a claim upon which relief can be granted.

3.       This Declaration supports dismissal of the claims as they pertain to CAL II, which are based, *inter alia*, upon the doctrine of *res judicata*.  The grounds for relief sought on behalf of CFS are set forth in the Declaration of Megan Payne ("Payne Declaration") being filed herewith. The legal bases for dismissal of the Complaint as to both CAL II and co-defendant Counsel Financial Services, LLC ("CFS") are set forth in the concurrently-filed Memorandum.

4.       A true and correct copy of the Complaint at issue is attached as **Exhibit 1** to the concurrently filed Request for Judicial Notice ("RFJN").  The Complaint is brought by plaintiff, Elissa D. Miller, in her capacity as the Chapter 7 trustee ("Trustee" or "Plaintiff") of the debtor Girardi & Keese, d/b/a Girardi Keese ("Girardi Keese" or the "Debtor" or the "Firm"), and as the Successor-in-Interest Trustee of the Girardi Keese Client Trust Account.

5.       There is no doubt that what Girardi Keese and its principal, Thomas V. Girardi ("Girardi"), are now known to have done to their clients was dishonest and despicable.  However, they did so without any participation in or knowledge of their heinous conduct by CAL II or CFS. CAL II and CFS had absolutely no knowledge of the massive theft of client funds by Debtor and Girardi.  If CAL II had even an inkling of what Debtor and Girardi were doing, from that moment on, no further loans would have been made to Debtor, and a default under the loan documents would have been declared.  That did not happen because, like the legal community at large, in both California and nationwide, CAL II and CFS were hoodwinked by the sterling reputation of Debtor and Girardi as pillars of the plaintiff's bar.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

6.       Although Trustee is seeking to recover funds for Debtor's estate, for the benefit of victims of the law firm larceny perpetrated by Girardi, it is simply wrong to seek recovery of the monies that Girardi absconded with from innocent parties such as CAL II and CFS, who had nothing to do with or any knowledge of the defalcation of client funds by Debtor and Girardi.

7.       Trustee asserts a great many, if not most, of the allegations of the Complaint upon information and belief.  Trustee's lack of personal knowledge no doubt accounts for why so many of her allegations are inaccurate and materially untrue.  In addition, a great many of the Complaint's allegations are also nonsensical, conclusory in nature, and lacking in the requisite specificity.  My refutation of the untrue, inaccurate, and insufficient allegations of the Complaint shall be limited to the instances where those allegations are incontrovertibly rebutted by facts gleaned from documents that are referred to in the Complaint or are integral thereto, and that indisputably mandate the granting of the relief requested by CAL II.

8.       CAL II, CFS, and the third defendant Joseph D. DiNardo ("DiNardo") are identified collectively in the Complaint as the "CFS Defendants" or simply as "CFS."  Grouping the defendants CAL II and CFS together in that fashion (it is my understanding that DiNardo shall be making his own motion to dismiss, and I leave it to him to address this issue as it pertains to him) is patently improper, as the claims asserted in the Complaint against CAL II and CFS are predicated upon a purported debtor-creditor relationship between Girardi Keese and those two defendants collectively.  However, although, as is set forth below, Girardi Keese and CAL II had a debtor-creditor relationship arising out of a series of secured loan transactions between them, as is set forth in the accompanying Payne Declaration, there was never any lender/borrower relationship between Girardi Keese and CFS, and the Complaint does not adequately allege one.  Simply alleging without any genuine factual support that the loans made by CAL II were also made by CFS is conclusory, nonsensical, and legally deficient.

9.       Trustee correctly alleges that CAL II is a New York corporation, Compl. ¶ 22, and that CFS is a Delaware limited liability company.  Compl. ¶ 21.  However, Trustee then mistakenly alleges, upon information and belief, that "CFS established CAL II as the entity for its California operations."  Compl. ¶ 22.  That is completely inaccurate.  Although CFS did business in California

through a licensed affiliate, that entity was California Attorney Lending LLC ("CAL"), and not CAL II. As is set forth in the Payne Declaration, CAL ceased doing business in 2012.

10.    CAL II is a fully licensed and authorized lender in the State of California. Compl. ¶ 22. As is hereinafter set forth and documented by the Exhibits annexed hereto, CAL II had a lender/borrower relationship with Girardi Keese, and as is acknowledged by Trustee, filed a secured claim in this bankruptcy proceeding. Compl. ¶ 7. However, as is demonstrated below, CAL II never had any such relationship with the California law firm known as Masry & Vititoe ("M&V").

11.    CAL II provides loans and working capital lines of credit to plaintiffs' contingency fee law firms for working capital, portfolio financing, and post-settlement funding. Compl. ¶ 22. As the documents referred to below establish, such loans are personally guaranteed by the law firm's principal attorneys and secured by a first priority lien upon and security interest in all assets of the obligors, including contractual rights to payment (e.g., attorneys' fees both earned and not yet earned) from the firm's contingency fee cases.

12.    Girardi Keese, a general partnership, was a plaintiffs' law firm based in Los Angeles, California practicing in the areas of personal injury, defective products, sexual abuse, toxic torts, business law, employment law, and aviation law. A significant number of Girardi Keese's matters were undertaken on a contingency basis such that Girardi Keese received payment of its legal fees only if a case resolved in favor of its clients. Girardi was one of the founding partners of Girardi Keese, the other being his former partner, Robert Keese. Compl. ¶¶ 2, 9, 26, 27. Girardi Keese and Girardi are referred to collectively in this Declaration as "Debtors."

13.    As the President and CEO of CAL II, it is part of my job to review the files of borrowers who are in default of their obligations under their promissory notes, security agreements, personal guaranties, and other agreements of a similar nature, and to work with the borrowers to resolve the delinquency, or if necessary, to oversee the legal enforcement of the agreements.

14.    I know for a fact that CAL II never made any loans to M&V. That accounts for why CAL II has no loan files on M&V. Trustee erroneously alleges that CAL II was the "largest secured creditor" of M&V. Compl. ¶¶ 9, 37. That is completely untrue. Equally untrue is the allegation

that "CAL II provided [M&V] with a $25,000,000 line of credit." Compl. ¶ 37, n. 13. In making those false allegations, Trustee relies upon Proofs of Claim filed in the M&V Chapter 11 proceeding. However, Trustee's reliance upon those Proofs of Claim is misplaced.

15.    In support of her mistaken allegation that M&V's "largest secured creditor was CAL II," (Compl. ¶ 9), Trustee cites to "Claim No. 22 filed in the amount of $25,784,026.11." Compl. ¶ 37. However, that Proof of Claim 22, a true and correct copy of which is attached as **Exhibit 4** to the RFJN, was an unsecured claim in the sum of $10,000,000.00 filed by a creditor named Paul Taing, PT Management Inc., PKT Profiles Inc., and PTMS, Inc. That unsecured creditor of M&V is unknown to CAL II.

16.    In further support of her mistaken allegation that "CAL II provided [M&V] with a $25,000,000 line of credit," Trustee cites to "Claim No. 19 1-3." Compl. ¶ 37, n.13. With respect thereto, Trustee confuses CAL II with CAL. In fact, as is established by the Proofs of Claim referred to below, CAL II had no borrower/lender relationship or any other debtor-creditor relationship with M&V. There were no loan transactions by and between CAL II and M&V. Contrary to Trustee's allegations, CAL II never filed a Proof of Claim in the M&V Chapter 11 proceeding. However, there was a debtor-creditor relationship between CAL and M&V, and CAL was M&V's largest secured creditor pursuant to a series of secured loan transactions between those two entities. Ultimately, M&V owed CAL in excess of $35,000,000, and CAL (not CAL II) filed three Proofs of Claim in the M&V Chapter 11 proceeding. Those three Proofs of Claim were claims 19-1, 19-2, and 19-3 in the M&V Chapter 11 proceeding, and true and correct copies thereof are attached as **Exhibit 5**, **Exhibit 6**, and **Exhibit 7**, respectively, to the RFJN.

17.    I am familiar with CAL II's file for the loans at issue that it made to Girardi Keese, which were personally guaranteed by Girardi and are evidenced by the loan documents described in this Declaration. I have reviewed the loan documents between CAL II and the Debtors in this action, and I am familiar with the Debtors' loan status and events of default. Except as stated otherwise, all information stated in this Declaration is based upon my personal knowledge, or from the business records of CAL II, which are made at or near the time that the records are created

and/or executed, and are maintained in the regular course of its business, and which are currently in CAL II's custody.

18.     Starting in 2011, CAL II provided a working line of credit to Girardi Keese. Over the course of several years, CAL II amended, amended and restated, supplemented, or otherwise modified its loan agreement with Girardi Keese and obtained the personal guaranty of Girardi.

19.     On or about July 5, 2011, Girardi Keese and CAL II entered into a loan transaction (as amended, the "Loan") in which Girardi Keese executed and delivered to CAL II, a Revolving Promissory Note in the principal amount of $3,500,000 and granted CAL II a security interest in certain assets to secure such obligations. Compl. ¶ 40. As consideration for the Loan, Girardi Keese granted to CAL II first priority security interests in the future proceeds of certain of Girardi Keese's cases and other assets. These rights to payment were a particularly important and valuable part of CAL II's collateral and represented a primary source for repayment of the Loan. In addition, Girardi executed an unconditional guarantee of payment. True and correct copies of the aforementioned loan documents are collectively attached hereto as **Exhibit A**.

20.     CAL II duly perfected its security interests by filing a UCC-1 against Girardi Keese on July 6, 2011, which was designated as Filing No. 11-7275806299 (and amended and continued by UCC-3 continuation statements to the present), a true and correct copy of which is attached hereto as **Exhibit B**.

21.     On or about August 12, 2011, Girardi Keese executed and delivered to CAL II that certain First Amended and Restated Revolving Promissory Note, which increased the principal amount of the Loan to $5,000,000, and that certain First Amended and Restated Security Agreement dated August 12, 2011, which continued to grant CAL II security interests in future proceeds of certain of Girardi Keese's cases and other assets to secure obligations thereunder. Compl. ¶ 41. True and correct copies of the aforementioned documents are collectively attached hereto as **Exhibit C**.

22.     CAL II filed a UCC-3 on or about August 18, 2011, which was designated as Filing No. 11-72814762, to amend the description of its collateral to reflect its security interest granted

under that certain First Amended and Restated Security Agreement. A true and correct copy of that financing statement is attached hereto as **Exhibit D**.

23.     On or about August 1, 2013, Girardi Keese renewed the CAL II Loan and delivered to CAL II that certain Second Amended and Restated Revolving Promissory Note, which maintained the principal amount of $5,000,000.  In the Second Amended and Restated Security Agreement, Girardi Keese now granted CAL II an ***unlimited lien on all assets*** of the Debtors, including the attorneys' fee proceeds from ***all*** cases of Girardi Keese.  Compl. ¶ 43.  True and correct copies of the aforementioned documents are collectively attached hereto as **Exhibit E**.

24.     On or about August 28, 2013, CAL II filed a UCC-3 (designated as Filing No. 1373755925) to evidence and perfect its security interest in ***all*** assets of Girardi Keese, which it has maintained ever since.  Compl. ¶ 44.  A true and correct copy of that UCC-3 is attached hereto as **Exhibit F**.

25.     On or about April 11, 2016, unbeknownst to CAL II, and without its knowledge or consent, Girardi Keese and Girardi sought yet another loan from an Arizona lender called Stillwell Madison, LLC ("Stillwell"), which issued a loan to Girardi Keese in the amount of $6,500,000, purported to be secured by the same collateral granted to CAL II and to LFG.  Stillwell also filed a UCC-1 to evidence an all-asset competing lien against the Debtors. Compl. ¶¶ 46, 47.

26.     By accepting the loan from Stillwell, Girardi Keese and Girardi breached numerous covenants contained in the CAL II loan agreement that prevented Girardi Keese from incurring any further indebtedness or placing any additional liens (even subordinated liens) on CAL II's collateral. For example, in the CAL II loan documents, the Debtors expressly covenanted, among other things, not to "create, incur, assume or have any indebtedness or other obligation…arising from the borrowing of any money or…pursuant to any guaranty or other contingent obligation, except for indebtedness and other obligations…fully and accurately described in the response to question 7 contained in the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement" without CAL II's prior written consent. (*See* Exhs. A at 21-23 (§ 4), C at 21-23 (§ 4), E at 28-30 (§ 4), G at 29-31 (§ 4), and K at 29-31 (§ 4).) Further, in executing each iteration of the loan documents, Debtors were required to identify in writing all liens against the collateral. (Exhs.

A at 30-31, C at 30-31, E at 37-38, G at 38-39 and K at 38-39.)  In each of the five iterations of the security agreement between 2011 and 2019, Debtors represented in each one that, other than certain bank liens against real property and various equipment liens, there were no other liens against the collateral securing the loan. *Id.*

27.    In 2017, Girardi Keese, once more without CAL II's knowledge or consent, secured financing from Law Finance Group ("LFG") in the approximate amount of $15,000,000 which was secured by the same collateral as granted to CAL II in 2013 and to Stillwell in 2016, again in breach of the covenants contained in the CAL II loan documents. Girardi Keese and Girardi had now re-pledged CAL II's collateral three times to two other lenders, without CAL II's knowledge and consent and in violation of the contractual covenants owed to CAL II.  Compl. ¶ 48.

28.    With CAL II unaware of the Debtors' conduct as described, on or around July 11, 2017, Girardi Keese executed and delivered to CAL II that certain Third Amended and Restated Revolving Promissory Note, which increased the principal amount of the Loan to $6,000,000, and that certain Third Amended and Restated Security Agreement, which continued the *unlimited* security interests in all of the Debtors' respective assets granted in 2013.   Compl. ¶ 49.  True and correct copies of these documents are attached hereto as **Exhibit G**.  An Allonge (short amendment) to the Third Amended and Restated Security Agreement, increasing the Loan amount to $6,500,000, was thereafter signed by the Debtors on August 6, 2018.  A true and correct copy of this document is attached hereto as **Exhibit H**.

29.    One month after CAL II entered into the Third Amended and Restated Revolving Promissory Note in July 2017 and without CAL II's knowledge or consent, the Debtors secured *yet another* loan from a Texas lender known as Virage Funding, which filed an original UCC-1 against Girardi Keese and Girardi's assets on August 18, 2017.  I am informed and believe that Corporation Service Company, the "debtor" listed in this financing statement, filed on behalf of Virage Funding. The amount of that indebtedness is believed to be approximately $9,000,000.  Compl. ¶ 50.

30.    In 2018, and without CAL II's knowledge or consent, Girardi Keese and Girardi secured additional financing from Nano Bank and further encumbered CAL II's collateral in breach of the covenants set forth in the CAL II loan documents. Compl. ¶ 52. The Debtors had now re-

pledged CAL II's collateral yet another two times, rendering these funding arrangements *the fourth and fifth times that Girardi Keese and Girardi had improperly granted security interests in the same collateral originally granted to CAL II in 2013.* Having secured tens of millions of dollars in loan proceeds (upon information and belief, a total of more than $39,000,000), from five different lenders, Girardi Keese and Girardi had created a web of deceit surrounding the law firm, its financing, and its collateral that was bound to disastrously unravel—which it did.

31.     In October 2019, Girardi was back again, asking CAL II for a multi-million dollar loan increase. This time, the public record revealed the Debtors' borrowings from LFG and Stillwell, and we confronted Girardi about them. In response, on October 25, 2019, Girardi wrote a letter to CAL II representing that: (i) the LFG loan ($17M) had been paid "by putting in a large sum of my own money" (i.e., CAL II's lien on Girardi Keese's attorneys' fees had not been violated); (ii) he would "sign a stipulated judgment" in our favor; (iii) he would simultaneously send a letter to defense counsel in certain settled cases known as the *Lion Air Crash Cases* directing defendant to pay that portion of the settlement which represented his legal fees up to $3.5M, directly to CAL II; and (iv) that one of his largest cases, *Porter Ranch,* was now worth almost a billion dollars and that he believed "very reasonable settlement would be in the $900 million area." Compl. ¶ 69. A true and correct copy of Girardi's October 25, 2019 letter is attached hereto as **Exhibit I** and a true and correct copy of Girardi's November 8, 2019 letter to the *Lion Air Crash Cases* defense counsel is attached hereto as **Exhibit J.**

32.     Based upon all of the additional protections offered by Girardi as described above, including the Confession of Judgment; the $3.5M paydown on the *Lion Air Crash Cases*; and the *Porter Ranch* settlement estimate of $900M; as well as his representations that LFG was paid off with his own funds; that the Stillwell loan was in dispute; and his promise not to seek any further loans without our permission, CAL II consented. Compl. ¶ 69.

33.     Thus, on or around November 8, 2019, Girardi Keese executed and delivered to CAL II that certain Fourth Amended and Restated Promissory Note, in the maximum amount of $8,000,000, which continued to be protected by CAL II's 2013 security interests in all of the Debtors' respective assets. Compl. ¶ 71.

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

34.    The lender/borrower relationship between CAL II and Girardi Keese is thus now governed by that certain (i) Fourth Amended and Restated Promissory Note dated November 8, 2019 (the "*Promissory Note*"), (ii) Fourth Amended and Restated Security Agreement dated November 11, 2019 (the "*Security Agreement*"), and (iii)) other loan documents executed in connection therewith, true and correct copies of which are attached hereto collectively as **Exhibit K.**

35.    The Security Agreement provides, *inter alia*:

> "The Collateral includes, without limitation, any right to payment of any [of Girardi Keese or Mr. Girardi] for client representation or referral (whether such right to payment is on a contingent, hourly, fixed fee or other basis) and for Costs and Expenses (as defined in the Note) whether or not yet earned by performance and the proceeds thereof, including Net Fees and Expenses (as defined in the Note)."

36.    As aforesaid, CAL II's security interest was duly perfected by the filing of a UCC-1 financing statement in the Office of the California Attorney General against Girardi Keese on July 6, 2011, designated as Filing No. 11-7275806299 (as amended and continued by UCC-3 financing statements to the present).[1] True and correct copies of the UCC financing statements are attached as Exhibit E to the CAL II Claim (as defined herein), which is attached as **Exhibit 12** to the RFJN.

37.    The Promissory Note required that Girardi Keese execute an irrevocable letter of instruction that authorized the defendant in the *Lion Air Crash Cases* to pay directly to CAL II 50% but not all of the attorneys' fees due to Girardi Keese – and NOT any proceeds due to the Firm's clients in those cases. Compl. ¶ 74.

---

[1] The financing statement, as amended, mirrors the Security Agreement and describes the entirety of the collateral as "[a]ll right, title and interest in all Goods (including Equipment, Fixtures and Inventory), Money, Instruments (including Promissory Notes), Accounts, Deposit Accounts, Chattel Paper, Investment Property, Letter-of-Credit Rights, Documents and General Intangibles (including payment intangibles), Commercial Tort Claims described in the Questionnaire, Insurance Proceeds and any other personal property (whether or not subject to the UCC), and all interest, dividends and other distributions thereon paid and payable in cash or in property; and all replacements and substitutions for, and all accessions and additions to, and all profits, offspring, Products and other Proceeds of, all of the foregoing… The Collateral includes, without limitation, any right to payment of any [of Girardi Keese or Girardi] for client representation or referral (whether such right to payment is on a contingent, hourly, fixed fee or other basis) and for Costs and Expenses (as defined in the Note) whether or not yet earned by performance and the proceeds thereof, including Net Fees and Expenses (as defined in the Note)."

38.     The requirement that Girardi Keese execute an irrevocable letter of instruction that authorized CAL II to directly receive proceeds from specified collateral from a third party is a typical secured creditor tool, and did not alter Girardi Keese's absolute obligation to repay the Promissory Note.

39.     Furthermore, Girardi Keese's overall repayment obligation to CAL II under the Promissory Note was not calculated as a percentage or share of Girardi Keese's overall fee revenues or contingent upon the outcome of a case or cases. Rather, the Promissory Note required that Girardi Keese make regularly scheduled payments of principal and interest and pay all outstanding amounts due and owing thereunder by a date certain.

40.     As noted above, part of the consideration given to CAL II in exchange for the Loan evidenced by the Fourth Amended and Restated Promissory Note, was the Debtors' duly executed and delivered Confession to Judgment dated November 12, 2019, pursuant to CCP §§ 1132-1134 ("Confession to Judgment"), wherein the Debtors agreed to entry of judgment without trial if, after Debtors' default under the Loan and notice thereof, the Debtors did not cure the default. A true and correct copy of the Confession to Judgment is attached as **Exhibit 11** to the RFJN. The parties agreed that judgment would be in the amount of $8,000,000, plus any other advances legal fees, costs and expenses, less any payments made by Girardi Keese, for possession of Girardi Keese's collateral, and for post-judgment attorneys' fees and expenses.

41.     Unbeknownst to CAL II at that time (and without the required disclosure by Debtors under the CAL II Loan), within just months of entering into forbearance agreements with LFG and Stillwell, Debtors had defaulted under such agreements.  Compl. ¶¶ 53, 54, 55.

42.     CAL II formally notified Debtors about their defaults under the Fourth Amended and Restated Promissory Note, by letter dated October 17, 2020, and demanded full and immediate payment of the Loan. A true and correct copy of this letter is attached hereto as **Exhibit L**.

43.     On October 27, 2020, the Judgment by Confession was filed and entered against the Debtors in the sum of $6,250,589.59 plus post-judgment interest and reasonable attorneys' fees and costs incurred in collecting the judgment ("Judgment") The Judgment also grants CAL II the right to immediate possession of the personal property of Girardi Keese.

44.    CAL II filed a Proof of Claim for a secured claim in the amount of $6,668,484.21 ("CAL II Claim") in the bankruptcy proceeding of Girardi Keese.  Compl. ¶ 92.  A true and correct copy of the CAL II Claim is attached as **Exhibit 12** to the RFJN.  The documents in support of that Proof of Claim are attached as Exhibits thereto, including the Fourth Amended and Restated Promissory Note dated November 8, 2019, and the Fourth Amended and Restated Security Agreement dated November 11, 2019, governing the lender/borrower relationship between CAL II and Girardi Keese.

45.    Trustee questioned the validity, priority, scope, and extent of CAL II's secured claim and conducted an extensive investigation into the propriety thereof.  In negotiating the allowability of CAL II's secured claim, Trustee demanded certain concessions and CAL II agreed to certain compromises.  Ultimately, a settlement agreement between Trustee and CAL II was reached, and Trustee sought Bankruptcy Court approval of the settlement agreed to by the parties. Compl. ¶ 93.

46.    Attached as **Exhibit 13** to the RFJN is a true and correct copy of Trustee's Motion for Order Approving Compromise With California Attorney Lending II, Inc. Pursuant to Federal Rule of Bankruptcy Procedure 9019; Memorandum of Points and Authorities, Declarations of Elissa D. Miller and Philip E. Stroh in Support (the "9019 Motion").  In her 9019 Motion and the Memorandum in support thereof, Trustee stated:

> The Court should approve the Trustee's settlement agreement with California Attorney Lending II, Inc. ("CAL II").  Since early in the Debtor's case, the Trustee has been evaluating the claims of parties alleging to hold secured claims against the Debtor's Estate.  CAL II has asserted a first priority secured claim and provided documentation in support of its claim to the Trustee.  After reviewing CAL II's documentation, the Trustee raised certain issues in connection with the validity, priority, scope, and extent of CAL II's claim and related security interests, which CAL II disputed.  The parties have entered into a compromise (the "Settlement Agreement") which resolves these disputes and acknowledges the validity, priority, scope, and extent of CAL II's claim and first priority perfected security interest in substantially all of the Debtor's personal property assets.
>
> The Settlement Agreement provides the Estate with two fundamental benefits:  (1) a guaranteed reduction in CAL II's claim; and (2) safeguards against excessive future increases to CAL II's claim.  First, there will be a six-figure reduction to CAL II's claim.  By completely eliminating CAL II's deferred closing fee of $62,574.40, and by reducing CAL II's claim for legal fees by over one third, CAL

II's claim will be reduced by a total of $160,122.69.  Second, funds disbursed to CAL II under the Settlement Agreement will be applied solely to CAL II's principal, thereby preventing additional interest from accruing.  Further, the Estate reserves its right to contest CAL II's request for post-petition fees and costs, and also preserves the Trustee/Estate's surcharge rights.  Together, these provisions provide meaningful savings that will benefit the Estate and all of its creditors.

The Settlement Agreement is fair and reasonable and in the best interest of the Estate.  Not only does the Settlement Agreement reduce CAL II's claim and guard against unexpected increases, it also avoids costly litigation that has uncertain prospects of success and will likely delay administration of the Estate, delay which will have the greatest impact on the Debtor's former clients/victims.  For these reasons, the Settlement Agreement should be approved.

47.    Trustee further acknowledged the following in her 9019 Motion and Memorandum regarding Girardi Keese's loan from CAL II:

On or about July 5, 2011, the Debtor and CAL II entered into a loan transaction (the "Loan").  Under the Loan documents, the Debtor borrowed the principal amount of $3,500,000.00 to fund its operations, with the parties agreeing that the Loan would be secured against, among other things, the Debtor's rights to payment for its representation of clients in various contingency fee cases.  On or about July 6, 2011, CAL II filed a UCC Financing Statement, designated as Filing No. 11-7275806299, against the Debtor. (citation omitted)

After the Loan, from 2011 through 2019, the Debtor and CAL II entered into additional agreements, with the Debtor increasing the principal amount of its debt to CAL II up to $8,000,000.00.  As with the Initial Loan, CAL II again filed continuations and amendments to its financing statements to perfect and maintain its security interest in substantially all of the Debtor's assets.  (citation omitted)

On or about November 8, 2019, the Debtor executed and delivered to CAL II the Fourth Amended and Restated Promissory Note in the maximum amount of $8,000,000.00.  The Fourth Amended and Restated Promissory Note was secured by CAL II's continuing security interests in substantially all of the Debtor's assets. Subsequently, the Debtor executed and delivered to CAL II its Confession to Judgment dated November 12, 2019.  Pursuant to the Confession to Judgment, the Debtor agreed to entry of judgment without a trial if, after the Debtor defaulted under the Loan, the Debtor (or its guarantor, Thomas Girardi), did not cure the default.

The Debtor defaulted on the Loan, and neither the Debtor nor Thomas Girardi cured the default.  On October 7, 2020, CAL II obtained a judgment against Debtor and Thomas Girardi in the amount of $6,250,589.59, plus post-judgment interest and reasonable attorney's fees and costs incurred in collecting on the judgment (the

"Judgment").  On November 2, 2020, the Debtor filed a Notice of Judgment Lien, designated as Filing No. U200033578428 (the "Judgment Lien").  (citation omitted)

CAL II asserts that as of December 18, 2020, the total sum of $6,668,484.24 was due and owing to CAL II pursuant to the judgment.  The sum is comprised as follows:  (i) the judgment balance of $6,250,589.59; (ii) interest at the 10% California judgment interest rate in the amount of $89,049.50; (iii) a deferred closing fee of $62,574.40; and (iv) legal fees of $266,270.75. (footnote omitted)

48.    Finally, in her 9019 Motion and Memorandum, Trustee asserted and represented to this Court:

Upon her appointment, the Trustee ran a UCC search with the California Secretary of State.  While the Trustee is not waiving any arguments to contest the validity, priority, scope, or extent of any alleged secured claims *(not including CAL II's claim)*, certain parties may contend that they hold a secured claim against the Estate. (emphasis added)

* * * * *

After reviewing the Loan documents associated with CAL II's claim, the Trustee investigated issues and potential claims of the Estate against CAL II concerning the validity, priority, scope, and extent of the Loan and any related security interests, and the Judgment and Judgment Lien. For example, the Trustee examined whether the doctrine of merger affected CAL II's Loan payoff amount and/or security interests, whether CAL II is entitled to attorneys' fees under California law, and whether CAL II is entitled to a deferred closing fee.  *See* Declaration of Philip E. Stroh.  Both the Trustee and CAL II have engaged in discussions concerning these and other issues. Through these discussions, the parties were ultimately able to reach a consensual resolution of their claims.

* * * * *

E.    The Settlement Agreement with CAL II

On May 3, 2021, the Trustee and CAL II entered into the Settlement Agreement.  A true and correct copy of the Settlement Agreement is attached hereto Ex. "5."   The salient terms of the Settlement Agreement are summarized as follows:

1.    The Allowed CAL II Claim.  CAL II shall have a single allowed claim of $6,508,361.55 as of the Petition Date (the "Allowed CAL II Claim").  The Allowed CAL II Claim is comprised of:  (a) the judgment balance of $6,250,589.59; (b) interest of $89,049.50 at the California judgment interest rate of 10%; and (c) legal fees of $168,722.46, reduced from $266,270.75.  CAL II shall also have a first priority perfected security interest in substantially all of the Debtor's personal property assets (the "CAL II Collateral"), as reflected in CAL II's Loan documents, filed UCC Financing

Statements, and continuations and amendments (the "CAL II Liens"). *See* Ex. "5."

**2.      Post-Petition Interest and Reasonable Fees, Costs or Charges.** CAL II reserves its right to later seek post-petition interest at the California judgment interest rate of 10%, along with reasonable fees, costs, or charges under 11 U.S.C. § 506(b).   The Trustee reserves all related rights, including without any limitation, the right to contest CAL II's entitlement to post-petition interest, fees, costs or charges and the reasonableness of any fees, costs, or charges that CAL II asserts.   Any post-petition interest and/or reasonable fees, costs or charges shall be added to the Allowed CAL II Claim, whether the parties agree or whether ordered by the Bankruptcy Court.  If a dispute about these issues and/or any issue relating to 11 U.S.C.  § 506(b) arises, the dispute will be resolved by the Bankruptcy Court.

49.      In her Declaration in support of the 9019 Motion, Trustee declared in relevant part:

3.      Recently, after a series of arms-length negotiations, I entered into the Settlement Agreement on behalf of the Estate with CAL II to resolve the Estate's claims related to the validity, priority, scope, or extent of CAL II's claim and related security interests.  A true and correct copy of the Settlement Agreement is attached hereto as Exhibit "5."

4.      The Settlement Agreement is the product of my arms-length negotiations with CAL II and will provide the Estate with current— and possibly future—savings.   Specifically, the Settlement Agreement provides for a guaranteed reduction of $160,122.69 to CAL II's claim and includes protections against certain future increases to CAL II's claim.

5.      Among other benefits, the Settlement Agreement may prevent delay to administration of the Estate.  CAL II has asserted a claim of $6,668,484.24 in first priority.  If the Estate were to dispute CAL II's claim, the amount of funds currently on hand in the Estate would be insufficient to set aside a reserve.  Accordingly, other creditors could be forced to wait for distributions from the Estate if the Trustee were to object to CAL II's claim.

6.      In my opinion and based on my business judgment, the Settlement Agreement is in the best interest of the Estate in part because it reduces CAL II's claim, includes protections against certain increases, and reduces the chances that administration of the Estate will be delayed.

50.      The Settlement Agreement between Trustee and CAL II, a true and correct copy of which is attached as Exhibit "5" to the 9019 Motion, which in turn is attached as **Exhibit 13** to the RFJN, explicitly provided:

# RECITALS

F.      Prior to the Petition Date, CAL II was a litigation financing source for the Debtor.  CAL II asserts that:

1.      In or around July 5, 2011, the Debtor and CAL II entered into a loan transaction (as amended, the "Loan") pursuant to which the Debtor borrowed the principal amount of $3,500,000.00 for the purpose of funding its operations;

2.      The Loan was secured against, among other things, the Debtor's rights to payment for its representation of clients in various contingency fee cases;

3.      CAL II duly filed a UCC Financing Statement against the Debtor on July 6, 2011, which was designated as Filing No. 11-7275806299;

4.      Between 2011 and 2019, CAL II and the Debtor entered into several iterations of the credit arrangement in which the Debtor increased the principal amount of the debt to up to $8,000,000.00;

5.      CAL II duly filed several continuations and amendments to its financing statements to maintain its perfected security interests in all assets of the Debtor;

6.      On or around November 8, 2019, the Debtor executed and delivered to CAL II that certain Fourth Amended and Restated Promissory Note, in the maximum amount of $8,000,000.00, and secured by CAL II's continuing security interests in substantially all of the Debtor's assets;

7.      As part of the consideration given to CAL II, the Debtor executed and delivered to CAL II that certain Confession to Judgment dated November 12, 2019, and agreed to entry of judgment without trial if, after the Debtor's default under the Loan and notice thereof, the Debtor or its guarantor, Thomas V. Girardi, did not cure the default;

8.      After default, on October 27, 2020, CAL II secured judgment against the Debtor and Thomas V. Girardi in the sum of $6,250,589.59 plus post-judgment interest and reasonable attorneys' fees and costs incurred in collecting the judgment (the "Judgment");

9.      CAL II duly filed a Notice of Judgment Lien against the Debtor on November 2, 2020, which was designated as Filing No. U200033578428 (the "Judgment Lien"); and

10.     As of the Petition Date, the total sum of $6,668,484.24 was due and owing to CAL II under the Judgment, comprised of (a) the Judgment Balance of $6,250,589.59, (b) interest rate at the 10% California judgment interest rate of $89,049.50, (c) a Deferred Closing Fee of $62,574.40, and (d) legal fees of $266,270.75.

* * * * *

H.     The Trustee, on behalf of the Estate, and CAL II previously entered into a stipulation for use of cash collateral and adequate protection (the "Original Stipulation").  The Original Stipulation was approved by the Bankruptcy Court by an interim order entered February 16, 2021 [Docket No. 193] and final order entered March 11, 2021 [Docket No. 257].

I.     At the time of the Original Stipulation, the Trustee had not yet concluded her review of the validity, priority, scope and extent of, among other things, the Loan and any related security interests and the Judgment and Judgment Lien and, therefore, she was not in a position to concede CAL II's assertions.  Since that time, CAL II has provided Loan documents and other relevant information and responded to the Trustee's inquiries related to the documents and information provided to the Trustee.

J.     The Trustee has raised certain issues with CAL II concerning the validity, priority, scope and extent of the Loan and any related security interests and the Judgment and Judgment Lien.  The Trustee and CAL II have reached an agreement to resolve these issues.

* * * * *

**ARTICLE 2**
**TERMS OF SETTLEMENT**

2.1     **The Allowed CAL II Claim.**  On account of the Loan and the Judgment, CAL II shall have a single allowed claim in the amount of $$6,508,361.55 as of the Petition Date (the "Allowed CAL II Claim") comprised of (i) the Judgment Balance of $6,250,589.59, (ii) interest at the 10% California judgment interest rate of $89,049.50, and (iii) legal fees of $168,722.46, with a first priority perfected security interest in substantially all of the Debtor's personal property assets (the "CAL II Collateral") as reflected in CAL II's Loan documents and filed UCC Financing Statements, continuations and amendments thereto (collectively, the "CAL II Liens").

2.2     **Post-Petition Interest and Reasonable Fees, Costs or Charges.**  CAL II reserves its right to seek post-Petition interest at the California judgment interest rate of 10% and reasonable fees, costs or charges under 11 U.S.C. § 506(b) and the Trustee reserves all rights related thereto including, without limitation, the right to contest CAL II's entitlement to post-Petition interest, fees, costs or charges and the reasonableness of any fees, costs or charges asserted by CAL II.  Any allowed post-Petition interest and/or reasonable fees, costs or charges, whether by Bankruptcy Court order or as agreed upon by the Trustee and CAL II, shall be added to the Allowed CAL II Claim.  The Parties agree that any dispute arising under 11 U.S.C. § 506(b) and/or this section shall be resolved by the Bankruptcy Court.

1      51.    Based upon Trustee's representations, the Court approved the compromise between

2  Trustee and CAL II. Compl. ¶ 94. A true and correct copy of the Court's Order Granting the 9019

3  Motion is attached as **Exhibit 14** to the RFJN ("Settlement Order").

4      52.    I am advised by CAL II's attorneys that by virtue of the court-approved settlement

5  and compromise by and between Trustee and CAL II, each and every one of the claims asserted

6  against CAL II in the Complaint must be dismissed pursuant to the doctrine of *res judicata.*

7      I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and

8  correct.

9      Executed on this ___ day of November, 2022, in Buffalo, New York.

10

11

12                        Paul Cody

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

CLOSING CHECKLIST
CALIFORNIA ATTORNEY LENDING II, INC.
$3,500,000 REVOLVING LOAN TO
GIRARDI KEESE, A GENERAL PARTNERSHIP
ORGANIZED UNDER CALIFORNIA LAW

Key:

| | | |
|---|---|---|
| Lender | = | California Attorney Lending II, Inc., a New York corporation |
| Borrower | = | Girardi Keese, a general partnership organized under California law |
| Individual Guarantor = | | Thomas V. Girardi |

**LOAN DOCUMENTS**

1.   Revolving Promissory Note for maximum principal amount of $3,500,000, signed by Borrower.

2.   Guaranty of Individual Guarantor.

3.   Security Agreement signed by Borrower, as debtor
     Exhibit A - Questionnaire

4.   Girardi Keese Certificate, together with the following attachments:
     Schedule I – Certificate of Partnership
     Schedule II – Partnership Agreement
     Schedule III – Resolutions

5.   Intercreditor Agreement with Comerica Bank.

6.   UCC-1 Financing Statement to be filed with California Secretary of State.

**SUPPLEMENTAL DOCUMENTS**

1.   Governmental Certificates from California:
     a.   Uniform Commercial Code Search for Borrower and Individual Guarantor

2.   Key Loan Term Summary with Lender Forms.

1

Initials

## REVOLVING PROMISSORY NOTE
### California Attorney Lending II, Inc.

Delivered in Buffalo, New York

$3,500,000
July ___, 2011

1. **DEFINITIONS.** For purposes of this Note:

a. **Borrower.** The "Borrower" means Girardi Keese, a general partnership organized under California law, having its principal office located at 1126 Wilshire Blvd, Los Angeles, CA 90017.

b. **Collateral.** "Collateral" means all of Borrower's present and future right, title and interest in and to any and all accounts, choses in action, causes of action, settlement proceeds, attorneys' liens, attorneys' fees, general intangibles, contract rights, deposit and other bank accounts and instruments, instruments, documents, chattel paper and obligations in any form in each case arising out of or related to the rendition of services by Debtor whether earned by performance or otherwise in connection with the following: (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; and (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation; all of Debtor's books related to the foregoing; and all cash and non-cash proceeds of any of the foregoing, in whatever form, including without limitation all proceeds of proceeds, all insurance policies covering same and all interest or dividends thereon.

c. **Credit.** The "Credit" means a revolving credit facility made available by the Lender to the Borrower in the maximum principal amount equal to the Limiting Principal Amount.

d. **Event of Default.** An "Event of Default" occurs or exists if:

(i) the Borrower defaults in the payment when due, whether by acceleration or otherwise, of any of the Outstanding Principal Amount or any interest or other amount payable pursuant to this Note; or

(ii) the Borrower or any Guarantor defaults in the observance or performance when due, whether by acceleration or otherwise, of any obligation (including, but not limited to, any obligation to pay any money except as described in clause (i) of this Section 1(d), whether for any principal, interest, fee, tax, charge, cost or expense or otherwise), whether now existing or hereafter arising or accruing, (a) under this Note or any agreement or arrangement now or hereafter entered into between the Borrower or any Guarantor and the Holder, (b) owed by Borrower to any third party, where the maturity of any such obligation is accelerated or there occurs or exists any event or condition that, whether immediately or after notice, lapse of time or both notice and lapse of time and whether or not waived, would constitute a default with respect to or permit the acceleration of the maturity of any such obligation, or (c) owed by Borrower to any governmental entity; or

(iii) the Borrower or any Guarantor fails to provide the Holder with (A) copies of the Borrower's and Guarantor's annual federal tax returns to be delivered on the sooner of (i) three days after filing or (ii) the 15th day of the

2

Initials

tenth month of each fiscal year for the immediately preceding fiscal year; (B) an updated case and status list with respect to the clients and cases of the Borrower at least once each calendar quarter, (C) copies of monthly bank statements of the Borrower from each of its bank accounts (trust and operating accounts) at least once each calendar quarter, (D) current updated financial statements of Borrower not later than the 15th day of each calendar quarter in the form completed by Borrower and delivered to Holder on or before execution of this Note, (E) a current updated personal financial statement for each Guarantor to be delivered on or before April 15th of each year in the form completed by the Guarantor and delivered to Holder on or before execution of this Note, (F) evidence of current malpractice insurance for the Borrower and life insurance coverage of Guarantor on the anniversary date of coverage; (G) notice of any material change in the business, clients or prospects of the Borrower, (H) copies of any notice of cancellation, revocation or non-renewal of any malpractice insurance or any life insurance policy assigned to Holder as part of the Collateral within five (5) business days after receipt thereof by the Borrower or the Guarantor, (I) copies of any default notice or notice of the existence of facts or circumstances that with the passage of time will constitute a default under any obligation of Borrower that are received by Borrower, or (J) any documentation or information reasonably requested by the Holder that relates to the business or assets of the Borrower or any Guarantor; or

(iv)     the Borrower or any Guarantor is dissolved, ceases to exist, participates or agrees to participate in any merger, consolidation or other absorption (unless the Borrower or such Guarantor is the surviving entity with respect thereto), assigns or otherwise transfers or disposes of a majority of his, her or its assets, makes or permits what might be a fraudulent transfer or fraudulent conveyance of any of his, her or its assets, becomes insolvent (however such insolvency is evidenced), generally fails to pay his, her or its debts as they become due, fails to pay, withhold or collect any tax as required by applicable law, suspends or ceases its business or has served, filed or recorded against him, her or it or any of his, her or its assets any judgment, order or award of any court, other governmental authority or arbitrator or any lien; or

(v)      any Guarantor dies, becomes incompetent or purports to terminate his, her or its obligations pursuant to any guaranty or other agreement evidencing obligations of such Guarantor to the Holder; or if this Note remains outstanding on August 1, 2012, Thomas V. Girardi fails to maintain in effect life insurance on his life in a minimum amount equal to $3,500,000 that is subject to an effective collateral assignment to the Holder of this Note at all times on and after August 1, 2012 while this Note is outstanding; or

(vi)     the Borrower or any Guarantor has any receiver, trustee, custodian or similar Person for him, her or it or any of his, her or its assets appointed (whether with or without his, her or its consent), makes any assignment for the benefit of creditors, admits in writing his, her or its inability to pay debts generally as they become due, or commences or has commenced against him, her or it any bankruptcy or insolvency proceeding or any formal or informal proceeding for the dissolution, liquidation or winding up of the affairs of or the settlement of claims against him, her or it; or

(vii)    any representation or warranty heretofore made to the Lender or hereafter made to the Holder, or any financial statement heretofore provided to the Lender or hereafter provided to the Holder, by or on behalf of the Borrower or any Guarantor, proves, as of the date thereof, to have been incorrect or misleading in any material respect, or before the execution and delivery to the Lender by the Borrower of this Note there occurred and was not disclosed to the Lender any material adverse change in any information disclosed in any such representation or warranty heretofore so made or in any such financial statement heretofore so provided; or

(viii)   there occurs any change in the management of, or the beneficial ownership of any stock of or other ownership interest in, the Borrower that is, in the opinion of the Holder, adverse to its interest and is not corrected to its

3

Initials

full satisfaction within 30 days after it gives to the Borrower a notice that it considers such change adverse to its interest; or

(ix)    there occurs any change in the value of the Collateral or Borrower's or any Guarantor's ownership interest in the Collateral, that is, in the opinion of the Holder, adverse to its interest and is not corrected to its full satisfaction within 10 days after it gives to the Borrower a notice that it considers such change adverse to its interest; or

(x)    except for Permitted Indebtedness, Borrower or any Guarantor incurs after the date of this Note or repays after the date of this Note any indebtedness or liability, including any indebtedness or liability to any member or shareholder of the Borrower or any Guarantor or any affiliate of any Guarantor (for clarity, any future indebtedness of Borrower or any Guarantor not included in Permitted Indebtedness requires the prior written consent of Holder which consent may require that the proceeds of such financing be used to repay this Note in whole or in part); or

(xi)    there occurs or exists any event or condition of default, without the prior written consent of the Holder, with respect to any (A) indebtedness or liability of Borrower or any Guarantor or (B) security agreement or other writing evidencing or relating to any Collateral; or

(xii)    Borrower or any Guarantor creates, assumes or suffers to exist any mortgage, security interest, judgment or lien (including tax liens) on any of its assets now or hereafter acquired other than liens relating to Permitted Indebtedness, purchase money liens relating to the acquisition of fixed assets, or consumer debt; or

(xiii)    any Guarantor owns or hereafter acquires, without prior written consent of the Holder, an ownership interest, either direct or indirect, in any entity engaged in the practice of law other than Borrower; or

(xiv)    any license to practice law held by Borrower or any Guarantor is suspended or revoked.

e.    **Guarantor.** "Guarantor" means, other than the Borrower, any Person (i) who or that is now or hereafter liable, whether directly or indirectly or absolutely or contingently, for the payment of any of the Outstanding Principal Amount or any interest or other amount payable pursuant to this Note or (ii) any asset of whom or which now or hereafter directly or indirectly secures the payment of any of the Outstanding Principal Amount or any such interest or other amount.

f.    **Holder.** The "Holder" means the Lender or any transferee of this Note.

g.    **Lender.** The "Lender" means California Attorney Lending II, Inc., a New York corporation having its chief executive office at 6400 Main Street, Suite 120, Williamsville, NY 14221, its successors and assigns.

h.    **Limiting Principal Amount.** "Limiting Principal Amount" means $3,500,000, US currency.

i.    **Loan.** "Loan" means any loan by the Holder pursuant to the Credit.

j.    **Loan Request.** "Loan Request" means any oral (including, but not limited to, telephonic), written or other (including, but not limited to, facsimile or email) request for a Loan.

k.    **Maturity Date.** The "Maturity Date" has the meaning set forth in Section 4 of this Note.

l.    **Outstanding Principal Amount.** The "Outstanding Principal Amount" means the outstanding principal

4

Initials

amount of this Note from time to time.

m.   **Permitted Indebtedness.** "Permitted Indebtedness" means indebtedness of a Person (A) to the Lender; (B) constituting unsecured normal trade debt incurred upon customary terms in the ordinary course of such Person's business; (C) arising from the endorsement in the ordinary course of such Person's business of any check or other negotiable instrument for deposit or collection; or (D) secured by a Permitted Lien as defined in the Security Agreement.

n.   **Person.** "Person" means (i) any individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated association, (ii) any court or other governmental authority or (iii) any other entity, body, organization or group.

o.   **Security Agreement.** "Security Agreement" means the Security Agreement described in Section 18 of this Note.

p.   **Specified Matters.** "Specified Matters" means collectively the following: (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; and (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation.

q.   **Uniform Commercial Code.** "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York.

2.   **PROMISE TO PAY.** For value received, the Borrower promises to pay to the order of the Holder in lawful money of the United States and immediately available funds at any of the offices of the Holder:

a.   The Outstanding Principal Amount and interest as described in Section 3 of this Note by paying the amounts described in Section 4 of this Note;

b.   On demand by the Holder, each cost and expense (including, but not limited to, the reasonable fees and disbursements of counsel, whether retained for advice, litigation or any other purpose) incurred by the Holder in endeavoring to (i) collect any of the Outstanding Principal Amount or any interest or other amount payable pursuant to this Note, (ii) preserve or exercise any right or remedy of the Holder pursuant to this Note or (iii) preserve or exercise any right or remedy of the Holder relating to any Collateral including the payment of unpaid insurance premiums, taxes, assessments or other obligations or incurrence of legal fees or court costs.

3.   **INTEREST.** The Borrower shall pay interest, calculated on the basis of a 360 day year for the actual number of days of each (365 or 366, as applicable), on the Outstanding Principal Amount from and including the date of this Note to but not including the date the Outstanding Principal Amount is paid in full. The rate per year shall be **Eighteen Percent (18%)**. Interest at such rate, and not any rate set by statute, shall be computed in any entry of judgment pertaining to this Note, and further, shall be paid subsequent to the entry of such judgment, and until actual satisfaction of said judgment. The judgment shall include both the action and the obligation itself. In such event, the Interest rate shall continue up through and including all foreclosure proceedings and proceedings for payment of monies, including but not limited to surplus money proceedings and shall be computed in the entry of any judgment, and further, subsequent to the entry of any judgment, and until actual satisfaction of this Note and

5

Initials

said judgment.

Notwithstanding the foregoing, (A) in no event shall such interest be payable at a rate in excess of the maximum rate permitted by applicable law and (B) solely to the extent necessary to result in such interest not being payable at a rate in excess of such maximum rate, any amount that would be treated as part of such interest under a final judicial interpretation of applicable law shall be deemed to have been a mistake and automatically canceled, and, if received by the Holder, shall be refunded to the Borrower or applied to the Outstanding Principal Amount, as determined by the Holder, it being the intention of the Lender and the Borrower that such interest not be payable at a rate in excess of such maximum rate.

4.      **PAYMENTS.** In addition to the Mandatory Prepayment provisions of Section 9 of this Note, the Borrower shall (a) pay the Outstanding Principal Amount in twenty-four (24) equal installment payments commencing on August 1, 2013 and continuing monthly thereafter with the final payment due and payable on July 1, 2015 (the "Maturity Date") and (b) pay monthly interest as described in Section 3 of this Note that has accrued on the Outstanding Principal Amount through the last day of any calendar month, beginning with the calendar month containing the date of this Note, all such payments of principal or interest by the 10th day of the succeeding calendar month.

In addition, the Borrower shall at all times prior to the Maturity Date (a) maintain an interest reserve (the "Reserve") with the Holder equal to 30 days' interest based on the Outstanding Principal Amount on the later of the date of the most recent Loan under this Note or the last day of the most recently ended calendar month during the term of this Note and (b) maintain an authorization for electronic funds tranfer by the Holder at a bank and account designated by Borrower and reasonably acceptable to the Holder for payments under this Note. The Holder may, but shall not be obligated to, deduct from the proceeds of any Loan an amount sufficient to fund the Reserve, may commingle the Reserve with its other funds, shall have no obligation to pay any interest on the Reserve and shall be entitled to set off against the Reserve, or authorize an electronic funds transfer for, any amount that is not paid to the Holder when due under this Note.

5.      **LOAN REQUESTS.**

(a) At any time prior to August 1, 2013, the Borrower may make a Loan Request, which Request shall be irrevocable, that specifies (i) the amount requested as the principal amount of the Loan, (ii) the law firm purposes for the Loan, and (iii) the business day of the Holder on which such Loan is requested to be made. All Loan Requests shall be for the sole purpose of funding the operating expenses of Borrower or interest payments under this Note. No Loan Requests may be made to fund the activities or operations of any Guarantor or any third party entity. Notwithstanding the foregoing, no Loan shall be made with respect to any principal amount prepaid under Section 9 of this Note until at least one (1) business day after the date of such prepayment. **Notwithstanding anything contained in this Note to the contrary, commencing August 1, 2013, Borrower shall not be permitted to make any further Loan Requests under this Note.**

(b) Notwithstanding anything contained in this Note to the contrary, the decision whether to honor such Loan Request and make such Loan shall be in the sole discretion of the Holder. The Holder may treat as made by the Borrower and rely upon, and the Borrower shall be bound by, any Loan Request that the Holder in good faith believes to be valid and to have been made in the name or on behalf of the Borrower by any officer, manager, member, partner or other individual authorized to act on behalf of the Borrower, and the Holder shall not incur any liability to the Borrower or any other Person as a direct or indirect result of honoring such Loan Request and making such Loan.

6.      **LIMITATION ON OUTSTANDING PRINCIPAL AMOUNT.** The Borrower shall not at any time permit, and the Holder shall not at any time be obligated to permit, the Outstanding Principal Amount to exceed the

6

Initials

Limiting Principal Amount.

7.      **SCHEDULE OF ADVANCES OR LOAN ACCOUNT.** There shall be payable as principal pursuant to this Note only so much of the Limiting Principal Amount as shall have been advanced by the Holder as a Loan or Loans and is outstanding. The Holder shall set forth on a schedule or loan account (including, but not limited to, any schedule or loan account maintained in computerized records) annotations evidencing (a) the date and principal amount of each Loan, (b) the date and amount of each payment applied to the Outstanding Principal Amount and (c) the Outstanding Principal Amount after each Loan and each such payment. Each such annotation shall, in the absence of manifest error, be conclusive and binding upon the Borrower. No failure by the Holder to make and no error by the Holder in making any annotation on such schedule or loan account shall affect the Borrower's obligation to repay the principal amount of each Loan, the Borrower's obligation to pay interest on the outstanding principal amount of each Loan or any other obligation of the Borrower to the Holder pursuant to this Note or otherwise.

8.      **OPTIONAL PREPAYMENT.** The Borrower shall have the option of prepaying, without penalty or premium, the Outstanding Principal Amount to the Holder in full or part at any time and from time to time provided, that (a) the Outstanding Principal Amount must exceed $50,000 at all times during the first one hundred twenty (120) days after the date of this Note, and (b) upon prepaying the Outstanding Principal Amount in full, the Borrower shall pay to the Holder all interest and other amounts payable to this Note and remaining unpaid. With respect to prepayments made on or after August 1, 2013, any partial prepayment shall not result in a reduction in the term of this Note, and the Holder will recalculate the monthly principal amortization for the remaining term of the Note as of the first day of the month immediately following the date of prepayment.

9.      **MANDATORY PREPAYMENT.** In addition to payments set forth above, Borrower shall be required to pay the Holder an amount equal to 100% of all Net Fees (as hereinafter defined) received by Borrower in connection with the Specified Matters, commencing on the date hereof and continuing until the Outstanding Principal Amount and interest thereon has been paid in full (collectively, the "Mandatory Prepayments"). All Mandatory Prepayments must be paid to Holder within three (3) business days after receipt thereof by Borrower and shall be applied first to the payment of any outstanding interest, then fees, and the balance to repay the Outstanding Principal Amount. When all Net Fees in connection with the Specified Matters have been paid as provided in this paragraph, Holder will reevaluate the availability of the Credit hereunder and may demand payment of any Outstanding Principal Balance and accrued interest and fees.

        For purposes of this section, "**Net Fees**" means all legal fees and reimbursed expenses resulting from any client representation or referral (whether contingent, hourly, fixed fee or other) after payment of all amounts owing to third party lawyers (other than employees or partners of Borrower) for assistance or referral with respect to such client representation. Until payment is remitted to Holder, any such funds payable to the Borrower and related to the Specified Matters shall be held in Borrower's trust account for the benefit of the Holder. Borrower shall continue to escrow any and all such funds received until payment of the mandatory amount is transmitted to Lender. Funds in Borrower's trust account in which the Holder has an interest shall not be paid to anyone except Holder. With respect to prepayments made on or after August 1, 2013, any partial prepayment shall not result in a reduction in the term of this Note, and Holder will recalculate the monthly principal amortization for the remaining term of the Note as of the first day of the month immediately following the date of prepayment.

10.     **PURPOSE OF LOANS.** The Borrower shall not obtain or use the proceeds of any Loan for any purpose other than for law firm purposes, that is for working capital of the Borrower including payments to any Guarantor but only as elsewhere permitted under this Note. The Borrower acknowledges, warrants and represents to, and agrees with, the Lender that no Loan proceeds shall be used by the Borrower for other than a business or commercial purpose of the Borrower.

11.     **AMOUNTS IMMEDIATELY DUE.** Upon or at any time or from time to time after the occurrence or

                                                    7

                                                                            Initials

existence of any Event of Default other than, with respect to the Borrower, an Event of Default described in clause (vi) of the definition of Event of Default set forth in Section 1(d) of this Note, the Outstanding Principal Amount and all interest and other amounts payable pursuant to this Note and remaining unpaid shall, at the sole option of the Holder and without any notice, demand, presentment or protest of any kind (each of which is knowingly, voluntarily, intentionally and irrevocably waived by the Borrower), become immediately due. Upon the occurrence or existence of, with respect to the Borrower, any Event of Default described in such clause (vi), the Outstanding Principal Amount and all such interest and other amounts shall, without any notice, demand, presentment or protest of any kind (each of which is knowingly, voluntarily, intentionally and irrevocably waived by the Borrower), automatically become immediately due.

12.     **BOOKS AND RECORDS.** The Borrower shall maintain accurate books and records regarding its financial condition, including, but not limited to, aged listings of accounts payable and accounts receivable, all expenses and disbursements, business operations, and the status and condition of the Collateral. Holder shall have the right at any time upon reasonable notice to inspect and audit such books, records, and accounts, and to make copies thereof.

13.     **CHANGES AND WAIVERS.** No course of conduct pursued, accepted or acquiesced in, and no oral, written or other agreement or representation made, by or on behalf of the Holder in the future will change this Note or waive any right or remedy of the Holder under or arising as a result of this Note. Any change in this Note or waiver of any right or remedy of the Holder under or arising as a result of this Note must be made in a writing signed by or on behalf of the Holder.

14.     **GOVERNING LAW.** This Note shall be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York, other than the conflict of law provisions of such State, and, to the extent applicable, the federal law of the United States, without regard to the law of any other jurisdiction.

15.     **CONSENT TO JURISDICTION. AS PART OF THE CONSIDERATION FOR NEW VALUE RECEIVED AND REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF BORROWER OR HOLDER, BORROWER HEREBY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN BORROWER AND HOLDER PERTAINING TO THIS NOTE OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS NOTE SHALL BE BROUGHT ONLY IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN THE COUNTY OF ERIE WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF ANY LEGAL ACTION; PROVIDED, HOWEVER, HOLDER MAY AT ITS OPTION, COMMENCE ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION TO OBTAIN EQUITABLE RELIEF OR TO ENFORCE ANY JUDGMENT OR ORDER OBTAINED BY HOLDER AGAINST BORROWER, TO ENFORCE ANY OTHER RIGHT OR REMEDY UNDER THIS NOTE, OR TO OBTAIN ANY OTHER RELIEF DEEMED APPROPRIATE BY HOLDER. BORROWER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, AND BORROWER HEREBY WAIVES ANY OBJECTION WHICH BORROWER MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH NEW YORK COURT. BORROWER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS CONSENT TO JURISDICTION PROVISION WITH ITS LEGAL COUNSEL, AND HAS MADE THIS WAIVER KNOWINGLY AND VOLUNTARILY.**

16.     **WAIVER OF TRIAL BY JURY. THE BORROWER KNOWINGLY, VOLUNTARILY,**

8

Initials

INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT THE BORROWER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO (a) THE CREDIT, ANY LOAN OR COLLATERAL, THIS NOTE OR ANY OTHER WRITING HERETOFORE OR HEREAFTER EXECUTED IN CONNECTION WITH THE CREDIT OR ANY LOAN OR COLLATERAL, (b) ANY TRANSACTION ARISING OUT OF OR OTHERWISE RELATING TO THE CREDIT, ANY LOAN OR COLLATERAL, THIS NOTE OR ANY SUCH OTHER WRITING OR (c) ANY NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT OF THE CREDIT, ANY LOAN OR COLLATERAL, THIS NOTE OR ANY SUCH OTHER WRITING.

17.    SERVICE OF PROCESS. PROCESS ON BORROWER IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS NOTE WILL BE DEEMED TO HAVE BEEN GIVEN WHEN GIVEN IN ANY ONE OF THE FOLLOWING WAYS: (I) PERSONALLY DELIVERED, (II) TWO BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, POSTAGE PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (III) 4 BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO THE BORROWER AT THE ADDRESS SET FORTH IN SECTION 1(a). Such service shall be deemed in every respect effective service of process upon Borrower and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon the Borrower. Nothing in this Section shall affect the Holder's right to serve process in any other manner permitted by law. Borrower may add additional addresses or change its address for purposes of service of process by giving 10 days' prior written notice of such change to the Holder in accordance with the notice provisions of the Security Agreement.

18.    SECURITY AGREEMENT. This Note is secured by the terms of a Security Agreement given by Borrower to Lender simultaneously herewith.

Dated: July 5, 2011

Girardi Keese

By: _____
Thomas V. Girardi, Partner

### ACKNOWLEDGMENT FOR NOTE

STATE OF CALIFORNIA

COUNTY OF Los Angeles : SS.

On the 5th day of July in the year 2011 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity as Partner of Girardi Keese, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

SHIRLEEN H. FUJIMOTO
COMMISSION # 1833089
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires May 15, 2015

9

Initials

28

Notary Public

**ALLONGE TO  REVOLVING PROMISSORY NOTE, DATED JULY __, 2011, ISSUED BY
GIRARDI KEESE
TO CALIFORNIA ATTORNEY LENDING II, INC.**

NOTICE:  THIS NOTE IS SUBJECT TO A SECURITY INTEREST GRANTED BY CALIFORNIA
ATTORNEY LENDING II, INC. TO BANK OF AMERICA PURSUANT TO A COLLATERAL
AGREEMENT DATED MARCH 31, 2010, BETWEEN SUCH PARTIES, AS SUCH COLLATERAL
AGREEMENT MAY BE AMENDED, SUPPLEMENTED, REPLACED, RESTATED OR
OTHERWISE MODIFIED FROM TIME TO TIME

10

Initials

29

## GUARANTY OF PAYMENT AND PERFORMANCE

**THIS GUARANTY** (the "Guaranty") from **THOMAS V. GIRARDI**, individually, with a principal address at 100 Los Altos Drive, Pasadena, CA 91105 (the "Guarantor") to **CALIFORNIA ATTORNEY LENDING II, INC.**, a New York corporation with a place of business at 6400 Main Street, Suite 120, Williamsville, NY 14221 (the "Lender").

### WITNESSETH:

**WHEREAS,** Girardi Keese ("Borrower") is, on the date hereof, executing and delivering to Lender that certain Revolving Promissory Note in the principal amount of $3,500,000 as the same may be amended from time to time ("Note") pursuant to which Lender is extending certain credit facilities (the "Credit Facilities") to Borrower; and

**WHEREAS,** the Lender is unwilling to extend the Credit Facilities to the Borrower unless it receives this Guaranty; and

**WHEREAS,** the Guarantor is willing to execute and deliver this Guaranty to Lender in order to induce the Lender to extend the Credit Facilities and the Guarantor has approved the form and substance of each and all of the documents relating to the Credit Facilities including the Revolving Promissory Note, Security Agreement, certifications, letters and other documentation (the "Loan Documents").

**NOW, THEREFORE,** in order to induce the Lender to extend the Credit Facilities to the Borrower and in consideration of the premises and of other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Guarantor intends to guarantee absolutely and unconditionally (and jointly and severally if there is more than one Guarantor) to the Lender, the punctual payment of collectively (i) the outstanding principal amount of the Note at any time and all interest and other amounts now or in the future payable under the Note and (ii) all other obligations of the Borrower to the Lender for the payment of money, however evidenced, regardless of the purpose for which incurred and whether for the payment of any principal, interest, fee or expense or otherwise, existing now or coming into existence in the future or absolute or contingent (the "Obligations") and such further payment and performance as may be set forth in Article 2 hereof.

### ARTICLE 1
### REPRESENTATIONS AND WARRANTIES OF THE GUARANTOR

The Guarantor hereby represents and warrants to Lender (if the Guarantors are more than one party, said representations and warranties are made only with respect to the particular party) that:

**Section 1.1**     **Capacity of the Guarantor.** The Guarantor:

(A)          has the capacity to enter into this Guaranty; and

(B)          has his principal residence address or its office address at the address set forth in the first paragraph of this Guaranty.

**Section 1.2**     **No Violation of Restrictions.** Neither the execution and delivery of this Guaranty, the consummation of the transactions contemplated hereby nor the fulfillment of or compliance with the provisions of this Guaranty will conflict with or result in a breach of any of the terms, covenants, conditions or provisions of any

11

Initials

agreement, judgment or order to which the Guarantor is a party or by which the Guarantor is bound, or will constitute a default under any of the foregoing, or result in the creation or imposition of any lien of any nature whatsoever.

**Section 1.3**    **Compliance with Law.** The Guarantor is not in violation of any law, ordinance, governmental rule, regulation, order or judgment to which the Guarantor may be subject which is likely to materially affect the financial condition of the Guarantor.

**Section 1.4**    **Financial Statements and Other Information.** The financial statements and any other information submitted by the Guarantor to Lender fairly represent the financial condition as of the date of each statement and there has been no material adverse change in the financial condition of the Guarantor since the date of the respective statements submitted to Lender.

**Section 1.5**    **Solvency of Guarantor and Borrower.** The Guarantor's assets exceed his liabilities and the Guarantor has made an appropriate financial investigation of the Borrower and has determined that the Borrower is solvent at the time of execution of this Guaranty.

## ARTICLE 2
## COVENANTS AND AGREEMENTS

**Section 2.1**    **Guaranty of Payment.** The Guarantor irrevocably, absolutely and unconditionally (and jointly and severally if there is more than one Guarantor) guarantees to the Lender:

(A)    The punctual payment of the Obligations.

(B)    The full and prompt performance of any and all obligations of the Borrower to Lender under the Loan Documents.

**Section 2.2**    **Obligations Unconditional.** This Guaranty shall remain in full force and effect until the Obligations and all sums due under the Loan Documents are paid in full, irrespective of any interruptions in the business relationships of the Borrower and the Guarantor with the Lender. The Guarantor's obligation hereunder shall not be affected, modified or impaired by any state of facts or the happening from time to time of any event, including, without limitation, any of the following, whether or not with notice to or the consent of the Guarantor:

(A)    The invalidity, irregularity, illegality or unenforceability of, or any defect in, any Loan Document or any collateral security for the Credit Facilities (including the "Collateral" as defined in the Security Agreement of even date herewith given by the Borrower and the Guarantor to the Lender);

(B)    Any present or future law or order of any government (de jure or de facto) or of any agency thereof purporting to reduce the Obligations or amend or otherwise affect any Loan Document or any other obligation of the Borrower or any other obligor or any other terms of payment.

(C)    The waiver, compromise, settlement, release or termination of any or all of the obligations, covenants or agreements of the Borrower under any Loan Document or of the Guarantor under any Loan Document, or of any other guarantor of the Credit Facilities or any part thereof, or of any other party who has given collateral as security for the payment of the Credit Facilities or any part thereof.

(D)    The failure to give notice to the Guarantor of the occurrence of an event of default under any Loan Document.

12

Initials

(E)    The loss, release, sale, exchange, surrender or other change in any Collateral.

(F)    The extension of the time for payment of any principal of or interest on the Obligations or of the time for performance of any other obligations, covenants or agreements under or arising out of any Loan Document or the extension or the renewal of any thereof.

(G)    The modification or amendment (whether material or otherwise) of any obligation, covenant or agreement set forth in any Loan Document.

(H)    The performance of, or the omission to perform, any of the actions referred to in any Loan Document.

(I)    Any failure, omission or delay on the part of the Lender to enforce, assert or exercise any right, power or remedy conferred on the Lender in any Loan Document.

(J)    The voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets, marshaling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition with creditors or readjustment of, or other similar proceedings affecting, the Guarantor or the Borrower or any of their assets, or any allegation or contest of the validity of any Loan Document.

(K)    The default or failure of the Guarantor to fully perform any obligations set forth in this Guaranty.

(L)    Any event or action that would, in the absence of this paragraph, result in the release or discharge of the Guarantor from the performance or observance of any obligation, covenant or agreement contained in this Guaranty (other than payment in full of the Obligations or a written release provided by Lender to the Guarantor).

(M)    Any other circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or a guarantor.

## Section 2.3    Waivers by Guarantor.

(A) Guarantor waives any and all rights that are or may become available to Guarantor by statute or otherwise to require Lender to (a) proceed against Borrower; (b) proceed against or exhaust any security held from Borrower; or (c) pursue any other remedy in Lender's power whatsoever. Lender may, at its election, exercise any right or remedy it may have against Guarantor or any security now or hereafter held by or for the benefit of Lender including, without limitation, the right to foreclose upon any such security by judicial or nonjudicial sale, without affecting or impairing in any way the liability of Guarantor hereunder except to the extent the Obligations may thereby be paid and performed, even though any rights which Guarantor may have or otherwise might obtain by subrogation against others might be diminished or destroyed. Guarantor acknowledges that any such exercise of a right or remedy with respect to any collateral security for the Obligations may result in a loss, in part or whole, of Lender's right to collect from Borrower any deficiency that may remain after any such exercise of such a right or remedy and that, where such a loss occurs, Guarantor will also suffer a loss of any rights and remedies, arising in law or equity, which Guarantor may have to collect any amount from Borrower; and Guarantor agrees to remain bound notwithstanding any such loss. Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for the Obligations, has destroyed Guarantor's rights of subrogation and reimbursement against Borrower by the operation of law or otherwise. Only the net proceeds from any such foreclosure, after deduction of all costs and expenses authorized to be deducted pursuant to the documents under which such security is held or by law, shall be applied against the Obligations. Lender may at its discretion purchase all or any part of such security so sold or offered for sale for its own account and may apply against the amount bid therefor all or any part of the

13

Initials

Obligations for which such security is held; and in such case, only that portion of the Obligations so applied, after deduction of all costs and expenses authorized to be deducted pursuant to the documents under which such security is held or law, shall be applied against the Obligations. Guarantor waives any defense arising out of the absence, impairment or loss of any right to reimbursement or subrogation or other right or remedy of Guarantor against Borrower or any such security, whether resulting from the election by Lender to exercise any right or remedy it may have against Debtor, any defect in, failure of, or loss or absence of priority with respect to Lender's interest in such security, or otherwise. In the event that any foreclosure sale is deemed to be not commercially reasonable, Guarantor waives any right that he, she or it may have to have any portion of the Obligations discharged except to the extent of the amount actually bid and received by Lender at any such sale. Lender shall not be required to institute or prosecute proceedings to recover any deficiency as a condition of payment or performance hereunder or enforcement hereof.

(B) **Waiver of Notices and Demands.** Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of default, and notices of acceptance of this Guaranty and of the existence, creation or incurring of new or additional Obligations. At the option of Lender, Guarantor may be joined in any action or proceeding commenced by Lender against Borrower in connection with or based upon the Obligations or any security therefor and recovery may be had against Guarantor in such action or proceeding, without any requirement that Lender first assert, prosecute or exhaust any remedy or claim against Borrower. Without limiting the foregoing, Guarantor acknowledges that repeated and successive demands may be made and payments or performance made hereunder in response to such demands as and when, from time to time, Borrower may default in payments or performance of the Obligations or other obligations under the Loan Documents. Notwithstanding any such performance hereunder, this Guaranty shall remain in full force and effect and shall apply to any and all subsequent defaults by Borrower in payment or performance of the Obligations or other obligations under the Loan Documents.

(C) **Waiver of Defenses.** Guarantor waives any defense arising by reason of any disability or defense of Borrower or by reason of the cessation from any cause whatsoever of the liability of Borrower. Guarantor waives any setoff, defense or counterclaim which Borrower or Guarantor may have or claim to have against Lender.

(D) **Real and Personal Property Waivers.** Guarantor waives all rights and defenses that Guarantor may have because Borrower's debt is secured by real property. This means, among other things: (i) that Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower; and (ii) if Lender forecloses on any real property collateral pledged by Borrower: (A) the amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from the Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property.

(E) **No Waiver; Remedies.** In addition to, and not in limitation of the waivers, no failure on the party of Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right thereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

(F) **Guarantor's Understanding With Respect To Waivers.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences, and that under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any of such waivers is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law.

14

Initials

**Section 2.4    Nature of Guaranty**. This Guaranty is a guaranty of payment and not of collection and the Guarantor hereby waives the right to require that any action be brought first against the Borrower or any other guarantor, or to require any security, or to require that resort be made to any security or to any balance of any deposit account or credit on the books of the Lender in favor of the Borrower or of the Guarantor.

**Section 2.5    Continuation of Guaranty**. The Guarantor further agrees that the obligations hereunder shall continue to be effective or reinstated, as the case may be, if at any time payment of all or any part thereof of the Credit Facilities is rescinded or must otherwise be restored by the Lender upon the bankruptcy or reorganization of the Borrower, the Guarantor or otherwise.

**Section 2.6    Subordination of Debt**. The Guarantor hereby subordinates any and all indebtedness of the Borrower now or hereafter owed to the Guarantor to all indebtedness of the Borrower to Lender and agree with Lender that, from and after the date whereon Lender notifies Guarantor that an event of default under one or more of the Loan Documents has occurred and is continuing, Guarantor shall not demand or accept any payment from the Borrower of any such indebtedness, shall not claim any offset or other reduction of Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any interest in any of the security described in and encumbered by the Loan Documents; provided, however, that, if Lender so requests, such indebtedness shall be collected, enforced and received by Guarantor as trustee for Lender and paid over to Lender on account of the indebtedness of such Borrower to Lender, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty except to the extent the principal amount of such outstanding indebtedness shall have been reduced by such payment.

**Section 2.7    Financial Statements and Other Information**. Guarantor agrees to deliver to Lender (A) on or before April 15th of each year, personal financial statements and information applicable to the Guarantor on Lender's standard form or other form acceptable to Lender and (B) copies of each of the Guarantor's annual federal tax return to be delivered on the sooner of (i) three days after filing or (ii) October 15th of each year for the immediately preceding fiscal year. Guarantor agrees to promptly deliver to Lender from time to time any additional documentation or information reasonable requested by the Lender that relates to the business or assets of the Guarantor.

**Section 2.8    Transfer of Interest**. Except as expressly permitted pursuant to the Loan Documents, the Guarantor agrees not to make or permit to be made, by voluntary or involuntary means, any transfer of the interest of the Guarantor in the Borrower, without first obtaining the prior written consent of Lender.

## ARTICLE 3
## EVENTS OF DEFAULT

**Section 3.1    Events of Default Defined**. An "Event of Default" shall exist if any of the following events occurs and is continuing:

(A)    The Guarantor fails to perform or observe any covenant contained herein.

(B)    Any warranty, representation or other statement by or on behalf of Guarantor contained in this Guaranty or in any Loan Document is false or misleading in any material respect when made.

(C)    A receiver, liquidator or trustee of Guarantor or any of his property is appointed by court order, or any party named as a Guarantor is adjudicated bankrupt or insolvent or any of his, her or its property is sequestered by court order and such order remains in effect for more than sixty (60) days, or a petition is filed against Guarantor

15

Initials

34

under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, and is not dismissed within ninety (90) days of such filing.

(D)     Guarantor files a petition in voluntary bankruptcy or seeks relief under any provision of any reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, or consents to the filing of any petition against it under any such law.

(E)     Guarantor makes an assignment for the benefit of creditors or admits in writing inability to pay debts generally as they become due, or consents to the appointment of a receiver, trustee or liquidator of all or any part of his, her or its property.

(F)     The occurrence of an Event of Default under the Note or any other Loan Document.

**Section 3.2     Remedies on Default**. If an Event of Default exists, Lender may proceed to enforce the provisions hereof and to exercise any other rights, powers and remedies available to the Lender without prior written notice to Guarantor.

**Section 3.3     Waiver and Notice**.

(A)     No remedy herein conferred upon or reserved to the Lender is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Guaranty now or hereafter existing at law or in equity or by statute.

(B)     No delay or omission to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right or power may be exercised from time to time and as often as may be deemed expedient.

(C)     In order to entitle the Lender to exercise any remedy reserved to it in this Guaranty, it shall not be necessary to give any notice, other than such notice as may be expressly required in this Guaranty.

(D)     No waiver, amendment, release or modification of this Guaranty shall be established by conduct, custom or course of dealing.

## ARTICLE 4
## MISCELLANEOUS

**Section 4.1     Construction**. If this Guaranty is executed by two or more parties, they shall be jointly and severally liable hereunder and the phrase Guarantor whenever used herein shall be construed to refer to each of the parties in the same manner and with the same effect as if each party had signed a separate guaranty.

**Section 4.2     Governing Law**. This Guaranty shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.

**Section 4.3     Successors and Assigns**. This Guaranty shall inure to the benefit of and be binding upon the successors and assigns of each of the parties hereto.

**Section 4.4     Notices**. Any notices required or permitted to be given hereunder shall be in writing and shall be deemed to have been sufficiently given or served for all purposes at the time of delivery in person, one day after delivery to a nationally recognized overnight courier with receipt requested to the parties at the addresses set forth at the head of this Guaranty, or to such other addresses as the parties may for themselves designate in writing as

16

Initials

provided herein for the purpose of receiving notices hereunder.

**Section 4.5**     **Entire Agreement.** This Guaranty and the Loan Documents constitute the entire understanding between the Borrower, the Guarantor and Lender and to the extent that any writings not signed by Lender or oral statements or conversations at any time made or had are inconsistent with the provisions of this Guaranty or the other Loan Documents, the same shall be null and void.

**Section 4.6**     **Amendments.** No amendment, change, modification, alteration or termination of this Guaranty shall be made except upon the written consent of Lender and the Guarantor.

**Section 4.7**     **Assignment.** This Guaranty is assignable by Lender in whole or in part in conjunction with an assignment of the Loan Documents and any assignment hereof or any transfer or assignment of the Loan Documents or portions thereof shall operate to vest in any such assignee the rights and powers, in whole or in part, as appropriate, herein conferred upon and granted to Lender.

**Section 4.8**     **Partial Invalidity.** The invalidity or unenforceability of any one or more phrases, sentences, clauses or sections in this Guaranty shall not affect the validity or enforceability of the remaining portions of the Guaranty or any part thereof.

**Section 4.9**     **SUBMISSION TO JURISDICTION.** THE GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY SHALL BE BROUGHT ONLY IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN THE COUNTY OF ERIE, WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF ANY LEGAL ACTION, AND GUARANTOR WAIVES ANY RIGHT TO OBJECT TO JURISDICTION WITHIN THE FOREGOING FORUM BY LENDER. NOTHING CONTAINED HEREIN SHALL PREVENT LENDER FROM BRINGING ANY SUIT, ACTION OR PROCEEDING OR EXERCISING ANY RIGHTS AGAINST ANY SECURITY, AGAINST GUARANTOR PERSONALLY, AGAINST ANY PROPERTY OF GUARANTOR, WITHIN ANY OTHER JURISDICTION, AND THE INITIATION OF SUCH SUIT, ACTION OR PROCEEDING OR TAKING OF SUCH ACTION IN ANY SUCH OTHER JURISDICTION SHALL IN NO EVENT CONSTITUTE A WAIVER OF THE AGREEMENTS CONTAINED HEREIN WITH RESPECT TO THE LAWS OF THE STATE OF NEW YORK GOVERNING THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO OR THE AGREEMENT OF THE GUARANTOR TO SUBMIT TO PERSONAL JURISDICTION WITHIN THE STATE OF NEW YORK AND COUNTY OF ERIE.

**Section 4.10**     **WAIVER OF JURY TRIAL.** THE GUARANTOR HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (1) ARISING UNDER THIS GUARANTY OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS GUARANTY OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE, AND THE GUARANTOR HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND LENDER MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE GUARANTOR'S CONSENT TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. THE GUARANTOR REPRESENTS AND WARRANTS THAT HE HAS REVIEWED THIS JURY WAIVER

17

Initials

PROVISION WITH HIS LEGAL COUNSEL, AND HAS MADE THIS WAIVER KNOWINGLY AND VOLUNTARILY.

Section 4.11    SERVICE OF PROCESS. PROCESS ON GUARANTOR IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS GUARANTY WILL BE DEEMED TO HAVE BEEN GIVEN WHEN GIVEN IN ANY ONE OF THE FOLLOWING WAYS: (I) PERSONALLY DELIVERED, (II) TWO BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, POSTAGE PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (III) 4 BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO THE GUARANTOR AT THE APPLICABLE ADDRESSES SET FORTH AT THE BEGINNING OF THIS GUARANTY. Such service shall be deemed in every respect effective service of process upon the Guarantor and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon the Guarantor. Nothing in this Section shall affect the Lender's right to serve process in any other manner permitted by law. Guarantor may add additional addresses or change an address for purposes of service of process by giving 10 days' prior written notice of such change to the Lender.

Section 4.12    Unlimited Guaranty.    This Guaranty is unlimited in amount.

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty as of the day and year set forth.

_____
Thomas V. Girardi, Individually

Dated: July 5, 2011

ACKNOWLEDGMENTS (FOR GUARANTY)

STATE OF CALIFORNIA
COUNTY OF Los Angeles

On the 5th day of July in the year 2011 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

SHIRLEEN H. FUJIMOTO
COMMISSION # 1933069
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires May 15, 2015

_____
Notary Public

18

Initials

## SECURITY AGREEMENT
## CALIFORNIA ATTORNEY LENDING II, INC.

In consideration of California Attorney Lending II, Inc., a New York corporation having its chief executive office at 6400 Main Street, Suite 120, Williamsville, NY 14221 (the "Secured Party") heretofore or hereafter (1) extending or agreeing to extend any credit or other financial accommodation to or relying on any guaranty, endorsement or other assurance of payment of Girardi Keese, a California general partnership having an office at 1126 Wilshire Blvd., Los Angeles, CA 90017 ("Borrower") or (2) agreeing to any direct or indirect extension, renewal, refinancing or other modification or replacement of or waiving or forbearing from exercising any right or remedy relating to any obligation heretofore or hereafter arising or accruing as a result of any such credit or other financial accommodation to Borrower, and for other valuable consideration, the receipt and adequacy of which is acknowledged, **Girardi Keese** (the "Debtor"), agrees with the Secured Party as follows:

1.    **DEFINITIONS.** In this Agreement:

a.    **Account Debtor.** An "Account Debtor" means any person or entity with an obligation to pay or transfer cash, property or proceeds to any Debtor on an account, chattel paper or general intangible regardless whether such obligation arises from business or personal matters or assets of such Debtor.

b.    **Collateral.** The "Collateral" means:

All Debtor's present and future right, title and interest in and to any and all accounts, choses in action, causes of action, settlement proceeds, attorneys' liens, attorneys' fees, general intangibles, contract rights, deposit and other bank accounts and instruments, instruments, documents, chattel paper and obligations in any form in each case arising out of or related to the rendition of services by Debtor whether earned by performance or otherwise in connection with the following:  (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; and (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation; all of Debtor's books related to the foregoing; and all cash and non-cash proceeds of any of the foregoing, in whatever form, including without limitation all proceeds of proceeds, all insurance policies covering same and all interest or dividends thereon.

c.    **Event of Default.** An "Event of Default" occurs or exists if

(i)    there occurs or exists any event or condition of default under any Revolving Promissory Note or other instrument (A) now or hereafter evidencing any of the Obligations or (B) the payment of which is now or hereinafter guaranteed by the Debtor (including, but not limited to, a Revolving Promissory Note, dated the date of this Agreement, issued by Borrower to the Secured Party, or any direct or indirect extension, renewal, refinancing or other modification or replacement of such Revolving Promissory Note); or

(ii)    there occurs or exists any event or condition of default under any guaranty of the Obligations; or

· 19 ·

Initials

(iii)   the Secured Party deems itself insecure with respect to the Obligations or is of the opinion that the Collateral is or may not be sufficient or has decreased or may decrease in value, whether or not the Secured Party has sought any Other Collateral from the Debtor or any Guarantor.

**d.    Obligations.** The "Obligations" means collectively all obligations to the Secured Party for the payment of any money (whether for the payment of any principal, interest, fee, charge, cost or expense or otherwise) or the performance of any other obligation (including, but not limited to, pursuant to this Agreement), however evidenced, regardless of kind, class or form, incurred for any business or commercial purpose or otherwise, now existing or hereafter arising or accruing, created directly or by any assignment or other transfer, direct or indirect, absolute or contingent (whether pursuant to any guaranty, endorsement or other assurance of payment or otherwise), similar or dissimilar or related or unrelated and whether or not arising or accrued subsequent to any commencement of, or made, proved, voted or allowed as a claim in any case or other proceeding pursuant to, any bankruptcy, insolvency or similar statute, that have been heretofore or are hereafter incurred by, whether alone or otherwise, the Debtor, the Borrower, any direct or indirect successor of the Debtor or the Borrower or any direct or indirect assignee or other transferee of all or substantially all of the assets of the Debtor or the Borrower.

**e.    Other Collateral.** "Other Collateral" means, other than the Collateral, any collateral, subordination, guaranty, endorsement or other security or assurance of payment, whether now existing or hereafter arising or accruing, that now or hereafter secures the payment of or is otherwise applicable to any of the Obligations.

**f.    Guarantor.** "Guarantor" means any Person, including Thomas V. Girardi, who or that is now or hereafter liable, whether directly or indirectly or absolutely or contingently, for the payment of any of the Obligations.

**g.    Permitted Liens.** "Permitted Liens" means (i) whether now existing or hereafter arising or accruing, any security interest in or other lien on any of the Collateral in favor of the Secured Party or (ii) any security interest in or other lien on any of the Collateral existing on this date that is (A) fully and accurately described in the response to question 6 contained in the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement or (B) consented to in writing by the Secured Party.

**h.    Person.** "Person" means (i) any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated association, government or political subdivision, (ii) any court, agency or other governmental body or (iii) any other entity, body, organization or group.

**i.    Record.** "Record" means any information that is now or hereafter (i) inscribed on a tangible medium or (ii) stored in an electronic or other medium and retrievable in perceivable form, except to the extent constituting confidential information (whether contained in any client file of the Debtor or otherwise) that the Debtor is not permitted to disclose to the Secured Party by reason of any ethical or disciplinary rule, regulation or law governing the Debtor's conduct.

**j.    Security Interest.** "Security Interest" means any security interest or other lien granted or otherwise created pursuant to the first sentence of Section 2 of this Agreement.

**k.    Uniform Commercial Code.** "Uniform Commercial Code" means the Uniform Commercial Code in effect at any time in the State of New York.

**l.    Other Terms.** All capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in the Uniform Commercial Code..

**2.    GRANT OF SECURITY INTEREST.** To secure the payment and performance of the Obligations, the

20

Initials

Debtor grants to the Secured Party a security interest in and assigns, pledges and hypothecates to the Secured Party the Collateral. Each Security Interest is a continuing, absolute and unconditional security interest or other lien.

**3.    REINSTATEMENT OF OBLIGATIONS.** Each portion of the Obligations heretofore or hereafter paid or satisfied by any of the Collateral, or any money or Other Collateral, heretofore or hereafter received, applied or retained by the Secured Party and later recovered from the Secured Party as a result of any claim (including, but not limited to, any claim involving any allegation that any money constituted trust funds or that the receipt, application or retention of any of the Collateral or any money or Other Collateral or the grant, perfection or other creation or protection of any security interest in or other lien on any of the Collateral or any Other Collateral constituted a preference or fraudulent conveyance or transfer), however asserted and whether now existing or hereafter arising or accruing, shall be reinstated as part of the Obligations for purposes of this Agreement as of the date it originally arose or accrued.

**4.    COVENANTS.**

**a.    Affirmative Covenants.** The Debtor shall (i) maintain complete and accurate Records relating to the Collateral, (ii) before the end of any applicable grace period, pay each tax, assessment, fee and charge imposed by any government or political subdivision upon any of the Collateral, this Agreement or any agreement, instrument or other Record evidencing any of the Collateral or any of the Obligations, (iii) defend the Collateral against each demand, claim, counterclaim, setoff and defense asserted by any Person (including, but not limited to, any Account Debtor) other than the Secured Party and (iv) promptly notify the Secured Party of (A) any threat or commencement of any action or other legal proceeding, any entry of any judgment or order of any court, agency or other governmental body, or any assertion by any Person (including, but not limited to, any Account Debtor) other than the Secured Party of any demand, claim, counterclaim, setoff or defense, relating to any of the Collateral, (B) any occurrence or existence of any Event of Default, any event or condition that, after notice, lapse of time or both notice and lapse of time, would constitute any Event of Default or any event or condition that has or will or might have any material adverse effect on (I) any of the Collateral, (II) the Debtor, (III) any Guarantor or (IV) the business, operations, assets, affairs or condition (financial or other) of the Debtor or any Guarantor and (C) any change in the location of the chief executive office of the Debtor.

**b.    Negative Covenants.** Without the prior written consent of the Secured Party, the Debtor shall not (i) sell or otherwise dispose of any of the Collateral or any interest or right in any of the Collateral except in the ordinary course of business, or (ii) provide to the Secured Party or permit to be provided to the Secured Party on his, her or its behalf any certificate, financial statement or other Record that contains any statement of fact that is incorrect or misleading in any material respect or omits to state any fact necessary to make any statement of fact contained therein not incorrect or misleading in any material respect, (iii) execute or otherwise authenticate or permit to be filed or remain on file in any public office any financing statement or amendment of any financing statement relating to any of the Collateral and naming any Person other than the Secured Party as a secured party, except for any financing statement or amendment of any financing statement heretofore consented to by the Secured Party in writing or relating solely to any Permitted Liens, or (iv) upon or at any time after any occurrence or existence of any Event of Default, (A) enforce, extend, renew, refinance or otherwise modify or replace, request, demand, accept, collect or otherwise realize upon, compromise, cancel, discharge, subordinate, accelerate, give any receipt, release or discharge relating to, commence, prosecute or settle any action or other legal proceeding relating to, waive or forbear from exercising any right or remedy relating to or adversely affect any obligation of any Person (including, but not limited to, any Account Debtor obligated with respect to any of the Collateral) relating to any of the Collateral, or (B) agree or otherwise incur any obligation to do anything described in clause (iv)(A) of this sentence, or (v) without giving the Secured Party at least 30 days' prior written notice (A) change its location for purposes of Article 9 of the Uniform Commercial Code (including, but not limited to, its jurisdiction of organization if it is a Registered Organization), (B) make any change in its name, identity or structure or (C)

21

Initials

participate in any merger, consolidation or other absorption, or (vi) grant or otherwise create, permit to exist or agree or otherwise incur any obligation to grant or otherwise create or permit to exist any security interest in or other lien on any of the Collateral other than Permitted Liens, or (vii) use any money of the Borrower, funds in any Deposit Account of the Borrower or funds represented by any certificate of deposit of the Borrower in partial or complete satisfaction of any obligation of the Borrower except for obligations incurred in the ordinary course of the business of the Borrower, or (viii) create, incur, assume or have any indebtedness or other obligation (A) arising from the borrowing of any money or (B) pursuant to any guaranty or other contingent obligation, except for indebtedness and other obligations (I) to the Secured Party, (II) constituting unsecured normal trade debt incurred upon customary terms in the ordinary course of its business, (III) arising from the endorsement in the ordinary course of its business of any check or other negotiable instrument for deposit or collection or (IV) secured by a Permitted Lien.

c.    **Additional Covenants Triggered by Request of Secured Party.** Promptly upon the request of the Secured Party, the Debtor shall (i) deliver to the Secured Party each financing statement, amendment of any financing statement and other Record, and take each other action (including, but not limited to, making any endorsement), requested by the Secured Party to perfect, maintain the validity, perfection or priority of, or enforce, any Security Interest, otherwise protect the interest of the Secured Party in or collect, sell or otherwise dispose of or otherwise realize upon any of the Collateral, whether under applicable law or otherwise, verify any of the Collateral or otherwise accomplish any purpose of this Agreement, (ii) deliver to the Secured Party each Record included in the Collateral, together with each endorsement, instrument of assignment and other Record that the Secured Party requests to accomplish the assignment or other transfer of such Record to the Secured Party, and, until such delivery, hold such Record in trust for the Secured Party, (iii) cause each Instrument representing Proceeds or other proceeds of any of the Collateral to be made payable, as requested by the Secured Party, to the Secured Party alone or the Secured Party and the Debtor jointly, (iv) provide to the Secured Party all information requested by the Secured Party and relating to (A) any of the Collateral, (B) any Person (including, but not limited to, any Account Debtor) obligated with respect to any of the Collateral, (C) the Debtor, (D) any Guarantor or (E) the business, operations, assets, affairs or condition (financial or other) of the Debtor or any Guarantor (including, but not limited to, financial statements prepared in a form satisfactory to the Secured Party and, if requested by the Secured Party, audited, reviewed or compiled by an independent certified public accountant satisfactory to the Secured Party) and (v) permit each officer, employee, accountant, attorney and other agent of the Secured Party to inspect the Collateral and audit, copy and extract each Record included in the Collateral.

d.    **Collateral Collections.** After an Event of Default shall have occurred, Secured Party shall have the right at any and all times to enforce Debtor's rights against Account Debtors and other parties obligated on Collateral, including, but not limited to, the right to: (a) notify and/or require Debtor to notify any or all Account Debtors and other parties obligated on Collateral to make payments directly to Secured Party or in the care of a post office lock box under the sole control of Secured Party established at the Debtor's expense subject to Secured Party's customary arrangements and charges therefor, and to take any or all action with respect to Collateral as Secured Party shall determine in its sole discretion, including, without limitation, the right to demand, collect, sue for and receive any money or property at any time due, payable or receivable on account thereof, compromise and settle with any person liable thereon, and extend the time of payment or otherwise change the terms thereof, without incurring liability or responsibility to Debtor; (b) require Debtor to segregate and hold in trust for Secured Party and, on the day of Debtor's receipt thereof, transmit to Secured Party in the exact form received by Debtor (except for such assignments and endorsements as may be required by Secured Party), all cash, checks, drafts, money orders and other items of payments constituting Collateral or proceeds of Collateral; and/or (c) establish and maintain at Secured Party a "Repayment Account," which shall be under the exclusive control and subject to the sole order of Secured Party and which shall be subject to the imposition of such customary charges as are imposed by Secured Party from time to time upon such accounts, for the deposit of cash, checks, drafts, money orders and other items of payments constituting Collateral or proceeds of Collateral from which Secured Party may, in its sole

22

Initials

discretion, at any time and from time to time, withdraw all or any part. Secured Party's collection and enforcement of Collateral against Account Debtors and other persons obligated thereon shall be deemed to be commercially reasonable if Secured Party exercises due care and follows the procedures that Secured Party generally applies to the collection of obligations owed to Secured Party. All cash and non-cash proceeds of the Collateral may be applied by Secured Party upon Secured Party's actual receipt of cash proceeds against such of the Obligations, matured or unmatured, as Secured Party shall determine in its sole discretion. Secured Party may defer the application of non-cash proceeds of Collateral, including, but not limited to, non-cash proceeds collected from Account Debtors and other persons obligated on Collateral, to the Obligations until cash proceeds are actually received by Secured Party.

e.     **Care of Collateral.** Debtor shall have all risk of loss of the Collateral. Secured Party shall have no liability or duty, either before or after an Event of Default, to collect or enforce any of its rights against the Collateral, to collect any income accruing on the Collateral, or to preserve rights against Account Debtors or other parties with prior interest in the Collateral. If Secured Party actually receives any notices requiring action with respect to Collateral in Secured Party's possession, Secured Party shall take reasonable steps to forward such notices to Debtor. Debtor is responsible for responding to notices concerning the Collateral, voting the Collateral, and exercising rights and options, calls and conversions of the Collateral. Secured Party's sole responsibility is to take such action as is reasonably required by Debtor in writing, provided, however, Secured Party is not required to take any action that, in Secured Party's sole judgment, would adversely affect the value of the Collateral as security for the Obligations. While Secured Party is not required to take certain actions, if action is needed, in Secured Party's sole discretion, to preserve and maintain the Collateral, Debtor authorizes Secured Party to take such actions, but Secured Party is not obligated to do so.

**5.    POWER OF ATTORNEY.** Upon the occurrence or existence of any Event of Default, the Debtor irrevocably and unconditionally appoints the Secured Party as the attorney-in-fact of the Debtor, with full power of substitution and revocation, to take, in the name and on behalf of the Debtor or otherwise, each action relating to any of the Collateral that the Debtor could take (subject to the limitations contained in Section 12(j) of this Agreement), provided such appointment and power does not violate any code of professional conduct and the ethical rules thereunder applicable to the legal profession. The power of attorney given pursuant to the preceding sentence is coupled with an interest in favor of the Secured Party.

**6.    CERTAIN RIGHTS, REMEDIES AND DUTIES.**

a.    **Rights and Remedies Pursuant to Applicable Law.** With respect to the Collateral, the Secured Party shall have each applicable right and remedy pursuant to applicable law (including, but not limited to, the Uniform Commercial Code) or this Agreement.

b.    **Additional Rights Without Event of Default.** The Secured Party shall have the right to (i) file in any public office each financing statement or amendment of any financing statement relating to any of the Collateral that the Secured Party desires to file and (ii) verify any of the Collateral in any manner or through any medium, whether directly with any Person (including, but not limited to, any Account Debtor) obligated with respect thereto or otherwise or in the name of the Debtor or otherwise.

c.    **Additional Rights Upon or After Event of Default.** Upon or at any time after any occurrence or existence of any Event of Default, the Secured Party shall have the right to, for the purpose of preserving or enhancing the value of any of the Collateral or exercising any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement, (i) perform each obligation of the Debtor pursuant to this Agreement and (ii) take control of all Proceeds and other proceeds thereof.

23

Initials

**d.    Application of Proceeds.** The Secured Party shall apply all proceeds received by the Secured Party from any collection, sale or other disposition of or other recovery upon or otherwise on account of any of the Collateral (including, but not limited to, as money payable pursuant to any insurance on any of the Collateral) first to liabilities, costs and expenses described in Section 7 of this Agreement and then to the remainder of the Obligations, whether due or not due, in any order determined by the Secured Party.

**e.    Notice of Disposition.** It is mutually agreed that commercial reasonableness and good faith require Lender to give Guarantors no more than ten days' prior written notice of the time and place of any public disposition of Collateral or of the time after which any private disposition or other intended disposition is to be made. It is mutually agreed that it is commercially reasonable for Lender to disclaim all warranties which arise with respect to the disposition of the Collateral.

## 7.    EXPENSES; INDEMNIFICATION.

**a.    Expenses.** The Debtor shall pay to the Secured Party on demand each cost and expense (including, but not limited to, if the Secured Party retains counsel for advice, litigation or any other purpose, reasonable attorneys' fees and disbursements) heretofore or hereafter incurred by the Secured Party in (i) searching for, filing or recording or obtaining any information relating to any financing statement, amendment of any financing statement or other Record relating to any of the Collateral or otherwise obtaining any information relating to the Debtor or any of the Collateral or (ii) endeavoring to (A) enforce any obligation of the Debtor pursuant to this Agreement or preserve or exercise any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement or (B) preserve or exercise any right or remedy relating to or collect, sell or otherwise dispose of or otherwise realize upon any of the Collateral. After such demand for the payment of any cost or expense incurred by the Secured Party in performing any obligation of the Debtor pursuant to this Agreement, the Debtor shall pay interest at an annual rate equal to the lesser of 25% or the highest rate permitted by applicable law on the portion of such cost or expense remaining unpaid.

**b.    Indemnification.** The Debtor shall indemnify and defend the Secured Party and each officer, employee, accountant, attorney, banker, lender and other agent of the Secured Party on demand, without any limitation as to amount, against each liability, cost and expense (including, but not limited to, if the Secured Party retains counsel for advice, litigation or any other purpose, reasonable attorneys' fees and disbursements) heretofore or hereafter imposed on, incurred by or asserted against the Secured Party or such officer, employee, accountant, attorney or other agent as a result of any claim (including, but not limited to, any claim involving any allegation of any violation of applicable law (including, but not limited to, any criminal statute)), however asserted and whether now existing or hereafter arising or accruing, arising out of any collection, sale or other disposition of any of the Collateral or any breach by the Debtor of any representation or warranty or any covenant or other agreement contained in, or any other fact or circumstance relating to, this Agreement, except to the extent any such liability, cost or expense is caused by the gross negligence, bad faith or willful misconduct of the Secured Party or such officer, employee, accountant, attorney or other agent.

**8.    TERMINATION.** This Agreement shall remain in full force and effect until and shall terminate only upon (a) the actual receipt by an officer of the Secured Party at the chief executive office of the Secured Party of a written notice of the termination of this Agreement by any one of the Debtor, (b) the expiration of a reasonable period of time for the Secured Party to act upon such written notice and (c) the final and indefeasible payment in full of (i) each portion of the Obligations (A) arising or accrued before such receipt of such written notice and the expiration of such period of time, (B) thereafter arising or accruing as a result of any credit or other financial accommodation theretofore committed or otherwise agreed to by the Secured Party or (C) thereafter arising or accruing as a result of any of the Obligations described in clause (c)(i)(A) or (B) of this sentence (including, but not limited to, (I) all interest, fees, charges, costs and expenses thereafter arising or accruing with respect to any of the

24

Initials

Obligations described in such clause (c)(i)(A) or (B) and (II) all of the Obligations thereafter arising or accruing as a result of any direct or indirect extension, renewal, refinancing or other modification or replacement of any of the Obligations described in such clause (c)(i)(A) or (B)) and (ii) each liability, cost and expense that the Debtor is obligated to pay pursuant to Section 7 of this Agreement, whether theretofore or thereafter arising or accruing.

9.     **REPRESENTATIONS, WARRANTIES AND ADDITIONAL COVENANTS.** The Debtor represents, warrants and covenants with and to the Secured Party as follows:

**a.**      **Authority.** The execution, delivery to the Secured Party and performance of this Agreement and the grant or other creation of each Security Interest by the Debtor (i) do not and will not violate applicable law, any judgment or order of any court, agency or other governmental body by which the Debtor is bound or, if the Debtor is not an individual, any certificate or articles of incorporation or organization, by-laws, operating or partnership agreement or other charter, organizational or other governing document of the Debtor or any resolution or other action of record of any shareholders, members, partners, directors or managers of the Debtor, (ii) do not and will not violate or constitute any default under any agreement, instrument or other Record by which the Debtor is bound or to which the Debtor's property is subject, (iii) if the Debtor is not an individual, are and will be in furtherance of the purposes and within the power and authority of the Debtor and (iv) do not and will not require any authorization of, notice to or other act by or relating to any Person (including, but not limited to, any Account Debtor or, if the Debtor is not an individual, any shareholder, member, partner, director or manager of the Debtor) that has not been duly obtained, given or done and is not in full force and effect.

**b.**      **Enforceability.** This Agreement is enforceable in accordance with its terms against the Debtor. All of Debtor's accounts, chattel paper, deposit accounts, documents, general intangibles, instruments, investment property, letter of credit rights and other liens, contracts, leases and agreements constituting the Collateral are and shall be valid, genuine and legally enforceable obligations and rights belonging to Debtor and not subject to any claim, defense, set-off, or counterclaim of any kind.

**c.**      **Ownership.** Debtor is and shall remain owner of the Collateral.

**d.**      **Questionnaire.** Each answer contained in any questionnaire submitted by or on behalf of the Debtor to the Secured Party in connection with this Agreement (including, but not limited to, the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement) is complete and accurate.

**e.**      **Rights and Obligations with Respect to Collateral.** Except as heretofore disclosed by the Debtor to the Secured Party in writing, there exists (i) no security interest in or other lien on any of the Collateral other than Permitted Liens, (ii) no presently effective financing statement or amendment of any financing statement relating to any of the Collateral and naming any Person other than the Secured Party as a secured party other than those relating solely to Permitted Liens, (iii) no contractual or other restriction on the grant or other creation of any security interest in or assignment, pledge or hypothecation of any of the Collateral, and (iv) no demand, claim, counterclaim, setoff or defense, no action or other legal proceeding, and no outstanding judgment or order of any court, agency or other governmental body, relating to any of the Collateral. Debtor (i) shall defend the Collateral against all claims and demands of all persons at any time claiming any interest therein; (ii) shall cooperate with Secured Party in obtaining and maintaining control with respect to all deposit accounts, investment property, letter of credit rights and electronic chattel paper constituting the Collateral; (iii) shall not become a party to any restructuring of its form of business or participate in any consolidation, merger, liquidation or dissolution without Secured Party's prior written consent; (iv) shall not change its state of organization without first notifying Secured Party in writing; (v) shall immediately advise Lender in writing of any change in address of Debtor or the Collateral; and (vi) shall provide Secured Party with possession, as appropriate, of all chattel paper, documents, instruments and investment property constituting the Collateral.

25

Initials

f.      **Actions with Respect to Collateral.** Except as heretofore disclosed by the Debtor to the Secured Party in writing, the Debtor has not (i) sold or otherwise disposed of any of the Collateral or any interest or right in any of the Collateral or (ii) extended, renewed, refinanced or otherwise modified or replaced, compromised, canceled, discharged, subordinated, accelerated, waived, forborne from exercising any right or remedy relating to or adversely affected any obligation of any Person (including, but not limited to, any Account Debtor) relating to any of the Collateral.

g.      **Accounts and General Intangibles.** Each Account and General Intangible included in the Collateral is or, if not now existing, will be genuine, in all respects what it purports to be and enforceable in accordance with its terms against each Person (including, but not limited to, any Account Debtor) obligated with respect thereto, subject to no demand, claim, counterclaim, setoff or defense.

h.      **Incorrect or Misleading Information.** The Debtor has not provided to the Secured Party or permitted to be provided to the Secured Party on his, her or its behalf any certificate, financial statement or other Record that contains any statement of fact that is incorrect or misleading in any material respect or omits to state any fact necessary to make any statement of fact contained therein not incorrect or misleading in any material respect.

i.      **Taxes.** The Debtor has duly filed all applicable income or other tax returns and has paid all income or other taxes when due, and there are no outstanding tax liens against the assets of any Debtor.

**10.    CERTAIN CONSENTS AND WAIVERS.**

a.      **Consents.** Except to the extent expressly provided in this Agreement, this Agreement shall not be modified or terminated, no Security Interest, no obligation of the Debtor pursuant to this Agreement and no right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement shall be impaired or otherwise adversely affected, and no such right or remedy shall be waived, by any act, omission or other thing, whether heretofore occurred or hereafter occurring. The Debtor knowingly, voluntarily, intentionally and irrevocably consents, without any notice, to each act, omission and other thing, whether heretofore occurred or hereafter occurring, that would or might, but for such consent, modify or terminate this Agreement, impair or otherwise adversely affect any Security Interest or any such obligation, right or remedy or operate as a waiver of any such right or remedy.

b.      **Waivers.** The Debtor knowingly, voluntarily, intentionally and irrevocably waives, without any notice, each act and other thing upon which, but for such waiver, any Security Interest, any obligation of the Debtor pursuant to this Agreement or any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement would or might be conditioned.

**11.    NOTICES AND OTHER COMMUNICATIONS.** Each notice and other communication relating to this Agreement (i) shall be given in writing, (ii) if given by facsimile, shall be directed to the Secured Party at (716) 568-0266 and to the Debtor at his, her or its facsimile number set forth on the signature page of this Agreement, (iii) if given otherwise in writing, shall be directed to the Secured Party or the Debtor at their respective addresses indicated at the beginning of the Agreement or on the Signature Page to this Agreement and (iv) if sent by mail or overnight courier service, shall be deemed to have been given when deposited in the mail, first-class or certified postage prepaid, or accepted by any post office or overnight courier service for delivery, and to have been received by the Secured Party or the Debtor upon such Person's actual receipt thereof. Address and facsimile information may be updated by any notice sent in accordance with the preceding sentence. Each requirement under applicable law of reasonable notice of any event by the Secured Party to the Debtor shall be deemed to have been met if a notice of such event is given by the Secured Party to the Debtor at least 10 days before the date on or after which

26

Initials

such event is to occur.

12.  **MISCELLANEOUS.**

**a.    Reliance by Other Persons.** Each Person (including, but not limited to, any Account Debtor) obligated with respect to any of the Collateral may accept without any question any exercise by the Secured Party of any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement.

**b.    Limitation on Security Interest.** The payment of the Obligations shall not be secured by any Security Interest to the extent of any amount in excess of the maximum amount the payment of which can be so secured without rendering such Security Interest unenforceable under applicable law as a fraudulent conveyance or transfer.

**c.    Obligations Relating to Collateral.** The grant or other creation of any Security Interest shall not constitute an assignment by the Debtor to the Secured Party of any obligation of the Debtor relating to any of the Collateral. The Debtor shall remain obligated to perform each such obligation, and the Secured Party shall not be obligated to perform any such obligation, whether or not the Secured Party exercises any right or remedy pursuant to this Agreement or arising or accruing as a result of this Agreement. The only obligations of the Secured Party relating to the Collateral shall be, to the extent required by applicable law, to act in a commercially reasonable manner in exercising with respect to any of the Collateral any right or remedy pursuant to this Agreement or arising or accruing as a result of this Agreement.

**d.    Liability.** If more than one Person executes this Agreement, (i) each of them shall be jointly and severally liable pursuant to this Agreement, and (ii) this Agreement shall be construed, interpreted and enforced, whether in any action or other legal proceeding or otherwise, as to each of them as though each of them had executed and delivered to the Secured Party a separate agreement identical to this Agreement.

**e.    Assignment or Grant of Participation.** In conjunction with any assignment or other transfer of or grant of any participation in any of the Obligations by the Secured Party, the Secured Party shall have the right to assign or otherwise transfer or grant any participation in this Agreement, any Security Interest, any obligation of the Debtor pursuant to this Agreement or any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement.

**f.    Binding Effect.** This Agreement shall be binding upon the Debtor and each direct or indirect legal representative, successor and assignee of the Debtor and shall inure to the benefit of and be enforceable by the Secured Party and each direct or indirect successor and assignee of the Secured Party.

**g.    Entire Agreement, Modifications and Waivers.** This Agreement contains the entire agreement between the Secured Party and the Debtor with respect to the subject matter of this Agreement and supersedes each action heretofore taken or not taken, each course of conduct heretofore pursued, accepted or acquiesced in, and each oral, written or other agreement and representation heretofore made, by or on behalf of the Secured Party with respect thereto. No action heretofore or hereafter taken or not taken, no course of conduct heretofore or hereafter pursued, accepted or acquiesced in, no oral, written or other agreement or representation heretofore made, and no agreement or representation hereafter made other than in writing, by or on behalf of the Secured Party shall modify or terminate this Agreement, impair or otherwise adversely affect any Security Interest, any obligation of the Debtor pursuant to this Agreement or any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement or operate as a waiver of any such right or remedy. No modification of this Agreement or waiver of any such right or remedy shall be effective unless made in a writing duly executed by the Secured Party and specifically referring to such modification or waiver.

27

Initials

46

h.   **Rights and Remedies Cumulative.** All rights and remedies of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement shall be cumulative, and no such right or remedy shall be exclusive of any other such right or remedy.

i.   **Extent of Consents and Waivers.** Each consent and waiver of the Debtor contained in this Agreement shall be deemed to have been given to the extent permitted by applicable law.

j.   **Exercise of Rights; Requests.** Except as expressly provided in this Agreement, each right and remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement may be exercised (i) at any time and from time to time, (ii) in the sole discretion of the Secured Party, (iii) without any notice or demand of any kind and (iv) whether or not any Event of Default or any other event or condition of default relating to any of the Obligations, any of the Collateral or any Other Collateral has occurred or existed, but the Secured Party shall not be obligated to exercise any such right or remedy. Each such right and remedy may be exercised only to the extent that the exercise thereof does not (i) violate applicable law or (ii) if requiring the Debtor to take any action, require the Debtor to violate any ethical or disciplinary rule, regulation or law governing non-disclosure of confidential information by an attorney or prohibiting the unauthorized practice of law. Each request by the Secured Party pursuant to this Agreement may be made (i) at any time and from time to time, (ii) in the sole discretion of the Secured Party and (iii) whether or not any Event of Default or any other event or condition of default relating to any of the Obligations, any of the Collateral or any Other Collateral has occurred or existed.

k.   **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law. If, however, any such provision shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law, or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

l.   **Governing Law.** This Agreement shall be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York without regard to principles of conflicts of laws.

m.   **Headings.** In this Agreement, headings of sections are for convenience of reference only and have no substantive effect.

13.   CONSENTS AND WAIVERS RELATING TO LEGAL PROCEEDINGS.

a.   JURISDICTIONAL CONSENTS AND WAIVERS. THE DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY CONSENTS AND AGREES THAT ANY ACTION OR OTHER LEGAL PROCEEDING COMMENCED BY THE SECURED PARTY SHALL BE BROUGHT ONLY IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF SUCH ACTION; PROVIDED, HOWEVER, SECURED PARTY MAY, AT ITS OPTION, COMMENCE ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION TO OBTAIN POSSESSION OR FORECLOSURE UPON ANY COLLATERAL, TO OBTAIN EQUITABLE RELIEF OR TO ENFORCE ANY JUDGMENT OR ORDER OBTAINED BY SECURED PARTY AGAINST DEBTOR OR WITH RESPECT TO ANY COLLATERAL, TO ENFORCE ANY OTHER RIGHT OR REMEDY UNDER THIS AGREEMENT OR TO OBTAIN ANY OTHER RELIEF DEEMED APPROPRIATE BY SECURED PARTY. DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO PERSONAL JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, AND DEBTOR HEREBY WAIVES ANY OBJECTIONS WHICH DEBTOR MAY HAVE BASED UPON LACK

28

Initials

OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH NEW YORK COURT.

b.   WAIVER OF TRIAL BY JURY. THE DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT THE DEBTOR MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION OR OTHER LEGAL PROCEEDING, WHETHER BASED ON ANY CONTRACT OR NEGLIGENT, INTENTIONAL OR OTHER TORT OR OTHERWISE, ARISING OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT, ANY OF THE OBLIGATIONS, ANY OF THE COLLATERAL OR ANY OTHER COLLATERAL.

c.   SERVICE OF PROCESS. PROCESS ON DEBTOR IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT WILL BE DEEMED TO HAVE BEEN GIVEN WHEN GIVEN IN ANY ONE OF THE FOLLOWING WAYS: (I) PERSONALLY DELIVERED, (II) TWO BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, POSTAGE PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (III) 4 BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO THE DEBTOR AT THE APPLICABLE ADDRESS SET FORTH IN THIS AGREEMENT. Such service shall be deemed in every respect effective service of process upon and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon the Debtor. Nothing in this Section shall affect the Secured Party's right to serve process in any other manner permitted by law. Debtor may add additional addresses or change the address for purposes of service of process by giving 10 days' prior written notice of such change to the Secured Party.

Dated: July 2, 2011

Girardi Keese

By: _____

Thomas V. Girardi, Partner
Facsimile No.  213 481 1554

29

Initials

48

## EXHIBIT A

### QUESTIONNAIRE

1. What is the Borrower's legal name?

   Girardi Keese

2. What is the Borrower's jurisdiction of organization and business structure:

   General partnership under the laws of California

3. What is the Borrower's Federal Employer Identification Number or Social Security Number?

   SSN ▮▮▮▮▮▮▮ (EIN# ▮▮▮▮995)

4. What is the address (including state, county and zip code) of a business office of the Borrower?

   1126 Wilshire Blvd., Los Angeles, CA 90017

5. What is the address (including state, county and zip code) of each location at which any Record included in the Collateral is or will be kept other than the locations the addresses of which are indicated in the answers to question 4?

   1126 Wilshire Blvd., Los Angeles, CA 90017

6. In the case of any security interest or other lien covering any of the Collateral and existing on the date of this Agreement in favor of any Person other than the Secured Party, what are the complete name and address of each such Person in whose favor such security interest or other lien exists, and what is the nature of such security interest or other lien?

### Permitted Liens

| Name of Person | Address | Nature of Security Interest/Lien |
| --- | --- | --- |
| Comerica Bank | 75 East Trimble Road San Jose, CA 95131 deposits | blanket lien, as well as various specific security interests in certain accounts, contracts and |
| Dell Financial Services L.P. | 12234 N. IH-35, Bldg. B Austin, TX 78753 | specific computer equipment |
| Key Equipment Finance Inc. | 1000 So. McCaslin Blvd. Superior, CO 80027 | specific leased equipment |
| Ikon Financial Svcs. | 1738 Bass Rd. Macon, GA 31210 | specific leased equipment |

30

Initials

| Comerica Bank-California | 333 W. Santa Clara St. San Jose, CA 95113 | as to Thomas V. Girardi, certain specified shares of stock in Coast Resorts, Inc. |

7.    What is the legal name and principal residence address of each Debtor other than the Borrower?

None

31

Initials

ACKNOWLEDGMENT (SECURITY AGREEMENT)

STATE OF CALIFORNIA
COUNTY OF Los Angeles
On the 5ᵗʰ day of July in the year 2011 before me, the undersigned, a notary public in and for said state, personally
appeared Thomas V. Girardi, personally known to me or proved to me on the basis of satisfactory evidence to be the
individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his
capacity as Partner of Girardi Keese, and that by his signature on the instrument, the entity upon behalf of which the
individual acted, executed the instrument.

_____
Notary Public

SHIRLEEN H. FUJIMOTO
COMMISSION # 1833089
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires May 15, 2015

32

Initials

51

## BORROWER'S CERTIFICATE

With respect to certain credit facilities to be extended by California Attorney Lending II, Inc., a New York corporation (the "Lender"), the undersigned certifies and verifies to Lender, its successors and assignees as follows:

1.  I am [check applicable box:]
    [ the duly elected and qualified President or Secretary
    [ the duly appointed Manager or other authorized Member
    ☑ a duly authorized Partner        of Girardi Keese, organized under the laws of California

2.  If the Borrower is a corporation or limited liability company, attached to this Borrowing Certificate as Schedule I is a correct and complete copy of, as applicable, the Certificate of Incorporation or Articles of Organization of the Borrower. If the Borrower is a partnership, attached to this Borrowing Certificate as Schedule I is a correct and complete copy of the publicly filed organizational document of the Borrower.

3.  If the Borrower is a corporation or limited liability company, attached to this Borrowing Certificate as Schedule II is a correct and complete copy of, as applicable, the By-Laws or Operating Agreement of the Borrower.

4.  If the Borrower is a general or limited liability partnership, attached to this Borrower's Certificate as Schedule II is a correct and complete copy of the Partnership Agreement of the Borrower.

5.  The resolutions attached to this Borrowing Certificate as Schedule III (collectively the "Resolutions") were duly adopted either (a) at a meeting of the board of directors, members or partners of the Borrower duly called and held on [specify date:]

    **July ___, 2011**
    which meeting a quorum was present and participated, or (b) by unanimous written consent of the directors, members or partners of the Borrower.

6.  None of the Resolutions has been rescinded, revoked or modified in any way.

7.  All of the Resolutions are in full force and effect.

8.  Neither any of the Resolutions nor any action taken or to be taken pursuant to any of the Resolutions (a) violates or will violate applicable law, any judgment or order of any court, agency or other governmental body by which the Borrower is bound, the Certificate of Incorporation, Articles of Organization, Certificate of Registration, By-Laws, Operating Agreement, Partnership Agreement or other governing document of the Borrower or any resolution or other action of record of the shareholders, directors or partners of the Borrower, (b) violates, will violate or constitutes or will constitute any default under any agreement, or instrument or other document by which the Borrower is bound or to which any of the Borrower's property is subject or (c) requires or will require any authorization of, notice to or other act by or relating to any individual, any court, agency or other governmental body or any other entity, body, organization or group (including, but not limited to, any shareholder, director, member, manager or partner of the Borrower) that has not been duly obtained, given or done and is not in full force and effect.

9.  Each of the following persons (individually a "Signer") (a) if the Borrower is a corporation or a limited liability company, has been duly elected to and qualified for and holds the office of the Borrower set opposite his or her name thereon, or (b) if the Borrower is a partnership, together constitute all of the partners of such partnership or (c) has been designated by Borrower as a person authorized to transact financial transactions on behalf of Borrower. Each Signer is duly authorized to execute the loan documents between Lender and the Borrower and is also authorized to make a Loan Request on behalf of the Borrower as that term is defined in the Note executed by Borrower to Lender:

| NAME | TITLE | SIGNATURE |
|------|-------|-----------|

33

Initials



Thomas V. Girardi            Partner

10.    The signature set opposite each Signer's name on the list above is a true specimen of such Signer's signature.

11.    With respect to the borrowing of $3,500,000 by Girardi Keese from California Attorney Lending II, Inc., (i) the terms of the borrowing were negotiated in the State of New York, (ii) the drafting of the loan documents and the funding of the loan was in the State of New York (iii) the laws of the State of New York are intended by the parties to apply with respect to the construction, interpretation and choice of law governing all documents executed by the Borrower; and (iv) California Attorney Lending II, Inc. and its legal counsel are located within the State of New York. The loan was intended by the Lender and Borrower as a New York loan to be construed under New York law regardless of any other location of the Borrower or any guarantor.

12.    The Borrower has not granted or incurred any liens against its assets since the date of its loan application to Lender.

13.    The undersigned certifies that the Borrower and each Guarantor has duly filed all applicable income or other tax returns and has paid all income or other taxes when due, and that there are no outstanding tax liens against the assets of any of them.

IN WITNESS WHEREOF, I have executed this Borrowing Certificate as of July __, 2011 and verify that all of the information contained herein is true and correct to the best of my knowledge being fully aware that Lender will rely on the accuracy of this Borrowing Certificate in extending credit facilities to Borrower.

_____
Thomas V. Girardi

STATE OF CALIFORNIA
COUNTY OF Los Angeles.

On the 5th day of July in the year 2011 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

SHIRLEEN H. FUJIMOTO
COMMISSION # 1935089
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires May 15, 2016

34

Initials

53

## SCHEDULE I

## CERTIFICATE OF PARTNERSHIP

35

Initials

## SCHEDULE II

### PARTNERSHIP AGREEMENT

36



Initials

SCHEDULE III

Resolutions

**Girardi Keese (the "Borrower")**
Organized under the laws of California

RESOLVED, that any officer, manager, member or partner of the Borrower (individually an "Authorized Person") be, and he or she hereby is, authorized, directed and empowered, acting alone, in the name or on behalf of the Borrower or otherwise, to transact with and through California Attorney Lending II, Inc. (the "Lender") all such business as he or she shall deem necessary or appropriate upon such terms as he or she shall deem necessary or appropriate (including, but not limited to, obtaining loans and other extensions of credit, guaranteeing or otherwise becoming contingently liable for obligations of others, applying for loans and other forms of credit and pledging, hypothecating, assigning, encumbering, granting security interests in and otherwise creating liens upon all assets including real and personal property, whether tangible or intangible, contingent or accrued, now owned or hereafter acquired ("Property") as security for loans and other extensions of credit and guaranties and other contingent liabilities) and, in connection with any such transaction of business, to do all such acts and other things as he or she shall deem necessary or appropriate (including, but not limited to, signing, drawing, endorsing, executing and delivering notes, guaranties, assignments, pledges, hypothecations, security agreements, mortgages, powers of attorney, confessions of judgment, indemnifications, receipts, waivers, releases and other agreements, instruments and other documents, making and receiving delivery of any Property, accepting, receiving, withdrawing and waiving demands and notices and incurring and paying liabilities, costs and expenses); and be it further

RESOLVED, that, without limiting the generality of the foregoing resolution, any Authorized Person be, and he or she hereby is, authorized, directed and empowered, acting alone, in the name or on behalf of the Borrower or otherwise, to obtain from the Lender revolving loans the total of the outstanding principal amounts of which does not at any time exceed $3,500,000 and to pledge, hypothecate, assign, encumber, grant security interests in and otherwise create liens on Property as security for such loans; and be it further

RESOLVED, that all loans and other extensions of credit heretofore obtained by the Borrower from the Lender, all actions heretofore taken by the Lender with respect to any Property of the Borrower and all transactions and agreements occurring or entered into between the Borrower and the Lender are ratified, approved and confirmed in all respects; and be it further

RESOLVED, that notwithstanding the dissolution or termination of existence of the Borrower or any change in the identity of or any modification or termination of any authority of any Authorized Person, the Lender may rely upon and act in accordance with the foregoing resolutions until it shall receive and have a reasonable time to act on a written notice to the contrary from an Authorized Person.

37

Initials

<u>Key Loan Term Summary with Lender Forms</u>

<u>The following summary sets forth certain key terms in the Loan Documents between California Attorney Lending II, Inc. ("CAL") and Borrower and provides copies of forms required to be used by the Lender. THIS IS NOT A LEGAL DOCUMENT, it is not a complete listing of all rights and obligations of the parties under the Loan Documents, and is intended solely for the purpose of assisting Borrower in its administration of its Loan with CAL. In all events, the Loan Documents are controlling with respect to the parties' rights and remedies with respect to the Loan.</u>

1.  <u>Draw Requests</u>: All Loan Requests are subject to the review and approval of CAL and must be submitted by e-mail or facsimile on the Draw Request form (attached).

2.  <u>Purpose</u>: The LOC will be used solely by Borrower to (i) refinance the Borrower's existing credit facilities (if any), (ii) pay the operating expenses of Borrower's legal practice, or (iii) fund interest payments on the LOC.

3.  <u>Payment Terms</u>: <u>Months 1-24</u>: Monthly interest only, except as described in "Mandatory Pre-Payments" below. <u>Months 25-48</u>: Monthly interest, plus 1/24 of the outstanding principal balance each month.

4.  <u>Mandatory Pre-Payments</u>: To the extent of outstanding interest and principal, 100% of all fees and reimbursed expenses from the following: (i) Award from the Vioxx Common Benefit Fund; (ii) Avandia litigation; (iii) Fogel v. Farmers Group, Inc. Line availability to be reevaluated upon the resolution and receipt of fees from these cases with adjustments made based upon remaining collateral.

5.  <u>Interest</u>: 18% per annum, payable on the 10th day of every month. Invoices are issued on the 1st day of every month. One month's interest in advance is payable to CAL at the closing and held on account, to be applied in the event timely payment is not made. We will require the Borrower to initiate preauthorized electronic funds transfers from a specified bank account to pay the interest on the 10th of every month.

6.  <u>Fees and Charges</u>: Borrower will be charged a closing fee equal to 3% of the LOC amount.

38

Initials

# *California Attorney Lending II, Inc.*

*Specialized Lending Exclusively For the Legal Community*

## AUTHORIZATION FOR LOAN PAYMENT
## AUTOMATIC WITHDRAWAL FORM

### Borrower's Information

Full Name: __GIRARDI KEESE__

SS# or EIN#: __EIN# ████ 995 (Soc Sec # ████████)__

Email Address: __tgirardi@girardikeese.com__

### Borrower's Bank Information

Bank Name: __COMERICA BANK__

Bank ABA (Routing) No. __121137522__

Bank Telephone No. __562 463 6565__

Bank Address: __13200 Crossroads Parkway North, Ste. 200,  City of Industry, CA 91746__

Borrower's Bank Account No. __████ 098__

The undersigned on behalf of Borrower authorizes California Attorney Lending II, Inc. to initiate preauthorized electronic funds transfers from the bank account indicated above, and the undersigned authorizes the bank named above to debit the transfers to that account. This authorization shall not be revoked, modified, or in any other way altered without the express written consent of both the undersigned and California Attorney Lending II, Inc.

Borrower: __GIRARDI KEESE__

Authorized Signature: _____   Date: __7/15/11__

Name and Title of Signer: __Thomas V. Girardi, Partner__

Return this Form and a Voided Check to California Attorney Lending II, Inc.

39

Initials

**GIRARDI KEESE**
1126 Wilshire Blvd.
Los Angeles, CA 90017

**DRAW REQUEST**

Ms. Megan Payne
Chief Operating Officer
California Attorney Lending II, Inc.
6400 Main St.
Suite 120
Williamsville, NY 14221

Re: Revolving Line of Credit

Dear Ms. Payne:

Girardi Keese hereby requests the additional sum of <u>Three Million</u> Dollars ($ 3,000,000), drawn from the Law Firm's revolving line of credit. Please deposit the funds on or before _____ into the bank account you have on file for our firm.

The funds will be used as follows:

| | |
|---|---|
| Operating Expenses: | $ yes |
| Client/Case Expenses: | $ case costs |
| Advertising: | $ |
| Partner draws/salary: | $ |
| Payroll: | $ |
| Other_____ | $ |

Very truly yours,
Girardi Keese

By:_____
Partner   Thomas V. Girardi

40

Initials

## WIRE INSTRUCTION STATEMENT INFORMATION

TO:      ACCOUNTING

FROM:    MEGAN PAYNE, CHIEF OPERATING OFFICER

SUBJECT: CLOSING – $3,500,000 REVOLVING LINE OF CREDIT – GIRARDI KEESE

DATED:   JULY 5, 2011

### WIRE INSTRUCTIONS FOR GIRARDI KEESE

NAME OF ACCOUNT DEBTOR:        THOMAS V. GIRARDI

NAME OF FINANCIAL INSTITUTION:  Comerica Bank

ADDRESS OF FINANCIAL INSTITUTION:  13200 Crossroads Parkway North, Ste. 200

                                   City of Industry, CA 91746

ABA NUMBER:                    ████7522

ACCOUNT NUMBER:                ████6098

GIRARDI KEESE

By: _____
    THOMAS V. GIRARDI

41

Initials

60

# EXHIBIT B

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Timothy C Cashmore
716-858-3883

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Damon Morey LLP
The Avant Building - Suite 1200
200 Delaware Avenue
Buffalo, NY 14202
USA

DOCUMENT NUMBER: 29534010002
FILING NUMBER: 11-7275806299
FILING DATE: 07/06/2011 09:08
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Girardi Keese | | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1126 Wilshire Blvd. | Los Angeles | CA | 90017 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 1e. TYPE OF ORGANIZATION general partnership | 1f. JURISDICTION OF ORGANIZATION CA | 1g. ORGANIZATIONAL ID#, if any ☑ NONE |
|---|---|---|---|---|

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names**

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any ☐ NONE |
|---|---|---|---|---|

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)**

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| California Attorney Lending II, Inc. | | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 6400 Main Street, Suite 120 | Williamsville | NY | 14221 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

All Debtor's present and future right, title and interest in and to any and all accounts, choses in action, causes of action, settlement proceeds, attorneys' liens, attorneys' fees, general intangibles, contract rights, deposit and other bank accounts and instruments, instruments, documents, chattel paper and obligations in any form in each case arising out of or related to the rendition of services by Debtor whether earned by performance or otherwise in connection with the following: (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; and (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation; all of Debtor's books related to the foregoing;

**5. ALT DESIGNATION:** ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

| ☐ 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]     [optional]  ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2 |
|---|---|

**8. OPTIONAL FILER REFERENCE DATA**
Girardi Keese

FILING OFFICE COPY

Page 2

## UCC FINANCING STATEMENT ADDENDUM

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| | 9a. ORGANIZATION'S NAME |
|---|---|
| | Girardi Keese |

| OR | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
|---|---|---|---|
| | | | |

**10. MISCELLANEOUS:**

DOCUMENT NUMBER: 29534010002
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

| | 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 11d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**12. ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)**

| | 12a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.**

**14. Description of real estate:**

**16. Additional collateral description:**

and all cash and non-cash proceeds of any of the foregoing, in whatever form, including without limitation all proceeds of proceeds, all insurance policies covering same and all interest or dividends thereon.

**15. Name and address of RECORD OWNER of above-described real estate (if Debtor does not have a record interest):**

**17. Check only if applicable and check only one box.**
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18. Check only if applicable and check only one box.**
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction - effective 30 years
☐ Filed in connection with a Public-Finance Transaction - effective 30 years

**FILING OFFICE COPY**

## UCC FINANCING STATEMENT AMENDMENT

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Timothy C. Cashmore
716-858-3883

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Damon Morey LLP
The Avant Building - Suite 1200
200 Delaware Avenue
Buffalo, NY 14202
USA

**DOCUMENT NUMBER:** 30040950002
**FILING NUMBER:** 11-72814762
**FILING DATE:** 08/18/2011 08:35
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**
**THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY**

| | |
|---|---|
| **1a. INITIAL FINANCING STATEMENT FILE #**<br>11-7275806299 | **1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination.

**3.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☐ **ASSIGNMENT (full or partial):** Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.  |  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  |  ☐ ADD name: Complete item 7a or 7b, and also item 7c

**6. CURRENT RECORD INFORMATION:**

| OR | **6a. ORGANIZATION'S NAME** | | | |
|---|---|---|---|---|
| | **6b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| OR | **7a. ORGANIZATION'S NAME** | | | |
|---|---|---|---|---|
| | **7b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |

| **7c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
|---|---|---|---|---|
| | | | | |

| **7d. SEE INSTRUCTIONS** | **ADD'L DEBTOR INFO** | **7e. TYPE OF ORGANIZATION** | **7f. JURISDICTION OF ORGANIZATION** | **7g. ORGANIZATIONAL ID#, if any** ☐ NONE |
|---|---|---|---|---|

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☑ restated collateral description, or describe collateral ☐ assigned.

All Debtor's present and future right, title and interest in and to any and all accounts, choses in action, causes of action, settlement proceeds, attorneys' liens, attorneys' fees, general intangibles, contract rights, deposit and other bank accounts and instruments, instruments, documents, chattel paper and obligations in any form in each case arising out of or related to the rendition of services by Debtor whether earned by performance or otherwise in connection with the following: (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation; and (iii) all matters with respect to which the

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☑ and enter name of DEBTOR authorizing this amendment.

| OR | **a. ORGANIZATION'S NAME**<br>Girardi Keese | | | |
|---|---|---|---|---|
| | **b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |

**10. OPTIONAL FILER REFERENCE DATA**
Girardi Keese

**FILING OFFICE COPY**

64

Page 2

## UCC FINANCING STATEMENT AMENDMENT ADDENDUM

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

| | |
|---|---|
| **11. INITIAL FINANCING STATEMENT FILE #** (same as item 1a on Amendment form) | |
| 11-7275806299 | |

**12. NAME OF PARTY AUTHORIZING THIS AMENDMENT**(same as item 9 on Amendment form)

| | 12a. ORGANIZATION'S NAME | | |
|---|---|---|---|
| | Girardi Keese | | |
| OR | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |

**DOCUMENT NUMBER:** 30040950002
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**
**THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY**

**13. Use this space for additional information**

Borrower is representing one or more individuals or estates against Southern California Regional Rail Authority d/b/a Metrolink, Connex Railroad, LLC and other defendants in the so-called "Chatsworth Metrolink Collision Cases" related to the Lead Case captioned and styled Magdaleno v. Southern California Regional Rail Authority dba Metrolink, Los Angeles County Superior Court, Case No. PC043703;

all of Debtor's books related to the foregoing; and all cash and non-cash proceeds of any of the foregoing, in whatever form, including without limitation all proceeds of proceeds, all insurance policies covering same and all interest or dividends thereon.

**FILING OFFICE COPY**

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
716-853-5100

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

CT LIEN SOLUTIONS    NMG
555 CAPITOL MALL
SUITE 1000
SACRAMENTO CA 95814
ACCT #10010537

**1373755925**

**08/28/2013 14:41**

FILED
CALIFORNIA
SECRETARY OF STATE
SOS

39205220005   UCC 3 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE #**
117275806299

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT (full or partial):** Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.
☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

**6. CURRENT RECORD INFORMATION:**

6a. ORGANIZATION'S NAME: **Girardi Keese**

| OR | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

**7. CHANGED (NEW) OR ADDED INFORMATION:**

7a. ORGANIZATION'S NAME

| OR | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any ☐ NONE |
|---|---|---|---|---|

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☑ restated collateral description, or describe collateral ☐ assigned.

**See Attached Schedule A**

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

9a. ORGANIZATION'S NAME: **California Attorney Lending II, Inc.**

| OR | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

10. OPTIONAL FILER REFERENCE DATA
CASOS #4384.78 Girardi Keese    39587536

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)    International Association of Commercial Administrators (IACA)

66

## SCHEDULE A

All of Debtor's right, title and interest in all Goods (including, Equipment, Fixtures and Inventory), Money, Instruments (including Promissory Notes), Accounts, Deposit Accounts, Chattel Paper, Investment Property, Letter-of-Credit Rights, Documents and General Intangibles (including payment intangibles), Commercial Tort Claims described in the Questionnaire, Insurance Proceeds and any other personal property (whether or not subject to the UCC), and all interest, dividends and other distributions thereon paid and payable in cash or in property; and all replacements and substitutions for, and all accessions and additions to, and all profits, offspring, Products and other Proceeds of, all of the foregoing. Debtor is prohibited from granting additional security interest in the Collateral or the Proceeds of the Collateral. (Notice to potential competing creditors under Official Note 5 of UCC Section 9-331).

The Collateral includes, without limitation, any right to payment of any Debtor for client representation or referral (whether such right to payment is on a contingent, hourly, fixed fee or other basis) and for Costs and Expenses (as defined in the Note), whether or not yet earned by performance, and the proceeds thereof, including Net Fees and Expenses (as defined in the Note) and Borrower's present and future right, title and interest in and to any and all legal fees and reimbursed expenses in connection with and/or derived from: (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation and (iii) all of Debtor's books related to the foregoing; and all cash and non-cash proceeds of any of the foregoing, in whatever form, including without limitation all proceeds of proceeds, all insurance policies covering same and all interest or dividends thereon.

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Jillian E. Deck, Esq.  716-853-5100

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)
CT Fulfillment
555 Capitol Ave. Suite 1000
Sacramento, CA 95814
54349303
Account 60574850

1675306737

06/10/2016 12:45

FILED
CALIFORNIA
SECRETARY OF STATE

SOS

55659130007    UCC 3 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a.** INITIAL FINANCING STATEMENT FILE NUMBER
11-7275806299

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 also indicate affected collateral in item 8

**4.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:    AND    Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record

☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME |
|---|
| Girardi Keese |

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME |
|---|
| |

| 7b. INDIVIDUAL'S SURNAME |
|---|
| |

| INDIVIDUAL'S FIRST PERSONAL NAME |
|---|
| |

| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|
| | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes:  ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME |
|---|
| California Attorney Lending II, Inc. |

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

**10. OPTIONAL FILER REFERENCE DATA:**
CASOS #4384.78                                           JK-54349303-1

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Jillian E. Deck, Esq.  716-853-5100

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

⌐CT Fulfillment
¡555 Capitol Mall, Suite 1000
Sacramento, CA 95814
      59857865-1
LAccount 60574850

1775969950
07/19/2017 14:47

FILED
CALIFORNIA
SECRETARY OF STATE
SOS

62796840002  UCC 3 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
11-7275806299

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☑ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                    AND    Check one of these three boxes to:

This Change affects ☑ Debtor or ☐ Secured Party of record

☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c

☑ ADD name: Complete item 7a or 7b, and item 7c

☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 7b. INDIVIDUAL'S SURNAME | | | |
|---|---|---|---|
| Girardi | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| Thomas | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| V. | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 100 Los Altos Drive | Pasadena | CA | 91105 | USA |

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| California Attorney Lending II, Inc. | | | |

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

**10. OPTIONAL FILER REFERENCE DATA:**
CASOS                    #4384.78                    JK-59857865-1

B0400-3667 06/10/2021 5:00 PM Received by California Secretary of State

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

**For Office Use Only**

**-FILED-**

File #: U210055268528

Date Filed: 6/10/2021

A. NAME & PHONE OF CONTACT AT FILER (optional)
Jillian E. Deck, Esq (716-853-5100)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

C T CORPORATION
555 CAPITOL MALL, SUITE 1150
SACRAMENTO, CA 95814
80915399 3
ACCOUNT 00051

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
**11-7275806299**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial):  Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☑ **CONTINUATION:**  Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:

This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:

☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b; and item 7c

☐ ADD name: Complete item 7a or 7b, and item 7c

☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:**  Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| Girardi | Thomas | V. | |

7. **CHANGED OR ADDED INFORMATION:**  Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

8. ☐ **COLLATERAL CHANGE:**  Also check one of these four boxes:  ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:**  Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| California Attorney Lending II, Inc. | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
CASOS #4384.78

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

# EXHIBIT C

**CLOSING CHECKLIST
CALIFORNIA ATTORNEY LENDING II, INC.
FIRST AMENDED AND RESTATED
$5,000,000 REVOLVING LOAN TO
GIRARDI KEESE, A GENERAL PARTNERSHIP
ORGANIZED UNDER CALIFORNIA LAW**

**Key:**

| | | |
|---|---|---|
| Lender | = | California Attorney Lending II, Inc., a New York corporation |
| Borrower | = | Girardi Keese, a general partnership organized under California law |
| Individual Guarantor | = | Thomas V. Girardi |

**LOAN DOCUMENTS**

1.  First Amended and Restated Revolving Promissory Note for maximum principal amount of $5,000,000, signed by Borrower.

2.  Guaranty of Individual Guarantor.

3.  First Amended and Restated Security Agreement signed by Borrower, as debtor
    Exhibit A - Questionnaire

4.  Girardi Keese Certificate, together with the following attachments:
    Schedule I – Certificate of Partnership
    Schedule II – Partnership Agreement
    Schedule III – Resolutions

**SUPPLEMENTAL DOCUMENTS**

1.  Key Loan Term Summary with Lender Forms.

1

Initials

## FIRST AMENDED AND RESTATED
## REVOLVING PROMISSORY NOTE
### California Attorney Lending II, Inc.

Delivered in Buffalo, New York

$5,000,000
August __, 2011

1.    **DEFINITIONS.** For purposes of this Note:

a.    **Borrower.** The "Borrower" means Girardi Keese, a general partnership organized under California law, having its principal office located at 1126 Wilshire Blvd, Los Angeles, CA 90017.

b.    **Collateral.** "Collateral" means all of Borrower's present and future right, title and interest in and to any and all accounts, choses in action, causes of action, settlement proceeds, attorneys' liens, attorneys' fees, general intangibles, contract rights, deposit and other bank accounts and instruments, instruments, documents, chattel paper and obligations in any form in each case arising out of or related to the rendition of services by Debtor whether earned by performance or otherwise in connection with the following: (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation; and (iii) all matters with respect to which the Borrower is representing one or more individuals or estates against Southern California Regional Rail Authority d/b/a Metrolink, Connex Railroad, LLC and other defendants in the so-called "Chatsworth Metrolink Collision Cases" related to the Lead Case captioned and styled *Magdaleno v. Southern California Regional Rail Authority dba Metrolink*, Los Angeles County Superior Court, Case No. PC043703; all of Debtor's books related to the foregoing; and all cash and non-cash proceeds of any of the foregoing, in whatever form, including without limitation all proceeds of proceeds, all insurance policies covering same and all interest or dividends thereon.

c.    **Credit.** The "Credit" means a revolving credit facility made available by the Lender to the Borrower in the maximum principal amount equal to the Limiting Principal Amount.

d.    **Event of Default.** An "Event of Default" occurs or exists if:

(i)    the Borrower defaults in the payment when due, whether by acceleration or otherwise, of any of the Outstanding Principal Amount or any interest or other amount payable pursuant to this Note; or

(ii)   the Borrower or any Guarantor defaults in the observance or performance when due, whether by acceleration or otherwise, of any obligation (including, but not limited to, any obligation to pay any money except as described in clause (i) of this Section 1(d), whether for any principal, interest, fee, tax, charge, cost or expense or otherwise), whether now existing or hereafter arising or accruing, (a) under this Note or any agreement or arrangement now or hereafter entered into between the Borrower or any Guarantor and the Holder, (b) owed by Borrower to any third party, where the maturity of any such obligation is accelerated or there occurs or exists any event or condition that, whether immediately or after notice, lapse of time or both notice and lapse of time and whether or not waived, would constitute a default with respect to or permit the

2

Initials

acceleration of the maturity of any such obligation, or (c) owed by Borrower to any governmental entity; or

(iii)    the Borrower or any Guarantor fails to provide the Holder with (A) copies of the Borrower's and Guarantor's annual federal tax returns to be delivered on the sooner of (i) three days after filing or (ii) the 15th day of the tenth month of each fiscal year for the immediately preceding fiscal year; (B) an updated case and status list with respect to the clients and cases of the Borrower at least once each calendar quarter, (C) copies of monthly bank statements of the Borrower from each of its bank accounts (trust and operating accounts) at least once each calendar quarter, (D) current updated financial statements of Borrower not later than the 15th day of each calendar quarter in the form completed by Borrower and delivered to Holder on or before execution of this Note, (E) a current updated personal financial statement for each Guarantor to be delivered on or before April 15th of each year in the form completed by the Guarantor and delivered to Holder on or before execution of this Note, (F) evidence of current malpractice insurance for the Borrower and life insurance coverage of Guarantor on the anniversary date of coverage; (G) notice of any material change in the business, clients or prospects of the Borrower, (H) copies of any notice of cancellation, revocation or non-renewal of any malpractice insurance or any life insurance policy assigned to Holder as part of the Collateral within five (5) business days after receipt thereof by the Borrower or the Guarantor, (I) copies of any default notice or notice of the existence of facts or circumstances that with the passage of time will constitute a default under any obligation of Borrower that are received by Borrower, or (J) any documentation or information reasonably requested by the Holder that relates to the business or assets of the Borrower or any Guarantor; or

(iv)    the Borrower or any Guarantor is dissolved, ceases to exist, participates or agrees to participate in any merger, consolidation or other absorption (unless the Borrower or such Guarantor is the surviving entity with respect thereto), assigns or otherwise transfers or disposes of a majority of his, her or its assets, makes or permits what might be a fraudulent transfer or fraudulent conveyance of any of his, her or its assets, becomes insolvent (however such insolvency is evidenced), generally fails to pay his, her or its debts as they become due, fails to pay, withhold or collect any tax as required by applicable law, suspends or ceases its business or has served, filed or recorded against him, her or it or any of his, her or its assets any judgment, order or award of any court, other governmental authority or arbitrator or any lien; or

(v)    any Guarantor dies, becomes incompetent or purports to terminate his, her or its obligations pursuant to any guaranty or other agreement evidencing obligations of such Guarantor to the Holder; or if this Note remains outstanding on August 1, 2012, Thomas V. Girardi fails to maintain in effect life insurance on his life in a minimum amount equal to $5,000,000 that is subject to an effective collateral assignment to the Holder of this Note at all times on and after August 1, 2012 while this Note is outstanding; or

(vi)    the Borrower or any Guarantor has any receiver, trustee, custodian or similar Person for him, her or it or any of his, her or its assets appointed (whether with or without his, her or its consent), makes any assignment for the benefit of creditors, admits in writing his, her or its inability to pay debts generally as they become due, or commences or has commenced against him, her or it any bankruptcy or insolvency proceeding or any formal or informal proceeding for the dissolution, liquidation or winding up of the affairs of or the settlement of claims against him, her or it; or

(vii)    any representation or warranty heretofore made to the Lender or hereafter made to the Holder, or any financial statement heretofore provided to the Lender or hereafter provided to the Holder, by or on behalf of the Borrower or any Guarantor, proves, as of the date thereof, to have been incorrect or misleading in any material respect, or before the execution and delivery to the Lender by the Borrower of this Note there occurred and was not disclosed to the Lender any material adverse change in any information disclosed in any such representation or warranty heretofore so made or in any such financial statement heretofore so provided;

3

Initials

or

(viii)    there occurs any change in the management of, or the beneficial ownership of any stock of or other ownership interest in, the Borrower that is, in the opinion of the Holder, adverse to its interest and is not corrected to its full satisfaction within 30 days after it gives to the Borrower a notice that it considers such change adverse to its interest; or

(ix)    there occurs any change in the value of the Collateral or Borrower's or any Guarantor's ownership interest in the Collateral, that is, in the opinion of the Holder, adverse to its interest and is not corrected to its full satisfaction within 10 days after it gives to the Borrower a notice that it considers such change adverse to its interest; or

(x)    except for Permitted Indebtedness, Borrower or any Guarantor incurs after the date of this Note or repays after the date of this Note any indebtedness or liability, including any indebtedness or liability to any member or shareholder of the Borrower or any Guarantor or any affiliate of any Guarantor (for clarity, any future indebtedness of Borrower or any Guarantor not included in Permitted Indebtedness requires the prior written consent of Holder which consent may require that the proceeds of such financing be used to repay this Note in whole or in part); or

(xi)    there occurs or exists any event or condition of default, without the prior written consent of the Holder, with respect to any (A) indebtedness or liability of Borrower or any Guarantor or (B) security agreement or other writing evidencing or relating to any Collateral; or

(xii)    Borrower or any Guarantor creates, assumes or suffers to exist any mortgage, security interest, judgment or lien (including tax liens) on any of its assets now or hereafter acquired other than liens relating to Permitted Indebtedness, purchase money liens relating to the acquisition of fixed assets, or consumer debt; or

(xiii)    any Guarantor owns or hereafter acquires, without prior written consent of the Holder, an ownership interest, either direct or indirect, in any entity engaged in the practice of law other than Borrower; or

(xiv)    any license to practice law held by Borrower or any Guarantor is suspended or revoked.

e.    **Guarantor.** "Guarantor" means, other than the Borrower, any Person (i) who or that is now or hereafter liable, whether directly or indirectly or absolutely or contingently, for the payment of any of the Outstanding Principal Amount or any interest or other amount payable pursuant to this Note or (ii) any asset of whom or which now or hereafter directly or indirectly secures the payment of any of the Outstanding Principal Amount or any such interest or other amount.

f.    **Holder.** The "Holder" means the Lender or any transferee of this Note.

g.    **Lender.** The "Lender" means California Attorney Lending II, Inc., a New York corporation having its chief executive office at 6400 Main Street, Suite 120, Williamsville, NY 14221, its successors and assigns.

h.    **Limiting Principal Amount.** "Limiting Principal Amount" means $5,000,000, US currency.

i.    **Loan.** "Loan" means any loan by the Holder pursuant to the Credit.

j.    **Loan Request.** "Loan Request" means any oral (including, but not limited to, telephonic), written or other (including, but not limited to, facsimile or email) request for a Loan.

4

Initials

k.       **Maturity Date.** The "Maturity Date" has the meaning set forth in Section 4 of this Note.

l.       **Outstanding Principal Amount.** The "Outstanding Principal Amount" means the outstanding principal amount of this Note from time to time.

m.       **Permitted Indebtedness.** "Permitted Indebtedness" means indebtedness of a Person (A) to the Lender; (B) constituting unsecured normal trade debt incurred upon customary terms in the ordinary course of such Person's business; (C) arising from the endorsement in the ordinary course of such Person's business of any check or other negotiable instrument for deposit or collection; or (D) secured by a Permitted Lien as defined in the Security Agreement.

n.       **Person.** "Person" means (i) any individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated association, (ii) any court or other governmental authority or (iii) any other entity, body, organization or group.

o.       **Security Agreement.** "Security Agreement" means the First Amended and Restated Security Agreement described in Section 18 of this Note.

p.       **Specified Matters.** "Specified Matters" means collectively the following: (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation; and (iii) all matters with respect to which the Borrower is representing one or more individuals or estates against Southern California Regional Rail Authority d/b/a Metrolink, Connex Railroad, LLC and other defendants in the so-called "Chatsworth Metrolink Collision Cases" related to the Lead Case captioned and styled *Magdaleno v. Southern California Regional Rail Authority dba Metrolink,* Los Angeles County Superior Court, Case No. PC043703.

q.       **Uniform Commercial Code.** "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York.

2.       **PROMISE TO PAY.** For value received, the Borrower promises to pay to the order of the Holder in lawful money of the United States and immediately available funds at any of the offices of the Holder:

a.       The Outstanding Principal Amount and interest as described in Section 3 of this Note by paying the amounts described in Section 4 of this Note;

b.       On demand by the Holder, each cost and expense (including, but not limited to, the reasonable fees and disbursements of counsel, whether retained for advice, litigation or any other purpose) incurred by the Holder in endeavoring to (i) collect any of the Outstanding Principal Amount or any interest or other amount payable pursuant to this Note, (ii) preserve or exercise any right or remedy of the Holder pursuant to this Note or (iii) preserve or exercise any right or remedy of the Holder relating to any Collateral including the payment of unpaid insurance premiums, taxes, assessments or other obligations or incurrence of legal fees or court costs.

3.       **INTEREST.** The Borrower shall pay interest, calculated on the basis of a 360 day year for the actual

5

Initials

number of days of each (365 or 366, as applicable), on the Outstanding Principal Amount from and including the date of this Note to but not including the date the Outstanding Principal Amount is paid in full. The rate per year shall be **Eighteen Percent (18%)**. Interest at such rate, and not any rate set by statute, shall be computed in any entry of judgment pertaining to this Note, and further, shall be paid subsequent to the entry of such judgment, and until actual satisfaction of said judgment. The judgment shall include both the action and the obligation itself. In such event, the Interest rate shall continue up through and including all foreclosure proceedings and proceedings for payment of monies, including but not limited to surplus money proceedings and shall be computed in the entry of any judgment, and further, subsequent to the entry of any judgment, and until actual satisfaction of this Note and said judgment.

Notwithstanding the foregoing, (A) in no event shall such interest be payable at a rate in excess of the maximum rate permitted by applicable law and (B) solely to the extent necessary to result in such interest not being payable at a rate in excess of such maximum rate, any amount that would be treated as part of such interest under a final judicial interpretation of applicable law shall be deemed to have been a mistake and automatically canceled, and, if received by the Holder, shall be refunded to the Borrower or applied to the Outstanding Principal Amount, as determined by the Holder, it being the intention of the Lender and the Borrower that such interest not be payable at a rate in excess of such maximum rate.

4.     **PAYMENTS.** In addition to the Mandatory Prepayment provisions of Section 9 of this Note, the Borrower shall (a) pay the Outstanding Principal Amount in twenty-four (24) equal installment payments commencing on August 1, 2013 and continuing monthly thereafter with the final payment due and payable on July 1, 2015 (the "Maturity Date") and (b) pay monthly interest as described in Section 3 of this Note that has accrued on the Outstanding Principal Amount through the last day of any calendar month, beginning with the calendar month containing the date of this Note, all such payments of principal or interest by the 10th day of the succeeding calendar month.

In addition, the Borrower shall at all times prior to the Maturity Date (a) maintain an interest reserve (the "Reserve") with the Holder equal to 30 days' interest based on the Outstanding Principal Amount on the later of the date of the most recent Loan under this Note or the last day of the most recently ended calendar month during the term of this Note and (b) maintain an authorization for electronic funds tranfer by the Holder at a bank and account designated by Borrower and reasonably acceptable to the Holder for payments under this Note. The Holder may, but shall not be obligated to, deduct from the proceeds of any Loan an amount sufficient to fund the Reserve, may commingle the Reserve with its other funds, shall have no obligation to pay any interest on the Reserve and shall be entitled to set off against the Reserve, or authorize an electronic funds transfer for, any amount that is not paid to the Holder when due under this Note.

5.     **LOAN REQUESTS.**

(a) At any time prior to August 1, 2013, the Borrower may make a Loan Request, which Request shall be irrevocable, that specifies (i) the amount requested as the principal amount of the Loan, (ii) the law firm purposes for the Loan, and (iii) the business day of the Holder on which such Loan is requested to be made. All Loan Requests shall be for the sole purpose of funding the operating expenses of Borrower or interest payments under this Note. No Loan Requests may be made to fund the activities or operations of any Guarantor or any third party entity. Notwithstanding the foregoing, no Loan shall be made with respect to any principal amount prepaid under Section 9 of this Note until at least one (1) business day after the date of such prepayment. **Notwithstanding anything contained in this Note to the contrary, commencing August 1, 2013, Borrower shall not be permitted to make any further Loan Requests under this Note.**

(b) Notwithstanding anything contained in this Note to the contrary, the decision whether to honor such

6

Initials

Loan Request and make such Loan shall be in the sole discretion of the Holder. The Holder may treat as made by the Borrower and rely upon, and the Borrower shall be bound by, any Loan Request that the Holder in good faith believes to be valid and to have been made in the name or on behalf of the Borrower by any officer, manager, member, partner or other individual authorized to act on behalf of the Borrower, and the Holder shall not incur any liability to the Borrower or any other Person as a direct or indirect result of honoring such Loan Request and making such Loan.

**6.      LIMITATION ON OUTSTANDING PRINCIPAL AMOUNT.** The Borrower shall not at any time permit, and the Holder shall not at any time be obligated to permit, the Outstanding Principal Amount to exceed the Limiting Principal Amount.

**7.      SCHEDULE OF ADVANCES OR LOAN ACCOUNT.** There shall be payable as principal pursuant to this Note only so much of the Limiting Principal Amount as shall have been advanced by the Holder as a Loan or Loans and is outstanding. The Holder shall set forth on a schedule or loan account (including, but not limited to, any schedule or loan account maintained in computerized records) annotations evidencing (a) the date and principal amount of each Loan, (b) the date and amount of each payment applied to the Outstanding Principal Amount and (c) the Outstanding Principal Amount after each Loan and each such payment. Each such annotation shall, in the absence of manifest error, be conclusive and binding upon the Borrower. No failure by the Holder to make and no error by the Holder in making any annotation on such schedule or loan account shall affect the Borrower's obligation to repay the principal amount of each Loan, the Borrower's obligation to pay interest on the outstanding principal amount of each Loan or any other obligation of the Borrower to the Holder pursuant to this Note or otherwise.

**8.      OPTIONAL PREPAYMENT.** The Borrower shall have the option of prepaying, without penalty or premium, the Outstanding Principal Amount to the Holder in full or part at any time and from time to time provided, that (a) the Outstanding Principal Amount must exceed $50,000 at all times during the first one hundred twenty (120) days after the date of this Note, and (b) upon prepaying the Outstanding Principal Amount in full, the Borrower shall pay to the Holder all interest and other amounts payable to this Note and remaining unpaid. With respect to prepayments made on or after August 1, 2013, any partial prepayment shall not result in a reduction in the term of this Note, and the Holder will recalculate the monthly principal amortization for the remaining term of the Note as of the first day of the month immediately following the date of prepayment.

**9.      MANDATORY PREPAYMENT.** In addition to payments set forth above, Borrower shall be required to pay the Holder an amount equal to 100% of all Net Fees (as hereinafter defined) received by Borrower in connection with the Specified Matters, commencing on the date hereof and continuing until the Outstanding Principal Amount and interest thereon has been paid in full (collectively, the "Mandatory Prepayments"). All Mandatory Prepayments must be paid to Holder within three (3) business days after receipt thereof by Borrower and shall be applied first to the payment of any outstanding interest, then fees, and the balance to repay the Outstanding Principal Amount. When all Net Fees in connection with the Specified Matters have been paid as provided in this paragraph, Holder will reevaluate the availability of the Credit hereunder and may demand payment of any Outstanding Principal Balance and accrued interest and fees.

        For purposes of this section, **"Net Fees"** means all legal fees and reimbursed expenses resulting from any client representation or referral (whether contingent, hourly, fixed fee or other) after payment of all amounts owing to third party lawyers (other than employees or partners of Borrower) for assistance or referral with respect to such client representation. Until payment is remitted to Holder, any such funds payable to the Borrower and related to the Specified Matters shall be held in Borrower's trust account for the benefit of the Holder. Borrower shall continue to escrow any and all such funds received until payment of the mandatory amount is transmitted to Lender. Funds in Borrower's trust account in which the Holder has an interest shall not be paid to anyone except Holder. With respect to prepayments made on or after August 1, 2013, any partial prepayment shall not result in a reduction in the term of this Note, and Holder will recalculate the monthly principal amortization for the remaining term of the Note as of the first day of the month immediately following the date of prepayment.

7

Initials

10.    **PURPOSE OF LOANS.** The Borrower shall not obtain or use the proceeds of any Loan for any purpose other than for law firm purposes, that is for working capital of the Borrower including payments to any Guarantor but only as elsewhere permitted under this Note. The Borrower acknowledges, warrants and represents to, and agrees with, the Lender that no Loan proceeds shall be used by the Borrower for other than a business or commercial purpose of the Borrower.

11.    **AMOUNTS IMMEDIATELY DUE.** Upon or at any time or from time to time after the occurrence or existence of any Event of Default other than, with respect to the Borrower, an Event of Default described in clause (vi) of the definition of Event of Default set forth in Section 1(d) of this Note, the Outstanding Principal Amount and all interest and other amounts payable pursuant to this Note and remaining unpaid shall, at the sole option of the Holder and without any notice, demand, presentment or protest of any kind (each of which is knowingly, voluntarily, intentionally and irrevocably waived by the Borrower), become immediately due. Upon the occurrence or existence of, with respect to the Borrower, any Event of Default described in such clause (vi), the Outstanding Principal Amount and all such interest and other amounts shall, without any notice, demand, presentment or protest of any kind (each of which is knowingly, voluntarily, intentionally and irrevocably waived by the Borrower), automatically become immediately due.

12.    **BOOKS AND RECORDS.** The Borrower shall maintain accurate books and records regarding its financial condition, including, but not limited to, aged listings of accounts payable and accounts receivable, all expenses and disbursements, business operations, and the status and condition of the Collateral. Holder shall have the right at any time upon reasonable notice to inspect and audit such books, records, and accounts, and to make copies thereof.

13.    **CHANGES AND WAIVERS.** No course of conduct pursued, accepted or acquiesced in, and no oral, written or other agreement or representation made, by or on behalf of the Holder in the future will change this Note or waive any right or remedy of the Holder under or arising as a result of this Note. Any change in this Note or waiver of any right or remedy of the Holder under or arising as a result of this Note must be made in a writing signed by or on behalf of the Holder.

14.    **GOVERNING LAW.** This Note shall be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York, other than the conflict of law provisions of such State, and, to the extent applicable, the federal law of the United States, without regard to the law of any other jurisdiction.

15.    **CONSENT TO JURISDICTION. AS PART OF THE CONSIDERATION FOR NEW VALUE RECEIVED AND REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF BORROWER OR HOLDER, BORROWER HEREBY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN BORROWER AND HOLDER PERTAINING TO THIS NOTE OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS NOTE SHALL BE BROUGHT ONLY IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN THE COUNTY OF ERIE WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF ANY LEGAL ACTION; PROVIDED, HOWEVER, HOLDER MAY AT ITS OPTION, COMMENCE ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION TO OBTAIN EQUITABLE RELIEF OR TO ENFORCE ANY JUDGMENT OR ORDER OBTAINED BY HOLDER AGAINST BORROWER, TO ENFORCE ANY OTHER RIGHT OR REMEDY UNDER THIS NOTE, OR TO OBTAIN ANY OTHER RELIEF DEEMED APPROPRIATE BY HOLDER. BORROWER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, AND BORROWER HEREBY WAIVES ANY OBJECTION WHICH**

8

_____
Initials

BORROWER MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH NEW YORK COURT. BORROWER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS CONSENT TO JURISDICTION PROVISION WITH ITS LEGAL COUNSEL, AND HAS MADE THIS WAIVER KNOWINGLY AND VOLUNTARILY.

16.      WAIVER OF TRIAL BY JURY. THE BORROWER KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT THE BORROWER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO (a) THE CREDIT, ANY LOAN OR COLLATERAL, THIS NOTE OR ANY OTHER WRITING HERETOFORE OR HEREAFTER EXECUTED IN CONNECTION WITH THE CREDIT OR ANY LOAN OR COLLATERAL, (b) ANY TRANSACTION ARISING OUT OF OR OTHERWISE RELATING TO THE CREDIT, ANY LOAN OR COLLATERAL, THIS NOTE OR ANY SUCH OTHER WRITING OR (c) ANY NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT OF THE CREDIT, ANY LOAN OR COLLATERAL, THIS NOTE OR ANY SUCH OTHER WRITING.

17.      SERVICE OF PROCESS. PROCESS ON BORROWER IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS NOTE WILL BE DEEMED TO HAVE BEEN GIVEN WHEN GIVEN IN ANY ONE OF THE FOLLOWING WAYS: (I) PERSONALLY DELIVERED, (II) TWO BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, POSTAGE PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (III) 4 BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO THE BORROWER AT THE ADDRESS SET FORTH IN SECTION 1(a). Such service shall be deemed in every respect effective service of process upon Borrower and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon the Borrower. Nothing in this Section shall affect the Holder's right to serve process in any other manner permitted by law. Borrower may add additional addresses or change its address for purposes of service of process by giving 10 days' prior written notice of such change to the Holder in accordance with the notice provisions of the Security Agreement.

18.      SECURITY AGREEMENT.   This Note is secured by the terms of a First Amended and Restated Security Agreement given by Borrower to Lender simultaneously herewith.

19.      RENEWAL NOTE. This Note evidences but does not extinguish or satisfy, and is not a novation of, a preexisting indebtedness evidenced by that certain Revolving Promissory Note executed by Borrower to Lender in the maximum principal amount of $3,500,000 dated July 5, 2011 ("Prior Note"). The Borrower hereby acknowledges that the outstanding principal balance under the Prior Note immediately prior to the funding of this Note was $3,397,589.73.

Dated: August 17, 2011

Girardi Keese

By: _____
Thomas V. Girardi, Partner

9

Initials

### ACKNOWLEDGMENT FOR NOTE

STATE OF CALIFORNIA

: SS.

COUNTY OF Los Angeles

On the 12th day of August in the year 2011 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity as Partner of Girardi Keese, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

SHIRLEEN H. FUJIMOTO
COMMISSION # 1933069
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires May 15, 2015

_____
Notary Public

### ALLONGE TO FIRST AMENDED AND RESTATED REVOLVING PROMISSORY NOTE, DATED AUGUST __, 2011, ISSUED BY GIRARDI KEESE TO CALIFORNIA ATTORNEY LENDING II, INC.

NOTICE: THIS NOTE IS SUBJECT TO A SECURITY INTEREST GRANTED BY CALIFORNIA ATTORNEY LENDING II, INC. TO BANK OF AMERICA PURSUANT TO A COLLATERAL AGREEMENT DATED MARCH 31, 2010, BETWEEN SUCH PARTIES, AS SUCH COLLATERAL AGREEMENT MAY BE AMENDED, SUPPLEMENTED, REPLACED, RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME

10

_____
Initials

## GUARANTY OF PAYMENT AND PERFORMANCE

**THIS GUARANTY** (the "Guaranty") from **THOMAS V. GIRARDI**, individually, with a principal address at 100 Los Altos Drive, Pasadena, CA 91105 (the "Guarantor") to **CALIFORNIA ATTORNEY LENDING II, INC.**, a New York corporation with a place of business at 6400 Main Street, Suite 120, Williamsville, NY 14221 (the "Lender").

### WITNESSETH:

**WHEREAS**, Girardi Keese ("Borrower") is, on the date hereof, executing and delivering to Lender that certain First Amended and Restated Revolving Promissory Note in the principal amount of $5,000,000 as the same may be amended from time to time ("Note") pursuant to which Lender is extending certain credit facilities (the "Credit Facilities") to Borrower; and

**WHEREAS**, the Lender is unwilling to extend the Credit Facilities to the Borrower unless it receives this Guaranty; and

**WHEREAS**, the Guarantor is willing to execute and deliver this Guaranty to Lender in order to induce the Lender to extend the Credit Facilities and the Guarantor has approved the form and substance of each and all of the documents relating to the Credit Facilities including the First Amended and Restated Revolving Promissory Note, First Amended and Restated Security Agreement, certifications, letters and other documentation (the "Loan Documents").

**NOW, THEREFORE**, in order to induce the Lender to extend the Credit Facilities to the Borrower and in consideration of the premises and of other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Guarantor intends to guarantee absolutely and unconditionally (and jointly and severally if there is more than one Guarantor) to the Lender, the punctual payment of collectively (i) the outstanding principal amount of the Note at any time and all interest and other amounts now or in the future payable under the Note and (ii) all other obligations of the Borrower to the Lender for the payment of money, however evidenced, regardless of the purpose for which incurred and whether for the payment of any principal, interest, fee or expense or otherwise, existing now or coming into existence in the future or absolute or contingent (the "Obligations") and such further payment and performance as may be set forth in Article 2 hereof.

### ARTICLE 1
### REPRESENTATIONS AND WARRANTIES OF THE GUARANTOR

The Guarantor hereby represents and warrants to Lender (if the Guarantors are more than one party, said representations and warranties are made only with respect to the particular party) that:

**Section 1.1**   **Capacity of the Guarantor**. The Guarantor:

(A)      has the capacity to enter into this Guaranty; and

(B)      has his principal residence address or its office address at the address set forth in the first paragraph of this Guaranty.

**Section 1.2**   **No Violation of Restrictions**. Neither the execution and delivery of this Guaranty, the

11

Initials

consummation of the transactions contemplated hereby nor the fulfillment of or compliance with the provisions of this Guaranty will conflict with or result in a breach of any of the terms, covenants, conditions or provisions of any agreement, judgment or order to which the Guarantor is a party or by which the Guarantor is bound, or will constitute a default under any of the foregoing, or result in the creation or imposition of any lien of any nature whatsoever.

**Section 1.3    Compliance with Law.** The Guarantor is not in violation of any law, ordinance, governmental rule, regulation, order or judgment to which the Guarantor may be subject which is likely to materially affect the financial condition of the Guarantor.

**Section 1.4    Financial Statements and Other Information.** The financial statements and any other information submitted by the Guarantor to Lender fairly represent the financial condition as of the date of each statement and there has been no material adverse change in the financial condition of the Guarantor since the date of the respective statements submitted to Lender.

**Section 1.5    Solvency of Guarantor and Borrower.** The Guarantor's assets exceed his liabilities and the Guarantor has made an appropriate financial investigation of the Borrower and has determined that the Borrower is solvent at the time of execution of this Guaranty.

### ARTICLE 2
### COVENANTS AND AGREEMENTS

**Section 2.1    Guaranty of Payment.** The Guarantor irrevocably, absolutely and unconditionally (and jointly and severally if there is more than one Guarantor) guarantees to the Lender:

(A)    The punctual payment of the Obligations.

(B)    The full and prompt performance of any and all obligations of the Borrower to Lender under the Loan Documents.

**Section 2.2    Obligations Unconditional.** This Guaranty shall remain in full force and effect until the Obligations and all sums due under the Loan Documents are paid in full, irrespective of any interruptions in the business relationships of the Borrower and the Guarantor with the Lender. The Guarantor's obligation hereunder shall not be affected, modified or impaired by any state of facts or the happening from time to time of any event, including, without limitation, any of the following, whether or not with notice to or the consent of the Guarantor:

(A)    The invalidity, irregularity, illegality or unenforceability of, or any defect in, any Loan Document or any collateral security for the Credit Facilities (including the "Collateral" as defined in the Security Agreement of even date herewith given by the Borrower and the Guarantor to the Lender).

(B)    Any present or future law or order of any government (de jure or de facto) or of any agency thereof purporting to reduce the Obligations or amend or otherwise affect any Loan Document or any other obligation of the Borrower or any other obligor or any other terms of payment.

(C)    The waiver, compromise, settlement, release or termination of any or all of the obligations, covenants or agreements of the Borrower under any Loan Document or of the Guarantor under any Loan Document, or of any other guarantor of the Credit Facilities or any part thereof, or of any other party who has given collateral as security for the payment of the Credit Facilities or any part thereof.

(D)    The failure to give notice to the Guarantor of the occurrence of an event of default under any Loan

12

Initials

Document.

(E)    The loss, release, sale, exchange, surrender or other change in any Collateral.

(F)    The extension of the time for payment of any principal of or interest on the Obligations or of the time for performance of any other obligations, covenants or agreements under or arising out of any Loan Document or the extension or the renewal of any thereof.

(G)    The modification or amendment (whether material or otherwise) of any obligation, covenant or agreement set forth in any Loan Document.

(H)    The performance of, or the omission to perform, any of the actions referred to in any Loan Document.

(I)    Any failure, omission or delay on the part of the Lender to enforce, assert or exercise any right, power or remedy conferred on the Lender in any Loan Document.

(J)    The voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets, marshaling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition with creditors or readjustment of, or other similar proceedings affecting, the Guarantor or the Borrower or any of their assets, or any allegation or contest of the validity of any Loan Document.

(K)    The default or failure of the Guarantor to fully perform any obligations set forth in this Guaranty.

(L)    Any event or action that would, in the absence of this paragraph, result in the release or discharge of the Guarantor from the performance or observance of any obligation, covenant or agreement contained in this Guaranty (other than payment in full of the Obligations or a written release provided by Lender to the Guarantor).

(M)    Any other circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or a guarantor.

**Section 2.3    Waivers by Guarantor.**

(A) Guarantor waives any and all rights that are or may become available to Guarantor by statute or otherwise to require Lender to (a) proceed against Borrower; (b) proceed against or exhaust any security held from Borrower; or (c) pursue any other remedy in Lender's power whatsoever. Lender may, at its election, exercise any right or remedy it may have against Guarantor or any security now or hereafter held by or for the benefit of Lender including, without limitation, the right to foreclose upon any such security by judicial or nonjudicial sale, without affecting or impairing in any way the liability of Guarantor hereunder except to the extent the Obligations may thereby be paid and performed, even though any rights which Guarantor may have or otherwise might obtain by subrogation against others might be diminished or destroyed. Guarantor acknowledges that any such exercise of a right or remedy with respect to any collateral security for the Obligations may result in a loss, in part or whole, of Lender's right to collect from Borrower any deficiency that may remain after any such exercise of such a right or remedy and that, where such a loss occurs, Guarantor will also suffer a loss of any rights and remedies, arising in law or equity, which Guarantor may have to collect any amount from Borrower; and Guarantor agrees to remain bound notwithstanding any such loss. Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for the Obligations, has destroyed Guarantor's rights of subrogation and reimbursement against Borrower by the operation of law or otherwise. Only the net proceeds from any such foreclosure, after deduction of all costs and expenses authorized to be deducted pursuant to the documents under which such security is held or by law,

13

Initials

shall be applied against the Obligations. Lender may at its discretion purchase all or any part of such security so sold or offered for sale for its own account and may apply against the amount bid therefor all or any part of the Obligations for which such security is held; and in such case, only that portion of the Obligations so applied, after deduction of all costs and expenses authorized to be deducted pursuant to the documents under which such security is held or law, shall be applied against the Obligations. Guarantor waives any defense arising out of the absence, impairment or loss of any right to reimbursement or subrogation or other right or remedy of Guarantor against Borrower or any such security, whether resulting from the election by Lender to exercise any right or remedy it may have against Debtor, any defect in, failure of, or loss or absence of priority with respect to Lender's interest in such security, or otherwise. In the event that any foreclosure sale is deemed to be not commercially reasonable, Guarantor waives any right that he, she or it may have to have any portion of the Obligations discharged except to the extent of the amount actually bid and received by Lender at any such sale. Lender shall not be required to institute or prosecute proceedings to recover any deficiency as a condition of payment or performance hereunder or enforcement hereof.

(B) **Waiver of Notices and Demands.** Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of default, and notices of acceptance of this Guaranty and of the existence, creation or incurring of new or additional Obligations. At the option of Lender, Guarantor may be joined in any action or proceeding commenced by Lender against Borrower in connection with or based upon the Obligations or any security therefor and recovery may be had against Guarantor in such action or proceeding, without any requirement that Lender first assert, prosecute or exhaust any remedy or claim against Borrower. Without limiting the foregoing, Guarantor acknowledges that repeated and successive demands may be made and payments or performance made hereunder in response to such demands as and when, from time to time, Borrower may default in payments or performance of the Obligations or other obligations under the Loan Documents. Notwithstanding any such performance hereunder, this Guaranty shall remain in full force and effect and shall apply to any and all subsequent defaults by Borrower in payment or performance of the Obligations or other obligations under the Loan Documents.

(C) **Waiver of Defenses.** Guarantor waives any defense arising by reason of any disability or defense of Borrower or by reason of the cessation from any cause whatsoever of the liability of Borrower. Guarantor waives any setoff, defense or counterclaim which Borrower or Guarantor may have or claim to have against Lender.

(D) **Real and Personal Property Waivers.** Guarantor waives all rights and defenses that Guarantor may have because Borrower's debt is secured by real property. This means, among other things: (i) that Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower; and (ii) if Lender forecloses on any real property collateral pledged by Borrower: (A) the amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from the Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property.

(E) **No Waiver; Remedies.** In addition to, and not in limitation of the waivers, no failure on the party of Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right thereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

(F) **Guarantor's Understanding With Respect To Waivers.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences, and that under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any of such waivers is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to

14

Initials

the extent permitted by law.

**Section 2.4**     <u>**Nature of Guaranty**</u>. This Guaranty is a guaranty of payment and not of collection and the Guarantor hereby waives the right to require that any action be brought first against the Borrower or any other guarantor, or to require any security, or to require that resort be made to any security or to any balance of any deposit account or credit on the books of the Lender in favor of the Borrower or of the Guarantor.

**Section 2.5**     <u>**Continuation of Guaranty**</u>. The Guarantor further agrees that the obligations hereunder shall continue to be effective or reinstated, as the case may be, if at any time payment of all or any part thereof of the Credit Facilities is rescinded or must otherwise be restored by the Lender upon the bankruptcy or reorganization of the Borrower, the Guarantor or otherwise.

**Section 2.6**     <u>**Subordination of Debt**</u>. The Guarantor hereby subordinates any and all indebtedness of the Borrower now or hereafter owed to the Guarantor to all indebtedness of the Borrower to Lender and agree with Lender that, from and after the date whereon Lender notifies Guarantor that an event of default under one or more of the Loan Documents has occurred and is continuing, Guarantor shall not demand or accept any payment from the Borrower of any such indebtedness, shall not claim any offset or other reduction of Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any interest in any of the security described in and encumbered by the Loan Documents; provided, however, that, if Lender so requests, such indebtedness shall be collected, enforced and received by Guarantor as trustee for Lender and paid over to Lender on account of the indebtedness of such Borrower to Lender, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty except to the extent the principal amount of such outstanding indebtedness shall have been reduced by such payment.

**Section 2.7**     <u>**Financial Statements and Other Information**</u>. Guarantor agrees to deliver to Lender (A) on or before April 15th of each year, personal financial statements and information applicable to the Guarantor on Lender's standard form or other form acceptable to Lender and (B) copies of each of the Guarantor's annual federal tax return to be delivered on the sooner of (i) three days after filing or (ii) October 15th of each year for the immediately preceding fiscal year. Guarantor agrees to promptly deliver to Lender from time to time any additional documentation or information reasonable requested by the Lender that relates to the business or assets of the Guarantor.

**Section 2.8**     <u>**Transfer of Interest**</u>. Except as expressly permitted pursuant to the Loan Documents, the Guarantor agrees not to make or permit to be made, by voluntary or involuntary means, any transfer of the interest of the Guarantor in the Borrower, without first obtaining the prior written consent of Lender.

**ARTICLE 3**
**EVENTS OF DEFAULT**

**Section 3.1**     <u>**Events of Default Defined**</u>. An "Event of Default" shall exist if any of the following events occurs and is continuing:

(A)    The Guarantor fails to perform or observe any covenant contained herein.

(B)    Any warranty, representation or other statement by or on behalf of Guarantor contained in this Guaranty or in any Loan Document is false or misleading in any material respect when made.

(C)    A receiver, liquidator or trustee of Guarantor or any of his property is appointed by court order, or any

15

Initials

party named as a Guarantor is adjudicated bankrupt or insolvent or any of his, her or its property is sequestered by court order and such order remains in effect for more than sixty (60) days, or a petition is filed against Guarantor under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, and is not dismissed within ninety (90) days of such filing.

(D)     Guarantor files a petition in voluntary bankruptcy or seeks relief under any provision of any reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, or consents to the filing of any petition against it under any such law.

(E)     Guarantor makes an assignment for the benefit of creditors or admits in writing inability to pay debts generally as they become due, or consents to the appointment of a receiver, trustee or liquidator of all or any part of his, her or its property.

(F)     The occurrence of an Event of Default under the Note or any other Loan Document.

**Section 3.2     Remedies on Default**.  If an Event of Default exists, Lender may proceed to enforce the provisions hereof and to exercise any other rights, powers and remedies available to the Lender without prior written notice to Guarantor.

**Section 3.3     Waiver and Notice**.

(A)     No remedy herein conferred upon or reserved to the Lender is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Guaranty now or hereafter existing at law or in equity or by statute.

(B)     No delay or omission to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right or power may be exercised from time to time and as often as may be deemed expedient.

(C)     In order to entitle the Lender to exercise any remedy reserved to it in this Guaranty, it shall not be necessary to give any notice, other than such notice as may be expressly required in this Guaranty.

(D)     No waiver, amendment, release or modification of this Guaranty shall be established by conduct, custom or course of dealing.

**ARTICLE 4**
**MISCELLANEOUS**

**Section 4.1     Construction**.  If this Guaranty is executed by two or more parties, they shall be jointly and severally liable hereunder and the phrase Guarantor whenever used herein shall be construed to refer to each of the parties in the same manner and with the same effect as if each party had signed a separate guaranty.

**Section 4.2     Governing Law**.  This Guaranty shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.

**Section 4.3     Successors and Assigns**.  This Guaranty shall inure to the benefit of and be binding upon the successors and assigns of each of the parties hereto.

**Section 4.4     Notices**.  Any notices required or permitted to be given hereunder shall be in writing and shall be deemed to have been sufficiently given or served for all purposes at the time of delivery in person, one day after

16

_____
Initials

delivery to a nationally recognized overnight courier with receipt requested to the parties at the addresses set forth at the head of this Guaranty, or to such other addresses as the parties may for themselves designate in writing as provided herein for the purpose of receiving notices hereunder.

**Section 4.5    Entire Agreement**. This Guaranty and the Loan Documents constitute the entire understanding between the Borrower, the Guarantor and Lender and to the extent that any writings not signed by Lender or oral statements or conversations at any time made or had are inconsistent with the provisions of this Guaranty or the other Loan Documents, the same shall be null and void.

**Section 4.6    Amendments**. No amendment, change, modification, alteration or termination of this Guaranty shall be made except upon the written consent of Lender and the Guarantor.

**Section 4.7    Assignment**. This Guaranty is assignable by Lender in whole or in part in conjunction with an assignment of the Loan Documents and any assignment hereof or any transfer or assignment of the Loan Documents or portions thereof shall operate to vest in any such assignee the rights and powers, in whole or in part, as appropriate, herein conferred upon and granted to Lender.

**Section 4.8    Partial Invalidity**. The invalidity or unenforceability of any one or more phrases, sentences, clauses or sections in this Guaranty shall not affect the validity or enforceability of the remaining portions of the Guaranty or any part thereof.

**Section 4.9    SUBMISSION TO JURISDICTION**. THE GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY SHALL BE BROUGHT ONLY IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN THE COUNTY OF ERIE, WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF ANY LEGAL ACTION, AND GUARANTOR WAIVES ANY RIGHT TO OBJECT TO JURISDICTION WITHIN THE FOREGOING FORUM BY LENDER. NOTHING CONTAINED HEREIN SHALL PREVENT LENDER FROM BRINGING ANY SUIT, ACTION OR PROCEEDING OR EXERCISING ANY RIGHTS AGAINST ANY SECURITY, AGAINST GUARANTOR PERSONALLY, AGAINST ANY PROPERTY OF GUARANTOR, WITHIN ANY OTHER JURISDICTION, AND THE INITIATION OF SUCH SUIT, ACTION OR PROCEEDING OR TAKING OF SUCH ACTION IN ANY SUCH OTHER JURISDICTION SHALL IN NO EVENT CONSTITUTE A WAIVER OF THE AGREEMENTS CONTAINED HEREIN WITH RESPECT TO THE LAWS OF THE STATE OF NEW YORK GOVERNING THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO OR THE AGREEMENT OF THE GUARANTOR TO SUBMIT TO PERSONAL JURISDICTION WITHIN THE STATE OF NEW YORK AND COUNTY OF ERIE.

**Section 4.10    WAIVER OF JURY TRIAL**. THE GUARANTOR HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (1) ARISING UNDER THIS GUARANTY OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS GUARANTY OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE, AND THE GUARANTOR HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND LENDER MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN

17

Initials

EVIDENCE OF THE GUARANTOR'S CONSENT TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. THE GUARANTOR REPRESENTS AND WARRANTS THAT HE HAS REVIEWED THIS JURY WAIVER PROVISION WITH HIS LEGAL COUNSEL, AND HAS MADE THIS WAIVER KNOWINGLY AND VOLUNTARILY.

**Section 4.11    SERVICE OF PROCESS. PROCESS ON GUARANTOR IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS GUARANTY WILL BE DEEMED TO HAVE BEEN GIVEN WHEN GIVEN IN ANY ONE OF THE FOLLOWING WAYS: (I) PERSONALLY DELIVERED, (II) TWO BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, POSTAGE PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (III) 4 BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO THE GUARANTOR AT THE APPLICABLE ADDRESSES SET FORTH AT THE BEGINNING OF THIS GUARANTY. Such service shall be deemed in every respect effective service of process upon the Guarantor and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon the Guarantor. Nothing in this Section shall affect the Lender's right to serve process in any other manner permitted by law. Guarantor may add additional addresses or change an address for purposes of service of process by giving 10 days' prior written notice of such change to the Lender.**

**Section 4.12    Unlimited Guaranty.**   This Guaranty is unlimited in amount.

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty as of the day and year set forth.

_____                    Dated: August 2, 2011
Thomas V. Girardi, Individually

### ACKNOWLEDGMENTS (FOR GUARANTY)

STATE OF CALIFORNIA
COUNTY OF   Los Angeles

On the __12th__ day of August in the year 2011 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

SHIRLEEN H. FUJIMOTO
COMMISSION # 1933089
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires May 15, 2015

_____
Notary Public

18

_____
Initials

## FIRST AMENDED AND RESTATED
### SECURITY AGREEMENT
### CALIFORNIA ATTORNEY LENDING II, INC.

In consideration of California Attorney Lending II, Inc., a New York corporation having its chief executive office at 6400 Main Street, Suite 120, Williamsville, NY 14221 (the "Secured Party") heretofore or hereafter (1) extending or agreeing to extend any credit or other financial accommodation to or relying on any guaranty, endorsement or other assurance of payment of Girardi Keese, a California general partnership having an office at 1126 Wilshire Blvd., Los Angeles, CA 90017 ("Borrower") or (2) agreeing to any direct or indirect extension, renewal, refinancing or other modification or replacement of or waiving or forbearing from exercising any right or remedy relating to any obligation heretofore or hereafter arising or accruing as a result of any such credit or other financial accommodation to Borrower, and for other valuable consideration, the receipt and adequacy of which is acknowledged, **Girardi Keese** (the "Debtor"), agrees with the Secured Party as follows:

<u>Introductory Statement</u>:  Secured Party and some or all of Debtor are parties to that certain Security Agreement dated July __, 2011 ("Security Agreement") in reliance upon which Secured Party has made certain loans and financial accommodations available to Borrower.  Borrower as of the date of this First Amended and Restated Security Agreement has executed an First Amended and Restated Revolving Promissory Note to the Secured Party in the principal amount of $5,000,000. The parties now desire to consolidate, amend and restate the Security Agreement in all respects as hereinafter set forth.

1.  **DEFINITIONS.** In this Agreement:

a.  **Account Debtor.**  An "Account Debtor" means any person or entity with an obligation to pay or transfer cash, property or proceeds to any Debtor on an account, chattel paper or general intangible regardless whether such obligation arises from business or personal matters or assets of such Debtor.

b.  **Collateral.** The "Collateral" means:

All Debtor's present and future right, title and interest in and to any and all accounts, choses in action, causes of action, settlement proceeds, attorneys' liens, attorneys' fees, general intangibles, contract rights, deposit and other bank accounts and instruments, instruments, documents, chattel paper and obligations in any form in each case arising out of or related to the rendition of services by Debtor whether earned by performance or otherwise in connection with the following:  (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation; and (iii) all matters with respect to which the Borrower is representing one or more individuals or estates against Southern California Regional Rail Authority d/b/a Metrolink, Connex Railroad, LLC and other defendants in the so-called "Chatsworth Metrolink Collision Cases" related to the Lead Case captioned and styled *Magdaleno v. Southern California Regional Rail Authority dba Metrolink,* Los Angeles County Superior Court, Case No. PC043703; all of Debtor's books related to the foregoing; and all cash and non-cash proceeds of any of the foregoing, in whatever form, including without limitation all proceeds of proceeds, all insurance policies covering same and all interest or dividends thereon.

19

Initials

90

c.   **Event of Default.** An "Event of Default" occurs or exists if

(i)   there occurs or exists any event or condition of default under any Revolving Promissory Note or other instrument (A) now or hereafter evidencing any of the Obligations or (B) the payment of which is now or hereinafter guaranteed by the Debtor (including, but not limited to, a First Amended and Restated Revolving Promissory Note, dated the date of this Agreement, issued by Borrower to the Secured Party, or any direct or indirect extension, renewal, refinancing or other modification or replacement of such Revolving Promissory Note); or

(ii)   there occurs or exists any event or condition of default under any guaranty of the Obligations; or

(iii)   the Secured Party deems itself insecure with respect to the Obligations or is of the opinion that the Collateral is or may not be sufficient or has decreased or may decrease in value, whether or not the Secured Party has sought any Other Collateral from the Debtor or any Guarantor.

d.   **Obligations.** The "Obligations" means collectively all obligations to the Secured Party for the payment of any money (whether for the payment of any principal, interest, fee, charge, cost or expense or otherwise) or the performance of any other obligation (including, but not limited to, pursuant to this Agreement), however evidenced, regardless of kind, class or form, incurred for any business or commercial purpose or otherwise, now existing or hereafter arising or accruing, created directly or by any assignment or other transfer, direct or indirect, absolute or contingent (whether pursuant to any guaranty, endorsement or other assurance of payment or otherwise), similar or dissimilar or related or unrelated and whether or not arising or accrued subsequent to any commencement of, or made, proved, voted or allowed as a claim in any case or other proceeding pursuant to, any bankruptcy, insolvency or similar statute, that have been heretofore or are hereafter incurred by, whether alone or otherwise, the Debtor, the Borrower, any direct or indirect successor of the Debtor or the Borrower or any direct or indirect assignee or other transferee of all or substantially all of the assets of the Debtor or the Borrower.

e.   **Other Collateral.** "Other Collateral" means, other than the Collateral, any collateral, subordination, guaranty, endorsement or other security or assurance of payment, whether now existing or hereafter arising or accruing, that now or hereafter secures the payment of or is otherwise applicable to any of the Obligations.

f.   **Guarantor.** "Guarantor" means any Person, including Thomas V. Girardi, who or that is now or hereafter liable, whether directly or indirectly or absolutely or contingently, for the payment of any of the Obligations.

g.   **Permitted Liens.** "Permitted Liens" means (i) whether now existing or hereafter arising or accruing, any security interest in or other lien on any of the Collateral in favor of the Secured Party or (ii) any security interest in or other lien on any of the Collateral existing on this date that is (A) fully and accurately described in the response to question 6 contained in the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement or (B) consented to in writing by the Secured Party.

h.   **Person.** "Person" means (i) any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated association, government or political subdivision, (ii) any court, agency or other governmental body or (iii) any other entity, body, organization or group.

i.   **Record.** "Record" means any information that is now or hereafter (i) inscribed on a tangible medium or (ii) stored in an electronic or other medium and retrievable in perceivable form, except to the extent constituting confidential information (whether contained in any client file of the Debtor or otherwise) that the Debtor is not permitted to disclose to the Secured Party by reason of any ethical or disciplinary rule, regulation or law governing

20

Initials

the Debtor's conduct.

**j.    Security Interest.** "Security Interest" means any security interest or other lien granted or otherwise created pursuant to the first sentence of Section 2 of this Agreement.

**k.    Uniform Commercial Code.** "Uniform Commercial Code" means the Uniform Commercial Code in effect at any time in the State of New York.

**l.    Other Terms.** All capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in the Uniform Commercial Code..

**2.    GRANT OF SECURITY INTEREST.** To secure the payment and performance of the Obligations, the Debtor grants to the Secured Party a security interest in and assigns, pledges and hypothecates to the Secured Party the Collateral. Each Security Interest is a continuing, absolute and unconditional security interest or other lien.

**3.    REINSTATEMENT OF OBLIGATIONS.** Each portion of the Obligations heretofore or hereafter paid or satisfied by any of the Collateral, or any money or Other Collateral, heretofore or hereafter received, applied or retained by the Secured Party and later recovered from the Secured Party as a result of any claim (including, but not limited to, any claim involving any allegation that any money constituted trust funds or that the receipt, application or retention of any of the Collateral or any money or Other Collateral or the grant, perfection or other creation or protection of any security interest in or other lien on any of the Collateral or any Other Collateral constituted a preference or fraudulent conveyance or transfer), however asserted and whether now existing or hereafter arising or accruing, shall be reinstated as part of the Obligations for purposes of this Agreement as of the date it originally arose or accrued.

**4.    COVENANTS.**

**a.    Affirmative Covenants.** The Debtor shall (i) maintain complete and accurate Records relating to the Collateral, (ii) before the end of any applicable grace period, pay each tax, assessment, fee and charge imposed by any government or political subdivision upon any of the Collateral, this Agreement or any agreement, instrument or other Record evidencing any of the Collateral or any of the Obligations, (iii) defend the Collateral against each demand, claim, counterclaim, setoff and defense asserted by any Person (including, but not limited to, any Account Debtor) other than the Secured Party and (iv) promptly notify the Secured Party of (A) any threat or commencement of any action or other legal proceeding, any entry of any judgment or order of any court, agency or other governmental body, or any assertion by any Person (including, but not limited to, any Account Debtor) other than the Secured Party of any demand, claim, counterclaim, setoff or defense, relating to any of the Collateral, (B) any occurrence or existence of any Event of Default, any event or condition that, after notice, lapse of time or both notice and lapse of time, would constitute any Event of Default or any event or condition that has or will or might have any material adverse effect on (I) any of the Collateral, (II) the Debtor, (III) any Guarantor or (IV) the business, operations, assets, affairs or condition (financial or other) of the Debtor or any Guarantor and (C) any change in the location of the chief executive office of the Debtor.

**b.    Negative Covenants.** Without the prior written consent of the Secured Party, the Debtor shall not (i) sell or otherwise dispose of any of the Collateral or any interest or right in any of the Collateral except in the ordinary course of business, or (ii) provide to the Secured Party or permit to be provided to the Secured Party on his, her or its behalf any certificate, financial statement or other Record that contains any statement of fact that is incorrect or misleading in any material respect or omits to state any fact necessary to make any statement of fact contained therein not incorrect or misleading in any material respect, (iii) execute or otherwise authenticate or permit to be filed or remain on file in any public office any financing statement or amendment of any financing statement

21

Initials

relating to any of the Collateral and naming any Person other than the Secured Party as a secured party, except for any financing statement or amendment of any financing statement heretofore consented to by the Secured Party in writing or relating solely to any Permitted Liens, or (iv) upon or at any time after any occurrence or existence of any Event of Default, (A) enforce, extend, renew, refinance or otherwise modify or replace, request, demand, accept, collect or otherwise realize upon, compromise, cancel, discharge, subordinate, accelerate, give any receipt, release or discharge relating to, commence, prosecute or settle any action or other legal proceeding relating to, waive or forbear from exercising any right or remedy relating to or adversely affect any obligation of any Person (including, but not limited to, any Account Debtor obligated with respect to any of the Collateral) relating to any of the Collateral, or (B) agree or otherwise incur any obligation to do anything described in clause (iv)(A) of this sentence, or (v) without giving the Secured Party at least 30 days' prior written notice (A) change its location for purposes of Article 9 of the Uniform Commercial Code (including, but not limited to, its jurisdiction of organization if it is a Registered Organization), (B) make any change in its name, identity or structure or (C) participate in any merger, consolidation or other absorption, or (vi) grant or otherwise create, permit to exist or agree or otherwise incur any obligation to grant or otherwise create or permit to exist any security interest in or other lien on any of the Collateral other than Permitted Liens, or (vii) use any money of the Borrower, funds in any Deposit Account of the Borrower or funds represented by any certificate of deposit of the Borrower in partial or complete satisfaction of any obligation of the Borrower except for obligations incurred in the ordinary course of the business of the Borrower, or (viii) create, incur, assume or have any indebtedness or other obligation (A) arising from the borrowing of any money or (B) pursuant to any guaranty or other contingent obligation, except for indebtedness and other obligations (I) to the Secured Party, (II) constituting unsecured normal trade debt incurred upon customary terms in the ordinary course of its business, (III) arising from the endorsement in the ordinary course of its business of any check or other negotiable instrument for deposit or collection or (IV) secured by a Permitted Lien.

**c.    Additional Covenants Triggered by Request of Secured Party.** Promptly upon the request of the Secured Party, the Debtor shall (i) deliver to the Secured Party each financing statement, amendment of any financing statement and other Record, and take each other action (including, but not limited to, making any endorsement), requested by the Secured Party to perfect, maintain the validity, perfection or priority of, or enforce, any Security Interest, otherwise protect the interest of the Secured Party in or collect, sell or otherwise dispose of or otherwise realize upon any of the Collateral, whether under applicable law or otherwise, verify any of the Collateral or otherwise accomplish any purpose of this Agreement, (ii) deliver to the Secured Party each Record included in the Collateral, together with each endorsement, instrument of assignment and other Record that the Secured Party requests to accomplish the assignment or other transfer of such Record to the Secured Party, and, until such delivery, hold such Record in trust for the Secured Party, (iii) cause each Instrument representing Proceeds or other proceeds of any of the Collateral to be made payable, as requested by the Secured Party, to the Secured Party alone or the Secured Party and the Debtor jointly, (iv) provide to the Secured Party all information requested by the Secured Party and relating to (A) any of the Collateral, (B) any Person (including, but not limited to, any Account Debtor) obligated with respect to any of the Collateral, (C) the Debtor, (D) any Guarantor or (E) the business, operations, assets, affairs or condition (financial or other) of the Debtor or any Guarantor (including, but not limited to, financial statements prepared in a form satisfactory to the Secured Party and, if requested by the Secured Party, audited, reviewed or compiled by an independent certified public accountant satisfactory to the Secured Party) and (v) permit each officer, employee, accountant, attorney and other agent of the Secured Party to inspect the Collateral and audit, copy and extract each Record included in the Collateral.

**d.    Collateral Collections.** After an Event of Default shall have occurred, Secured Party shall have the right at any and all times to enforce Debtor's rights against Account Debtors and other parties obligated on Collateral, including, but not limited to, the right to: (a) notify and/or require Debtor to notify any or all Account Debtors and other parties obligated on Collateral to make payments directly to Secured Party or in the care of a post office lock box under the sole control of Secured Party established at the Debtor's expense subject to Secured Party's

22

Initials

customary arrangements and charges therefor, and to take any or all action with respect to Collateral as Secured Party shall determine in its sole discretion, including, without limitation, the right to demand, collect, sue for and receive any money or property at any time due, payable or receivable on account thereof, compromise and settle with any person liable thereon, and extend the time of payment of otherwise change the terms thereof, without incurring liability or responsibility to Debtor; (b) require Debtor to segregate and hold in trust for Secured Party and, on the day of Debtor's receipt thereof, transmit to Secured Party in the exact form received by Debtor (except for such assignments and endorsements as may be required by Secured Party), all cash, checks, drafts, money orders and other items of payments constituting Collateral or proceeds of Collateral; and/or (c) establish and maintain at Secured Party a "Repayment Account," which shall be under the exclusive control and subject to the sole order of Secured Party and which shall be subject to the imposition of such customary charges as are imposed by Secured Party from time to time upon such accounts, for the deposit of cash, checks, drafts, money orders and other items of payments constituting Collateral or proceeds of Collateral from which Secured Party may, in its sole discretion, at any time and from time to time, withdraw all or any part. Secured Party's collection and enforcement of Collateral against Account Debtors and other persons obligated thereon shall be deemed to be commercially reasonable if Secured Party exercises due care and follows the procedures that Secured Party generally applies to the collection of obligations owed to Secured Party. All cash and non-cash proceeds of the Collateral may be applied by Secured Party upon Secured Party's actual receipt of cash proceeds against such of the Obligations, matured or unmatured, as Secured Party shall determine in its sole discretion. Secured Party may defer the application of non-cash proceeds of Collateral, including, but not limited to, non-cash proceeds collected from Account Debtors and other persons obligated on Collateral, to the Obligations until cash proceeds are actually received by Secured Party.

e.    **Care of Collateral.** Debtor shall have all risk of loss of the Collateral. Secured Party shall have no liability or duty, either before or after an Event of Default, to collect or enforce any of its rights against the Collateral, to collect any income accruing on the Collateral, or to preserve rights against Account Debtors or other parties with prior interest in the Collateral. If Secured Party actually receives any notices requiring action with respect to Collateral in Secured Party's possession, Secured Party shall take reasonable steps to forward such notices to Debtor. Debtor is responsible for responding to notices concerning the Collateral, voting the Collateral, and exercising rights and options, calls and conversions of the Collateral. Secured Party's sole responsibility is to take such action as is reasonably required by Debtor in writing, provided, however, Secured Party is not required to take any action that, in Secured Party's sole judgment, would adversely affect the value of the Collateral as security for the Obligations. While Secured Party is not required to take certain actions, if action is needed, in Secured Party's sole discretion, to preserve and maintain the Collateral, Debtor authorizes Secured Party to take such actions, but Secured Party is not obligated to do so.

5.    **POWER OF ATTORNEY.** Upon the occurrence or existence of any Event of Default, the Debtor irrevocably and unconditionally appoints the Secured Party as the attorney-in-fact of the Debtor, with full power of substitution and revocation, to take, in the name and on behalf of the Debtor or otherwise, each action relating to any of the Collateral that the Debtor could take (subject to the limitations contained in Section 12(j) of this Agreement), provided such appointment and power does not violate any code of professional conduct and the ethical rules thereunder applicable to the legal profession. The power of attorney given pursuant to the preceding sentence is coupled with an interest in favor of the Secured Party.

6.    **CERTAIN RIGHTS, REMEDIES AND DUTIES.**

a.    **Rights and Remedies Pursuant to Applicable Law.** With respect to the Collateral, the Secured Party shall have each applicable right and remedy pursuant to applicable law (including, but not limited to, the Uniform Commercial Code) or this Agreement.

23

Initials

**b.    Additional Rights Without Event of Default.** The Secured Party shall have the right to (i) file in any public office each financing statement or amendment of any financing statement relating to any of the Collateral that the Secured Party desires to file and (ii) verify any of the Collateral in any manner or through any medium, whether directly with any Person (including, but not limited to, any Account Debtor) obligated with respect thereto or otherwise or in the name of the Debtor or otherwise.

**c.    Additional Rights Upon or After Event of Default.** Upon or at any time after any occurrence or existence of any Event of Default, the Secured Party shall have the right to, for the purpose of preserving or enhancing the value of any of the Collateral or exercising any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement, (i) perform each obligation of the Debtor pursuant to this Agreement and (ii) take control of all Proceeds and other proceeds thereof.

**d.    Application of Proceeds.** The Secured Party shall apply all proceeds received by the Secured Party from any collection, sale or other disposition of or other recovery upon or otherwise on account of any of the Collateral (including, but not limited to, as money payable pursuant to any insurance on any of the Collateral) first to liabilities, costs and expenses described in Section 7 of this Agreement and then to the remainder of the Obligations, whether due or not due, in any order determined by the Secured Party.

**e.    Notice of Disposition.** It is mutually agreed that commercial reasonableness and good faith require Lender to give Guarantors no more than ten days' prior written notice of the time and place of any public disposition of Collateral or of the time after which any private disposition or other intended disposition is to be made. It is mutually agreed that it is commercially reasonable for Lender to disclaim all warranties which arise with respect to the disposition of the Collateral.

**7.    EXPENSES; INDEMNIFICATION.**

**a.    Expenses.** The Debtor shall pay to the Secured Party on demand each cost and expense (including, but not limited to, if the Secured Party retains counsel for advice, litigation or any other purpose, reasonable attorneys' fees and disbursements) heretofore or hereafter incurred by the Secured Party in (i) searching for, filing or recording or obtaining any information relating to any financing statement, amendment of any financing statement or other Record relating to any of the Collateral or otherwise obtaining any information relating to the Debtor or any of the Collateral or (ii) endeavoring to (A) enforce any obligation of the Debtor pursuant to this Agreement or preserve or exercise any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement or (B) preserve or exercise any right or remedy relating to or collect, sell or otherwise dispose of or otherwise realize upon any of the Collateral. After such demand for the payment of any cost or expense incurred by the Secured Party in performing any obligation of the Debtor pursuant to this Agreement, the Debtor shall pay interest at an annual rate equal to the lesser of 25% or the highest rate permitted by applicable law on the portion of such cost or expense remaining unpaid.

**b.    Indemnification.** The Debtor shall indemnify and defend the Secured Party and each officer, employee, accountant, attorney, banker, lender and other agent of the Secured Party on demand, without any limitation as to amount, against each liability, cost and expense (including, but not limited to, if the Secured Party retains counsel for advice, litigation or any other purpose, reasonable attorneys' fees and disbursements) heretofore or hereafter imposed on, incurred by or asserted against the Secured Party or such officer, employee, accountant, attorney or other agent as a result of any claim (including, but not limited to, any claim involving any allegation of any violation of applicable law (including, but not limited to, any criminal statute)), however asserted and whether now existing or hereafter arising or accruing, arising out of any collection, sale or other disposition of any of the Collateral or any breach by the Debtor of any representation or warranty or any covenant or other agreement contained in, or any other fact or circumstance relating to, this Agreement, except to the extent any such liability,

24

_____
Initials

cost or expense is caused by the gross negligence, bad faith or willful misconduct of the Secured Party or such officer, employee, accountant, attorney or other agent.

**8.    TERMINATION.** This Agreement shall remain in full force and effect until and shall terminate only upon (a) the actual receipt by an officer of the Secured Party at the chief executive office of the Secured Party of a written notice of the termination of this Agreement by any one of the Debtor, (b) the expiration of a reasonable period of time for the Secured Party to act upon such written notice and (c) the final and indefeasible payment in full of (i) each portion of the Obligations (A) arising or accrued before such receipt of such written notice and the expiration of such period of time, (B) thereafter arising or accruing as a result of any credit or other financial accommodation theretofore committed or otherwise agreed to by the Secured Party or (C) thereafter arising or accruing as a result of any of the Obligations described in clause (c)(i)(A) or (B) of this sentence (including, but not limited to, (I) all interest, fees, charges, costs and expenses thereafter arising or accruing with respect to any of the Obligations described in such clause (c)(i)(A) or (B) and (II) all of the Obligations thereafter arising or accruing as a result of any direct or indirect extension, renewal, refinancing or other modification or replacement of any of the Obligations described in such clause (c)(i)(A) or (B)) and (ii) each liability, cost and expense that the Debtor is obligated to pay pursuant to Section 7 of this Agreement, whether theretofore or thereafter arising or accruing.

**9.    REPRESENTATIONS, WARRANTIES AND ADDITIONAL COVENANTS.** The Debtor represents, warrants and covenants with and to the Secured Party as follows:

**a.    Authority.** The execution, delivery to the Secured Party and performance of this Agreement and the grant or other creation of each Security Interest by the Debtor (i) do not and will not violate applicable law, any judgment or order of any court, agency or other governmental body by which the Debtor is bound or, if the Debtor is not an individual, any certificate or articles of incorporation or organization, by-laws, operating or partnership agreement or other charter, organizational or other governing document of the Debtor or any resolution or other action of record of any shareholders, members, partners, directors or managers of the Debtor, (ii) do not and will not violate or constitute any default under any agreement, instrument or other Record by which the Debtor is bound or to which the Debtor's property is subject, (iii) if the Debtor is not an individual, are and will be in furtherance of the purposes and within the power and authority of the Debtor and (iv) do not and will not require any authorization of, notice to or other act by or relating to any Person (including, but not limited to, any Account Debtor or, if the Debtor is not an individual, any shareholder, member, partner, director or manager of the Debtor) that has not been duly obtained, given or done and is not in full force and effect.

**b.    Enforceability.** This Agreement is enforceable in accordance with its terms against the Debtor. All of Debtor's accounts, chattel paper, deposit accounts, documents, general intangibles, instruments, investment property, letter of credit rights and other liens, contracts, leases and agreements constituting the Collateral are and shall be valid, genuine and legally enforceable obligations and rights belonging to Debtor and not subject to any claim, defense, set-off, or counterclaim of any kind.

**c.    Ownership.** Debtor is and shall remain owner of the Collateral.

**d.    Questionnaire.** Each answer contained in any questionnaire submitted by or on behalf of the Debtor to the Secured Party in connection with this Agreement (including, but not limited to, the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement) is complete and accurate.

**e.    Rights and Obligations with Respect to Collateral.** Except as heretofore disclosed by the Debtor to the Secured Party in writing, there exists (i) no security interest in or other lien on any of the Collateral other than Permitted Liens, (ii) no presently effective financing statement or amendment of any financing statement relating to any of the Collateral and naming any Person other than the Secured Party as a secured party other than those

25

Initials

relating solely to Pemitted Liens, (iii) no contractual or other restriction on the grant or other creation of any security interest in or assignment, pledge or hypothecation of any of the Collateral, and (iv) no demand, claim, counterclaim, setoff or defense, no action or other legal proceeding, and no outstanding judgment or order of any court, agency or other governmental body, relating to any of the Collateral. Debtor (i) shall defend the Collateral against all claims and demands of all persons at any time claiming any interest therein; (ii) shall cooperate with Secured Party in obtaining and maintaining control with respect to all deposit accounts, investment property, letter of credit rights and electronic chattel paper consituting the Collateral; (iii) shall not become a party to any restructuring of its form of business or participate in any consolidation, merger, liquidation or dissolution without Secured Party's prior written consent; (iv) shall not change its state of organization without first notifying Secured Party in writing; (v) shall immediately advise Lender in writing of any change in address of Debtor or the Collateral; and (vi) shall provide Secured Party with possession, as appropriate, of all chattel paper, documents, instruments and investment property constituting the Collateral.

   f.    **Actions with Respect to Collateral.** Except as heretofore disclosed by the Debtor to the Secured Party in writing, the Debtor has not (i) sold or otherwise disposed of any of the Collateral or any interest or right in any of the Collateral or (ii) extended, renewed, refinanced or otherwise modified or replaced, compromised, canceled, discharged, subordinated, accelerated, waived, forborne from exercising any right or remedy relating to or adversely affected any obligation of any Person (including, but not limited to, any Account Debtor) relating to any of the Collateral.

   g.    **Accounts and General Intangibles.** Each Account and General Intangible included in the Collateral is or, if not now existing, will be genuine, in all respects what it purports to be and enforceable in accordance with its terms against each Person (including, but not limited to, any Account Debtor) obligated with respect thereto, subject to no demand, claim, counterclaim, setoff or defense.

   h.    **Incorrect or Misleading Information.** The Debtor has not provided to the Secured Party or pemitted to be provided to the Secured Party on his, her or its behalf any certificate, financial statement or other Record that contains any statement of fact that is incorrect or misleading in any material respect or omits to state any fact necessary to make any statement of fact contained therein not incorrect or misleading in any material respect.

   i.    **Taxes.** The Debtor has duly filed all applicable income or other tax returns and has paid all income or other taxes when due, and there are no outstanding tax liens against the assets of any Debtor.

10.   **CERTAIN CONSENTS AND WAIVERS.**

   a.    **Consents.** Except to the extent expressly provided in this Agreement, this Agreement shall not be modified or terminated, no Security Interest, no obligation of the Debtor pursuant to this Agreement and no right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement shall be impaired or otherwise adversely affected, and no such right or remedy shall be waived, by any act, omission or other thing, whether heretofore occurred or hereafter occurring.  The Debtor knowingly, voluntarily, intentionally and irrevocably consents, without any notice, to each act, omission and other thing, whether heretofore occurred or hereafter occurring, that would or might, but for such consent, modify or terminate this Agreement, impair or otherwise adversely affect any Security Interest or any such obligation, right or remedy or operate as a waiver of any such right or remedy.

   b.    **Waivers.** The Debtor knowingly, voluntarily, intentionally and irrevocably waives, without any notice, each act and other thing upon which, but for such waiver, any Security Interest, any obligation of the Debtor pursuant to this Agreement or any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement would or might be conditioned.

26

Initials

**11.    NOTICES AND OTHER COMMUNICATIONS.** Each notice and other communication relating to this Agreement (i) shall be given in writing, (ii) if given by facsimile, shall be directed to the Secured Party at (716) 568-0266 and to the Debtor at his, her or its facsimile number set forth on the signature page of this Agreement, (iii) if given otherwise in writing, shall be directed to the Secured Party or the Debtor at their respective addresses indicated at the beginning of the Agreement or on the Signature Page to this Agreement and (iv) if sent by mail or overnight courier service, shall be deemed to have been given when deposited in the mail, first-class or certified postage prepaid, or accepted by any post office or overnight courier service for delivery, and to have been received by the Secured Party or the Debtor upon such Person's actual receipt thereof. Address and facsimile information may be updated by any notice sent in accordance with the preceding sentence. Each requirement under applicable law of reasonable notice of any event by the Secured Party to the Debtor shall be deemed to have been met if a notice of such event is given by the Secured Party to the Debtor at least 10 days before the date on or after which such event is to occur.

**12.    MISCELLANEOUS.**

**a.    Reliance by Other Persons.** Each Person (including, but not limited to, any Account Debtor) obligated with respect to any of the Collateral may accept without any question any exercise by the Secured Party of any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement.

**b.    Limitation on Security Interest.** The payment of the Obligations shall not be secured by any Security Interest to the extent of any amount in excess of the maximum amount the payment of which can be so secured without rendering such Security Interest unenforceable under applicable law as a fraudulent conveyance or transfer.

**c.    Obligations Relating to Collateral.** The grant or other creation of any Security Interest shall not constitute an assignment by the Debtor to the Secured Party of any obligation of the Debtor relating to any of the Collateral. The Debtor shall remain obligated to perform each such obligation, and the Secured Party shall not be obligated to perform any such obligation, whether or not the Secured Party exercises any right or remedy pursuant to this Agreement or arising or accruing as a result of this Agreement. The only obligations of the Secured Party relating to the Collateral shall be, to the extent required by applicable law, to act in a commercially reasonable manner in exercising with respect to any of the Collateral any right or remedy pursuant to this Agreement or arising or accruing as a result of this Agreement.

**d.    Liability.** If more than one Person executes this Agreement, (i) each of them shall be jointly and severally liable pursuant to this Agreement, and (ii) this Agreement shall be construed, interpreted and enforced, whether in any action or other legal proceeding or otherwise, as to each of them as though each of them had executed and delivered to the Secured Party a separate agreement identical to this Agreement.

**e.    Assignment or Grant of Participation.** In conjunction with any assignment or other transfer of or grant of any participation in any of the Obligations by the Secured Party, the Secured Party shall have the right to assign or otherwise transfer or grant any participation in this Agreement, any Security Interest, any obligation of the Debtor pursuant to this Agreement or any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement.

**f.    Binding Effect.** This Agreement shall be binding upon the Debtor and each direct or indirect legal representative, successor and assignee of the Debtor and shall inure to the benefit of and be enforceable by the Secured Party and each direct or indirect successor and assignee of the Secured Party.

**g.    Entire Agreement, Modifications and Waivers.** This Agreement contains the entire agreement between the

27

Initials

Secured Party and the Debtor with respect to the subject matter of this Agreement and supersedes each action heretofore taken or not taken, each course of conduct heretofore pursued, accepted or acquiesced in, and each oral, written or other agreement and representation heretofore made, by or on behalf of the Secured Party with respect thereto. No action heretofore or hereafter taken or not taken, no course of conduct heretofore or hereafter pursued, accepted or acquiesced in, no oral, written or other agreement or representation heretofore made, and no agreement or representation hereafter made other than in writing, by or on behalf of the Secured Party shall modify or terminate this Agreement, impair or otherwise adversely affect any Security Interest, any obligation of the Debtor pursuant to this Agreement or any right or remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement or operate as a waiver of any such right or remedy. No modification of this Agreement or waiver of any such right or remedy shall be effective unless made in a writing duly executed by the Secured Party and specifically referring to such modification or waiver.

**h.     Rights and Remedies Cumulative.** All rights and remedies of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement shall be cumulative, and no such right or remedy shall be exclusive of any other such right or remedy.

**i.     Extent of Consents and Waivers.** Each consent and waiver of the Debtor contained in this Agreement shall be deemed to have been given to the extent permitted by applicable law.

**j.     Exercise of Rights; Requests.** Except as expressly provided in this Agreement, each right and remedy of the Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement may be exercised (i) at any time and from time to time, (ii) in the sole discretion of the Secured Party, (iii) without any notice or demand of any kind and (iv) whether or not any Event of Default or any other event or condition of default relating to any of the Obligations, any of the Collateral or any Other Collateral has occurred or existed, but the Secured Party shall not be obligated to exercise any such right or remedy. Each such right and remedy may be exercised only to the extent that the exercise thereof does not (i) violate applicable law or (ii) if requiring the Debtor to take any action, require the Debtor to violate any ethical or disciplinary rule, regulation or law governing non-disclosure of confidential information by an attorney or prohibiting the unauthorized practice of law. Each request by the Secured Party pursuant to this Agreement may be made (i) at any time and from time to time, (ii) in the sole discretion of the Secured Party and (iii) whether or not any Event of Default or any other event or condition of default relating to any of the Obligations, any of the Collateral or any Other Collateral has occurred or existed.

**k.     Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law. If, however, any such provision shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law, or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

**l.     Governing Law.** This Agreement shall be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York without regard to principles of conflicts of laws.

**m.     Headings.** In this Agreement, headings of sections are for convenience of reference only and have no substantive effect.

**13.   CONSENTS AND WAIVERS RELATING TO LEGAL PROCEEDINGS.**

**a.     JURISDICTIONAL CONSENTS AND WAIVERS. THE DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY CONSENTS AND AGREES THAT ANY ACTION OR OTHER LEGAL PROCEEDING COMMENCED BY THE SECURED PARTY SHALL BE BROUGHT ONLY IN**

28

_____
Initials

THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF SUCH ACTION; PROVIDED, HOWEVER, SECURED PARTY MAY, AT ITS OPTION, COMMENCE ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION TO OBTAIN POSSESSION OR FORECLOSURE UPON ANY COLLATERAL, TO OBTAIN EQUITABLE RELIEF OR TO ENFORCE ANY JUDGMENT OR ORDER OBTAINED BY SECURED PARTY AGAINST DEBTOR OR WITH RESPECT TO ANY COLLATERAL, TO ENFORCE ANY OTHER RIGHT OR REMEDY UNDER THIS AGREEMENT OR TO OBTAIN ANY OTHER RELIEF DEEMED APPROPRIATE BY SECURED PARTY.  DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO PERSONAL JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, AND DEBTOR HEREBY WAIVES ANY OBJECTIONS WHICH DEBTOR MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH NEW YORK COURT.

b.    WAIVER OF TRIAL BY JURY. THE DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT THE DEBTOR MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION OR OTHER LEGAL PROCEEDING, WHETHER BASED ON ANY CONTRACT OR NEGLIGENT, INTENTIONAL OR OTHER TORT OR OTHERWISE, ARISING OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT, ANY OF THE OBLIGATIONS, ANY OF THE COLLATERAL OR ANY OTHER COLLATERAL.

c.    SERVICE OF PROCESS. PROCESS ON DEBTOR IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT WILL BE DEEMED TO HAVE BEEN GIVEN WHEN GIVEN IN ANY ONE OF THE FOLLOWING WAYS: (I) PERSONALLY DELIVERED, (II) TWO BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, POSTAGE PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (III) 4 BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO THE DEBTOR AT THE APPLICABLE ADDRESS SET FORTH IN THIS AGREEMENT.  Such service shall be deemed in every respect effective service of process upon and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon the Debtor.  Nothing in this Section shall affect the Secured Party's right to serve process in any other manner permitted by law.  Debtor may add additional addresses or change the address for purposes of service of process by giving 10 days' prior written notice of such change to the Secured Party.

Dated: August 1 2, 2011

Girardi Keese

By: _____
Thomas V. Girardi, Partner
Facsimile No.

29

Initials

100

## EXHIBIT A

### QUESTIONNAIRE

1.  What is the Borrower's legal name?

    Girardi Keese

2.  What is the Borrower's jurisdiction of organization and business structure:

    General partnership under the laws of California

3.  What is the Borrower's Federal Employer Identification Number or Social Security Number?

    995

4.  What is the address (including state, county and zip code) of a business office of the Borrower?

    1126 Wilshire Blvd., Los Angeles, CA 90017

5.  What is the address (including state, county and zip code) of each location at which any Record included in the Collateral is or will be kept other than the locations the addresses of which are indicated in the answers to question 4?

    1126 Wilshire Blvd., Los Angeles, CA 90017

6.  In the case of any security interest or other lien covering any of the Collateral and existing on the date of this Agreement in favor of any Person other than the Secured Party, what are the complete name and address of each such Person in whose favor such security interest or other lien exists, and what is the nature of such security interest or other lien?

### Permitted Liens

| Name of Person | Address | Nature of Security Interest/Lien |
| --- | --- | --- |
| Comerica Bank | 75 East Trimble Road<br>San Jose, CA 95131 | blanket lien, as well as various specific security<br>interests in certain accounts, contracts and<br>deposits |
| Dell Financial Services L.P. | 12234 N. 1H-35, Bldg. B<br>Austin, TX 78753 | specific computer equipment |
| Key Equipment Finance Inc. | 1000 So. McCaslin Blvd.<br>Superior, CO 80027 | specific leased equipment |
| Ikon Financial Svcs. | 1738 Bass Rd.<br>Macon, GA 31210 | specific leased equipment |

30

Initials

| | | |
|---|---|---|
| Comerica Bank-California | 333 W. Santa Clara St. San Jose, CA 95113 | as to Thomas V. Girardi, certain specified shares of stock in Coast Resorts, Inc. |

7.    What is the legal name and principal residence address of each Debtor other than the Borrower?

None

31

Initials

ACKNOWLEDGMENT (SECURITY AGREEMENT)

STATE OF CALIFORNIA
COUNTY OF  Los Angeles
On the _12th_ day of August in the year 2011 before me, the undersigned, a notary public in and for said state,
personally appeared Thomas V. Girardi, personally known to me or proved to me on the basis of satisfactory evidence
to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the
same in his capacity as Partner of Girardi Keese, and that by his signature on the instrument, the entity upon behalf of
which the individual acted, executed the instrument.

_Shirleen H. Fujimoto_
Notary Public

SHIRLEEN H. FUJIMOTO
COMMISSION # 1933089
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires May 15, 2015

32

Initials

103

## BORROWER'S CERTIFICATE

With respect to certain credit facilities to be extended by California Attorney Lending II, Inc., a New York corporation (the "Lender"), the undersigned certifies and verifies to Lender, its successors and assignees as follows:

1.    I am [check applicable box:]
      [ the duly elected and qualified President or Secretary
      [ the duly appointed Manager or other authorized Member
      ☑ a duly authorized Partner      **of Girardi Keese, organized under the laws of California**

2.    If the Borrower is a corporation or limited liability company, attached to this Borrowing Certificate as Schedule I is a correct and complete copy of, as applicable, the Certificate of Incorporation or Articles of Organization of the Borrower. If the Borrower is a partnership, attached to this Borrowing Certificate as Schedule I is a correct and complete copy of the publicly filed organizational document of the Borrower.

3     If the Borrower is a corporation or limited liability company, attached to this Borrowing Certificate as Schedule II is a correct and complete copy of, as applicable, the By-Laws or Operating Agreement of the Borrower.

4.    If the Borrower is a general or limited liability partnership, attached to this Borrower's Certificate as Schedule II is a correct and complete copy of the Partnership Agreement of the Borrower.

5.    The resolutions attached to this Borrowing Certificate as Schedule III (collectively the "Resolutions") were duly adopted either (a) at a meeting of the board of directors, members or partners of the Borrower duly called and held on [specify date:]

      **August ____, 2011**
      which meeting a quorum was present and participated, or (b) by unanimous written consent of the directors, members or partners of the Borrower.

6.    None of the Resolutions has been rescinded, revoked or modified in any way.

7.    All of the Resolutions are in full force and effect.

8.    Neither any of the Resolutions nor any action taken or to be taken pursuant to any of the Resolutions (a) violates or will violate applicable law, any judgment or order of any court, agency or other governmental body by which the Borrower is bound, the Certificate of Incorporation, Articles of Organization, Certificate of Registration, By-Laws, Operating Agreement, Partnership Agreement or other governing document of the Borrower or any resolution or other action of record of the shareholders, directors or partners of the Borrower, (b) violates, will violate or constitutes or will constitute any default under any agreement, or instrument or other document by which the Borrower is bound or to which any of the Borrower's property is subject or (c) requires or will require any authorization of, notice to or other act by or relating to any individual, any court, agency or other governmental body or any other entity, body, organization or group (including, but not limited to, any shareholder, director, member, manager or partner of the Borrower) that has not been duly obtained, given or done and is not in full force and effect.

9.    Each of the following persons (individually a "Signer") (a) if the Borrower is a corporation or a limited liability company, has been duly elected to and qualified for and holds the office of the Borrower set opposite his or her name thereon, or (b) if the Borrower is a partnership, together constitute all of the partners of such partnership or (c) has been designated by Borrower as a person authorized to transact financial transactions on behalf of Borrower. Each Signer is duly authorized to execute the loan documents between Lender and the Borrower and is also authorized to make a Loan Request on behalf of the Borrower as that term is defined in the Note executed by Borrower to Lender:

| NAME | TITLE | SIGNATURE |
|------|-------|-----------|

33

Initials

Thomas V. Girardi   Partner

10. The signature set opposite each Signer's name on the list above is a true specimen of such Signer's signature.

11. With respect to the borrowing of $5,000,000 by Girardi Keese from California Attorney Lending II, Inc., (i) the terms of the borrowing were negotiated in the State of New York, (ii) the drafting of the loan documents and the funding of the loan was in the State of New York (iii) the laws of the State of New York are intended by the parties to apply with respect to the construction, interpretation and choice of law governing all documents executed by the Borrower; and (iv) California Attorney Lending II, Inc. and its legal counsel are located within the State of New York. The loan was intended by the Lender and Borrower as a New York loan to be construed under New York law regardless of any other location of the Borrower or any guarantor.

12. **The Borrower has not granted or incurred any liens against its assets since the date of its loan application to Lender.**

13. The undersigned certifies that the Borrower and each Guarantor has duly filed all applicable income or other tax returns and has paid all income or other taxes when due, and that there are no outstanding tax liens against the assets of any of them.

IN WITNESS WHEREOF, I have executed this Borrowing Certificate as of August __, 2011 and verify that all of the information contained herein is true and correct to the best of my knowledge being fully aware that Lender will rely on the accuracy of this Borrowing Certificate in extending credit facilities to Borrower.

        Thomas V. Girardi

STATE OF CALIFORNIA
COUNTY OF Los Angeles

On the 12th day of August in the year 2011 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

        Notary Public

SHIRLEEN H. FUJIMOTO
COMMISSION # 1933089
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires May 15, 2015

34

Initials

## SCHEDULE I

## CERTIFICATE OF PARTNERSHIP

35

Initials

# SCHEDULE II

## PARTNERSHIP AGREEMENT

36

Initials

## SCHEDULE III

### Resolutions

### Girardi Keese (the "Borrower")
Organized under the laws of California

RESOLVED, that any officer, manager, member or partner of the Borrower (individually an "Authorized Person") be, and he or she hereby is, authorized, directed and empowered, acting alone, in the name or on behalf of the Borrower or otherwise, to transact with and through California Attorney Lending II, Inc. (the "Lender") all such business as he or she shall deem necessary or appropriate upon such terms as he or she shall deem necessary or appropriate (including, but not limited to, obtaining loans and other extensions of credit, guaranteeing or otherwise becoming contingently liable for obligations of others, applying for loans and other forms of credit and pledging, hypothecating, assigning, encumbering, granting security interests in and otherwise creating liens upon all assets including real and personal property, whether tangible or intangible, contingent or accrued, now owned or hereafter acquired ("Property") as security for loans and other extensions of credit and guaranties and other contingent liabilities) and, in connection with any such transaction of business, to do all such acts and other things as he or she shall deem necessary or appropriate (including, but not limited to, signing, drawing, endorsing, executing and delivering notes, guaranties, assignments, pledges, hypothecations, security agreements, mortgages, powers of attorney, confessions of judgment, indemnifications, receipts, waivers, releases and other agreements, instruments and other documents, making and receiving delivery of any Property, accepting, receiving, withdrawing and waiving demands and notices and incurring and paying liabilities, costs and expenses); and be it further

RESOLVED, that, without limiting the generality of the foregoing resolution, any Authorized Person be, and he or she hereby is, authorized, directed and empowered, acting alone, in the name or on behalf of the Borrower or otherwise, to obtain from the Lender revolving loans the total of the outstanding principal amounts of which does not at any time exceed $5,000,000 and to pledge, hypothecate, assign, encumber, grant security interests in and otherwise create liens on Property as security for such loans; and be it further

RESOLVED, that all loans and other extensions of credit heretofore obtained by the Borrower from the Lender, all actions heretofore taken by the Lender with respect to any Property of the Borrower and all transactions and agreements occurring or entered into between the Borrower and the Lender are ratified, approved and confirmed in all respects; and be it further

RESOLVED, that notwithstanding the dissolution or termination of existence of the Borrower or any change in the identity of or any modification or termination of any authority of any Authorized Person, the Lender may rely upon and act in accordance with the foregoing resolutions until it shall receive and have a reasonable time to act on a written notice to the contrary from an Authorized Person.

37

Initials

**Key Loan Term Summary with Lender Forms**

**The following summary sets forth certain key terms in the Loan Documents between California Attorney Lending II, Inc. ("CAL") and Borrower and provides copies of forms required to be used by the Lender. THIS IS NOT A LEGAL DOCUMENT, it is not a complete listing of all rights and obligations of the parties under the Loan Documents, and is intended solely for the purpose of assisting Borrower in its administration of its Loan with CAL. In all events, the Loan Documents are controlling with respect to the parties' rights and remedies with respect to the Loan.**

1. Draw Requests: All Loan Requests are subject to the review and approval of CAL and must be submitted by e-mail or facsimile on the Draw Request form (attached).

2. Purpose: The LOC will be used solely by Borrower to (i) refinance the Borrower's existing credit facilities (if any), (ii) pay the operating expenses of Borrower's legal practice, or (iii) fund interest payments on the LOC.

3. Payment Terms: Months 1-24: Monthly interest only, except as described in "Mandatory Pre-Payments" below. Months 25-48: Monthly interest, plus 1/24 of the outstanding principal balance each month.

4. Mandatory Pre-Payments: To the extent of outstanding interest and principal, 100% of all fees and reimbursed expenses from the following: (i) Award from the Vioxx Common Benefit Fund; (ii) Avandia litigation; (iii) Fogel v. Farmers Group, Inc. Line availability to be reevaluated upon the resolution and receipt of fees from these cases with adjustments made based upon remaining collateral.

5. Interest: 18% per annum, payable on the 10th day of every month. Invoices are issued on the 1st day of every month. One month's interest in advance is payable to CAL at the closing and held on account, to be applied in the event timely payment is not made. We will require the Borrower to initiate preauthorized electronic funds transfers from a specified bank account to pay the interest on the 10th of every month.

6. Fees and Charges: Borrower will be charged a closing fee equal to 3% of the increased LOC amount ($45,000), Lender's attorneys' fees as invoiced (estimated at $1,050), Lender's attorneys' costs as invoiced (estimated at $400 for one Borrower and one Guarantor and an additional $100 for each additional party), and a wire fee of $20. All such fees are payable at the closing and will be deducted from the first draw from the LOC.

38



Initials

# *California Attorney Lending II, Inc.*

*Specialized Lending Exclusively For the Legal Community*

## AUTHORIZATION FOR LOAN PAYMENT
## AUTOMATIC WITHDRAWAL FORM

**Borrower's Information**

Full Name: __GIRARDI KEESE__

SS# or EIN#: EIN#███████995 (Soc Sec #██████████

Email Address: tgirardi@girardikeese.com

**Borrower's Bank Information**

Bank Name: __TORREY PINES BANK__

Bank ABA (Routing) No. __122243635__

Bank Telephone No. __213 362 5200__

Bank Address: __601 W. 5th Street, Suite 100, Los Angeles, CA 90071__

Borrower's Bank Account No. ██████824

The undersigned on behalf of Borrower authorizes California Attorney Lending II, Inc. to initiate preauthorized electronic funds transfers from the bank account indicated above, and the undersigned authorizes the bank named above to debit the transfers to that account. This authorization shall not be revoked, modified, or in any other way altered without the express written consent of both the undersigned and California Attorney Lending II, Inc.

Borrower: __GIRARDI KEESE__

Authorized Signature: _____   Date: __8/12/11__

Name and Title of Signer: __THOMAS V. GIRARDI, PARTNER__

Return this Form and a Voided Check to California Attorney Lending II, Inc.

39

Initials

**GIRARDI KEESE**
1126 Wilshire Blvd.
Los Angeles, CA 90017

**DRAW REQUEST**

Ms. Megan Payne
Chief Operating Officer
California Attorney Lending II, Inc.
6400 Main St.
Suite 120
Williamsville, NY 14221

Re: <u>Revolving Line of Credit</u>

Dear Ms. Payne:

Girardi Keese hereby requests the additional sum of <u>One million three hundred thousand ($</u>Dollars ($<u>1</u>.3 million) drawn from the Law Firm's revolving line of credit. Please deposit the funds on or before <u>August 15, 2011</u> into the bank account you have on file for our firm.

The funds will be used as follows:

| | |
|---|---|
| Operating Expenses: | $ <u>1.3 million</u> |
| Client/Case Expenses: | $ |
| Advertising: | $ |
| Partner draws/salary: | $ |
| Payroll: | $ |
| Other_____: | $ |

Very truly yours,
Girardi Keese

By:_____
Partner      Thomas V. Girardi

40

Initials

## WIRE INSTRUCTION STATEMENT INFORMATION

**TO:**        ACCOUNTING

**FROM:**     MEGAN PAYNE, CHIEF OPERATING OFFICER

**SUBJECT:**  CLOSING – $5,000,000 REVOLVING LINE OF CREDIT – GIRARDI KEESE

**DATED:**        AUGUST 15 2011

### WIRE INSTRUCTIONS FOR GIRARDI KEESE

**NAME OF ACCOUNT DEBTOR:**              THOMAS V. GIRARDI

**NAME OF FINANCIAL INSTITUTION:**       TORREY PINES BANK

**ADDRESS OF FINANCIAL INSTITUTION:**    601 W. 5th Street, Suite 100

                                         Los Angeles, CA 90071

**ABA NUMBER:**                          122243635

**ACCOUNT NUMBER:**                      ████324

GIRARDI KEESE

By: _____

41

Initials

# EXHIBIT D

## UCC FINANCING STATEMENT AMENDMENT

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Timothy C. Cashmore
716-858-3883

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Damon Morey LLP
The Avant Building - Suite 1200
200 Delaware Avenue
Buffalo, NY 14202
USA

**DOCUMENT NUMBER:** 30040950002
**FILING NUMBER:** 11-72814762
**FILING DATE:** 08/18/2011 08:35
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**
**THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY**

**1a. INITIAL FINANCING STATEMENT FILE #**
11-7275806299

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination.

**3.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☐ **ASSIGNMENT (full or partial):** Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  ☐ ADD name: Complete item 7a or 7b, and also item 7c

**6. CURRENT RECORD INFORMATION:**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **OR** 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **OR** 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☑ restated collateral description, or describe collateral ☐ assigned.

All Debtor's present and future right, title and interest in and to any and all accounts, choses in action, causes of action, settlement proceeds, attorneys' liens, attorneys' fees, general intangibles, contract rights, deposit and other bank accounts and instruments, instruments, documents, chattel paper and obligations in any form in each case arising out of or related to the rendition of services by Debtor whether earned by performance or otherwise in connection with the following: (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation; and (iii) all matters with respect to which the

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☑ and enter name of DEBTOR authorizing this amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Girardi Keese | | | |
| **OR** 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

**10. OPTIONAL FILER REFERENCE DATA**
Girardi Keese

**FILING OFFICE COPY**

Page 2
## UCC FINANCING STATEMENT AMENDMENT ADDENDUM
**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

| | |
|---|---|
| **11. INITIAL FINANCING STATEMENT FILE #** (same as item 1a on Amendment form) | |
| 11-7275806299 | |

**12. NAME OF PARTY AUTHORIZING THIS AMENDMENT**(same as item 9 on Amendment form)

| | | |
|---|---|---|
| **12a. ORGANIZATION'S NAME** | | |
| Girardi Keese | | |
| **OR** **12b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME, SUFFIX** |

**DOCUMENT NUMBER:** 30040950002
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**
**THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY**

**13. Use this space for additional information**

Borrower is representing one or more individuals or estates against Southern California Regional Rail Authority d/b/a Metrolink, Connex Railroad, LLC and other defendants in the so-called "Chatsworth Metrolink Collision Cases" related to the Lead Case captioned and styled Magdaleno v. Southern California Regional Rail Authority dba Metrolink, Los Angeles County Superior Court, Case No. PC043703;

all of Debtor's books related to the foregoing; and all cash and non-cash proceeds of any of the foregoing, in whatever form, including without limitation all proceeds of proceeds, all insurance policies covering same and all interest or dividends thereon.

**FILING OFFICE COPY**

# EXHIBIT E

**CLOSING CHECKLIST**
**CALIFORNIA ATTORNEY LENDING II, INC.**
**$5,000,000 SECOND AMENDED AND RESTATED**
**REVOLVING LOAN TO**
**GIRARDI KEESE, A GENERAL PARTNERSHIP**
**ORGANIZED UNDER CALIFORNIA LAW**

**Key:**
Lender              =        California Attorney Lending II, Inc., a New York corporation
Borrower          =        Girardi Keese, a general partnership organized under California law
Individual Guarantor =    Thomas V. Girardi

## LOAN DOCUMENTS

1. Second Amended and Restated Revolving Promissory Note for maximum principal amount of $5,000,000, signed by Borrower and Guarantor

2. Guaranty of Individual Guarantor

3. Second Amended and Restated Security Agreement signed by Borrower and Individual Guarantor, as debtors

    Exhibit A – Questionnaire

4. Girardi Keese Certificate, together with the following attachments:

    Schedule I – Resolutions

5. Post Closing Agreement

6. UCC-1 Financing Statement
    Borrower: Girardi Keese, Filing Office: California
    Guarantor: Thomas V. Girardi, Filing Office: California

## SUPPLEMENTAL DOCUMENTS

7. Uniform Commercial Code Search for Borrower and Individual Guarantor

8. Key Loan Term Summary with Lender Forms

117

# SECOND AMENDED AND RESTATED
# REVOLVING PROMISSORY NOTE
### California Attorney Lending II, Inc.

Delivered in Buffalo, New York

$5,000,000

August ⌊, 2013

     For value received, Girardi Keese a general partnership organized under California law ("**Borrower**"), having its principal office located at 1126 Wilshire Blvd, Los Angeles, CA 90017, promises to pay to the order of **CALIFORNIA ATTORNEY LENDING II, INC.**, a New York corporation ("Lender"), in lawful money of the United States and immediately available funds, any of the offices of Lender at 6400 Main Street, Suite 120, Williamsville, NY 14221 the principal amount of $5,000,000 or the Outstanding Principal Amount (as defined below) if less, together with all interest, fees, charges and costs and expenses payable under this Note, all at the times and in the manner provided in Section 2 below.

1. **DEFINITIONS.** For purposes of this Note:

    a. **"Advance Period"** means the period starting on the date of this Note and ending on August 31, 2015.

    b. **"Amortizing Period"** means the period starting immediately following the end of the Advance Period and ending on the Maturity Date.

    c. **"Avandia Litigation"** means all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl.

    d. **"Collateral"** means the "Collateral" as defined in the Security Agreement or any other collateral securing from time to time the obligations of Borrower or any Guarantor to Holder, including but not limited to all of Borrower's present and future right, title and interest in and to any and all legal fees and reimbursed expenses in connection with and/or derived from: (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation; (iii) all of Borrower's books related to the foregoing; and all cash and non-cash proceeds of any of the foregoing, in whatever form, including without limitation all proceeds of proceeds, all insurance policies covering same and all interest or dividends thereon; and (iv) all of Borrower's personal property, contingent or otherwise due to, or owned by the Borrower and each guarantor, including but not limited to, any right to payment of any Borrower for client representation or referral (whether such right to payment is on a contingent, hourly, fixed fee or other basis) and for costs and expenses, whether or not yet earned by performance, and the proceeds thereof, including Net Fees and Expenses.

    e. **"Credit"** means a revolving credit facility made available by Lender to Borrower in the maximum principal

2

Initials

amount equal to the Maximum Amount.

f. **"Event of Default"** means "Event of Default" as defined in Section 5 hereof.

g. **"Guarantor"** means, other than Borrower, any Person (i) who or that is now or hereafter liable, whether directly or indirectly or absolutely or contingently, for the payment of any of the Outstanding Principal Amount or any interest or other amount payable pursuant to this Note or (ii) any asset of whom or which now or hereafter directly or indirectly secures the payment of any of the Outstanding Principal Amount or any such interest or other amount.

h. **"Holder"** means Lender or any transferee of this Note.

i. **"LIBOR Rate"** means the one-month London Interbank Offered Rate, as fixed by the British Bankers Association for United States dollar deposits in the London interbank market at approximately 11:00 a.m. London, England time (or as soon thereafter as practicable) each day, as determined by Lender from any broker, quoting service or commonly available source utilized by Lender or a comparable rate or index selected by Lender should such London Interbank Offered Rate cease to be determined in such manner, cease to exist or otherwise become unavailable.

j. **"Loan"** means any loan by Holder pursuant to the Credit.

k. **"Loan Request"** means any oral (including, but not limited to, telephonic), written or other (including, but not limited to, facsimile or email) request for a Loan.

l. **"Maturity Date"** has the meaning set forth in Section 2(a)(ii) of this Note.

m. **"Maximum Amount"** means $5,000,000, US currency, as reduced in accordance with Section 2 (b) (ii) of this Note.

n. **"Net Fees and Expenses"** means all legal fees and any other amounts paid or reimbursed to Borrower for Costs, and Expenses (as defined in the next sentence), resulting from any client representation or referral (whether contingent, hourly, fixed fee or other) after payment of all amounts owing to third party lawyers (other than employees or partners of Borrower) for assistance or referral with respect to such client representation. **"Costs and Expenses"** as used in the preceding sentence means all costs, disbursements, advances and other expenses, however denominated, of any type or character, whether an out-of-pocket expense or an internal cost or expense that is allocated by Borrower to specific clients, including without limitation, all court and filing fees, witness, expert and private investigators fees and expenses, search and research charges, and reproduction, meal, travel, mailing, fax, overtime, secretarial and delivery and courier charges, that are reimbursable or payable to Borrower.

o. **"Outstanding Principal Amount"** means the outstanding principal amount of this Note from time to time.

p. **"Person"** means (i) any individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated association, (ii) any court or other governmental authority or (iii) any other entity, body, organization or group.

q. **"Security Agreement"** means the Security Agreement by Borrower to Lender dated on or about the date hereof.

r. **"Uniform Commercial Code"** means the Uniform Commercial Code as in effect from time to time in the State

3

Initials

of New York.

s. **"Zimmer Litigation"** means all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation.

2. **Payments.** The payment of principal, interest, fees and costs and expenses under this Note shall be subject to the following terms and conditions:

    a. **Regularly Scheduled Payments of Interest and Principal.**

        (i) *Monthly Interest.* Borrower shall pay monthly all interest that has accrued on the Outstanding Principal Amount through the last day of each calendar month (beginning with the calendar month containing the date of this Note), no later than the 10th day following the end of such calendar month, calculated at the rate and in the manner set forth in Section 2(d) below.

        (ii) *Principal Payment Schedule During Amortization Period.* In addition to the mandatory prepayments required under Section 2(b) below, Borrower shall pay the Outstanding Principal Amount during the Amortization Period in twenty-four (24) consecutive monthly installments commencing on September 1, 2015 and continuing on the same day of each month thereafter with the final payment due and payable on August 1, 2017 (the "Maturity Date"). Borrower shall pay each monthly installment payable for a calendar month no later than the 10th day following the end of such calendar month.

        (iii) *Monthly Principal Amount; Effect of Prepayment on Monthly Principal Amount.* Each such monthly principal intallment payable during the Amortization Period shall be in an equal amount, sufficient to amortize in full in 24 installments the Oustanding Principal Amount determined as of the last day of the Advance Period. In the event of a mandatory prepayment or optional prepayment of this Note during the Amortization Period, the amount of each remaining monthly principal installment shall be recalculated so as to equal the level monthly amount sufficient to amortize the then Oustanding Principal Amount after giving effect to such mandatory or optional prepayment over the then remaining Amortization Period (and the term of this Note shall not be shortened).

    b. **Mandatory Prepayments Based on Net Fees and Expenses.**

        (i) *Payments Based on Net Fees and Expenses.* During the entire term of this Note and subject to the last sentence of this paragraph, Borrower shall pay to Holder within 3 business days of the receipt of any Net Fees and Expenses, only to the extent of the Outstanding Principal Amount and accrued but unpaid interest, an amount equal to 100% of such Net Fees and Expenses with respect to the Avandia Litigation and the Zimmer Litigation, to be applied in the manner set forth below. Borrower shall continue to hold in Borrower's trust account any Net Fees and Expenses received until such Net Fees and Expenses are transmitted to Holder. Borrower, and each Guarantor acting on behalf of Borrower, holds all Net Fees and Expenses received by Borrower subject to an express trust as further described in Section 13 and is required to remit 100% of Net Fees and Expenses to Lender under the circumstances described in Section 13.

        (ii) *Application during the Advance Period; Reduction of Maximum Amount.* During the Advance Period, any payments based on Net Fees and Expenses received by Holder will be applied as a mandatory prepayment, first to prepay accrued and unpaid interest and fees and then to prepay the Outstanding Principal Amount. Availability of the Credit shall be re-evaluated upon the resolution of the Avandia Litigation and the Zimmer Litigation and receipt of Net Fees and Expenses with adjustments made based

4


Initials

120

on the remaining Collateral.

      (iii) *Application during the Amortization Period*. During the Amortization Period, each such payment received by Holder based on Net Fees and Expenses shall be applied first to offset Borrower's obligation to make the regularly scheduled monthly principal installment payable for the month in which Holder receives such payment (but such offset shall only be to the extent of such payment received by Holder and shall not affect Borrower's obligation to pay the balance of such regularly scheduled monthly principal installment). If Net Fees and Expenses (as set forth in Section 2(b)(i) above) in any month exceeds the monthly principal installment for such month, the excess will be applied as a mandatory prepayment of the Outstanding Principal Amount and shall not be applied to satisfy all or any portion of Borrower's obligation to make any monthly interest payment. Any such mandatory prepayment shall have the effect set forth in Section 2(a)(iii) on the remaining monthly principal installments payable during the Amortization period.

  c. **Optional Prepayments**. Borrower shall have the option of prepaying, without penalty or premium, the Outstanding Principal Amount to Holder in full or part at any time and from time to time provided, that (a) the Outstanding Principal Amount must exceed $50,000 at all times during the first one hundred twenty (120) days after the date of this Note, and (b) upon prepaying the Outstanding Principal Amount in full, Borrower shall pay to Holder all interest and other amounts payable pursuant to this Note and remaining unpaid. Any such optional prepayment made during the Amortization Period shall have the effect set forth in Section 2(a)(iii) on the remaining monthly principal installments payable during the Amortization Period.

  d. **Interest Rates and Calculation.**

      (i) *Calculation of Interest*. Interest shall be calculated on the basis of a 360 day year for the actual number of days of each year (365 or 366, as applicable), on the Outstanding Principal Amount for each day from and including the date of this Note to but not including the date the Outstanding Principal Amount is paid in full.

      (ii) *Interest Rate*. Interest will accrue on the Outstanding Principal Amount at the rate of 18% per annum, except as set forth below.

      (iii) *Increase in Interest Rate*. If on the first business day of any calendar month, the LIBOR Rate equals more than 2.5% per annum, the interest rate applicable on each day during such calendar month will equal (A) 18% per annum, plus (B) the excess of the LIBOR Rate on such first business day of such calendar month over 2.5%.

      (iv) *Default Interest*. On and after the occurrence of an Event of Default, the interest rate applicable to this Note shall equal the rate per year that is the lesser of (i) 24.9% or (ii) the maximum rate permitted by applicable law ("Default Interest"). Default Interest shall be payable during any period of default and up to and including the date of the next payment made after such period of default. Default Interest, and not any rate set by statute, shall be computed in any entry of judgment pertaining to this Note, and further, shall be paid subsequent to the entry of such judgment, and until actual satisfaction of said judgment. The judgment shall include both the action and the obligation itself. In such event, the Default Interest rate shall continue up through and including all foreclosure proceedings and proceedings for payment of monies, including but not limited to surplus money proceedings and shall be computed in the entry of any judgment, and further, subsequent to the entry of any judgment, and until actual satisfaction of this Note and said judgment.

      (v) *Maximum Applicable Rate*. In no event shall such interest be payable at a rate in excess of the maximum

5

Initials

rate permitted by applicable law. Any amount payable under this Note that is interest, or that is treated as interest, and that would cause such maximum rate to be so exceeded shall be deemed to have been a mistake and automatically canceled. If any such amount that causes the maximum rate to be exceeded is received by Holder, such amount shall be refunded to Borrower or applied to the Outstanding Principal Amount, as determined by Holder. It is the intention of Lender and Borrower that interest not be payable at a rate in excess of such maximum rate.

(vi) *One Month's Advance Interest*. Borrower must maintain on account with Holder at all times one month's advance payment of interest. The required amount of such advance payment will initially be determined based on the Outstanding Principal Amount on the date of the first Loan under this Note. Thereafter, the amount of the required advance payment to be held by Lender will be adjusted so that it equals one month's advance interest on the Outstanding Principal Amount determined as of the later of the date of the most recent Loan under this Note or the last day of the most recently ended calendar month, and Borrower will be required to pay any increase in the required amount to Holder (or if there is a reduction in the required amount, Holder will apply any excess held by Holder against other amounts then or thereafter payable by Borrower to Holder). Holder does not pay any interest on such advance payment amount or provide any discount in consideration of such advance payment. Any such advance payment will be commingled with Holder's other funds. Holder will hold such advance payment on account, and may apply any such advance payment in such manner as it determines to any amount owing to Holder that is not paid when due or to the final payment to be made to Holder under this Note.

(vii) *Availability Block/Interest Reserve*. At all times during the Advance Period, Borrower shall maintain unused borrowing availability with Holder equal to 60 days' interest based on the Outstanding Principal Amount determined as of the later of the date of the most recent Loan under this Note or the last day of the most recently ended calendar month during the term of this Note. Holder may, but shall not be obligated to, make a Loan (without any express authorization from Borrower), to pay interest that is due and payable on the Outstanding Principal Sum. On or after conclusion of the Advance Period, Lender may require Borrower to fund from time to time, an amount sufficient to establish and replenish as necessary a reserve for the payment of interest for such 60 day period (a "Reserve"). Lender may commingle any Reserve with its other funds and shall have no obligation to pay any interest on any Reserve. Lender shall be entitled to set off against any Reserve any amount that is not paid to Holder when due and payable under this Note. Borrower's obligation under this paragraph to maintain unused availability or a Reserve to cover 60 days' interest is in addition to the required one months's advance payment of interest contemplated by (vi) above.

e. **Electronic Funds Transfer.** At all times during the Advance Period and thereafter until all amounts payable under this Note have been irreovcably paid in full, Borrower shall maintain an authorization for electronic funds tranfer by Holder at a bank and from an account designated by Borrower and reasonably acceptable to Holder for payments under this Note. Lender may authorize an electronic funds transfer from such designated account of Borrower for any amount that is not paid to Holder when due and payable under this Note.

f. **Late Payment Charges.** If any principal, interest or other amount (including mandatory prepayments), payable pursuant to this Note is not paid by the date it becomes due, Borrower shall pay on demand by Holder, a monthly late charge for each month or part thereof that such overdue payment remains unpaid of the greater of (i) 5% of the overdue payment or (ii) $50.

g. **Special Deliquency Charges.** If any document or information required to be provided to Holder under this Note is not delivered when due or within 10 business days following request from Holder, Borrower shall pay a late charge of $250 per month until such documentation has been provided to Holder. If after the scheduling of an audit, Borrower (i) cancels the audit within five (5) business days prior to the scheduled date or (ii) fails at

6

Initials

the audit to provide Holder's representative with the necessary books and records to permit Holder's representative to complete the audit, Borrower shall promptly reimburse Holder for the costs associated with such cancelled or failed audit, including all costs incurred by Holder with respect to its representative such as compensation and travel expenses, in an amount equal to the greater of $500 or actual costs.

h. **Expenses.** On demand by Holder, Borrower shall pay each cost and expense (including, but not limited to, the reasonable fees and disbursements of counsel, whether retained for advice, litigation or any other purpose) incurred by Holder in endeavoring to (i) collect any of the Outstanding Principal Amount or any interest or other amount payable pursuant to this Note, (ii) preserve or exercise any right or remedy of Holder pursuant to this Note or (iii) preserve or exercise any right or remedy of Holder relating to any Collateral including the payment of unpaid insurance premiums, taxes, assessments or other obligations.

3. **LOANS.**

a. **Timing and Procedure.** At any time during the Advance Period, Borrower may make a Loan Request, which Request shall be irrevocable, that specifies (i) the amount requested as the principal amount of the Loan, (ii) the the purpose of the loan (which must comply with (b) below), and (iii) the business day of Holder on which such Loan is requested to be made. **Notwithstanding anything contained in this Note to the contrary, commencing September 1, 2015 Borrower shall not be permitted to make any further Loan Requests under this Note.**

b. **Purpose of Loans.** All Loan Requests shall be for the sole purpose of funding the operating expenses of Borrower or interest payments under this Note. Borrower shall not obtain or use the proceeds of any Loan for any purpose other than for law firm purposes, that is, for working capital of Borrower including payments to any Guarantor. Borrower covenants that no Loan proceeds shall be used by Borrower for other than a business or commercial purpose of Borrower. No Loan Requests may be made to fund the activities or operations of any Guarantor or any third party entity. The Borrower further acknowledges, warrants and represents to, and agrees with, the Lender that the Lender has made no representation to the Borrower regarding the adequacy of any loans or advances made to the Borrower pursuant to this Note for purposes of conducting the Borrower's legal practice or other business operations.

c. **Minimum Unused Credit Availability.** Borrower shall maintain unused credit availability at all times under this Note in an amount equal to not less than 60 days' interest based on the Outstanding Principal Amount on the later of the date of the most recent Loan under this Note or the last day of the most recently ended calendar month during the term of this Note as contemplated by Section 2(d)(vii) of this Note.

d. **Holder's Discretion.** The decision whether to honor such Loan Request and make such Loan shall be in the sole discretion of Holder. Without limiting Lender's discretion to fund or not fund any Loan, no Loan shall be made with respect to any principal amount prepaid until at least one (1) business day after the date of such prepayment.

e. **Reliance by Holder.** Holder may treat as made by Borrower and rely upon, and Borrower shall be bound by, any Loan Request that Holder in good faith believes to be valid and to have been made in the name or on behalf of Borrower by any officer, manager, member, partner or other individual authorized to act on behalf of Borrower, and Holder shall not incur any liability to Borrower or any other Person as a direct or indirect result of honoring such Loan Request and making such Loan.

f. **Limitation on Outstanding Principal Amount. Borrower shall not at any time permit, and Holder shall not at any time be obligated to permit, the Outstanding Principal Amount to exceed the Maximum**

7

Initials

**Amount. If the Maximum Amount is exceeded at any time, Borrower shall forthwith repay to Lender the amount of any such excess.**

g. **Schedule of Advances or Loan Account.** There shall be payable as principal pursuant to this Note only so much of the Maximum Amount as shall have been advanced by Holder as a Loan or Loans and is outstanding. Holder shall set forth on a schedule or loan account (including, but not limited to, any schedule or loan account maintained in computerized records) annotations evidencing (a) the date and principal amount of each Loan, (b) the date and amount of each payment applied to the Outstanding Principal Amount and (c) the Outstanding Principal Amount after each Loan and each such payment. Each such annotation shall, in the absence of manifest error, be conclusive and binding upon Borrower. No failure by Holder to make and no error by Holder in making any annotation on such schedule or loan account shall affect Borrower's obligation to repay the principal amount of each Loan, Borrower's obligation to pay interest on the outstanding principal amount of each Loan or any other obligation of Borrower to Holder pursuant to this Note or otherwise.

4. **COVENANTS.** So long as any obligations are owing to Holder under this Note, Borrower and each Guarantor, to the extent applicable to such Guarantor, shall comply with the following covenants:

a. **Reporting Obligations**: Borrower shall provide or cause to be provided to Holder, and each Guarantor shall provide to Holder to the extent relating to such Guarantor, within the time periods indicated below each of the following:

(i) *Tax Returns.* Copies of Borrower's and each Guarantor's annual federal tax returns no later than the earlier of (A) three days after filing or (B) the 15th day of the tenth month of each fiscal year for the immediately preceding fiscal year;

(ii) *Case Status Report; Fee Sharing and Referral Agreements.* Updated complete and accurate case and status list with respect to the clients and cases of Borrower and a copy of each fee sharing agreement or referral agreement and any amendments thereto, with any law firm or lawyer (including a lawyer that may be a shareholder, member or employee of the Borrower) with respect to any case or matter described in such list, at least once each calendar quarter;

(iii) *Bank Statements.* Copies of monthly bank statements of Borrower from each of its bank accounts (operating and trust) and monthly settlement report no later than the 10th day of each month;

(iv) *Financial Statements.* Current updated financial statements of Borrower, compiled by an independent third party accountant, not later than the 15th day of each calendar quarter in the same form delivered to Holder on or before execution of this Note;

(v) *Personal Financial Statements.* A current updated personal financial statement for each Guarantor to be delivered on or before April 15th of each year in the form completed by such Guarantor and delivered to Holder on or before execution of this Note;

(vi) *Malpractice and Life Insurance.* Evidence of coverage under a current malpractice insurance policy for Borrower, and of continuing coverage under any life insurance policy that has been assigned as part of the Collateral, on each anniversary date of coverage, and copy of any notice of cancellation, revocation or non-renewal of any malpractice insurance or any such life insurance policy within five (5) business days after receipt thereof by Borrower or any Guarantor;

(vii) *Notice of Certain Material Events or Material Change.* Notice of any tax audit with respect to Borrower or any Guarantor, any investitation by any governmental agency or regulatory body affecting Borrower

8


Initials

124

or any Guarantor, any litigation commenced against Borrower or any Guarantor, or any material change in the business, clients or prospects of Borrower, in each case as soon as Borrower or any Guarantor is aware, or should be aware, of such audit, investigation, litigation or change;

(viii) *Default Notices.* A copy of any default notice or other notice of the existence of facts or circumstances that with the passage of time will constitute such a default, under any obligation of Borrower to any party, in each case immediately following receipt by Borrower; and

(ix) *Other Information.* Any documentation or information reasonably requested by Holder that relates to the business or assets of Borrower or such Guarantor, in each case promptly following each request by Holder.

b. **Accuracy and Access to Books and Records.** Borrower shall maintain accurate books and records regarding its financial condition, including, but not limited to, aged listings of accounts payable and accounts receivable, all expenses and disbursements, business operations, and the status and condition of the Collateral; and shall grant Holder access thereto at any time upon reasonable notice to inspect and audit such books, records, and accounts, and to make copies thereof.

c. **Life Insurance.** Borrower shall cause to be maintained in effect life insurance on the life of Thomas V. Girardi in a minimum amount equal to $5,000,000 that is subject to an effective collateral assignment to Holder at all times while this Note is outstanding.

d. **Minimum Collateral Coverage.** Borrower shall not permit legal fees collectible by Borrower from the Collateral as estimated by Holder at any time to be less than **EIGHT TIMES** the Outstanding Principal Amount plus interest on this Note. In making such estimate, Holder may take into consideration, among other matters, Holder's assessment of the actual client files of Borrower from time to time and any law, judicial decision, administrative order, or professional ethics opinion that may affect the rights of law firms to sue clients for the collection of legal fees or expenses, and will reduce such estimate by the amount of any indebtedness or obligation of Borrower having priority over the collection rights of Holder.

e. **Minimun Net Worth Requirement.** Thomas V. Girardi  shall refrain from selling, gifting, transfering or otherwise disposing of assets or incurring indebtedness that reduces the personal net worth (including his or her indirect interest in Borrower's assets and his or her interest in joint assets) of such Guarantor to less than $15,000,000.

f. **Restriction on Additonal Indebtedness.** Borrower and each Guarantor shall not incur or assume, on or after the date of this Note, any indebtedness or liability (including any indebtedness or liability to any member or shareholder of Borrower or any Guarantor or any affiliate of any Guarantor) other than indebtedness that is:

(i) owing to Lender;

(ii) constituting unsecured normal trade debt incurred upon customary terms in the ordinary course of Borrower's or any Guarantor's business or in the case of any Guarantor that is an individual, ordinary consumer debt;

(iii) arising from the endorsement in the ordinary course of Borrower's or any Guarantor's business of any check or other negotiable instrument for deposit or collection;

(iv) secured by a Permitted Lien as defined in the Security Agreement; or

9


Initials

(v) incurred with the prior written consent of Holder which consent may require that the proceeds of such financing be used to repay this Note in whole or in part and that repayment of such financing be subordinated to repayment of the indebtedness due to Holder on terms acceptable to Holder.

g. **Restriction on Liens**. Borrower and each Guarantor shall refrain from creating, assuming or suffering to exist any mortgage, security interest, judgment or lien (including tax liens) on any of its assets now or hereafter acquired, other than a Permitted Lien or a security interest relating to consumer debt.

h. **No Other Law Practice**. Borrower and each Guarantor shall not own or hereafter acquire, without the prior written consent of Holder, an ownership interest, either direct or indirect, in any entity engaged in the practice of law other than Borrower.

i. **License to Practice Law**. Borrower and each Guarantor shall not permit any license to practice law held by Borrower or such Gurantor, as the case may be, to be suspended or revoked.

j. **Fee Sharing and Referral Agreements**. Without the prior written approval of Lender, Borrower shall not enter into a fee sharing or referral agreement unless such agreement is entered into in the ordinary course of business and on an arms-length basis. and shall not modify any fee sharing or referral agreement in any way that would reduce the fees or other amounts payable to Borrower thereunder or that would otherwise prejudice Lender.

5. **EVENTS OF DEFAULT AND REMEDIES.**

a. **Events of Default**. The existence or occurrence of any of the following events or circumstances shall each constitute an "Event of Default" under this Note:

   (i) *Failure to Pay Amounts due Under this Note*. Borrower defaults in the payment when due, whether by acceleration or otherwise, of any of the Outstanding Principal Amount or any interest or other amount payable pursuant to this Note; or

   (ii) *Breach of Covenants or Other Obligations to Holder*. Borrower or any Guarantor fails to comply with any of the covenants in Section 4 of this Note or defaults in the payment or performance when due of any other obligation to Holder, whether now existing or hereafter arising or accruing and whether under this Note or any other present or future agreement with Holder; or

   (iii) *Obligations Owing to Third Parties*. Borrower or any Guarantor defaults in the payment or performance of any obligation owing by Borrower or any Guarantor to any third party or there exists a default or event of default under any agreement evidencing such obligation owing to such third party; or

   (iv) *Obligations Owing to the Government*. Borrower or any Guarantor defaults in the payment of any taxes or other charges owing to any governmental entity; or

   (v) *Cessation of Business and Other Material Events*. Borrower or any Guarantor is dissolved, ceases to exist, participates or agrees to participate in any merger, consolidation or other absorption, assigns or otherwise transfers or disposes of a majority of his, her or its assets, makes or permits what might be a fraudulent transfer or fraudulent conveyance of any of his, her or its assets, becomes insolvent (however such insolvency is evidenced), generally fails to pay his, her or its debts as they become due, fails to pay, withhold or collect any tax as required by applicable law, suspends or ceases its business or has served, filed or recorded against him, her or it or any of his, her or its assets any judgment, order or award of any court, other governmental authority or arbitrator or any lien; or

10

Initials

126

(vi) *Death or Incompetency*. Borrower or any Guarantor dies or becomes incompetent; or

(vii) *Termination or Revocation*. Borrower or any Guarantor purports to terminate his, her or its obligations pursuant to any guaranty or other agreement with or for the benefit of Holder; or

(viii) *Insolvency*. Borrower or any Guarantor has any receiver, trustee, custodian or similar Person for him, her or it or any of his, her or its assets appointed (whether with or without his, her or its consent), makes any assignment for the benefit of creditors, admits in writing his, her or its inability to pay debts generally as they become due, or commences or has commenced against him, her or it any bankruptcy or insolvency proceeding or any formal or informal proceeding for the dissolution, liquidation or winding up of the affairs of or the settlement of claims against him, her or it; or

(ix) *Representations and Warranties*. Any representation or warranty heretofore made to Lender or hereafter made to Holder, or any financial statement heretofore provided to Lender or hereafter provided to Holder, by or on behalf of Borrower or any Guarantor, proves, as of the date thereof, to have been incorrect or misleading in any material respect, or before the execution and delivery to Lender by Borrower of this Note, there occurred and was not disclosed to Lender any material adverse change in any information disclosed in any such representation or warranty or in any such financial statement so provided; or

(x) *Change in Management or Control*. There occurs any change in the management of, or the beneficial ownership of any stock of or other ownership interest in, Borrower that is, in the opinion of Holder, adverse to its interest and is not corrected to its full satisfaction within 30 days after it gives to Borrower a notice that it considers such change adverse to its interest; or

(xi) *Collateral Value*. There occurs any change in the value of the Collateral or Borrower's or any Guarantor's ownership interest in the Collateral, that is, in the opinion of Holder, adverse to its interest and is not corrected to its full satisfaction within 10 days after Holder gives to Borrower a notice that Holder considers such change adverse to its interest; or

(xii) *Other Loan Document Default*. There occurs or exists any event or condition of default under any guaranty or any security agreement or other writing evidencing or relating to any Collateral or the Credit.

b.  **Acceleration**. Upon or at any time or from time to time after the occurrence or existence of any Event of Default other than, with respect to Borrower, an Event of Default described in clause (viii) above (an "Insolvency Event"), the Outstanding Principal Amount and all interest and other amounts payable pursuant to this Note and remaining unpaid shall, at the sole option of Holder and without any notice, demand, presentment or protest of any kind (each of which is knowingly, voluntarily, intentionally and irrevocably waived by Borrower), become immediately due. Upon the occurrence or existence of, with respect to Borrower, any Insolvency Event, the Outstanding Principal Amount and all such interest and other amounts shall, without any notice, demand, presentment or protest of any kind (each of which is knowingly, voluntarily, intentionally and irrevocably waived by Borrower), automatically become immediately due.

6.  **CHANGES AND WAIVERS; PARTIALLY INVALIDITY.** No course of conduct pursued, accepted or acquiesced in, and no oral, written or other agreement or representation made, by or on behalf of Holder in the future will change this Note or waive any right or remedy of Holder under or arising as a result of this Note. Any change in this Note or waiver of any right or remedy of Holder under or arising as a result of this Note must be made in a writing signed by or on behalf of Holder. Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law. If, however, any such provision shall be prohibited by or invalid under such

11

Initials

law, it shall be deemed modified to conform to the minimum requirements of such law, or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

7. **GOVERNING LAW.** This Note shall be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York, without regard to principles of conflicts of law or to the law of any other jurisdiction.

8. **CONSENT TO JURISDICTION. AS PART OF THE CONSIDERATION FOR NEW VALUE RECEIVED AND REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF BORROWER OR HOLDER, BORROWER HEREBY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN BORROWER AND HOLDER PERTAINING TO THIS NOTE OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS NOTE SHALL BE BROUGHT ONLY IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN THE COUNTY OF ERIE WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF ANY LEGAL OR EQUITABLE ACTION; PROVIDED, HOWEVER, HOLDER MAY AT ITS OPTION, COMMENCE ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION TO OBTAIN EQUITABLE RELIEF OR TO ENFORCE ANY JUDGMENT OR ORDER OBTAINED BY HOLDER AGAINST BORROWER, TO ENFORCE ANY OTHER RIGHT OR REMEDY UNDER THIS NOTE, OR TO OBTAIN ANY OTHER RELIEF DEEMED APPROPRIATE BY HOLDER. BORROWER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, AND BORROWER HEREBY WAIVES ANY OBJECTION WHICH BORROWER MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH NEW YORK COURT. BORROWER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS CONSENT TO JURISDICTION PROVISION WITH ITS LEGAL COUNSEL, AND HAS MADE THIS WAIVER KNOWINGLY AND VOLUNTARILY.**

9. **WAIVER OF TRIAL BY JURY. BORROWER KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT BORROWER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO (A) THE CREDIT, ANY LOAN OR COLLATERAL, THIS NOTE OR ANY OTHER WRITING HERETOFORE OR HEREAFTER EXECUTED IN CONNECTION WITH THE CREDIT OR ANY LOAN OR COLLATERAL, (B) ANY TRANSACTION ARISING OUT OF OR OTHERWISE RELATING TO THE CREDIT, ANY LOAN OR COLLATERAL, THIS NOTE OR ANY SUCH OTHER WRITING OR (C) ANY NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT OF THE CREDIT, ANY LOAN OR COLLATERAL, THIS NOTE OR ANY SUCH OTHER WRITING.**

10. **SERVICE OF PROCESS. PROCESS ON BORROWER IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS NOTE WILL BE DEEMED TO HAVE BEEN GIVEN WHEN GIVEN IN ANY <u>ONE</u> OF THE FOLLOWING WAYS: (A) PERSONALLY DELIVERED, (B) TWO (2) BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, CHARGES PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (C) FOUR (4) BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER AT THE ADDRESS SET FORTH AT THE BEGINNING OF THIS NOTE.** Such service shall be deemed in every respect effective service of process upon Borrower and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon Borrower. Nothing in this Section shall affect Holder's right to serve process in any other manner permitted by law. Borrower may add

12

Initials

additional addresses or change its address for purposes of service of process by giving 10 days' prior written notice of such change to Holder in accordance with the notice provisions of the Security Agreement.

11. **SECURITY AGREEMENT.** Repayment of this Note is secured by the Collateral in accordance with the terms of the Security Agreement and any other agreements relating to the Collateral.

12. **SOLVENCY.** On the date hereof, and immediately prior to and after giving effect to the borrowing represented by this Note and the use of the proceeds thereof, Borrower's assets will exceed its liabilities and Borrower will be solvent, will be able to pay its debts as they mature and will have capital sufficient to carry on its business as then constituted.

13. **BORROWER'S FIDUCIARY OBLIGATION TO LENDER/EXPRESS TRUST.** All Net Fees and Expenses received by Borrower are subject to an express trust in favor of Lender. Borrower and any Guarantor that acts on behalf of Borrower, holds all Net Fees and Expenses as a fiduciary for the benefit of Lender and any use of any Net Fees and Expenses that is not authorized by Lender is a defalcation by Borrower and any such Guarantor so acting on Borrower's behalf. Before maturity of this Note (by acceleration or otherwise), and only after Borrower has timely remitted to Lender Net Fees and Expenses as required by Section 2(b) hereof, Lender authorizes Borrower to use any such Net Fees and Expenses for its operations in the ordinary course of business unless Lender has notified Borrower after the occurrence and during the continuation of an Event of Default that Lender is revoking such authorization. **After maturity of this Note (whether by acceleration or otherwise) or if Lender so revokes the foregoing authorization following the occurrence and during the continuance of an Event of Default, Borrower shall remit to Lender 100% of Net Fees and Expenses for application to Borrower's obligations under this Note in such manner as Lender shall determine.**

14. **RENEWAL NOTE.** This Note evidences but does not extinguish or satisfy, and is not a novation of, a preexisting indebtedness evidenced by that certain Revolving Promissory Note executed by Borrower to Lender in the maximum principal amount of $3,500,000 dated July 5, 2011 as amended and restated by First Amended and Restated Revolving Promissory Note executed by Borrower to Lender in the maximum principal amount of $5,000,000 dated August 12, 2011 ("Prior Notes"). Borrower hereby acknowledges that the outstanding principal balance under the Prior Notes immediately prior to the funding of this Note was $4,706,001.30.

Dated: August 1 , 2013

Girardi Keese

By: _____
        Thomas V. Girardi, Partner

# BORROWER ACKNOWLEDGMENT FOR NOTE

STATE OF CALIFORNIA
                        : SS.

13

Initials

COUNTY OF *Los Angeles*

On the 1st day of August in the year 2013 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity as Partner of Girardi Keese, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

_Shirleen H. Fujimoto_
Notary Public

SHIRLEEN H. FUJIMOTO
COMMISSION # 1933089
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires May 15, 2015

14

Initials

130

**GUARANTOR AGREEMENT TO PROMISSORY NOTE COVENANTS**

Each of the undersigned individually agree(s) to those covenants set forth in Section 4 of this Note that are applicable to the undersigned as Guarantor and agrees to be bound by the provisions of Section 13 of this Note.

Date: August 1, 2013

_____
Thomas V. Girardi

GUARANTOR ACKNOWLEDGMENT FOR PROMISSORY NOTE

STATE OF CALIFORNIA
                                    : SS.
COUNTY OF Los Angeles

On the 1st day of August in the year 2013 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

SHIRLEEN H. FUJIMOTO
COMMISSION # 1933089
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires May 15, 2015

15

Initials

131

**ALLONGE TO REVOLVING PROMISSORY NOTE, DATED AUGUST___, 2013 ISSUED BY
GIRARDI KEESE
TO CALIFORNIA ATTORNEY LENDING II, INC.**

NOTICE:  THIS NOTE IS SUBJECT TO A SECURITY INTEREST GRANTED BY CALIFORNIA ATTORNEY LENDING HOLDINGS LLC AND ITS WHOLLY-OWNED SUBSIDIARY, CALIFORNIA ATTORNEY LENDING II, INC., TO BANK OF AMERICA, N.A. PURSUANT TO A SECURITY AGREEMENT SUPPLEMENT, DATED MARCH 31, 2010, BY WHICH CALIFORNIA ATTORNEY LENDING HOLDINGS LLC AND CALIFORNIA ATTORNEY LENDING II, INC. AGREED TO BE BOUND BY A SECURITY AGREEMENT, DATED SEPTEMBER 17, 2009, IN FAVOR OF BANK OF AMERICA, N.A., AS SUCH SECURITY AGREEMENT HAS BEEN OR IS HEREAFTER AMENDED, SUPPLEMENTED, REPLACED, RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME.

16

Initials

## GUARANTY OF PAYMENT AND PERFORMANCE

**THIS GUARANTY** ("Guaranty") from **THOMAS V. GIRARDI**, individually, with a principal address at 100 Los Altos Drive, Pasadena, CA 91105 (the "Guarantor") to **CALIFORNIA ATTORNEY LENDING II, INC.**, a New York corporation with a place of business at 6400 Main Street, Suite 120, Williamsville, NY 14221 ("Lender").

### W I T N E S S E T H:

**WHEREAS**, Girardi Keese ("Borrower") on the date hereof, has executed and delivered to Lender that certain Second Amended and Restated Revolving Promissory Note in the principal amount of $5,000,000 as the same may be amended, renewed, increased or replaced from time to time ("Note") pursuant to which Lender is extending certain credit facilities (collectively, the "Credit Facilities") to Borrower; and

**WHEREAS**, Lender is unwilling to extend the Credit Facilities to Borrower unless it receives this Guaranty; and

**WHEREAS**, each Guarantor is willing to execute and deliver this Guaranty to Lender in order to induce Lender to extend the Credit Facilities and each Guarantor has approved the form and substance of each and all of the documents relating to the Credit Facilities including the Revolving Promissory Note, the Security Agreement as herein defined and all certifications, agreements, letters and other documents executed with respect to the Credit Facilities.

**NOW, THEREFORE**, in order to induce Lender to extend the Credit Facilities to Borrower and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, each Guarantor agrees as follows with Lender:

### ARTICLE 1
### REPRESENTATIONS AND WARRANTIES OF GUARANTORS

Each Guarantor hereby represents and warrants to Lender (with respect to himself, herself or itself and not any other Guarantor) that:

**Section 1.1     Capacity of Guarantors**. Such Guarantor:

(A)     has the capacity to enter into this Guaranty; and

(B)     has his or her principal residence or its primary office at the address set forth in the first paragraph of this Guaranty.

**Section 1.2     No Violation of Restrictions**. Neither the execution and delivery of this Guaranty, the consummation of the transactions contemplated hereby nor the fulfillment of or compliance with the provisions of this Guaranty will conflict with or result in a breach of any of the terms, covenants, conditions or provisions of any agreement, judgment or order to which such Guarantor is a party or by which such Guarantor is bound, or will constitute a default under any of the foregoing, or result in the creation or imposition of any lien of any nature whatsoever.

**Section 1.3     Compliance with Law**. Such Guarantor is not in violation of any law, ordinance, governmental rule, regulation, order or judgment to which such Guarantor may be subject which is likely to materially affect the financial condition of such Guarantor.

**Section 1.4     Financial Statements and Other Information**. The financial statements and any other information submitted by such Guarantor to Lender fairly represent the financial condition as of the date of each statement and there

17

Initials

133

has been no material adverse change in the financial condition of such Guarantor since the date of the respective statements submitted to Lender.

**Section 1.5** **Solvency of Guarantors and Borrower.** Such Guarantor's assets exceed his, her or its liabilities (without in any way limiting any obligation that any Guarantor may have to maintain a specified minimum net worth). Such Guarantor has made an appropriate financial investigation of Borrower and has determined that Borrower is solvent at the time of execution of this Guaranty.

## ARTICLE 2
## COVENANTS AND AGREEMENTS

**Section 2.1** **Guaranty of Payment and Performance.** Each Guarantor irrevocably, absolutely and unconditionally (and jointly and severally if there is more than one Guarantor) guarantees to Lender, the punctual payment and performance of the Obligations as hereafter defined.

"Obligations" means all the present and future monetary and other obligations of Borrower to Lender, of whatever nature or character, and whether absolute or contingent, arising under the Note and all of the other Loan Documents, including, without limitation any obligation of Borrower to pay any principal, interest, fee, charge, cost or expense under the Loan Documents, whether or not any such amounts arise or are accrued after the commencement of any bankruptcy or other insolvency proceeding and whether or not allowed as a claim in any such proceeding.

"Loan Documents" means collectively (a) the Note, (b) the Security Agreement, dated on or about the date hereof, from Borrower to Lender ("Security Agreement"), (c) each other security agreement, assignment, mortgage, document, instrument, letter and certificate that has been or is hereafter executed and delivered in connection with any of the foregoing and (d) each amendment, increase, extension, amendment and restatement or replacement of any of the foregoing.

**Section 2.2** **Obligations Unconditional.** This Guaranty shall remain in full force and effect until the Obligations are irrevocably paid in full and the Loan Documents are terminated, irrespective of any interruptions in the business relationships of Borrower or any Guarantor with Lender. No Guarantor's obligation hereunder shall be affected, modified or impaired by any state of facts or the happening from time to time of any event, including, without limitation, any of the following, whether or not with notice to or the consent of such Guarantor or any other Guarantor:

(A)     The invalidity, irregularity, illegality or unenforceability of, or any defect in, any Loan Document or any collateral security for the Credit Facilities or any Guaranty (collectively, the "Collateral"), including, without limitation, the Collateral under the Security Agreement, or the failure to perfect any security interest in or assignment of any of the Collateral, or the amendment, release or termination of any such security interest or assignment.

(B)     Any present or future law or order of any government (de jure or de facto) or of any agency thereof purporting to reduce the Obligations or amend or otherwise affect any Loan Document or any other obligation of Borrower or any other obligor under the Loan Documents or any other terms of payment.

(C)     The waiver, compromise, settlement, release or termination of any or all of the obligations, covenants or agreements of Borrower under any Loan Document, of any Guarantor under any Loan Document, of any other guarantor of the Credit Facilities or any part thereof, or of any other party who has given collateral as security for the payment of the Credit Facilities or any part thereof.

(D)     The failure to give notice to any Guarantor of the occurrence of an event of default under any Loan Document.

(E)     The loss, release, sale, exchange, surrender or other change in any Collateral.

18

Initials

(F)     The extension of the time for payment or performance or renewal of any of the Obligations.

(G)     The modification or amendment (whether material or otherwise) of any obligation, covenant or agreement set forth in any Loan Document.

(H)     The performance of, or the omission to perform, any of the actions referred to in any Loan Document.

(I)     Any failure, omission or delay on the part of Lender to enforce, assert or exercise any right, power or remedy conferred on Lender in any Loan Document.

(J)     The voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets, marshaling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition with creditors or readjustment of, or other similar proceedings affecting, any Guarantor or Borrower or any of their respective assets, or any allegation or contest of the validity of any Loan Document.

(K)     The default or failure of any Guarantor to fully perform any obligations set forth in this Guaranty.

(L)     Any event or action that would, in the absence of this paragraph, result in the release or discharge of any Guarantor from the performance or observance of any obligation, covenant or agreement contained in this Guaranty (other than the irrevocable payment in full of the Obligations or a written release provided by Lender to such Guarantor).

(M)     Any other circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or a guarantor.

**Section 2.3     Waivers by Guarantors.**

(A) Each Guarantor waives any and all rights that are or may become available to such Guarantor by statute or otherwise to require Lender to (i) proceed against Borrower; (ii) proceed against or exhaust any security held from Borrower; or (iii) pursue any other remedy in Lender's power whatsoever. Lender may, at its election, exercise any right or remedy it may have against each Guarantor or any Collateral now or hereafter held by or for the benefit of Lender including, without limitation, the right to foreclose upon any such Collateral by judicial or nonjudicial sale, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Obligations may thereby be paid and performed, even though any rights which any Guarantor may have or otherwise might obtain by subrogation against others might be diminished or destroyed. Each Guarantor acknowledges that any such exercise of a right or remedy with respect to Collateral may result in a loss, in part or whole, of Lender's right to collect from Borrower any deficiency that may remain after any such exercise of such a right or remedy and that, where such a loss occurs, each Guarantor will also suffer a loss of any rights and remedies, arising in law or equity, which such Guarantor may have to collect any amount from Borrower; and each Guarantor agrees to remain bound notwithstanding any such loss. Each Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to Collateral, has destroyed each Guarantor's right of subrogation and reimbursement against Borrower by the operation of law or otherwise. Only the net proceeds from any such foreclosure, after deduction of all costs and expenses authorized to be deducted pursuant to the documents under which such Collateral is held or by law, shall be applied against the Obligations. Lender may at its discretion purchase all or any part of such Collateral so sold or offered for sale for its own account and may apply against the amount bid therefor all or any part of the Obligations for which such Collateral is held; and in such case, only that portion of the Obligations so applied, after deduction of all costs and expenses authorized to be deducted by law or pursuant to the documents under which such Collateral is held, shall be applied against the Obligations. Each Guarantor waives any defense arising out of the absence, impairment or loss of any right to reimbursement or subrogation or other

19


Initials

right or remedy of such Guarantor against Borrower or any such Collateral, whether resulting from the election by Lender to exercise any right or remedy it may have against any person, any defect in, failure of, or loss or absence of priority with respect to Lender's interest in such Collateral, or otherwise. In the event that any foreclosure sale is deemed to be not commercially reasonable, each Guarantor waives any right that he, she or it may have to have any portion of the Obligations discharged except to the extent of the amount actually bid and received by Lender at any such sale. Lender shall not be required to institute or prosecute proceedings to recover any deficiency as a condition of payment or performance hereunder or enforcement hereof.

(B) **Waiver of Notices and Demands.** Each Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of default, and notices of acceptance of this Guaranty and of the existence, creation or incurring of new or additional Obligations. At the option of Lender, each Guarantor may be joined in any action or proceeding commenced by Lender against Borrower in connection with or based upon the Obligations or any Collateral and recovery may be had against such Guarantor in such action or proceeding, without any requirement that Lender first assert, prosecute or exhaust any remedy or claim against Borrower. Without limiting the foregoing, each Guarantor acknowledges that repeated and successive demands may be made and payments or performance made hereunder in response to such demands as and when, from time to time, Borrower may default in payments or performance of the Obligations. Notwithstanding any such performance hereunder, this Guaranty shall remain in full force and effect and shall apply to any and all subsequent defaults by Borrower in payment or performance of the Obligations.

(C) **Waiver of Defenses.** Each Guarantor waives any defense arising by reason of any disability or defense of Borrower or by reason of the cessation from any cause whatsoever of the liability of Borrower. Each Guarantor waives any setoff, defense or counterclaim which Borrower or such Guarantor may have or claim to have against Lender.

(D) **Real Property and Other Surety Waivers.** Each Guarantor waives all rights and defenses that such Guarantor may have because Borrower's debt, or any guaranty thereof, is secured by real property, including but not limited to any life insurance. This means, among other things: (i) that Lender may collect from any Guarantor without first foreclosing on any real property Collateral; and (ii) if Lender forecloses on any real property Collateral: (A) the amount of the debt may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the Collateral is worth more than the sale price, and (B) Lender may collect from each Guarantor even if Lender, by foreclosing on the real property Collateral, has destroyed any right such Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses that any Guarantor may have because Borrower's debt or any guaranty is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based on Section 580a, 580b, 580d , or 726 of the California Code of Civil Procedure.

Each Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed such Guarantor's rights of subrogation and reimbursement against Borrower by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

Without limiting any waiver, consent or agreement in this Guaranty, each Guarantor further expressly waives to the extent not prohibited by applicable law any and all rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to a Guarantor under California Civil Code Sections 2787 to 2855, inclusive, 2899 and 3433, including any revision or replacement of such statutes or rules hereafter enacted.

Any reference to California law does not in any way affect or impair Guarantor's choice of New York law pursuant to Section 4.2 of this Guaranty or constitute Lender's acknowledgement or agreement that California law will apply in any respect to this Guaranty. Such references to California law are for the sole purpose of providing Lender the broadest waivers of defenses and rights by a guarantor that are enforceable under California law in case California

20


Initials

law is applied for matters of procedure or otherwise in any action or proceeding initiated by Lender in California relating to this Guaranty.

(E) **No Waiver; Remedies.** In addition to, and not in limitation of the waivers, no failure on the part of Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right thereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

(F) **Guarantors' Understanding With Respect To Waivers.** Each Guarantor warrants and agrees that each of the waivers set forth above is made with such Guarantor's full knowledge of its significance and consequences, and that under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any of such waivers is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law.

**Section 2.4    Nature of Guaranty.** This Guaranty is a guaranty of payment and not of collection and each Guarantor hereby waive the right to require that any action be brought first against Borrower, any other Guarantor or any other party, or to require any security, or to require that resort be made to any security or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or of any Guarantor.

**Section 2.5    Continuation of Guaranty.** Each Guarantor further agrees that the obligations hereunder shall continue to be effective or reinstated, as the case may be, if at any time payment of all or any part thereof of the Credit Facilities is rescinded or must otherwise be restored by Lender upon the bankruptcy or reorganization of Borrower, any Guarantor or otherwise.

**Section 2.6    Subordination of Debt.** Each Guarantor hereby subordinates any and all indebtedness of Borrower now or hereafter owed to such Guarantor to all indebtedness of Borrower to Lender and agree with Lender that, from and after the date whereon Lender notifies such Guarantor that an event of default under one or more of the Loan Documents has occurred and is continuing, such Guarantor shall not demand or accept any payment from Borrower of any such indebtedness, shall not claim any offset or other reduction of such Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any interest in any of the security described in and encumbered by the Loan Documents; provided, however, that, if Lender so requests, such indebtedness shall be collected, enforced and received by such Guarantor as trustee for Lender and paid over to Lender on account of the indebtedness of the Borrower to Lender, but without reducing or affecting in any manner the liability of any Guarantor under the other provisions of this Guaranty except to the extent the principal amount of such outstanding indebtedness shall have been reduced by such payment.

**Section 2.7    Financial Statements and Other Information.** Each Guarantor agrees to deliver to Lender (A) on or before April 15 of each year, personal financial statements and information applicable to such Guarantor on Lender's standard form or other form acceptable to Lender and (B) copies of such Guarantor's annual federal tax return to be delivered on the sooner of (i) three days after filing or (ii) October 15 of each year for, as applicable, the immediately preceding fiscal or calendar year. Each Guarantor agrees to promptly deliver to Lender from time to time any additional documentation or information reasonable requested by Lender that relates to the business or assets of such Guarantor.

**Section 2.8    Transfer of Interest.** Except as expressly permitted pursuant to the Loan Documents, each Guarantor agree not to make or permit to be made, by voluntary or involuntary means, any transfer of the interest of such Guarantor in Borrower, without first obtaining the prior written consent of Lender.

**Section 2.9    Compliance with Note Covenants.** Each Guarantor shall comply with all covenants applicable to such Guarantor that are set forth in the Note. Any Guarantor that acts on behalf of Borrower has the fiduciary obligations described in the Note with respect to Net Fees and Expenses as defined in the Note.

21

Initials

## ARTICLE 3
## EVENTS OF DEFAULT

**Section 3.1    Events of Default Defined**. An "Event of Default" shall exist if any of the following events occurs and is continuing:

(A)    Any Guarantor fails to perform or observe any covenant contained herein.

(B)    Any warranty, representation or other statement by or on behalf of any Guarantor contained in this Guaranty or in any Loan Document is false or misleading in any material respect when made.

(C)    A receiver, liquidator or trustee of any Guarantor or any of his, her or its property is appointed by court order, or any party named as a Guarantor is adjudicated bankrupt or insolvent or any of his, her or its property is sequestered by court order and such order remains in effect for more than sixty (60) days, or a petition is filed against any Guarantor under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, and is not dismissed within ninety (90) days of such filing.

(D)    Any Guarantor files a bankruptcy petition or seeks relief under any provision of any reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, or consents to the filing of any petition against it under any such law.

(E)    Any Guarantor makes an assignment for the benefit of creditors or admits in writing inability to pay debts generally as they become due, or consents to the appointment of a receiver, trustee or liquidator of all or any part of his, her or its property.

(F)    The occurrence of an Event of Default under the Note or any other Loan Document.

**Section 3.2    Remedies on Default**. If an Event of Default exists, Lender may proceed to enforce the provisions hereof and to exercise any other rights, powers and remedies available to Lender without prior written notice to any Guarantor.

**Section 3.3    Waiver and Notice**.

(A)    No remedy herein conferred upon or reserved to Lender is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Guaranty now or hereafter existing at law or in equity or by statute.

(B)    No delay or omission to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right or power may be exercised from time to time and as often as may be deemed expedient.

(C)    In order to entitle Lender to exercise any remedy reserved to it in this Guaranty, it shall not be necessary to give any notice, other than such notice as may be expressly required in this Guaranty.

(D)    No waiver, amendment, release or modification of this Guaranty shall be established by conduct, custom or course of dealing.

22

Initials

138

## ARTICLE 4
## MISCELLANEOUS

**Section 4.1** **Construction**. If this Guaranty is executed by two or more parties, they shall be jointly and severally liable hereunder and the term "Guarantors" whenever used herein shall be construed to refer to each of the parties in the same manner and with the same effect as if each party had signed a separate guaranty.

**Section 4.2** **Governing Law**. This Guaranty shall be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York, without regard to principles of conflicts of law or to the laws of any other jurisdiction.

**Section 4.3** **Successors and Assigns**. This Guaranty shall inure to the benefit of and be binding upon the successors and assigns of each of the parties hereto.

**Section 4.4** **Notices**. Any notice required or permitted to be given hereunder must be in writing and delivered or transmitted to a party at the address or any fax number for such party set forth at the head of this Guaranty, or to such other address or fax number as such party may designate in writing as provided herein for the purpose of receiving notices hereunder. Any such notice to a party is effective if by personal delivery, upon such delivery; if by nationally recognized overnight courier, on the next business day after delivery to such courier; if by fax transmission, upon receipt by the sender of an electronic confirmation of a successful transmission; and otherwise upon receipt of such notice by such party.

**Section 4.5** **Entire Agreement**. This Guaranty and the Loan Documents constitute the entire understanding between Borrower, each Guarantor and Lender and to the extent that any writings not signed by Lender or oral statements or conversations at any time made or had are inconsistent with the provisions of this Guaranty or the other Loan Documents, the same shall be null and void.

**Section 4.6** **Amendments**. No amendment, change, modification, alteration or termination of this Guaranty shall be made except upon the written consent of Lender and any Guarantor to be bound thereby.

**Section 4.7** **Assignment**. This Guaranty is assignable by Lender in whole or in part in conjunction with an assignment of the Loan Documents and any assignment hereof or any transfer or assignment of the Loan Documents or portions thereof shall operate to vest in any such assignee the rights and powers, in whole or in part, as appropriate, herein conferred upon and granted to Lender.

**Section 4.8** **Partial Invalidity**. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law. If, however, any such provision shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law, or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

**Section 4.9** **SUBMISSION TO JURISDICTION**. EACH GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY SHALL BE BROUGHT ONLY IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN THE COUNTY OF ERIE, WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF ANY LEGAL ACTION, AND

23

Initials

EACH GUARANTOR WAIVES ANY RIGHT TO OBJECT TO JURISDICTION WITHIN THE FOREGOING FORUM BY LENDER. NOTHING CONTAINED HEREIN SHALL PREVENT LENDER FROM BRINGING ANY SUIT, ACTION OR PROCEEDING OR EXERCISING ANY RIGHTS AGAINST ANY COLLATERAL, AGAINST ANY GUARANTOR PERSONALLY OR AGAINST ANY PROPERTY OF ANY GUARANTOR, WITHIN ANY OTHER JURISDICTION, AND THE INITIATION OF SUCH SUIT, ACTION OR PROCEEDING OR TAKING OF SUCH ACTION IN ANY SUCH OTHER JURISDICTION SHALL IN NO EVENT CONSTITUTE A WAIVER OF THE AGREEMENTS CONTAINED HEREIN WITH RESPECT TO THE LAWS OF THE STATE OF NEW YORK GOVERNING THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO OR THE AGREEMENT OF EACH GUARANTOR TO SUBMIT TO PERSONAL JURISDICTION WITHIN THE STATE OF NEW YORK AND COUNTY OF ERIE.

Section 4.10    WAIVER OF JURY TRIAL. EACH GUARANTOR HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS HE, SHE OR IT MAY HAVE TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (A) ARISING UNDER THIS GUARANTY OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS GUARANTY OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE, AND EACH GUARANTOR HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND LENDER MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF EACH GUARANTOR'S CONSENT TO THE WAIVER OF HIS, HER OR ITS RIGHT TO TRIAL BY JURY. EACH GUARANTOR REPRESENTS AND WARRANTS THAT HE, SHE OR IT HAS REVIEWED THIS JURY WAIVER PROVISION WITH HIS, HER OR ITS LEGAL COUNSEL, AND HAVE MADE THIS WAIVER KNOWINGLY AND VOLUNTARILY.

Section 4.11    SERVICE OF PROCESS. PROCESS ON ANY GUARANTOR IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS GUARANTY WILL BE DEEMED TO HAVE BEEN GIVEN WHEN GIVEN IN ANY ONE OF THE FOLLOWING WAYS: (A) PERSONALLY DELIVERED, (B) TWO BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, ALL CHARGES PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (C) 4 BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO EACH GUARANTOR AT THE APPLICABLE ADDRESS FOR SUCH GUARANTOR .SET FORTH AT THE BEGINNING OF THIS GUARANTY. Such service on a Guarantor shall be deemed in every respect effective service of process upon such Guarantor and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon such Guarantor. Nothing in this Section shall affect Lender's right to serve process in any other manner permitted by law. Any Guarantor may add additional addresses or change an address for purposes of service of process by giving 10 days' prior written notice of such change to Lender.

Section 4.12    Unlimited Guaranty.   This Guaranty is unlimited in amount.

IN WITNESS WHEREOF, each Guarantor has executed this Guaranty as of the day and year set forth.

_____        Dated: August __, 2013
Thomas V. Girardi, Individually

24

Initials

140

**ACKNOWLEDGMENTS (FOR GUARANTY)**

STATE OF CALIFORNIA
COUNTY OF Los Angeles

On the 1st day of August in the year 2013 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

_Shirleen H. Fujimoto_
Notary Public

SHIRLEEN H. FUJIMOTO
COMMISSION # 1933089
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires May 15, 2015

25

Initials

141

### SECOND AMENDED AND RESTATED
### SECURITY AGREEMENT
### CALIFORNIA ATTORNEY LENDING II, INC.

In consideration of **California Attorney Lending II, Inc.**, a New York corporation having its chief executive office at 6400 Main Street, Suite 120, Williamsville, NY 14221 ("Secured Party") heretofore or hereafter (1) extending or agreeing to extend any credit or other financial accommodation to or relying on any guaranty, endorsement or other assurance of payment of Girardi Keese, a California general partnership having an office at 1126 Wilshire Blvd., Los Angeles, CA 90017 ("Borrower") or (2) agreeing to any direct or indirect extension, renewal, refinancing or other modification or replacement of or waiving or forbearing from exercising any right or remedy relating to any obligation heretofore or hereafter arising or accruing as a result of any such credit or other financial accommodation to Borrower, and for other valuable consideration, the receipt and adequacy of which is acknowledged, **Borrower and Thomas V. Girardi, individually,** having his or her principal residence address at 100 Los Altos Drive, Pasadena, CA 91105 (Borrower and each such individual being, a "Debtor" and collectively the "Debtors"), agrees with Secured Party as follows:

Introductory Statement: Secured Party and some or each or all of the Debtors are parties to that certain Security Agreement dated July 5, 2011 as amended and/or restated on August 12, 2011 (collectively, "Security Agreement") in reliance upon which Secured Party has made certain loans and financial accommodations available to Borrower. Borrower as of the date of this Second Amended and Restated Security Agreement has executed a Second Amended and Restated Revolving Promissory Note to Secured Party in the principal amount of $5,000,000. The parties now desire to consolidate, amend and restate the Security Agreement in all respects as hereinafter set forth.

**1.    DEFINITIONS.** In this Security Agreement (the "Agreement"):

**a.    Account Debtor.** "Account Debtor" means any person or entity with an obligation to pay or transfer cash, property or proceeds to any Debtor on an Account, Chattel Paper, General Intangible regardless whether such obligation arises from business or personal matters or assets of such Debtor.

**b.    Collateral.** "Collateral" means collectively the following:

All of each Debtor's right, title and interest in all Goods (including, Equipment, Fixtures and Inventory), Money, Instruments (including Promissory Notes), Accounts, Deposit Accounts, Chattel Paper, Investment Property, Letter-of-Credit Rights, Documents and General Intangibles (including payment intangibles), Commercial Tort Claims described in the Questionnaire, Insurance Proceeds and any other personal property (whether or not subject to the UCC), and all interest, dividends and other distributions thereon paid and payable in cash or in property; and all replacements and substitutions for, and all accessions and additions to, and all profits, offspring, Products and other Proceeds of, all of the foregoing. Each Debtor is prohibited from granting additional security interest in the Collateral or the Proceeds of the Collateral. (Notice to potential competing creditors under Official Note 5 of UCC Section 9-331).

The Collateral includes, without limitation, any right to payment of any Debtor for client representation or referral (whether such right to payment is on a contingent, hourly, fixed fee or other basis) and for Costs and Expenses (as defined in the Note), whether or not yet earned by performance, and the proceeds thereof, including Net Fees and Expenses (as defined in the Note) and Borrower's present and future right, title and interest in and to any and all legal fees and reimbursed expenses in connection with and/or derived from: (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation and (iii) all of Debtor's books related to the foregoing; and all

26

Initials

cash and non-cash proceeds of any of the foregoing, in whatever form, including without limitation all proceeds of proceeds, all insurance policies covering same and all interest or dividends thereon.

**c.     Event of Default.** An "Event of Default" occurs or exists if:

(i)     there occurs or exists any event or condition of default under any Revolving Promissory Note or other instrument (A) now or hereafter evidencing any of the Obligations, hereinafter defined, or (B) the payment of which is now or hereinafter guaranteed by any Debtor (including, but not limited to, that certain Note, dated the date of this Agreement, issued by Borrower to Secured Party, or any direct or indirect extension, renewal, refinance or other modification or replacement of such Note); or

(ii)    there occurs or exists any event or condition of default under any guaranty of the Obligations; or

(iii)   Secured Party deems itself insecure with respect to the Obligations or is of the opinion that the Collateral is or may not be sufficient or has decreased or may decrease in value, whether or not Secured Party has sought any Other Collateral from any Debtor or any Guarantor.

**d.     Fiduciary Obligations.** "Fiduciary Obligations" means the fiduciary obligations of any Debtor, as set forth in the Note, relating to Net Fees and Expenses as defined in the Note.

**e.     Guarantor.** "Guarantor" means any Person, including Thomas V. Girardi, who or that is now or hereafter liable, whether directly or indirectly or absolutely or contingently, for the payment of any of the Obligations.

**f      Loan Documents.** "Loan Documents" means collectively (i) the Note, dated on or about the date hereof, from Borrower to Secured Party, (ii) this Security Agreement, (iii) the Guaranty of Payment and Performance, dated on or about the date hereof, from the Guarantors identified therein to Lender, (iv) each other guaranty, security agreement, assignment, mortgage, document, instrument, letter and certificate that has been or is hereafter executed and delivered in connection with any of the foregoing and (v) each amendment, increase, extension, amendment and restatement or replacement of any of the foregoing.

**g.     Note.** "Note" means the Second Amended and Restated Revolving Promissory Note, dated on or about the date hereof, from Borrower to Secured Party as amended, increased, extended, amended and restated or replaced from time to time.

**h      Obligations.** "Obligations" means collectively all obligations that are now owing or in the future owing by each Debtor (including, any direct or indirect successor of any Debtor or any direct or indirect assignee or other transferee of all or substantially all of the assets of any Debtor) to Secured Party for the payment of any money or the performance of any other obligation under the Loan Documents, regardless of type, class or form, whether direct or indirect, absolute or contingent (whether pursuant to any guaranty, endorsement or other assurance of payment or otherwise), whether for any business or commercial purpose or otherwise, including without limitation any such present and future obligations owing under the Loan Documents, (i) for the payment of any principal, interest, fee, charge, cost or expense, whether or not any such amounts arise or accrue after the commencement of any bankruptcy or other insolvency proceeding and whether or not allowed in any such proceeding, (ii) by such Debtor alone or with others, and (iii) whether owing from inception to Secured Party or acquired by assignment or other transfer to Secured Party.

**i.     Other Collateral.** "Other Collateral" means, other than the Collateral, any collateral, subordination, guaranty, endorsement or other security or assurance of payment, whether now existing or hereafter arising or accruing, that now or hereafter secures the payment of or is otherwise applicable to any of the Obligations.

**j.     Permitted Liens.** "Permitted Liens" means (i) any security interest in or other lien on any of the Collateral in

27

Initials

favor of Secured Party or (ii) any security interest in or other lien on any of the Collateral existing on this date that is (A) fully and accurately described in the response to question 7 contained in the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement but only to the extent such security interest or other lien secures the indebtedness described in such response or (B) consented to in writing by Secured Party.

**k.     Person.** "Person" means (i) any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated association, government or political subdivision, (ii) any court, agency or other governmental body or (iii) any other entity, body, organization or group.

**l.     Record.** "Record" means any information that is now or hereafter (i) inscribed on a tangible medium or (ii) stored in an electronic or other medium and retrievable in perceivable form, except to the extent constituting confidential information (whether contained in any client file of any Debtor or otherwise) that any Debtor is not permitted to disclose to Secured Party by reason of any ethical or disciplinary rule, regulation or law governing such Debtor's conduct.

**m.     Security Interest.** "Security Interest" means any security interest or other lien granted or otherwise created pursuant to the first sentence of Section 2 of this Agreement.

**n.     Uniform Commercial Code.** "Uniform Commercial Code" or "UCC" means the Uniform Commercial Code in effect at any time in the State of New York.

**o.     Other Terms.** All capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in the Uniform Commercial Code.

**2.     GRANT OF SECURITY INTEREST.** To secure the payment and performance of the Obligations, each Debtor grants to Secured Party a security interest in and assigns, pledges and hypothecates to Secured Party the Collateral. Each Security Interest is a continuing, absolute and unconditional security interest or other lien.

**3.     REINSTATEMENT OF OBLIGATIONS.** Each portion of the Obligations heretofore or hereafter paid or satisfied by any of the Collateral, or any money or Other Collateral, heretofore or hereafter received, applied or retained by Secured Party and later recovered from Secured Party as a result of any claim (including, but not limited to, any claim involving preference or fraudulent conveyance or any allegation that any money received by Secured Party constituted trust funds), however asserted and whether now existing or hereafter arising or accruing, shall be reinstated as part of the Obligations for purposes of this Agreement as of the date it originally arose or accrued.

**4.     COVENANTS.**

**a.     Affirmative Covenants.** Each Debtor shall (i) maintain complete and accurate Records relating to the Collateral, (ii) before the end of any applicable grace period, pay each tax, assessment, fee and charge imposed by any government or political subdivision upon any of the Collateral, this Agreement or any agreement, instrument or other Record evidencing any of the Collateral or any of the Obligations, (iii) defend the Collateral against each demand, claim, counterclaim, setoff and defense asserted by any Person (including, but not limited to, any Account Debtor) other than Secured Party and (iv) promptly notify Secured Party of (A) any threat or commencement of any action or other legal proceeding, any entry of any judgment or order of any court, agency or other governmental body, or any assertion by any Person (including, but not limited to, any Account Debtor) other than Secured Party of any demand, claim, counterclaim, setoff or defense, relating to any of the Collateral, (B) any occurrence or existence of any Event of Default, any event or condition that, after notice, lapse of time or both notice and lapse of time, would constitute any Event of Default or any event or condition that has or will or might have any material adverse effect on (I) any of the Collateral, (II) any Debtor, (III) any Guarantor or (IV) the business, operations, assets, affairs or condition (financial or other) of any Debtor or any Guarantor and (C) any change in the location of the chief executive office or principal place

28

Initials

of business of any Debtor or the residence of any Debtor that is an individual.

**b.    Negative Covenants.** Without the prior written consent of Secured Party, no Debtor shall (i) sell or otherwise dispose of any of the Collateral or any interest or right in any of the Collateral except in the ordinary course of business and in compliance with any Fiduciary Obligations relating thereto, or (ii) provide to Secured Party or permit to be provided to Secured Party on his, her or its behalf any certificate, financial statement or other Record that contains any statement of fact that is incorrect or misleading in any material respect or omits to state any fact necessary to make any statement of fact contained therein not incorrect or misleading in any material respect, or (iii) permit to be filed or remain on file in any public office any financing statement or amendment of any financing statement relating to any of the Collateral and naming any Person other than Secured Party as a secured party, except for any financing statement or amendment of any financing statement heretofore consented to by Secured Party in writing or relating solely to any Permitted Liens, or (iv) upon or at any time after any occurrence or existence of any Event of Default, (A) enforce, extend, renew, refinance or otherwise modify or replace, request, demand, accept, collect or otherwise realize upon, compromise, cancel, discharge, subordinate, accelerate, give any receipt, release or discharge relating to, commence, prosecute or settle any action or other legal proceeding relating to, waive or forbear from exercising any right or remedy relating to or adversely affect any obligation of any Person (including, but not limited to, any Account Debtor obligated with respect to any of the Collateral) relating to any of the Collateral, or (B) agree or otherwise incur any obligation to do anything described in clause (iv)(A) of this sentence, or (v) without giving Secured Party at least 30 days' prior written notice (A) change its location for purposes of Article 9 of the Uniform Commercial Code (including, but not limited to, its jurisdiction of organization if it is a Registered Organization), (B) make any change in its name, identity or structure or (C) participate in any merger, consolidation or other absorption, or (vi) grant or otherwise create, permit to exist or agree or otherwise incur any obligation to grant or otherwise create or permit to exist any security interest in or other lien on any of the Collateral other than Permitted Liens, or (vii) use any money of Borrower, funds in any Deposit Account of Borrower or funds represented by any certificate of deposit of Borrower in partial or complete satisfaction of any obligation of Borrower except for obligations incurred in the ordinary course of the business of Borrower and in full compliance with the Fiduciary Obligations, or (viii) create, incur, assume or have any indebtedness or other obligation (A) arising from the borrowing of any money or (B) pursuant to any guaranty or other contingent obligation, except for indebtedness and other obligations (I) to Secured Party, (II) constituting unsecured normal trade debt incurred upon customary terms in the ordinary course of its business or for any Debtor that is an individual, ordinary consumer debt, (III) arising from the endorsement in the ordinary course of its business of any check or other negotiable instrument for deposit or collection or (IV) fully and accurately described in the response to question 7 contained in the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement.

**c.    Additional Covenants Triggered by Request of Secured Party.** Promptly upon the request of Secured Party, each Debtor shall (i) deliver to Secured Party each financing statement, amendment of any financing statement and other Record, and take each other action (including, but not limited to, making any endorsement), requested by Secured Party to perfect, maintain the validity, perfection or priority of, or enforce, any Security Interest, otherwise protect the interest of Secured Party in or collect, sell or otherwise dispose of or otherwise realize upon any of the Collateral, whether under applicable law or otherwise, verify any of the Collateral or otherwise accomplish any purpose of this Agreement, (ii) deliver to Secured Party each Record included in the Collateral, together with each endorsement, instrument of assignment and other Record that Secured Party requests to accomplish the assignment or other transfer of such Record to Secured Party, and, until such delivery, hold such Record in trust for Secured Party, (iii) cause each Instrument representing Proceeds or other proceeds of any of the Collateral to be made payable, as requested by Secured Party, to Secured Party alone or Secured Party and any one or more of Debtors jointly, (iv) provide to Secured Party all information requested by Secured Party and relating to (A) any of the Collateral, (B) any Person (including, but not limited to, any Account Debtor) obligated with respect to any of the Collateral, (C) any Debtor, (D) any Guarantor or (E) the business, operations, assets, affairs or condition (financial or other) of any Debtor or any Guarantor (including, but not limited to, financial statements prepared in a form satisfactory to Secured Party and, if requested by Secured Party, audited, reviewed or compiled by an independent certified public accountant satisfactory to Secured Party) and (v) permit each officer, employee, accountant, attorney and other agent of Secured Party to inspect the Collateral and

29

Initials

audit, copy and extract each Record included in the Collateral.

**d.    Collateral Collections.** After an Event of Default shall have occurred, Secured Party shall have the right at any and all times to enforce any Debtor's rights against Account Debtors and other parties obligated on Collateral, including, but not limited to, the right to: (i) notify and/or require any Debtor to notify any or all Account Debtors and other parties obligated on Collateral to make payments directly to Secured Party or in the care of a post office lock box under the sole control of Secured Party established at Debtors' expense subject to Secured Party's customary arrangements and charges therefor, and to take any or all action with respect to Collateral as Secured Party shall determine in its sole discretion, including, without limitation, the right to demand, collect, sue for and receive any money or property at any time due, payable or receivable on account thereof, compromise and settle with any person liable thereon, and extend the time of payment or otherwise change the terms thereof, without incurring liability or responsibility to any Debtor; (ii) revoke any prior authorization given to any Debtor to use Net Fees and Expenses held in trust by such Debtor pursuant to the Fiduciary Obligations and require any Debtor to also segregate and hold in trust for Secured Party any other Collateral not subject to the Fiduciary Obligations, and, on the day of such Debtor's receipt thereof, transmit to Secured Party in the exact form received by such Debtor (except for such assignments and endorsements as may be required by Secured Party), all cash, checks, drafts, money orders and other items of payments constituting Collateral or proceeds of Collateral; and/or (iii) establish and maintain at Secured Party a "Repayment Account," which shall be under the exclusive control and subject to the sole order of Secured Party and which shall be subject to the imposition of such customary charges as are imposed by Secured Party from time to time upon such accounts, for the deposit of cash, checks, drafts, money orders and other items of payments constituting Collateral and proceeds of Collateral from which Secured Party may, in its sole discretion, at any time and from time to time, withdraw all or any part. Secured Party's collection and enforcement of Collateral against Account Debtors and other persons obligated thereon shall be deemed to be commercially reasonable if Secured Party exercises due care and follows the procedures that Secured Party generally applies to the collection of obligations owed to Secured Party. All cash and non-cash proceeds of the Collateral may be applied by Secured Party upon Secured Party's actual receipt of cash proceeds against such of the Obligations, matured or unmatured, as Secured Party shall determine in its sole discretion. Secured Party may defer the application of non-cash proceeds of Collateral, including, but not limited to, non-cash proceeds collected from Account Debtors and other persons obligated on Collateral, to the Obligations until cash proceeds are actually received by Secured Party.

**e.    Care of Collateral.** Each Debtor shall have all risk of loss of the Collateral. Secured Party shall have no liability or duty, either before or after an Event of Default, to collect or enforce any of its rights against the Collateral, to collect any income accruing on the Collateral, or to preserve rights against Account Debtors or other parties with any prior interest in the Collateral. If Secured Party actually receives any notices requiring action with respect to Collateral of a Debtor in Secured Party's possession, Secured Party shall take reasonable steps to forward such notices to such Debtor. Each Debtor is responsible for responding to notices concerning the Collateral, voting the Collateral, and exercising rights and options, calls and conversions of the Collateral. Secured Party's sole responsibility is to take such action as is reasonably required by such Debtor in writing, provided, however, Secured Party is not required to take any action that, in Secured Party's sole judgment, would adversely affect the value of the Collateral as security for the Obligations. While Secured Party is not required to take certain actions, if action is needed, in Secured Party's sole discretion, to preserve and maintain the Collateral, each Debtor authorizes Secured Party to take such actions, but Secured Party is not obligated to do so.

**5.    POWER OF ATTORNEY.** Upon the occurrence or existence of any Event of Default, each Debtor irrevocably and unconditionally appoints Secured Party as the attorney-in-fact of such Debtor, with full power of substitution and revocation, to take, in the name and on behalf of such Debtor or otherwise, each action relating to any of the Collateral that such Debtor could take (subject to the limitations contained in Section 12(j) of this Agreement), provided such appointment and power does not violate any code of professional conduct and the ethical rules thereunder applicable to the legal profession. The power of attorney given pursuant to the preceding sentence is coupled with an interest in favor of Secured Party.

30

Initials

## 6.   CERTAIN RIGHTS, REMEDIES AND DUTIES.

**a.   Rights and Remedies Pursuant to Applicable Law.** With respect to the Collateral, Secured Party shall have each applicable right and remedy pursuant to applicable law (including, but not limited to, the Uniform Commercial Code) or this Agreement.

**b.   Additional Rights Without Event of Default.** Secured Party shall have the right to (i) file in any public office each financing statement or amendment of any financing statement relating to any of the Collateral that Secured Party desires to file (which may describe the collateral as "all assets" or "all personal property and fixtures" of a Debtor or using other supergeneric terms) and (ii) verify any of the Collateral in any manner or through any medium, whether directly with any Person (including, but not limited to, any Account Debtor) obligated with respect thereto or otherwise or in the name of any Debtor or otherwise.

**c.   Additional Rights Upon or After Event of Default.** Upon or at any time after any occurrence or existence of any Event of Default, Secured Party, for the purpose of preserving or enhancing the value of any of the Collateral or exercising any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement, shall have the right to (i) perform each obligation of any Debtor pursuant to this Agreement and (ii) revoke any prior authorization given to any Debtor to use Net Fees and Expenses held in trust by such Debtor pursuant to the Fiduciary Obligations, require such Debtor to forthwith remit to Secured Party all Net Fees and Expenses and take control of all Proceeds and other proceeds thereof.

**d.   Application of Proceeds.** Secured Party shall apply all proceeds received by Secured Party from any collection, sale or other disposition of or other recovery upon or otherwise on account of any of the Collateral (including, but not limited to, as money payable pursuant to any insurance on any of the Collateral) first to liabilities, costs and expenses described in Section 7 of this Agreement and then to the remainder of the Obligations, whether due or not due, in any order determined by Secured Party.

**e.   Notice of Disposition.** Debtor agrees with Secured Party that commercial reasonableness and good faith require Secured Party to give each Debtor no more than ten days' prior written notice of the time and place of any public disposition of Collateral or of the time after which any private disposition or other intended disposition is to be made. Debtor also agrees with Secured Party that it is commercially reasonable for Secured Party to disclaim all warranties which arise with respect to the disposition of the Collateral.

## 7.   EXPENSES; INDEMNIFICATION.

**a.   Expenses.** Each Debtor shall pay to Secured Party on demand each cost and expense (including, but not limited to, if Secured Party retains counsel for advice, litigation or any other purpose, reasonable attorneys' fees and disbursements) heretofore or hereafter incurred by Secured Party in (i) searching for, filing or recording or obtaining any information relating to any financing statement, amendment of any financing statement or other Record relating to any of the Collateral or otherwise obtaining any information relating to any Debtor or any of the Collateral or (ii) endeavoring to (A) enforce any obligation of any Debtor pursuant to this Agreement or preserve or exercise any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement or (B) preserve or exercise any right or remedy relating to or collect, sell or otherwise dispose of or otherwise realize upon any of the Collateral. After such demand for the payment of any cost or expense incurred by Secured Party in performing any obligation of any Debtor pursuant to this Agreement, Debtors shall pay interest at an annual rate equal to the lesser of 24.9% or the highest rate permitted by applicable law on the portion of such cost or expense remaining unpaid.

**b.   Indemnification.** Each Debtor shall indemnify and defend Secured Party and each officer, employee, accountant, attorney, banker or lender and other agent of Secured Party on demand, without any limitation as to amount, against

31

Initials

each liability, cost and expense (including, but not limited to, if Secured Party retains counsel for advice, litigation or any other purpose, reasonable attorneys' fees and disbursements) heretofore or hereafter imposed on, incurred by or asserted against Secured Party or such officer, employee, accountant, attorney or other agent as a result of any claim (including, but not limited to, any claim involving any allegation of any violation of applicable law (including, but not limited to, any criminal statute)), however asserted and whether now existing or hereafter arising or accruing, arising out of any collection, sale or other disposition of any of the Collateral or any breach by any Debtor of any representation or warranty or any covenant or other agreement contained in, or any other fact or circumstance relating to, this Agreement, except to the extent any such liability, cost or expense is determined in a final, non-appealable judgment of a court of competent jurisdiction to have been caused by the gross negligence, bad faith or willful misconduct of Secured Party or such officer, employee, accountant, banker, lender, attorney or other agent.

**8.      TERMINATION.** This Agreement shall remain in full force and effect until and shall terminate only upon the the final and indefeasible payment in full of the Obligations and the termination of the Loan Documents, irrespective of any interruptions in the business relationships of any Debtor with Secured Party.

**9.      REPRESENTATIONS, WARRANTIES AND ADDITIONAL COVENANTS.** Each Debtor represents, warrants and covenants with and to Secured Party as follows:

**a.      Authority.** The execution, delivery to Secured Party and performance of this Agreement and the grant or other creation of each Security Interest by such Debtor (i) do not and will not violate applicable law, any judgment or order of any court, agency or other governmental body by which such Debtor is bound or, if such Debtor is not an individual, any certificate or articles of incorporation or organization, by-laws, operating or partnership agreement or other charter, organizational or other governing document of such Debtor or any resolution or other action of record of any shareholders, members, partners, directors or managers of such Debtor, (ii) do not and will not violate or constitute any default under any agreement, instrument or other Record by which such Debtor is bound or to which such Debtor's property is subject, (iii) if such Debtor is not an individual, are and will be in furtherance of the purposes and within the power and authority of such Debtor and (iv) do not and will not require any authorization of, notice to or other act by or relating to any Person (including, but not limited to, any Account Debtor or, if any Debtor is not an individual, any shareholder, member, partner, director or manager of such Debtor) that has not been duly obtained, given or done and is not in full force and effect.

**b.      Enforceability.** This Agreement is enforceable in accordance with its terms against each Debtor. All of each Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, General intangibles, Instruments, Investment Property, Letter-of-Credit Rights and other liens, contracts, leases and agreements constituting the Collateral are and shall be valid, genuine and legally enforceable obligations and rights belonging to such Debtor and not subject to any claim, defense, set-off, or counterclaim of any kind.

**c.      Ownership.** Debtors are and shall remain the owners of the Collateral.

**d.      Questionnaire.** Each answer contained in any questionnaire submitted by or on behalf of any Debtor to Secured Party in connection with this Agreement (including, but not limited to, the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement) is complete and accurate.

**e.      Rights and Obligations with Respect to Collateral.** Except as heretofore disclosed by any Debtor to Secured Party in writing, there exists (i) no security interest in or other lien on any of the Collateral other than Permitted Liens, (ii) no presently effective financing statement or amendment of any financing statement relating to any of the Collateral and naming any Person other than Secured Party as a secured party other than those relating solely to Pemitted Liens, (iii) no contractual or other restriction on the grant or other creation of any security interest in or assignment, pledge or hypothecation of any of the Collateral, and (iv) no demand, claim, counterclaim, setoff or defense, no action or other legal proceeding, and no outstanding judgment or order of any court, agency or other governmental body, relating to

32

Initials

any of the Collateral. Each Debtor (i) shall defend the Collateral against all claims and demands of all persons at any time claiming any interest therein; (ii) shall cooperate with Secured Party in obtaining and maintaining control with respect to all Deposit Accounts, Investment Property, Letter-of-Credit Rights and electronic chattel paper consituting the Collateral; (iii) shall not become a party to any restructuring of its form of business or participate in any consolidation, merger, liquidation or dissolution without Secured Party's prior written consent; (iv) shall not change its state of organization without first notifying Secured Party in writing; (v) shall immediately advise Lender in writing of any change in address of any Debtor or the Collateral; and (vi) shall provide Secured Party with possession of all Chattel Paper, Documents, Instruments and Investment Property constituting the Collateral that are embodied in a tangible document, intrument or certificate.

f.     **Actions with Respect to Collateral.** Except as heretofore disclosed by any Debtor to Secured Party in writing, no Debtor has (i) sold or otherwise disposed of any of the Collateral or any interest or right in any of the Collateral or (ii) extended, renewed, refinanced or otherwise modified or replaced, compromised, canceled, discharged, subordinated, accelerated, waived, forborne from exercising any right or remedy relating to or adversely affected any obligation of any Person (including, but not limited to, any Account Debtor) relating to any of the Collateral.

g.     **Accounts and General Intangibles.** Each Account and General Intangible included in the Collateral is or, if not now existing, will be genuine, in all respects what it purports to be and enforceable in accordance with its terms against each Person (including, but not limited to, any Account Debtor) obligated with respect thereto, subject to no demand, claim, counterclaim, setoff or defense.

h.     **Incorrect or Misleading Information.** Each Debtor has not provided to Secured Party or permitted to be provided to Secured Party on his, her or its behalf any certificate, financial statement or other Record that contains any statement of fact that is incorrect or misleading in any material respect or omits to state any fact necessary to make any statement of fact contained therein not incorrect or misleading in any material respect.

i.     **Taxes.** Each Debtor has duly filed all applicable income or other tax returns and has paid all income or other taxes when due, and there are no outstanding tax liens against the assets of any Debtor.

**10.   CERTAIN CONSENTS AND WAIVERS.**

a.     **Consents.** Except to the extent expressly provided in this Agreement, this Agreement shall not be modified or terminated, no Security Interest, no obligation of any Debtor pursuant to this Agreement and no right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement shall be impaired or otherwise adversely affected, and no such right or remedy shall be waived, by any act, omission or other thing, whether heretofore occurred or hereafter occurring. Each Debtor knowingly, voluntarily, intentionally and irrevocably consents, without any notice, to each act, omission and other thing, whether heretofore occurred or hereafter occurring, that would or might, but for such consent, modify or terminate this Agreement, impair or otherwise adversely affect any Security Interest or any such obligation, right or remedy or operate as a waiver of any such right or remedy.

b.     **Waivers.** Each Debtor knowingly, voluntarily, intentionally and irrevocably waives, without any notice, each act and other thing upon which, but for such waiver, any Security Interest, any obligation of such Debtor pursuant to this Agreement or any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement would or might be conditioned.

**11.   NOTICES.** Any notice required or permitted to be given hereunder must be in writing and must be delivered or transmitted to a party at the address or any fax number for such party set forth at the beginning of this Agreement or on the Signature Page to this Agreement, or to such other address or fax number as such party may designate in writing as provided herein for the purpose of receiving notices hereunder. Any such notice to a party is effective if by personal delivery, upon such delivery; if by nationally recognized overnight courier, on the next business day after delivery to

Initials

such nationally recognized overnight courier; if by fax transmission, upon receipt by the sender of an electronic confirmation of a successful transmission; and otherwise upon receipt of such notice by such party. Each requirement under applicable law of reasonable notice of any event by Secured Party to any Debtor shall be deemed to have been met if a notice of such event is given by Secured Party to such Debtor at least 10 days before the date on or after which such event is to occur.

## 12.  MISCELLANEOUS.

**a.   Reliance by Other Persons.** Each Person (including, but not limited to, any Account Debtor) obligated with respect to any of the Collateral may accept without any question any exercise by Secured Party of any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement.

**b.   Limitation on Security Interest.** The payment of the Obligations shall not be secured by any Security Interest to the extent of any amount in excess of the maximum amount the payment of which can be so secured without rendering such Security Interest unenforceable under applicable law as a fraudulent conveyance or transfer.

**c.   Obligations Relating to Collateral.** The grant or other creation of any Security Interest shall not constitute an assignment by any Debtor to Secured Party of any obligation of such Debtor relating to any of the Collateral. Each Debtor shall remain obligated to perform each such obligation, and Secured Party shall not be obligated to perform any such obligation, whether or not Secured Party exercises any right or remedy pursuant to this Agreement or arising or accruing as a result of this Agreement. The only obligations of Secured Party relating to the Collateral shall be, to the extent required by applicable law, to act in a commercially reasonable manner in exercising with respect to any of the Collateral any right or remedy pursuant to this Agreement or arising or accruing as a result of this Agreement.

**d.   Liability.** If more than one Person executes this Agreement, (i) each of them shall be jointly and severally liable pursuant to this Agreement, and (ii) this Agreement shall be construed, interpreted and enforced, whether in any action or other legal proceeding or otherwise, as to each of them as though each of them had executed and delivered to Secured Party a separate agreement identical to this Agreement.

**e.   Assignment or Grant of Participation.** In conjunction with any assignment or other transfer of or grant of any participation in any of the Obligations by Secured Party, Secured Party shall have the right to assign or otherwise transfer or grant any participation in this Agreement, any Security Interest, any obligation of any Debtor pursuant to this Agreement or any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement.

**f.   Binding Effect.** This Agreement shall be binding upon each Debtor and each direct or indirect legal representative, successor and assignee of each Debtor and shall inure to the benefit of and be enforceable by Secured Party and each direct or indirect successor and assignee of Secured Party.

**g.   Entire Agreement, Modifications and Waivers.** This Agreement contains the entire agreement between Secured Party and each Debtor with respect to the subject matter of this Agreement and supersedes each action heretofore taken or not taken, each course of conduct heretofore pursued, accepted or acquiesced in, and each oral, written or other agreement and representation heretofore made, by or on behalf of Secured Party with respect thereto. No action heretofore or hereafter taken or not taken, no course of conduct heretofore or hereafter pursued, accepted or acquiesced in, no oral, written or other agreement or representation heretofore made, and no agreement or representation hereafter made other than in writing, by or on behalf of Secured Party shall modify or terminate this Agreement, impair or otherwise adversely affect any Security Interest, any obligation of any Debtor pursuant to this Agreement or any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement or operate as a

34

Initials

waiver of any such right or remedy. No modification of this Agreement or waiver of any such right or remedy shall be effective unless made in a writing duly executed by Secured Party and specifically referring to such modification or waiver.

**h.    Rights and Remedies Cumulative.** All rights and remedies of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement shall be cumulative, and no such right or remedy shall be exclusive of any other such right or remedy.

**i.    Extent of Consents and Waivers.** Each consent and waiver of any Debtor contained in this Agreement shall be deemed to have been given to the extent permitted by applicable law.

**j.    Exercise of Rights; Requests.** Except as expressly provided in this Agreement, each right and remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement may be exercised (i) at any time and from time to time, (ii) in the sole discretion of Secured Party, (iii) without any notice or demand of any kind and (iv) whether or not any Event of Default or any other event or condition of default relating to any of the Obligations, any of the Collateral or any Other Collateral has occurred or existed, but Secured Party shall not be obligated to exercise any such right or remedy. Each such right and remedy may be exercised only to the extent that the exercise thereof does not (i) violate applicable law or (ii) if requiring any Debtor to take any action, require any Debtor to violate any ethical or disciplinary rule, regulation or law governing non-disclosure of confidential information by an attorney or prohibiting the unauthorized practice of law. Each request by Secured Party pursuant to this Agreement may be made (i) at any time and from time to time, (ii) in the sole discretion of Secured Party and (iii) whether or not any Event of Default or any other event or condition of default relating to any of the Obligations, any of the Collateral or any Other Collateral has occurred or existed.

**k.    Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law. If, however, any such provision shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law, or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

**l.    Governing Law.** This Agreement shall be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York, without regard to principles of conflicts of law or to the law of any other jurisdiction.

**m.    Headings.** In this Agreement, headings of sections are for convenience of reference only and have no substantive effect.

**13.   CONSENTS AND WAIVERS RELATING TO LEGAL PROCEEDINGS.**

**a.    JURISDICTIONAL CONSENTS AND WAIVERS. EACH DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY CONSENTS AND AGREES THAT ANY ACTION OR OTHER LEGAL PROCEEDING COMMENCED BY SECURED PARTY SHALL BE BROUGHT ONLY IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF SUCH ACTION; PROVIDED, HOWEVER, SECURED PARTY MAY, AT ITS OPTION, COMMENCE ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION TO OBTAIN POSSESSION OR FORECLOSURE UPON ANY COLLATERAL, TO OBTAIN EQUITABLE RELIEF OR TO ENFORCE ANY JUDGMENT OR ORDER OBTAINED BY SECURED PARTY AGAINST DEBTOR OR WITH RESPECT TO ANY COLLATERAL, TO ENFORCE ANY OTHER RIGHT OR REMEDY UNDER THIS AGREEMENT OR TO OBTAIN ANY OTHER RELIEF DEEMED APPROPRIATE**

35

Initials

BY SECURED PARTY. DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO PERSONAL JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, AND DEBTOR HEREBY WAIVES ANY OBJECTIONS WHICH DEBTOR MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH NEW YORK COURT.

b.    WAIVER OF TRIAL BY JURY. EACH DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT SUCH DEBTOR MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION OR OTHER LEGAL PROCEEDING, WHETHER BASED ON ANY CONTRACT OR NEGLIGENT, INTENTIONAL OR OTHER TORT OR OTHERWISE, ARISING OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT, ANY OF THE OBLIGATIONS, ANY OF THE COLLATERAL OR ANY OTHER COLLATERAL.

c.    SERVICE OF PROCESS. PROCESS ON DEBTORS IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT WILL BE DEEMED TO HAVE BEEN GIVEN TO A DEBTOR WHEN GIVEN IN ANY ONE OF THE FOLLOWING WAYS: (I) PERSONALLY DELIVERED, (II) TWO (2) BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, CHARGES PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (III) FOUR (4) BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH DEBTOR AT THE APPLICABLE ADDRESS SET FORTH IN THIS AGREEMENT. Such service on any Debtor shall be deemed in every respect effective service of process upon and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon such Debtor. Nothing in this Section shall affect Secured Party's right to serve process in any other manner permitted by law. Each Debtor may add additional addresses or change the address for purposes of service of process by giving 10 days' prior written notice of such change to Secured Party.

Dated: August 1, 2013

Girardi Keese

By: _____
Thomas V. Girardi, Partner
Facsimile No.  (213)  481  1554

_____
Thomas V. Girardi, individually
Facsimile No.  (213)  481  1554

36

Initials

## EXHIBIT A

## QUESTIONNAIRE

1.   What is Borrower's legal name?

     Girardi Keese

2.   What is Borrower's jurisdiction of organization and business structure:

     General partnership under the laws of California

3.   What is Borrower's Federal Employer Identification Number or Social Security Number?

     ███████995

4.   What is the address (including state, county and zip code) of a business office of Borrower?

     1126 Wilshire Blvd., Los Angeles, CA 90017

5.   What is the address (including state, county and zip code) of each location at which any Record included in
     the Collateral is or will be kept other than the locations the addresses of which are indicated in the answers to
     question 4?

     1126 Wilshire Blvd., Los Angeles, CA 90017
     100 Los Altos Drive, Pasadena, CA 91105

6.   **Deposit Accounts owned by each Debtor**

     For each deposit account of each Debtor, what is the name and address of the bank maintaining such account,
     what type of account is such account (include each trust account but indicate its status as a trust account) and
     what is the account number of each such account?

| Debtor Name | Name & Address of Depositary Bank | Type of Account | Account Number |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

7.   **Existing Liens**

     In the case of any security interest or other lien covering any of the Collateral and existing on the date of this
     Agreement in favor of any Person other than Secured Party, what are the complete name and address of each
     such Person in whose favor such security interest or other lien exists, and what is the nature of such security
     interest or other lien and the debt secured thereby?

37

Initials

| Debtor Name | Name & Address of the Secured Party holding the Permitted Lien | Description of Collateral and Debt Secured Including Principal Amountt of such Debt |
|---|---|---|
| Comerica Bank | 75 East Trimble Road San Jose, CA 95131 | blanket lien, as well as various specific security interests in certain accounts, contracts and deposits |
| Key Equipment Finance Inc. | 1000 So. McCaslin Blvd. Superior, CO 80027 | specific leased equipment |
| Ikon Financial Svcs. | 1738 Bass Rd. Macon, GA 31210 | specific leased equipment |
| Comerica Bank-California | 333 W. Santa Clara St. San Jose, CA 95113 | as to Thomas V. Girardi, certain specified shares of stock in Coast Resorts, Inc. |
| Torrey Pine Bank | 9295 Farnham Street, Suite 200 San Diego, CA 92123 | Real property located at 100 Los Altos Drive, in the City of Pasadena, County of Los Angeles, State of California and all furniture, fixtures, improvements, accounts and records related thereto |

8.    What is the legal name and principal residence address of each Debtor other than Borrower?

Thomas V. Girardi - 100 Los Altos Drive, Pasadena, CA 91105

9.    Description of any Commercial Tort Claims owned by any Debtor

In the case of any Commericial Tort Claim existing on the date of this Agreement, which Debtor is the owner of such claim and what is the description of such claim?

| Debtor Name | Description of Commercial Tort Claim |
|---|---|
| NA | |

38

Initials

154

ACKNOWLEDGMENT (SECURITY AGREEMENT)

STATE OF CALIFORNIA
COUNTY OF Los Angeles
On the 1st day of August in the year 2013 before me, the undersigned, a notary public in and for said state,
personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to
be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same
in his capacity as Partner of Girardi Keese and that by his signature on the instrument, the entity upon behalf of which
the individual acted, executed the instrument.

_____
Notary Public

SHIRLEEN H. FUJIMOTO
COMMISSION # 1933089
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires May 15, 2015

STATE OF CALIFORNIA
COUNTY OF Los Angeles
On the 1st day of August in the year 2013 before me, the undersigned, a notary public in and for said state, personally
appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the
individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same
in his (her) capacity, and that by his (her) signature on the instrument, the individual, or other person upon behalf of
which the individual acted, executed the instrument.

_____
Notary Public

SHIRLEEN H. FUJIMOTO
COMMISSION # 1933089
Notary Public - California
LOS ANGELES COUNTY
My Comm. Expires May 15, 2015

39

_____
Initials

155

## COMPANY CERTIFICATE

With respect to certain credit facilities (collectively the "Loan") to be extended by California Attorney Lending II, Inc., a New York corporation  (the "Lender"), the undersigned certifies and verifies to Lender, its successors and assigns as follows:

1.      I am [check applicable box:]
        the duly elected and qualified President or Secretary
        the duly appointed Manager or other authorized Member
        ☑  a duly authorized Partner

        **of Girardi Keese (the "Company"), organized under the laws of California**

2.      The resolutions attached to this Company Certificate as Schedule I (collectively the "Resolutions") were duly adopted (a) at a meeting of the partners of the Company duly called and held on **August __ , 2013** at which meeting a quorum was present and participated, or (b) by unanimous written consent of all partners of the Company.

3       None of the Resolutions has been rescinded, revoked or modified in any way.

4.      All of the Resolutions are in full force and effect.

5.      Neither any of the Resolutions nor any action taken or to be taken pursuant to any of the Resolutions (a) violates or will violate applicable law, any judgment or order of any court, agency or other governmental body by which the Company is bound or any governing document of the Company or any resolution or other action of record of the partners of the Company, (b) violates, will violate or constitutes or will constitute any default under any agreement, instrument or other document by which the Company is bound or to which any of the Company's property is subject or (c) requires or will require any authorization of, notice to or other act by or relating to any individual, any court, agency or other governmental body or any other entity, body, organization or group (including, but not limited to, any shareholder, director, member, manager or partner of the Company) that has not been duly obtained, given or done and is not in full force and effect.

6.      Each of the following persons (individually a "Signer") (a) together constitute all of the partners of such partnership or (b) has been designated by the Company as a person authorized to transact financial transactions on behalf of the Company. Each Signer is duly authorized to execute the documents between Lender and the Company and is also authorized, if applicable, to make a loan request to Lender (if the Company is the borrower with respect to the credit facilities obtained from Lender) on behalf of the Company:

| NAME | TITLE | SIGNATURE |
|------|-------|-----------|
| Thomas V. Girardi | Partner | |
| | | |

7.      The signature set opposite each Signer's name listed above is a true specimen of such Signer's signature.

8.      With respect to the borrowing of $5,000,000 by Girardi Keese from Lender, and all related transactions (a) the terms of such borrowing and other transactions were negotiated in the State of New York, (b) the drafting of all documents and the funding of the Loan were in the State of New York (c) the laws of the State of New York are intended by the parties to apply with respect to the construction, interpretation and choice of law governing all documents executed by the

40

Initials

Company to Lender and (d) Lender and its legal counsel are located within the State of New York. The Loan and any related transactions were intended by Lender and the Company as New York transactions to be construed under New York law regardless of any other location of any borrower or any guarantor.

9.   **The Company has not granted any liens against its assets since the date of its application to Lender for the Loan.**

10.  **The undersigned certifies that the Company and each guarantor with respect to the Loan have duly filed all applicable income or other tax returns and have paid all income or other taxes when due, and that there are no outstanding tax liens against the assets of any of them.**

IN WITNESS WHEREOF, I have executed this Company Certificate as of August 1, 2013 and verify that all of the information contained herein is true and correct to the best of my knowledge being fully aware that Lender will rely on the accuracy of this Company Certificate in extending the Loan to the Company.

_____
Thomas V. Girardi

STATE OF ~~NEW YORK~~ California
COUNTY OF Los Angeles

On the 1st day of August in the year 2013 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (~~she~~) executed the same in his (~~her~~) capacity, and that by his (~~her~~) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

> SHIRLEEN H. FUJIMOTO
> COMMISSION # 1933086
> Notary Public - California
> LOS ANGELES COUNTY
> My Comm. Expires May 15, 2015

41

_____
Initials

**SCHEDULE 1**
**Resolutions**

Girardi Keese (the "<u>Company</u>")
A general partnership organized under the laws of California

RESOLVED, that, from time to time, the Company borrow from California Attorney Lending II, Inc. ("<u>Lender</u>") or enter into other financial transactions with Lender, or both, including guaranteeing repayment of borrowings obtained by any other party from Lender (any such borrowing and each such guaranty thereof and other transaction, collectively the "<u>Transactions</u>"); and be it further

RESOLVED that in connection with the Transactions, the Company grant a security interest or other lien in all of its present and future assets (collectively the "<u>Property</u>") to secure all of its present and future obligations to Lender; and be it further

RESOLVED, that the terms of each of the Transactions shall be on such terms as any officer, manager, member or partner or of the Company (individually an "<u>Authorized Person</u>") shall determine; and be it further

RESOLVED that any Authorized Person acting alone, is authorized to do all such acts and other things as he or she shall deem necessary or appropriate to effectuate the Transactions, in the name and on behalf of the Company or otherwise, including, but not limited to, signing, drawing, endorsing, executing and delivering notes, guaranties, assignments, pledges, security agreements, mortgages, powers of attorney, confessions of judgment, indemnifications, receipts, waivers, releases and other agreements, instruments and other documents; all on such terms as such Authorized Person shall determine (his or her approval to be evidenced by his or her execution thereof); and be it further

RESOLVED, that, without limiting the generality of the foregoing resolutions, any Authorized Person is authorized, directed and empowered, acting alone, in the name or on behalf of the Company, to obtain from Lender (or guarantee) revolving loans the total of the outstanding principal amounts of which shall not at any time exceed $5,000,000 and to grant a lien or security interest in any Property as security for the obligations owing to Lender with respect to the Transactions; and be it further

RESOLVED, that all actions heretofore taken by the Company with respect to any security interest in any Property or to effectuate the Transactions are ratified, approved and confirmed in all respects; and be it further

RESOLVED, that notwithstanding the dissolution or termination of existence of the Company or any change in the identity of or any modification or termination of any authority of any Authorized Person, Lender may rely upon and act in accordance with the foregoing resolutions until it shall receive and have a reasonable time to act on a written notice to the contrary from any Authorized Person, provided, further, that any such dissolution, termination, or modification shall be of no effect with respect to obligations of the Company with respect to the Transactions (a) arising or accrued before such receipt of such written notice and the expiration of such period of time, or (b) thereafter arising or accruing as a result of any credit or other financial accommodation theretofore committed or otherwise agreed to by Lender.

42


Initials

158

**POST CLOSING LETTER TO CALIFORNIA ATTORNEY LENDING II, INC.
REGARDING $5,000,000 REVOLVING LINE OF CREDIT
AND POST CLOSING ITEMS TO BE COMPLETED**

August  1, 2013

California Attorney Lending II, Inc
6400 Main Street, Suite 120
Williamsville, NY 14221

Ladies and Gentlemen:

Re: Closing of $5,000,000 Revolving Loan

Reference is made to the Second Amended and Restated Revolving Promissory Note (the "Note"), dated as of August  1, 2013 delivered to you and various agreements, instruments and other writtings being executed and delivered by us in connection with such Note (collectively, as hereafter modified at any time, the "Transaction Documents").  As a further condition of closing, and for other valuable consideration the receipt and sufficiency of which are acknowledged, we have agreed with you that, notwithstanding anything in the Transaction Documents to the contrary, and with respect to certain documentation and other requirements to have been satisfied by us by closing but that have not been satisfied (collectively the "Post Closing Requirements") we will cause;

-    A Collateral Assignment of Life Insurance Policies insuring the life of Thomas V. Girardi in the aggregate face amount of $5,000,000 to be delivered to you within 12 months of the date hereof if the Credit (as defined in the note) is outstanding on or afer 12 months following the date hereof,

We hereby agree that any failure by us to satisfy the above within the agreed upon time frames shall be deemed an Event of Default under the Note.  We further understand that nothing in this letter is intended to nor does it change or modify in any respect the fact that the decision whether to honor any Loan Request and make any Loan shall be in your sole discretion.

This letter shall be governed by and construed, interperted and enforced in accordance with the law of the State of New York and the federal law of the United States without regard to the law of any other jurisdiction.  This letter shall be binding upon us and our respective successors and assigns, and inure to the benefit of you and your successors and assigns.

Girardi Keese

By: _____

Name:  Thomas V. Girardi
Title:  Partner

43

_____
Initials

**Key Loan Term Summary with Lender Forms**

**The following summary sets forth certain key terms in the loan documents between California Attorney Lending II, Inc. ("CAL" or "Lender") and Borrower and provides copies of forms required to be used by Lender. THIS IS NOT A LEGAL DOCUMENT, it is not a complete listing of all rights and obligations of the parties under the loan documents, and is intended solely for the purpose of assisting Borrower in its administration of its loan with CAL. In all events, the loan documents are controlling with respect to the parties' rights and remedies with respect to the loan.**

1. <u>Draw Requests:</u> All loan requests are subject to the review and approval of CAL and must be submitted by e-mail or facsimile on the draw request form (attached).

2. <u>Purpose:</u> The line of credit ("LOC") will be used solely by Borrower to (i) refinance Borrower's existing credit facilities (if any), (ii) pay the operating expenses of Borrower's legal practice, or (iii) fund interest payments on the LOC.

3. <u>Payment Terms:</u> <u>Months 1-24:</u> Monthly interest only, except as described in "Mandatory Pre-Payments" below. <u>Months 25-48:</u> Monthly interest, plus 1/24 of the outstanding principal balance each month. No borrowings are allowed during months 25-48.

4. <u>Mandatory Pre-Payments:</u> To the extent of outstanding interest and principal, 100% of all fees and reimbursed expenses from the following: (i) Avandia litigation and (iii) Zimmer Litigation. Line availability to be reevaluated upon the resolution and receipt of fees from these cases with adjustments made based upon remaining collateral.

5. <u>Interest:</u> 18% per annum, subject to increase by the amount that the LIBOR Rate exceeds 2.5%, payable on the 10th day of every month. Invoices are issued on the 1st day of every month. We will require Borrower to authorize CAL to initiate preauthorized electronic funds transfers from a specified bank account to pay the interest on the 10th of every month. Default interest rate is 24.9%.

6. <u>Advance Interest Payment.</u> Borrower must maintain on account with CAL at all times one month's advance payment of interest. The required amount of such advance payment will initially be determined at the time of the first loan but will be adjusted from time to time based on the then outstanding principal. CAL may apply any such advance payment in such manner as it determines to any amount owing to CAL that is not paid when due or to the final payment to be made to CAL with respect to the loan.

7  <u>Availability Block for Interest /Interest Reserve.</u> In addition, Borrower must maintain unused availability on the line of credit at all times to cover interest for at least 60 days. During months 25-48, when no borrowings are allowed, CAL may require Borrower to fund a reserve or make an additional advance payment of interest to cover such 60 days' interest.

8. <u>Financial Covenants:</u> The loan documentation will include requirements for:

   a. The estimated future, aggregate legal fees collectible from Borrower's case files must exceed eight times the outstanding principal amount of the loan at all times.
   b. Each principal Guarantor must maintain a net worth of at least three times the maximum credit facility.
   c. No future third party loans, liens (including tax liens) or security interests other than purchase money equipment financing.

9. <u>Information Updates:</u> Borrower will be required to provide copies of annual tax returns, malpractice insurance renewals, quarterly financial statements for Borrower, annual financial statements for each Guarantor, quarterly case and status lists, fee sharing and referral agreements, monthly bank statements, default and cancellation notices, and other updates as may be required by CAL.

44

Initials

10.   Fees and Charges: Borrower will be charged a closing fee equal to 1.5% of the LOC amount, Lender's attorneys' fees as invoiced **(estimated at $2,500)**, Lender's attorneys' costs as invoiced (estimated at $400 for one Borrower and one Guarantor and an additional $100 for each additional party), and a wire fee of $20. Borrower may be assessed a 5% per month fee for late payments (including Mandatory Pre-Payments), a $250 per month fee for late information updates, a $500 or cost charge for cancelled or incomplete audit reviews, and reimbursement charges for CAL costs associated with actions undertaken by CAL to enforce, collect or protect its rights under the loan documents.

Initials

*California Attorney Lending II, Inc.*
*Specialized Lending Exclusively For the Legal Community*

### AUTHORIZATION FOR LOAN PAYMENT
### AUTOMATIC WITHDRAWAL FORM

**Borrower's Information**

Full Name: _____("Borrower")

SS# or EIN#: _____

Email Address: _____

**Borrower's Bank Information**

Bank Name: _____("Bank")

Bank ABA (Routing) No. _____

Bank Telephone No. _____

Bank Address: _____

Borrower's Bank Account No. _____("Account")

The undersigned on behalf of Borrower, (a) authorizes California Attorney Lending II, Inc. to initiate preauthorized electronic funds transfers from the Account indicated and (b) authorizes Bank to debit the Account for such transfers.

This authorization may not be revoked, modified, or in any other way altered without the express prior written consent of both the undersigned and California Attorney Lending II, Inc.

Borrower: _____

Authorized Signature: _____ Date: _____

Name and Title of Signer: _____

Return this Form and a Voided Check to California Attorney Lending II, Inc.

46

Initials

**GIRARDI KEESE**
**1126 Wilshire Blvd.**
**Los Angeles, CA 90017**


**DRAW REQUEST**


Ms. Megan Payne
Chief Operating Officer
California Attorney Lending II, Inc.
6400 Main St.
Suite 120
Williamsville, NY 14221


Re: <u>Revolving Line of Credit (the "Line")</u>


Dear Ms. Payne:

    Girardi Keese hereby requests the additional sum of _____ Dollars ($_____)
<u>as a draw on the Line.</u> Please deposit such amount so requested into the bank account you have on file for our firm
on or before the later of one (1) business day from your receipt of this Draw Request (duly completed) or

_____.


    The draw will be used as follows:

| | |
|---|---|
| Operating Expenses: | $_____ |
| Client/Case Expenses: | $_____ |
| Advertising: | $_____ |
| Partner draws/salary: | $_____ |
| Payroll: | $_____ |
| Other_____: | $_____ |


    Very truly yours,
    Girardi Keese


    By:_____
    Partner

Initials

## WIRE INSTRUCTION STATEMENT INFORMATION

**TO:**        ACCOUNTING

**FROM:**      MEGAN PAYNE, CHIEF OPERATING OFFICER

**SUBJECT:**   CLOSING – $5,000,000 REVOLVING LINE OF CREDIT – GIRARDI KEESE

**DATED:**     **AUGUST __, 2013**

WIRE INSTRUCTIONS FOR GIRARDI KEESE

**NAME OF ACCOUNT DEBTOR:**        _____

**NAME OF FINANCIAL INSTITUTION:**  _____

**ADDRESS OF FINANCIAL INSTITUTION:** _____

                                    _____

**ABA NUMBER:**                     _____

**ACCOUNT NUMBER:**                 _____

GIRARDI KEESE

By:_____
Name: _____
Title: _____

48

Initials

# EXHIBIT F

██████████
██████████
██████████
██████████

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**1373755925**

**08/28/2013 14:41**

**FILED**

CALIFORNIA
SECRETARY OF STATE

SOS

39205220005    UCC 3 FILING

A. NAME & PHONE OF CONTACT AT FILER [optional]
**716-853-5100**

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CT LIEN SOLUTIONS          NMG
555 CAPITOL MALL
SUITE 1000
SACRAMENTO CA 95814
ACCT #10010537

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
**117275806299**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| | | | |
|---|---|---|---|
| 6a. ORGANIZATION'S NAME **Girardi Keese** | | | |
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| | | | |
|---|---|---|---|
| 7a. ORGANIZATION'S NAME | | | |
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☑ restated collateral description, or describe collateral ☐ assigned.

**See Attached Schedule A**

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| | | | |
|---|---|---|---|
| 9a. ORGANIZATION'S NAME **California Attorney Lending II, Inc.** | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA
**CASOS #4384.78 Girardi Keese    39587536**

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

## SCHEDULE A

All of Debtor's right, title and interest in all Goods (including, Equipment, Fixtures and Inventory), Money, Instruments (including Promissory Notes), Accounts, Deposit Accounts, Chattel Paper, Investment Property, Letter-of-Credit Rights, Documents and General Intangibles (including payment intangibles), Commercial Tort Claims described in the Questionnaire, Insurance Proceeds and any other personal property (whether or not subject to the UCC), and all interest, dividends and other distributions thereon paid and payable in cash or in property; and all replacements and substitutions for, and all accessions and additions to, and all profits, offspring, Products and other Proceeds of, all of the foregoing. Debtor is prohibited from granting additional security interest in the Collateral or the Proceeds of the Collateral. (Notice to potential competing creditors under Official Note 5 of UCC Section 9-331).

The Collateral includes, without limitation, any right to payment of any Debtor for client representation or referral (whether such right to payment is on a contingent, hourly, fixed fee or other basis) and for Costs and Expenses (as defined in the Note), whether or not yet earned by performance, and the proceeds thereof, including Net Fees and Expenses (as defined in the Note) and Borrower's present and future right, title and interest in and to any and all legal fees and reimbursed expenses in connection with and/or derived from:  (i) all matters with respect to which the Borrower is representing one or more individuals or estates against SmithKline Beecham Corporation d/b/a GlaxoSmithKline, GlaxoSmithKline PLC, Glaxo Wellcome UK Ltd., GlaxoSmithKline UK Limited Brentford, McKesson Corporation and others, or any of them, in connection with the prescription drug Rosiglitazone, marketed under the trade names Avandia, Avandamet and Avandaryl; (ii) all matters with respect to which the Borrower is representing one or more individuals or estates against Zimmer Inc., Zimmer Holdings Inc. and others, or any of them, in connection with the so-called "Zimmer Hip" litigation and (iii) all of Debtor's books related to the foregoing; and all cash and non-cash proceeds of any of the foregoing, in whatever form, including without limitation all proceeds of proceeds, all insurance policies covering same and all interest or dividends thereon.

# EXHIBIT G

CONFIDENTIAL

CLOSING CHECKLIST
CALIFORNIA ATTORNEY LENDING II, INC.
$6,000,000 THIRD AMENDED AND RESTATED REVOLVING LOAN TO
GIRARDI KEESE, A GENERAL PARTNERSHIP
ORGANIZED UNDER CALIFORNIA LAW

Key:
| | | |
|---|---|---|
| Lender | = | California Attorney Lending II, Inc., a New York corporation |
| Borrower | = | Girardi Keese, a general partnership organized under California law |
| Individual Guarantor | = | Thomas V. Girardi |

**LOAN DOCUMENTS**

1. Third Amended and Restated Revolving Promissory Note for maximum principal amount of $6,000,000, signed by Borrower and Guarantor

2. Guaranty of Individual Guarantor

3. Third Amended and Restated Security Agreement signed by Borrower and Individual Guarantor, as debtors

       Exhibit A – Questionnaire

4. Girardi Keese Certificate, together with the following attachments:

       Schedule I – Resolutions

5. Acknowledgement, Waiver and Release

6. UCC-1 Financing Statement
   Borrower: Girardi Keese, Filing Office: California
   Guarantor: Thomas V. Girardi, Filing Office: California

**SUPPLEMENTAL DOCUMENTS**

7. Uniform Commercial Code Search for Borrower and Individual Guarantor

8. Key Loan Term Summary with Lender Forms

1

Initials

CONFIDENTIAL

### THIRD AMENDED AND RESTATED
### REVOLVING PROMISSORY NOTE
**California Attorney Lending II, Inc.**

Delivered in Buffalo, New York

$6,000,000
July __, 2017

For value received, Girardi Keese a general partnership organized under California law ("**Borrower**"), having its principal office located at 1126 Wilshire Blvd, Los Angeles, CA 90017, promises to pay to the order of **CALIFORNIA ATTORNEY LENDING II, INC.**, a New York corporation ("**Lender**"), in lawful money of the United States and immediately available funds, any of the offices of Lender at 6400 Main Street, Suite 120, Williamsville, NY 14221 the principal amount of $6,000,000 or the Outstanding Principal Amount (as defined below) if less, together with all interest, fees, charges and costs and expenses payable under this Note, all at the times and in the manner provided in Section 2 below.

1. **DEFINITIONS.** For purposes of this Note:

   a. **"Advance Period"** means the period starting on the date of this Note and ending on July 31, 2019.

   b. **"Amortizing Period"** means the period starting immediately following the end of the Advance Period and ending on the Maturity Date.

   c. **"Collateral"** means the "Collateral" as defined in the Security Agreement or any other collateral securing from time to time the obligations of Borrower or any Guarantor to Holder.

   d. **"Credit"** means a revolving credit facility made available by Lender to Borrower in the maximum principal amount equal to the Maximum Amount.

   e. **"Event of Default"** means "Event of Default" as defined in Section 5 hereof.

   f. **"Guarantor"** means, other than Borrower, any Person (i) who or that is now or hereafter liable, whether directly or indirectly or absolutely or contingently, for the payment of any of the Outstanding Principal Amount or any interest or other amount payable pursuant to this Note or (ii) any asset of whom or which now or hereafter directly or indirectly secures the payment of any of the Outstanding Principal Amount or any such interest or other amount.

   g. **"Holder"** means Lender or any transferee of this Note.

   h. **"LIBOR Rate"** means the one-month London Interbank Offered Rate, as fixed by the British Bankers Association for United States dollar deposits in the London interbank market at approximately 11:00 a.m. London, England time (or as soon thereafter as practicable) each day, as determined by Lender from any broker, quoting service or commonly available source utilized by Lender or a comparable rate or index selected by Lender should such London Interbank Offered Rate cease to be determined in such manner, cease to exist or otherwise become unavailable.

   i. **"Loan"** means any loan by Holder pursuant to the Credit.

   j. **"Loan Documents"** means collectively (a) this Note, (b) the Security Agreement, (c) each other security

2

_N_
Initials

CONFIDENTIAL

agreement, assignment, mortgage, document, instrument, letter and certificate that has been or is hereafter executed and delivered in connection with any of the foregoing and (d) each amendment, increase, extension, amendment and restatement or replacement of any of the foregoing.

k. **"Loan Request"** means any oral (including, but not limited to, telephonic), written or other (including, but not limited to, facsimile or email) request for a Loan.

l. **"Maturity Date"** has the meaning set forth in Section 2(a)(ii) of this Note.

m. **"Maximum Amount"** means $6,000,000, US currency, as reduced in accordance with Section 2 (b) (ii) of this Note.

n. **"Net Fees and Expenses"** means all legal fees and any other amounts paid or reimbursed to Borrower for Costs, and Expenses (as defined in the next sentence), resulting from any client representation or referral (whether contingent, hourly, fixed fee or other) after payment of all amounts owing to third party lawyers (other than employees or partners of Borrower) for assistance or referral with respect to such client representation. **"Costs and Expenses"** as used in the preceding sentence means all costs, disbursements, advances and other expenses, however denominated, of any type or character, whether an out-of-pocket expense or an internal cost or expense that is allocated by Borrower to specific clients, including without limitation, all court and filing fees, witness, expert and private investigators fees and expenses, search and research charges, and reproduction, meal, travel, mailing, fax, overtime, secretarial and delivery and courier charges, that are reimbursable or payable to Borrower.

o. **"Outstanding Principal Amount"** means the outstanding principal amount of this Note from time to time.

p. **"Person"** means (i) any individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated association, (ii) any court or other governmental authority or (iii) any other entity, body, organization or group.

q. **"Security Agreement"** means the Third Amended and Restated Security Agreement by Borrower to Lender dated on or about the date hereof.

r. **"Uniform Commercial Code"** means the Uniform Commercial Code as in effect from time to time in the State of New York.

2. **Payments.** The payment of principal, interest, fees and costs and expenses under this Note shall be subject to the following terms and conditions:

3

Initials

CONFIDENTIAL

a. **Regularly Scheduled Payments of Interest and Principal**.

    (i) *Monthly Interest*. Borrower shall pay monthly all interest that has accrued on the Outstanding Principal Amount through the last day of each calendar month (beginning with the calendar month containing the date of this Note), no later than the 10th day following the end of such calendar month, calculated at the rate and in the manner set forth in Section 2(d) below.

    (ii) *Principal Payment Schedule During Amortization Period.* In addition to the mandatory prepayments required under Section 2(b) below, Borrower shall pay the Outstanding Principal Amount during the Amortization Period in twenty-four (24) consecutive monthly installments commencing on August 1, 2019 and continuing on the same day of each month thereafter with the final payment due and payable on July 1, 2021 (the "Maturity Date"). Borrower shall pay each monthly installment payable for a calendar month no later than the 10th day following the end of such calendar month.

    (iii) *Monthly Principal Amount; Effect of Prepayment on Monthly Principal Amount*. Each such monthly principal installment payable during the Amortization Period shall be in an equal amount, sufficient to amortize in full in 24 installments the Outstanding Principal Amount determined as of the last day of the Advance Period. In the event of a mandatory prepayment or optional prepayment of this Note during the Amortization Period, the amount of each remaining monthly principal installment shall be recalculated so as to equal the level monthly amount sufficient to amortize the then Outstanding Principal Amount after giving effect to such mandatory or optional prepayment over the then remaining Amortization Period (and the term of this Note shall not be shortened).

b. **Mandatory Prepayments**.

    (i) *Mandatory Prepayments*. During the entire term of this Note and subject to the last sentence of this paragraph, Borrower shall pay to Holder within 3 business days of the receipt, proceeds received by Borrower in connection with the sale of Spectrum to Repligen in an amount sufficient to reduce the Maximum Amount hereunder to $5,000,000. Such payment shall also include for the payment of all accrued but unpaid interest due and owing hereunder and a closing fee equal to $50,000. Borrower shall continue to hold in Borrower's trust account any proceeds received by Borrower in connection with the sale of Spectrum to Repligen until such required amount is transmitted to Holder. Borrower, and each Guarantor acting on behalf of Borrower, holds all proceeds received by Borrower subject to an express trust as further described in Section 16 and is required to remit 100% of such funds to Lender under the circumstances described in Section 16.

    (ii) *Application during the Advance Period; Reduction of Maximum Amount*. During the Advance Period, any payments received by Holder will be applied as a mandatory prepayment, first to prepay accrued and unpaid interest and fees and then to prepay the Outstanding Principal Amount. Any such mandatory prepayments set forth in Section 2(b)(i) above to reduce the Outstanding Principal Amount shall be considered a permanent paydown.

    (iii) *Application during the Amortization Period*. During the Amortization Period, each such mandatory pre-payment received by Holder shall be applied first to offset Borrower's obligation to make the regularly scheduled monthly principal installment payable for the month in which Holder receives such payment (but such offset shall only be to the extent of such payment received by Holder and shall not affect Borrower's obligation to pay the balance of such regularly scheduled monthly principal installment). If mandatory pre-payments in any month exceeds the monthly principal installment for such month, the excess will be applied as a mandatory prepayment of the Outstanding Principal Amount and shall not be applied to satisfy all or any portion of Borrower's obligation to make any monthly interest payment. Any such mandatory prepayment shall have the effect set forth in Section 2(a)(iii) on the remaining monthly

4



Initials

CONFIDENTIAL

principal installments payable during the Amortization period.

c. **Optional Prepayments**. Borrower shall have the option of prepaying, without penalty or premium, the Outstanding Principal Amount to Holder in full or part at any time and from time to time provided, that upon prepaying the Outstanding Principal Amount in full, Borrower shall pay to Holder all interest and other amounts payable pursuant to this Note and remaining unpaid. Any such optional prepayment made during the Amortization Period shall have the effect set forth in Section 2(a)(iii) on the remaining monthly principal installments payable during the Amortization Period.

d. **Interest Rates and Calculation.**

    (i) *Calculation of Interest*. Interest shall be calculated on the basis of a 360 day year for the actual number of days of each year (365 or 366, as applicable), on the Outstanding Principal Amount for each day from and including the date of this Note to but not including the date the Outstanding Principal Amount is paid in full. Notwithstanding the foregoing, at Lender's option without further consent by the Borrower, Lender may compound interest on a monthly or annual basis as determined by the Lender in its sole discretion.

    (ii) *Interest Rate*. On the first $5,000,000 of Credit availability, interest will accrue on the Outstanding Principal Amount at the rate of 14.5% per annum, except as set forth below. On the remaining $1,000,000 of Credit availability, Interest will accrue on the Outstanding Principal Amount at the rate of 12% per annum, except as set forth below.

    (iii) *Increase in Interest Rate*. If on the first business day of any calendar month, the LIBOR Rate equals more than 0.5% per annum, the interest rate applicable on each day during such calendar month will equal (A) the applicable rate set forth above, plus (B) the excess of the LIBOR Rate on such first business day of such calendar month over 0.5%.

    (iv) *Default Interest*. On and after the occurrence of an Event of Default, the interest rate applicable to this Note shall equal the rate per year that is the lesser of (i) 24.9% or (ii) the maximum rate permitted by applicable law ("Default Interest"). Default Interest shall be payable during any period of default and up to and including the date of the next payment made after such period of default. Default Interest, and not any rate set by statute, shall be computed in any entry of judgment pertaining to this Note, and further, shall be paid subsequent to the entry of such judgment, and until actual satisfaction of said judgment. The judgment shall include both the action and the obligation itself. In such event, the Default Interest rate shall continue up through and including all foreclosure proceedings and proceedings for payment of monies, including but not limited to surplus money proceedings and shall be computed in the entry of any judgment, and further, subsequent to the entry of any judgment, and until actual satisfaction of this Note and said judgment.

    (v) *Maximum Applicable Rate*. In no event shall such interest be payable at a rate in excess of the maximum rate permitted by applicable law. Any amount payable under this Note that is interest, or that is treated as interest, and that would cause such maximum rate to be so exceeded shall be deemed to have been a mistake and automatically canceled. If any such amount that causes the maximum rate to be exceeded is received by Holder, such amount shall be refunded to Borrower or applied to the Outstanding Principal Amount, as determined by Holder. It is the intention of Lender and Borrower that interest not be payable at a rate in excess of such maximum rate.

    (vi) *One Month's Advance Interest*. If requested by the Lender, Borrower must maintain on account with

5

Initials

173

CONFIDENTIAL

Holder at all times one month's advance payment of interest. The required amount of such advance payment will initially be determined based on the Outstanding Principal Amount on the date of the first Loan under this Note. Thereafter, the amount of the required advance payment to be held by Lender will be adjusted so that it equals one month's advance interest on the Outstanding Principal Amount determined as of the later of the date of the most recent Loan under this Note or the last day of the most recently ended calendar month, and Borrower will be required to pay any increase in the required amount to Holder (or if there is a reduction in the required amount, Holder will apply any excess held by Holder against other amounts then or thereafter payable by Borrower to Holder). Holder does not pay any interest on such advance payment amount or provide any discount in consideration of such advance payment. Any such advance payment will be commingled with Holder's other funds. Holder will hold such advance payment on account, and may apply any such advance payment in such manner as it determines to any amount owing to Holder that is not paid when due or to the final payment to be made to Holder under this Note.

(vii) *Availability Block/Interest Reserve.* At all times during the Advance Period, Borrower shall maintain unused borrowing availability with Holder equal to 60 days' interest based on the Outstanding Principal Amount determined as of the later of the date of the most recent Loan under this Note or the last day of the most recently ended calendar month during the term of this Note. Holder may, but shall not be obligated to, make a Loan (without any express authorization from Borrower), to pay interest that is due and payable on the Outstanding Principal Sum. On or after conclusion of the Advance Period, Lender may require Borrower to fund from time to time, an amount sufficient to establish and replenish as necessary a reserve for the payment of interest for such 60 day period (a "Reserve"). Lender may commingle any Reserve with its other funds and shall have no obligation to pay any interest on any Reserve. Lender shall be entitled to set off against any Reserve any amount that is not paid to Holder when due and payable under this Note. Borrower's obligation under this paragraph to maintain unused availability or a Reserve to cover 60 days' interest is in addition to the required one months' advance payment of interest contemplated by (vi) above.

e. **Electronic Funds Transfer.** At all times during the Advance Period and thereafter until all amounts payable under this Note have been irrevocably paid in full, Borrower shall maintain an authorization for electronic funds transfer by Holder at a bank and from an account designated by Borrower and reasonably acceptable to Holder for payments under this Note. Lender may authorize an electronic funds transfer from such designated account of Borrower for any amount that is not paid to Holder when due and payable under this Note.

f. **Late Payment Charges.** If any principal, interest or other amount (including mandatory prepayments), payable pursuant to this Note is not paid by the date it becomes due, Borrower shall pay on demand by Holder, a monthly late charge for each month or part thereof that such overdue payment remains unpaid of the greater of (i) 5% of the overdue payment or (ii) $50.

g. **Special Delinquency Charges.** If any document or information required to be provided to Holder under this Note is not delivered when due or within 10 business days following request from Holder, Borrower shall pay a late charge of $250 per month until such documentation has been provided to Holder. If after the scheduling of an audit, Borrower (i) cancels the audit within five (5) business days prior to the scheduled date or (ii) fails at the audit to provide Holder's representative with the necessary books and records to permit Holder's representative to complete the audit, Borrower shall promptly reimburse Holder for the costs associated with such cancelled or failed audit, including all costs incurred by Holder with respect to its representative such as compensation and travel expenses, in an amount equal to the greater of $500 or actual costs.

h. **Expenses.** On demand by Holder, Borrower shall pay each cost and expense (including, but not limited to, the reasonable fees and disbursements of counsel, whether retained for advice, litigation or any other purpose)

6

Initials

CONFIDENTIAL

incurred by Holder in endeavoring to (i) collect any of the Outstanding Principal Amount or any interest or other amount payable pursuant to this Note, (ii) preserve or exercise any right or remedy of Holder pursuant to this Note or (iii) preserve or exercise any right or remedy of Holder relating to any Collateral including the payment of unpaid insurance premiums, taxes, assessments or other obligations.

## 3. LOANS.

a. **Timing and Procedure**. At any time during the Advance Period, Borrower may make a Loan Request, which Request shall be irrevocable, that specifies (i) the amount requested as the principal amount of the Loan, (ii) the purpose of the loan (which must comply with (b) below), and (iii) the business day of Holder on which such Loan is requested to be made. **Notwithstanding anything contained in this Note to the contrary, commencing August 1, 2019 Borrower shall not be permitted to make any further Loan Requests under this Note.**

b. **Purpose of Loans**. All Loan Requests shall be for the sole purpose of funding the operating expenses of Borrower or interest payments under this Note. Borrower shall not obtain or use the proceeds of any Loan for any purpose other than for law firm purposes, that is, for working capital of Borrower including payments to any Guarantor. Borrower covenants that no Loan proceeds shall be used by Borrower for other than a business or commercial purpose of Borrower. No Loan Requests may be made to fund the activities or operations of any Guarantor or any third party entity. The Borrower further acknowledges, warrants and represents to, and agrees with, the Lender that the Lender has made no representation to the Borrower regarding the adequacy of any loans or advances made to the Borrower pursuant to this Note for purposes of conducting the Borrower's legal practice or other business operations.

c. **Minimum Unused Credit Availability**. Borrower shall maintain unused credit availability at all times under this Note in an amount equal to not less than 60 days' interest based on the Outstanding Principal Amount on the later of the date of the most recent Loan under this Note or the last day of the most recently ended calendar month during the term of this Note as contemplated by Section 2(d)(vii) of this Note.

d. **Holder's Discretion**. The decision whether to honor such Loan Request and make such Loan shall be in the sole discretion of Holder. Without limiting Lender's discretion to fund or not fund any Loan, no Loan shall be made with respect to any principal amount prepaid until at least one (1) business day after the date of such prepayment.

e. **Reliance by Holder**. Holder may treat as made by Borrower and rely upon, and Borrower shall be bound by, any Loan Request that Holder in good faith believes to be valid and to have been made in the name or on behalf of Borrower by any officer, manager, member, partner or other individual authorized to act on behalf of Borrower, and Holder shall not incur any liability to Borrower or any other Person as a direct or indirect result of honoring such Loan Request and making such Loan.

f. **Limitation on Outstanding Principal Amount. Borrower shall not at any time permit, and Holder shall not at any time be obligated to permit, the Outstanding Principal Amount to exceed the Maximum Amount. If the Maximum Amount is exceeded at any time, Borrower shall forthwith repay to Lender the amount of any such excess.**

g. **Schedule of Advances or Loan Account**. There shall be payable as principal pursuant to this Note only so much of the Maximum Amount as shall have been advanced by Holder as a Loan or Loans and is outstanding. Holder shall set forth on a schedule or loan account (including, but not limited to, any schedule or loan account maintained in computerized records) annotations evidencing (a) the date and principal amount of each Loan, (b) the date and amount of each payment applied to the Outstanding Principal Amount and (c) the Outstanding

7

Initials

CONFIDENTIAL

Principal Amount after each Loan and each such payment. Each such annotation shall, in the absence of manifest error, be conclusive and binding upon Borrower. No failure by Holder to make and no error by Holder in making any annotation on such schedule or loan account shall affect Borrower's obligation to repay the principal amount of each Loan, Borrower's obligation to pay interest on the outstanding principal amount of each Loan or any other obligation of Borrower to Holder pursuant to this Note or otherwise.

4. **COVENANTS.** So long as any obligations are owing to Holder under this Note, Borrower and each Guarantor, to the extent applicable to such Guarantor, shall comply with the following covenants:

   a. **Reporting Obligations:** Borrower shall provide or cause to be provided to Holder, and each Guarantor shall provide to Holder to the extent relating to such Guarantor, within the time periods indicated below each of the following:

      (i) *Tax Returns.* Copies of Borrower's and each Guarantor's annual federal tax returns no later than the earlier of (A) three days after filing or (B) the 15th day of the tenth month of each fiscal year for the immediately preceding fiscal year;

      (ii) *Case Status Report; Fee Sharing and Referral Agreements.* Updated complete and accurate case and status list with respect to the clients and cases of Borrower and a copy of each fee sharing agreement or referral agreement and any amendments thereto, with any law firm or lawyer (including a lawyer that may be a shareholder, member or employee of the Borrower) with respect to any case or matter described in such list, at least once each calendar quarter;

      (iii) *Bank Statements.* Copies of monthly bank statements of Borrower from each of its bank accounts (operating and trust) and monthly settlement report no later than the 10th day of each month;

      (iv) *Financial Statements.* Current updated financial statements of Borrower, compiled by an independent third party accountant, not later than the 15th day of each calendar quarter in the same form delivered to Holder on or before execution of this Note;

      (v) *Personal Financial Statements.* A current updated personal financial statement for each Guarantor to be delivered on or before April 15th of each year in the form completed by such Guarantor and delivered to Holder on or before execution of this Note;

      (vi) *Malpractice and Life Insurance.* Evidence of coverage under a current malpractice insurance policy for Borrower, and of continuing coverage under any life insurance policy that has been assigned as part of the Collateral, on each anniversary date of coverage, and copy of any notice of cancellation, revocation or non-renewal of any malpractice insurance or any such life insurance policy within five (5) business days after receipt thereof by Borrower or any Guarantor;

      (vii) *Notice of Certain Material Events or Material Change.* Notice of any tax audit with respect to Borrower or any Guarantor, any investigation by any governmental agency or regulatory body affecting Borrower or any Guarantor, any litigation commenced against Borrower or any Guarantor, or any material change in the business, clients or prospects of Borrower, in each case as soon as Borrower or any Guarantor is aware, or should be aware, of such audit, investigation, litigation or change;

      (viii) *Default Notices.* A copy of any default notice or other notice of the existence of facts or circumstances that with the passage of time will constitute such a default, under any obligation of Borrower to any party, in each case immediately following receipt by Borrower; and

8

Initials

CONFIDENTIAL

(ix) *Other Information.* Any documentation or information reasonably requested by Holder that relates to the business or assets of Borrower or such Guarantor, in each case promptly following each request by Holder.

b. **Accuracy and Access to Books and Records.** Borrower shall maintain accurate books and records regarding its financial condition, including, but not limited to, aged listings of accounts payable and accounts receivable, all expenses and disbursements, business operations, and the status and condition of the Collateral; and shall grant Holder access thereto at any time upon reasonable notice to inspect and audit such books, records, and accounts, and to make copies thereof.

c. **Life Insurance.** Borrower shall cause to be maintained in effect life insurance on the life of Thomas V. Girardi in a minimum amount equal to $5,000,000 that is subject to an effective collateral assignment to Holder at all times while this Note is outstanding.

d. **Minimum Collateral Coverage.** Borrower shall not permit legal fees collectible by Borrower from the Collateral as estimated by Holder at any time to be less than **EIGHT TIMES** the Outstanding Principal Amount plus interest on this Note. In making such estimate, Holder may take into consideration, among other matters, Holder's assessment of the actual client files of Borrower from time to time and any law, judicial decision, administrative order, or professional ethics opinion that may affect the rights of law firms to sue clients for the collection of legal fees or expenses, and will reduce such estimate by the amount of any indebtedness or obligation of Borrower having priority over the collection rights of Holder.

e. **Minimum Net Worth Requirement.** Thomas V. Girardi shall refrain from selling, gifting, transferring or otherwise disposing of assets or incurring indebtedness that reduces the personal net worth (including his or her indirect interest in Borrower's assets and his or her interest in joint assets) of such Guarantor to less than $15,000,000.

f. **Restriction on Additional Indebtedness.** Borrower and each Guarantor shall not incur or assume, on or after the date of this Note, any indebtedness or liability (including any indebtedness or liability to any member or shareholder of Borrower or any Guarantor or any affiliate of any Guarantor) other than indebtedness that is:

(i) owing to Lender;

(ii) constituting unsecured normal trade debt incurred upon customary terms in the ordinary course of Borrower's or any Guarantor's business or in the case of any Guarantor that is an individual, ordinary consumer debt;

(iii) arising from the endorsement in the ordinary course of Borrower's or any Guarantor's business of any check or other negotiable instrument for deposit or collection;

(iv) secured by a Permitted Lien as defined in the Security Agreement; or

(v) incurred with the prior written consent of Holder which consent may require that the proceeds of such financing be used to repay this Note in whole or in part and that repayment of such financing be subordinated to repayment of the indebtedness due to Holder on terms acceptable to Holder.

g. **Restriction on Liens.** Borrower and each Guarantor shall refrain from creating, assuming or suffering to exist any mortgage, security interest, judgment or lien (including tax liens) on any of its assets now or hereafter acquired, other than a Permitted Lien or a security interest relating to consumer debt.

9

Initials

CONFIDENTIAL

h. **No Other Law Practice**. Borrower and each Guarantor shall not own or hereafter acquire, without the prior written consent of Holder, an ownership interest, either direct or indirect, in any entity engaged in the practice of law other than Borrower.

i. **License to Practice Law**. Borrower and each Guarantor shall not permit any license to practice law held by Borrower or such Guarantor, as the case may be, to be suspended or revoked.

j. **Fee Sharing and Referral Agreements**. Without the prior written approval of Lender, Borrower shall not enter into a fee sharing or referral agreement unless such agreement is entered into in the ordinary course of business and on an arms-length basis. and shall not modify any fee sharing or referral agreement in any way that would reduce the fees or other amounts payable to Borrower thereunder or that would otherwise prejudice Lender.

5. **EVENTS OF DEFAULT AND REMEDIES.**

a. **Events of Default**. The existence or occurrence of any of the following events or circumstances shall each constitute an "Event of Default" under this Note:

(i) *Failure to Pay Amounts due Under this Note*. Borrower defaults in the payment when due, whether by acceleration or otherwise, of any of the Outstanding Principal Amount or any interest or other amount payable pursuant to this Note; or

(ii) *Breach of Covenants or Other Obligations to Holder*. Borrower or any Guarantor fails to comply with any of the covenants in Section 4 of this Note or defaults in the payment or performance when due of any other obligation to Holder, whether now existing or hereafter arising or accruing and whether under this Note or any other present or future agreement with Holder; or

(iii) *Obligations Owing to Third Parties*. Borrower or any Guarantor defaults in the payment or performance of any obligation owing by Borrower or any Guarantor to any third party or there exists a default or event of default under any agreement evidencing such obligation owing to such third party; or

(iv) *Obligations Owing to the Government*. Borrower or any Guarantor defaults in the payment of any taxes or other charges owing to any governmental entity; or

(v) *Cessation of Business and Other Material Events*. Borrower or any Guarantor is dissolved, ceases to exist, participates or agrees to participate in any merger, consolidation or other absorption, assigns or otherwise transfers or disposes of a majority of his, her or its assets, makes or permits what might be a fraudulent transfer or fraudulent conveyance of any of his, her or its assets, becomes insolvent (however such insolvency is evidenced), generally fails to pay his, her or its debts as they become due, fails to pay, withhold or collect any tax as required by applicable law, suspends or ceases its business or has served, filed or recorded against him, her or it or any of his, her or its assets any judgment, order or award of any court, other governmental authority or arbitrator or any lien; or

(vi) *Death or Incompetency*. Borrower or any Guarantor dies or becomes incompetent; or

(vii) *Termination or Revocation*. Borrower or any Guarantor purports to terminate his, her or its obligations pursuant to any guaranty or other agreement with or for the benefit of Holder; or

(viii) *Insolvency*. Borrower or any Guarantor has any receiver, trustee, custodian or similar Person for him, her or it or any of his, her or its assets appointed (whether with or without his, her or its consent), makes any

10

Initials

CONFIDENTIAL

assignment for the benefit of creditors, admits in writing his, her or its inability to pay debts generally as they become due, or commences or has commenced against him, her or it any bankruptcy or insolvency proceeding or any formal or informal proceeding for the dissolution, liquidation or winding up of the affairs of or the settlement of claims against him, her or it; or

(ix) *Representations and Warranties*. Any representation or warranty heretofore made to Lender or hereafter made to Holder, or any financial statement heretofore provided to Lender or hereafter provided to Holder, by or on behalf of Borrower or any Guarantor, proves, as of the date thereof, to have been incorrect or misleading in any material respect, or before the execution and delivery to Lender by Borrower of this Note, there occurred and was not disclosed to Lender any material adverse change in any information disclosed in any such representation or warranty or in any such financial statement so provided; or

(x) *Change in Management or Control*. There occurs any change in the management of, or the beneficial ownership of any stock of or other ownership interest in, Borrower that is, in the opinion of Holder, adverse to its interest and is not corrected to its full satisfaction within 30 days after it gives to Borrower a notice that it considers such change adverse to its interest; or

(xi) *Collateral Value*. There occurs any change in the value of the Collateral or Borrower's or any Guarantor's ownership interest in the Collateral, that is, in the opinion of Holder, adverse to its interest and is not corrected to its full satisfaction within 10 days after Holder gives to Borrower a notice that Holder considers such change adverse to its interest; or

(xii) *Other Loan Document Default*. There occurs or exists any event or condition of default under any guaranty or any security agreement or other writing evidencing or relating to any Collateral or the Credit.

b. **Acceleration**. Upon or at any time or from time to time after the occurrence or existence of any Event of Default other than, with respect to Borrower, an Event of Default described in clause (viii) above (an "Insolvency Event"), the Outstanding Principal Amount and all interest and other amounts payable pursuant to this Note and remaining unpaid shall, at the sole option of Holder and without any notice, demand, presentment or protest of any kind (each of which is knowingly, voluntarily, intentionally and irrevocably waived by Borrower), become immediately due. Upon the occurrence or existence of, with respect to Borrower, any Insolvency Event, the Outstanding Principal Amount and all such interest and other amounts shall, without any notice, demand, presentment or protest of any kind (each of which is knowingly, voluntarily, intentionally and irrevocably waived by Borrower), automatically become immediately due.

6. **CHANGES AND WAIVERS; PARTIALLY INVALIDITY**. No course of conduct pursued, accepted or acquiesced in, and no oral, written or other agreement or representation made, by or on behalf of Holder in the future will change this Note or waive any right or remedy of Holder under or arising as a result of this Note. Any change in this Note or waiver of any right or remedy of Holder under or arising as a result of this Note must be made in a writing signed by or on behalf of Holder. Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law. If, however, any such provision shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law, or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

7. **DISCLAIMER. EXCEPT AS SET FORTH IN THE LOAN DOCUMENTS, LENDER HAS NOT MADE, NOR HAS BORROWER RELIED UPON, ANY TERM, PROMISE, REPRESENTATION, GUARANTEE OR WARRANTY OF ANY KIND (ORAL, EXPRESS, STATUTORY OR IMPLIED), DIRECTLY OR THROUGH ANY THIRD-PARTY (EACH, AN "EXTRINSIC TERM"),**

11

Initials

CONFIDENTIAL

INCLUDING, WITHOUT LIMITATION, ANY EXTRINSIC TERM WITH RESPECT TO BORROWING OR ANY LOAN PRODUCT, ANY PARTICULAR CLAIM OR LITIGATION, ANY PAST OR PRESENT CLIENTS OF LENDER, ANY ATTORNEY OR LAW FIRM OR ANY AGREEMENT OR ARRANGEMENT THEREWITH, OR PARTICIPATION IN ANY PROGRAM ADMINISTERED, IN WHOLE OR IN PART, BY LENDER RELATING TO (A) PAST PERFORMANCE, RETURNS OR RESULTS THEREOF, (B) THE QUALITY, CHARACTER, NUMBER OR VALUE OF OPPORTUNITIES OR OUTCOMES THEREFROM, OR (C) THE FINANCIAL OR LEGAL BENEFITS, REQUIREMENTS, IMPLICATIONS OR ADVISABILITY (INCLUDING ANY RELEVANT TAX OR PROFESSIONAL RESPONSIBILITY MATTERS) THEREWITH, AND THE EXISTENCE OF ANY SUCH EXTRINSIC TERM (INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF FITNESS FOR PARTICULAR PURPOSE OR ANY WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING, OR USAGE OF TRADE), AND RELIANCE THEREUPON BY BORROWER, IS EXPRESSLY DISCLAIMED TO THE FULLEST EXTENT PERMITTED BY LAW.

8. **ENTIRE AGREEMENT.** This Note and the Loan Documents contain the entire agreement between Borrower and Lender and supersede each action heretofore taken or not taken, each course of conduct heretofore pursued, accepted or acquiesced in, and each oral, written or other agreement and representation heretofore made, by or on behalf of Lender with respect thereto.

9. **GOVERNING LAW.** This Note shall be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York, without regard to principles of conflicts of law or to the law of any other jurisdiction.

10. **CONSENT TO JURISDICTION. AS PART OF THE CONSIDERATION FOR NEW VALUE RECEIVED AND REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF BORROWER OR HOLDER, BORROWER HEREBY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN BORROWER AND HOLDER PERTAINING TO THIS NOTE OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS NOTE SHALL BE BROUGHT ONLY IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN THE COUNTY OF ERIE WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF ANY LEGAL OR EQUITABLE ACTION; PROVIDED, HOWEVER, HOLDER MAY AT ITS OPTION, COMMENCE ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION TO OBTAIN EQUITABLE RELIEF OR TO ENFORCE ANY JUDGMENT OR ORDER OBTAINED BY HOLDER AGAINST BORROWER, TO ENFORCE ANY OTHER RIGHT OR REMEDY UNDER THIS NOTE, OR TO OBTAIN ANY OTHER RELIEF DEEMED APPROPRIATE BY HOLDER. BORROWER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, AND BORROWER HEREBY WAIVES ANY OBJECTION WHICH BORROWER MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH NEW YORK COURT. BORROWER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS CONSENT TO JURISDICTION PROVISION WITH ITS LEGAL COUNSEL, AND HAS MADE THIS WAIVER KNOWINGLY AND VOLUNTARILY.**

11. **WAIVER OF TRIAL BY JURY. BORROWER KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT BORROWER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO (A) THE CREDIT, ANY LOAN OR COLLATERAL, THIS NOTE OR ANY OTHER WRITING**

12

Initials

CONFIDENTIAL

HERETOFORE OR HEREAFTER EXECUTED IN CONNECTION WITH THE CREDIT OR ANY LOAN OR COLLATERAL, (B) ANY TRANSACTION ARISING OUT OF OR OTHERWISE RELATING TO THE CREDIT, ANY LOAN OR COLLATERAL, THIS NOTE OR ANY SUCH OTHER WRITING OR (C) ANY NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT OF THE CREDIT, ANY LOAN OR COLLATERAL, THIS NOTE OR ANY SUCH OTHER WRITING.

12. SERVICE OF PROCESS. PROCESS ON BORROWER IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS NOTE WILL BE DEEMED TO HAVE BEEN GIVEN WHEN GIVEN IN ANY ONE OF THE FOLLOWING WAYS: (A) PERSONALLY DELIVERED, (B) TWO (2) BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, CHARGES PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (C) FOUR (4) BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER AT THE ADDRESS SET FORTH AT THE BEGINNING OF THIS NOTE. Such service shall be deemed in every respect effective service of process upon Borrower and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon Borrower. Nothing in this Section shall affect Holder's right to serve process in any other manner permitted by law. Borrower may add additional addresses or change its address for purposes of service of process by giving 10 days' prior written notice of such change to Holder in accordance with the notice provisions of the Security Agreement.

13. **SECURITY AGREEMENT**. Repayment of this Note is secured by the Collateral in accordance with the terms of the Security Agreement and any other agreements relating to the Collateral.

14. **SOLVENCY.** On the date hereof, and immediately prior to and after giving effect to the borrowing represented by this Note and the use of the proceeds thereof, Borrower's assets will exceed its liabilities and Borrower will be solvent, will be able to pay its debts as they mature and will have capital sufficient to carry on its business as then constituted.

15. **SIGNATURES.** In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a \".pdf\" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or \".pdf\" signature page were an original thereof.

16. **BORROWER'S FIDUCIARY OBLIGATION TO LENDER/EXPRESS TRUST**. All proceeds received by Borrower in connection with the sale of Spectrum to Repligen are subject to an express trust in favor of Lender. Borrower and any Guarantor that acts on behalf of Borrower, holds all such amounts as a fiduciary for the benefit of Lender and any use of such amounts that is not authorized by Lender is a defalcation by Borrower and any such Guarantor so acting on Borrower's behalf. Before maturity of this Note (by acceleration or otherwise), and only after Borrower has timely remitted to such amounts as required by Section 2(b) hereof, Lender authorizes Borrower to use any such funds for its operations in the ordinary course of business unless Lender has notified Borrower after the occurrence and during the continuation of an Event of Default that Lender is revoking such authorization. **After maturity of this Note (whether by acceleration or otherwise) or if Lender so revokes the foregoing authorization following the occurrence and during the continuance of an Event of Default, Borrower shall remit to Lender 100% of such amounts for application to Borrower's obligations under this Note in such manner as Lender shall determine.**

17. **CONFIDENTIALITY.** Borrower and each Guarantor agrees that by execution of this Note, Borrower and such Guarantor becomes bound by and agrees to keep this Note, any other Loan Document, and any facts of and details surrounding the relationship between the parties hereto reflected by the Loan Documents, confidential and not to disclose the existence of this Note or any other Loan Document, or its terms, except as required by law or as otherwise necessary to implement the terms of the Loan Documents. Nothing in this Note, any other Loan Document, or otherwise shall prevent Holder from disclosing the existence of this Note, any Loan Document, and its terms, to Holder's

13



Initials

CONFIDENTIAL

respective affiliates, officers, directors, agents, partners, members, employees, investors, lenders, attorneys, auditors, affiliates (including investment managers) and any other similarly situated persons where Holders have a reasonable business purpose for such disclosure. The Borrower and each Guarantor agrees that the Loan Documents may not be used in connection with, or as the basis of documents for, any other transaction by Borrower (other than a transaction with Holder), except as consented to in writing by Holder.

18. **RIGHT OF FIRST REFUSAL AND PARTICIPATIONS.** In the event that the Borrower elects to refinance this Note with a different lender, the Borrower will provide the Lender with the terms of such refinancing and the Lender shall have the right, but not the obligation, to refinance this Note on such terms; provided it gives notice to the Borrower within fifteen (15) days after receipt of such terms. Lender, at its option, may at any time and from time to time, grant to one or more lenders (each a "Participant") participating interests in Lender's rights with respect to this Note and the other Loan Documents. In the event of such a grant by Lender of a participating interest to a Participant, Borrower shall continue to deal solely and directly with Lender in connection with Lender's rights hereunder, and Lender shall retain the sole right to approve, without the consent of any Participant, any amendment, modification or waiver of any provision of the Loan Documents which Lender is entitled to approve pursuant to this Note. Lender may furnish any information concerning Borrower in its possession from time to time to prospective Participants, provided that Lender shall require any prospective Participant to agree in writing to maintain the confidentiality of such information.

19. **RENEWAL NOTE.** This Note evidences but does not extinguish or satisfy, and is not a novation of, a preexisting indebtedness evidenced by that certain Revolving Promissory Note executed by Borrower to Lender in the maximum principal amount of $3,500,000 dated July 5, 2011 as amended and restated by First Amended and Restated Revolving Promissory Note executed by Borrower to Lender in the maximum principal amount of $5,000,000 dated August 12, 2011, as amended and restated by Second Amended and Restated Revolving Promissory Note executed by Borrower to Lender in the maximum principal amount of $5,000,000 dated August 1, 2013 ("Prior Notes"). Borrower hereby acknowledges that the outstanding principal balance under the Prior Notes immediately prior to the funding of this Note was $_____

Dated: July _11_, 2017

Girardi Keese

By: _____
Thomas V. Girardi, Partner

## BORROWER ACKNOWLEDGEMENT FOR NOTE

STATE OF CALIFORNIA
                                    : SS.
COUNTY OF

     On the _____ day of July in the year 2017 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity as Partner of Girardi Keese, and that by his (her) signature on the instrument, the individual,

14

_____
Initials

CONFIDENTIAL

or other person upon behalf of which the individual acted, executed the instrument.

_See attached acknowledgment_
Notary Public

15

Initials

# ACKNOWLEDGEMENT BY NOTARY PUBLIC

## Borrower Acknowledgement for Note

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA                    )
                                       ) ss.
COUNTY OF LOS ANGELES                  )

On <u>July 11, 2017</u>, before me <u>Shirleen H. Fujimoto,</u> Notary Public in and for said state, personally appeared <u>THOMAS V. GIRARDI</u>, who proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity as Partner of Girardi|Keese, and that by his/her signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



_Shirleen H. Fujimoto_
_[Signature of Officer]_

SHIRLEEN H. FUJIMOTO
COMM. # 2107442
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 15, 2019

CONFIDENTIAL

## GUARANTOR AGREEMENT TO PROMISSORY NOTE COVENANTS

Each of the undersigned individually agree(s) to those covenants set forth in Section 4 of this Note that are applicable to the undersigned as Guarantor and agrees to be bound by the provisions of Sections 16 and 17 of this Note.

Date: July __, 2017

_____
Thomas V. Girardi

## GUARANTOR ACKNOWLEDGEMENT FOR PROMISSORY NOTE

STATE OF CALIFORNIA

               : SS.

COUNTY OF

On the _____ day of July in the year 2017 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument. *See attached Acknowledgement*

16

_____
Initials

185

## ACKNOWLEDGEMENT BY NOTARY PUBLIC

## GUARANTOR ACKNOWLEDGEMENT FOR PROMISSORY NOTE

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA                    )
                                       ) ss.
COUNTY OF LOS ANGELES                  )

On July 11, 2017, before me Shirleen H. Fujimoto, Notary Public in and for said state, personally

appeared THOMAS V. GIRARDI, who proved to me on the basis of satisfactory evidence to be the

individual whose name is subscribed to the within instrument and acknowledged to me that he/she

executed the same, and that by his/her signature on the instrument, the individual, or other person upon

behalf of which the individual acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing

paragraph is true and correct.

WITNESS my hand and official seal.



SHIRLEEN H. FUJIMOTO
COMM. # 2107442
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 15, 2019

_____
[Signature of Officer]

186

CONFIDENTIAL

**ALLONGE TO THIRD AMENDED AND RESTATED REVOLVING PROMISSORY NOTE, DATED
JULY __, 2017 ISSUED BY
GIRARDI KEESE
TO CALIFORNIA ATTORNEY LENDING II, INC.**

NOTICE: THIS NOTE IS SUBJECT TO A SECURITY INTEREST GRANTED BY CALIFORNIA ATTORNEY
LENDING HOLDINGS LLC AND ITS WHOLLY-OWNED SUBSIDIARY, CALIFORNIA ATTORNEY LENDING
II, INC., TO BANK OF AMERICA, N.A. PURSUANT TO A SECURITY AGREEMENT SUPPLEMENT, DATED
MARCH 31, 2010, BY WHICH CALIFORNIA ATTORNEY LENDING HOLDINGS LLC AND CALIFORNIA
ATTORNEY LENDING II, INC. AGREED TO BE BOUND BY A SECURITY AGREEMENT, DATED
SEPTEMBER 17, 2009, IN FAVOR OF BANK OF AMERICA, N.A., AS SUCH SECURITY AGREEMENT HAS
BEEN OR IS HEREAFTER AMENDED, SUPPLEMENTED, REPLACED, RESTATED OR OTHERWISE
MODIFIED FROM TIME TO TIME.

17



Initials

CONFIDENTIAL

## GUARANTY OF PAYMENT AND PERFORMANCE

**THIS GUARANTY** ("Guaranty") from **THOMAS V. GIRARDI**, individually, with a principal address at 100 Los Altos Drive, Pasadena, CA 91105 (the "Guarantor") to **CALIFORNIA ATTORNEY LENDING II, INC.**, a New York corporation with a place of business at 6400 Main Street, Suite 120, Williamsville, NY 14221 ("Lender").

### WITNESSETH:

**WHEREAS**, Girardi Keese ("Borrower") on the date hereof, has executed and delivered to Lender that certain Third Amended and Restated Revolving Promissory Note in the principal amount of $6,000,000 as the same may be amended, renewed, increased or replaced from time to time ("Note") pursuant to which Lender is extending certain credit facilities (collectively, the "Credit Facilities") to Borrower; and

**WHEREAS**, Lender is unwilling to extend the Credit Facilities to Borrower unless it receives this Guaranty; and

**WHEREAS**, each Guarantor is willing to execute and deliver this Guaranty to Lender in order to induce Lender to extend the Credit Facilities and each Guarantor has approved the form and substance of each and all of the documents relating to the Credit Facilities including the Note, the Security Agreement (as defined in the Note) and all certifications, agreements, letters and other documents executed with respect to the Credit Facilities.

**NOW, THEREFORE**, in order to induce Lender to extend the Credit Facilities to Borrower and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, each Guarantor agrees as follows with Lender:

### ARTICLE 1
### REPRESENTATIONS AND WARRANTIES OF GUARANTORS

Each Guarantor hereby represents and warrants to Lender (with respect to himself, herself or itself and not any other Guarantor) that:

**Section 1.1    Capacity of Guarantors**. Such Guarantor:

(A)    has the capacity to enter into this Guaranty; and

(B)    has his or her principal residence or its primary office at the address set forth in the first paragraph of this Guaranty.

**Section 1.2    No Violation of Restrictions**. Neither the execution and delivery of this Guaranty, the consummation of the transactions contemplated hereby nor the fulfillment of or compliance with the provisions of this Guaranty will conflict with or result in a breach of any of the terms, covenants, conditions or provisions of any agreement, judgment or order to which such Guarantor is a party or by which such Guarantor is bound, or will constitute a default under any of the foregoing, or result in the creation or imposition of any lien of any nature whatsoever.

**Section 1.3    Compliance with Law**. Such Guarantor is not in violation of any law, ordinance, governmental rule, regulation, order or judgment to which such Guarantor may be subject which is likely to materially affect the financial condition of such Guarantor.

**Section 1.4    Financial Statements and Other Information**. The financial statements and any other information submitted by such Guarantor to Lender fairly represent the financial condition as of the date of each statement and there has been no material adverse change in the financial condition of such Guarantor since the date of the respective

18

Initials

CONFIDENTIAL

statements submitted to Lender.

**Section 1.5    Solvency of Guarantors and Borrower.** Such Guarantor's assets exceed his, her or its liabilities (without in any way limiting any obligation that any Guarantor may have to maintain a specified minimum net worth). Such Guarantor has made an appropriate financial investigation of Borrower and has determined that Borrower is solvent at the time of execution of this Guaranty.

**ARTICLE 2**
**COVENANTS AND AGREEMENTS**

**Section 2.1    Guaranty of Payment and Performance.** Each Guarantor irrevocably, absolutely and unconditionally (and jointly and severally if there is more than one Guarantor) guarantees to Lender, the punctual payment and performance of the Obligations as hereafter defined.

"Obligations" means all the present and future monetary and other obligations of Borrower to Lender, of whatever nature or character, and whether absolute or contingent, arising under the Note and all of the other Loan Documents, including, without limitation any obligation of Borrower to pay any principal, interest, fee, charge, cost or expense under the Loan Documents, whether or not any such amounts arise or are accrued after the commencement of any bankruptcy or other insolvency proceeding and whether or not allowed as a claim in any such proceeding.

"Loan Documents" shall have the same meaning as defined in that certain Third Amended and Restated Revolving Promissory Note by and between Lender and Borrower dated July __, 2017.

**Section 2.2    Obligations Unconditional.** This Guaranty shall remain in full force and effect until the Obligations are irrevocably paid in full and the Loan Documents are terminated, irrespective of any interruptions in the business relationships of Borrower or any Guarantor with Lender. No Guarantor's obligation hereunder shall be affected, modified or impaired by any state of facts or the happening from time to time of any event, including, without limitation, any of the following, whether or not with notice to or the consent of such Guarantor or any other Guarantor:

(A)    The invalidity, irregularity, illegality or unenforceability of, or any defect in, any Loan Document or any collateral security for the Credit Facilities or any Guaranty (collectively, the "Collateral"), including, without limitation, the Collateral under the Security Agreement, or the failure to perfect any security interest in or assignment of any of the Collateral, or the amendment, release or termination of any such security interest or assignment.

(B)    Any present or future law or order of any government (de jure or de facto) or of any agency thereof purporting to reduce the Obligations or amend or otherwise affect any Loan Document or any other obligation of Borrower or any other obligor under the Loan Documents or any other terms of payment.

(C)    The waiver, compromise, settlement, release or termination of any or all of the obligations, covenants or agreements of Borrower under any Loan Document, of any Guarantor under any Loan Document, of any other guarantor of the Credit Facilities or any part thereof, or of any other party who has given collateral as security for the payment of the Credit Facilities or any part thereof.

(D)    The failure to give notice to any Guarantor of the occurrence of an event of default under any Loan Document.

(E)    The loss, release, sale, exchange, surrender or other change in any Collateral.

(F)    The extension of the time for payment or performance or renewal of any of the Obligations.

(G)    The modification or amendment (whether material or otherwise) of any obligation, covenant or agreement set forth in any Loan Document.

19

Initials

CONFIDENTIAL

(H)    The performance of, or the omission to perform, any of the actions referred to in any Loan Document.

(I)    Any failure, omission or delay on the part of Lender to enforce, assert or exercise any right, power or remedy conferred on Lender in any Loan Document.

(J)    The voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets, marshaling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition with creditors or readjustment of, or other similar proceedings affecting, any Guarantor or Borrower or any of their respective assets, or any allegation or contest of the validity of any Loan Document.

(K)    The default or failure of any Guarantor to fully perform any obligation set forth in this Guaranty.

(L)    Any event or action that would, in the absence of this paragraph, result in the release or discharge of any Guarantor from the performance or observance of any obligation, covenant or agreement contained in this Guaranty (other than the irrevocable payment in full of the Obligations or a written release provided by Lender to such Guarantor).

(M)    Any other circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or a guarantor.

### Section 2.3    Waivers by Guarantors.

(A) Each Guarantor waives any and all rights that are or may become available to such Guarantor by statute or otherwise to require Lender to (i) proceed against Borrower; (ii) proceed against or exhaust any security held from Borrower; or (iii) pursue any other remedy in Lender's power whatsoever. Lender may, at its election, exercise any right or remedy it may have against each Guarantor or any Collateral now or hereafter held by or for the benefit of Lender including, without limitation, the right to foreclose upon any such Collateral by judicial or nonjudicial sale, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Obligations may thereby be paid and performed, even though any rights which any Guarantor may have or otherwise might obtain by subrogation against others might be diminished or destroyed. Each Guarantor acknowledges that any such exercise of a right or remedy with respect to Collateral may result in a loss, in part or whole, of Lender's right to collect from Borrower any deficiency that may remain after any such exercise of such a right or remedy and that, where such a loss occurs, each Guarantor will also suffer a loss of any rights and remedies, arising in law or equity, which such Guarantor may have to collect any amount from Borrower; and each Guarantor agrees to remain bound notwithstanding any such loss. Each Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to any Collateral, has destroyed each Guarantor's right of subrogation and reimbursement against Borrower by the operation of law or otherwise. Only the net proceeds from any such foreclosure, after deduction of all costs and expenses authorized to be deducted pursuant to the documents under which such Collateral is held or by law, shall be applied against the Obligations. Lender may at its discretion purchase all or any part of such Collateral so sold or offered for sale for its own account and may apply against the amount bid therefor all or any part of the Obligations for which such Collateral is held; and in such case, only that portion of the Obligations so applied, after deduction of all costs and expenses authorized to be deducted by law or pursuant to the documents under which such Collateral is held, shall be applied against the Obligations. Each Guarantor waives any defense arising out of the absence, impairment or loss of any right to reimbursement or subrogation or other right or remedy of such Guarantor against Borrower or any such Collateral, whether resulting from the election by Lender to exercise any right or remedy it may have against any person, any defect in, failure of, or loss or absence of priority with respect to Lender's interest in such Collateral, or otherwise. In the event that any foreclosure sale is deemed to be not commercially reasonable, each Guarantor waives any right that he, she or it may have to have any portion of the Obligations discharged except to the extent of the amount actually bid and received by Lender at any such sale. Lender shall not be required to institute or prosecute proceedings to recover any deficiency as a condition of

20

Initials

CONFIDENTIAL

payment or performance hereunder or enforcement hereof.

(B) **Waiver of Notices and Demands.** Each Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of default, and notices of acceptance of this Guaranty and of the existence, creation or incurring of new or additional Obligations. At the option of Lender, each Guarantor may be joined in any action or proceeding commenced by Lender against Borrower in connection with or based upon the Obligations or any Collateral and recovery may be had against such Guarantor in such action or proceeding, without any requirement that Lender first assert, prosecute or exhaust any remedy or claim against Borrower. Without limiting the foregoing, each Guarantor acknowledges that repeated and successive demands may be made and payments or performance made hereunder in response to such demands as and when, from time to time, Borrower may default in payments or performance of the Obligations. Notwithstanding any such performance hereunder, this Guaranty shall remain in full force and effect and shall apply to any and all subsequent defaults by Borrower in payment or performance of the Obligations.

(C) **Waiver of Defenses.** Each Guarantor waives any defense arising by reason of any disability or defense of Borrower or by reason of the cessation from any cause whatsoever of the liability of Borrower. Each Guarantor waives any setoff, defense or counterclaim which Borrower or such Guarantor may have or claim to have against Lender.

(D) **Real Property and Other Surety Waivers.** Each Guarantor waives all rights and defenses that such Guarantor may have because Borrower's debt, or any guaranty thereof, is secured by real property, including but not limited to any life insurance. This means, among other things: (i) that Lender may collect from any Guarantor without first foreclosing on any real property Collateral; and (ii) if Lender forecloses on any real property Collateral: (A) the amount of the debt may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the Collateral is worth more than the sale price, and (B) Lender may collect from each Guarantor even if Lender, by foreclosing on the real property Collateral, has destroyed any right such Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses that any Guarantor may have because Borrower's debt or any guaranty is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based on Section 580a, 580b, 580d , or 726 of the California Code of Civil Procedure.

Each Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed such Guarantor's rights of subrogation and reimbursement against Borrower by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

Without limiting any waiver, consent or agreement in this Guaranty, each Guarantor further expressly waives to the extent not prohibited by applicable law any and all rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to a Guarantor under California Civil Code Sections 2787 to 2855, inclusive, 2899 and 3433, including any revision or replacement of such statutes or rules hereafter enacted.

Any reference to California law does not in any way affect or impair Guarantor's choice of New York law pursuant to Section 4.2 of this Guaranty or constitute Lender's acknowledgement or agreement that California law will apply in any respect to this Guaranty. Such references to California law are for the sole purpose of providing Lender the broadest waivers of defenses and rights by a guarantor that are enforceable under California law in case California law is applied for matters of procedure or otherwise in any action or proceeding initiated by Lender in California relating to this Guaranty.

(E) **No Waiver; Remedies.** In addition to, and not in limitation of the waivers, no failure on the part of Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right thereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

21

Initials

CONFIDENTIAL

(F) **Guarantors' Understanding With Respect To Waivers.** Each Guarantor warrants and agrees that each of the waivers set forth above is made with such Guarantor's full knowledge of its significance and consequences, and that under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any of such waivers is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law.

**Section 2.4     Nature of Guaranty.** This Guaranty is a guaranty of payment and not of collection and each Guarantor hereby waive the right to require that any action be brought first against Borrower, any other Guarantor or any other party, or to require any security, or to require that resort be made to any security or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or of any Guarantor.

**Section 2.5     Continuation of Guaranty.** Each Guarantor further agrees that the obligations hereunder shall continue to be effective or reinstated, as the case may be, if at any time payment of all or any part thereof of the Credit Facilities is rescinded or must otherwise be restored by Lender upon the bankruptcy or reorganization of Borrower, any Guarantor or otherwise.

**Section 2.6     Subordination of Debt.** Each Guarantor hereby subordinates any and all indebtedness of Borrower now or hereafter owed to such Guarantor to all indebtedness of Borrower to Lender and agree with Lender that, from and after the date whereon Lender notifies such Guarantor that an event of default under one or more of the Loan Documents has occurred and is continuing, such Guarantor shall not demand or accept any payment from Borrower or any such indebtedness, shall not claim any offset or other reduction of such Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any interest in any of the security described in and encumbered by the Loan Documents; provided, however, that, if Lender so requests, such indebtedness shall be collected, enforced and received by such Guarantor as trustee for Lender and paid over to Lender on account of the indebtedness of the Borrower to Lender, but without reducing or affecting in any manner the liability of any Guarantor under the other provisions of this Guaranty except to the extent the principal amount of such outstanding indebtedness shall have been reduced by such payment.

**Section 2.7     Financial Statements and Other Information.** Each Guarantor agrees to deliver to Lender (A) on or before April 15 of each year, personal financial statements and information applicable to such Guarantor on Lender's standard form or other form acceptable to Lender and (B) copies of such Guarantor's annual federal tax return to be delivered on the sooner of (i) three days after filing or (ii) October 15 of each year for, as applicable, the immediately preceding fiscal or calendar year. Each Guarantor agrees to promptly deliver to Lender from time to time any additional documentation or information reasonable requested by Lender that relates to the business or assets of such Guarantor.

**Section 2.8     Transfer of Interest.** Except as expressly permitted pursuant to the Loan Documents, each Guarantor agree not to make or permit to be made, by voluntary or involuntary means, any transfer of the interest of such Guarantor in Borrower, without first obtaining the prior written consent of Lender.

**Section 2.9     Compliance with Note Covenants.** Each Guarantor shall comply with all covenants applicable to such Guarantor that are set forth in the Note. Any Guarantor that acts on behalf of Borrower has the fiduciary obligations described in the Note.

**ARTICLE 3
EVENTS OF DEFAULT**

22

Initials

CONFIDENTIAL

**Section 3.1**     **Events of Default Defined.** An "Event of Default" shall exist if any of the following events occurs and is continuing:

(A)     Any Guarantor fails to perform or observe any covenant contained herein.

(B)     Any warranty, representation or other statement by or on behalf of any Guarantor contained in this Guaranty or in any Loan Document is false or misleading in any material respect when made.

(C)     A receiver, liquidator or trustee of any Guarantor or any of his, her or its property is appointed by court order, or any party named as a Guarantor is adjudicated bankrupt or insolvent or any of his, her or its property is sequestered by court order and such order remains in effect for more than sixty (60) days, or a petition is filed against any Guarantor under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, and is not dismissed within ninety (90) days of such filing.

(D)     Any Guarantor files a bankruptcy petition or seeks relief under any provision of any reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, or consents to the filing of any petition against it under any such law.

(E)     Any Guarantor makes an assignment for the benefit of creditors or admits in writing inability to pay debts generally as they become due, or consents to the appointment of a receiver, trustee or liquidator of all or any part of his, her or its property.

(F)     The occurrence of an Event of Default under the Note or any other Loan Document.

**Section 3.2**     **Remedies on Default.** If an Event of Default exists, Lender may proceed to enforce the provisions hereof and to exercise any other rights, powers and remedies available to Lender without prior written notice to any Guarantor.

**Section 3.3**     **Waiver and Notice.**

(A)     No remedy herein conferred upon or reserved to Lender is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Guaranty now or hereafter existing at law or in equity or by statute.

(B)     No delay or omission to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right or power may be exercised from time to time and as often as may be deemed expedient.

(C)     In order to entitle Lender to exercise any remedy reserved to it in this Guaranty, it shall not be necessary to give any notice, other than such notice as may be expressly required in this Guaranty.

(D)     No waiver, amendment, release or modification of this Guaranty shall be established by conduct, custom or course of dealing.

## ARTICLE 4
## MISCELLANEOUS

23

Initials

CONFIDENTIAL

**Section 4.1**     **Construction.** If this Guaranty is executed by two or more parties, they shall be jointly and severally liable hereunder and the term "Guarantors" whenever used herein shall be construed to refer to each of the parties in the same manner and with the same effect as if each party had signed a separate guaranty.

**Section 4.2**     **Governing Law.** This Guaranty shall be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York, without regard to principles of conflicts of law or to the laws of any other jurisdiction.

**Section 4.3**     **Successors and Assigns.** This Guaranty shall inure to the benefit of and be binding upon the successors and assigns of each of the parties hereto.

**Section 4.4**     **Notices.** Any notice required or permitted to be given hereunder must be in writing  and delivered or transmitted to a party at the address or any fax number for such party set forth at the head of this Guaranty, or to such other address or fax number as such party may designate in writing as provided herein for the purpose of receiving notices hereunder. Any such notice to a party is effective if by personal delivery, upon such delivery; if by nationally recognized overnight courier, on the next business day after delivery to such courier; if by fax transmission, upon receipt by the sender of an electronic confirmation of a successful transmission; and otherwise upon receipt of such notice by such party.

**Section 4.5**     **Entire Agreement.** This Guaranty and the Loan Documents constitute the entire understanding between Borrower, each Guarantor and Lender and to the extent that any writings not signed by Lender or oral statements or conversations at any time made or had are inconsistent with the provisions of this Guaranty or the other Loan Documents, the same shall be null and void.

**Section 4.6**     **Amendments.** No amendment, change, modification, alteration or termination of this Guaranty shall be made except upon the written consent of Lender and any Guarantor to be bound thereby.

**Section 4.7**     **Assignment.** This Guaranty is assignable by Lender in whole or in part in conjunction with an assignment of the Loan Documents and any assignment hereof or any transfer or assignment of the Loan Documents or portions thereof shall operate to vest in any such assignee the rights and powers, in whole or in part, as appropriate, herein conferred upon and granted to Lender.

**Section 4.8**     **Partial Invalidity.** Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law. If, however, any such provision shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law, or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

**Section 4.9**     **SUBMISSION TO JURISDICTION. EACH GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY SHALL BE BROUGHT ONLY IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN THE COUNTY OF ERIE, WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF ANY LEGAL ACTION, AND EACH GUARANTOR WAIVES ANY RIGHT TO OBJECT TO JURISDICTION WITHIN THE FOREGOING FORUM BY LENDER. NOTHING CONTAINED HEREIN SHALL PREVENT LENDER FROM BRINGING ANY SUIT, ACTION OR PROCEEDING OR EXERCISING ANY RIGHTS AGAINST ANY COLLATERAL, AGAINST ANY GUARANTOR PERSONALLY OR AGAINST ANY PROPERTY OF ANY GUARANTOR, WITHIN ANY OTHER JURISDICTION, AND THE INITIATION OF SUCH SUIT, ACTION OR PROCEEDING OR TAKING OF SUCH ACTION IN ANY SUCH OTHER JURISDICTION SHALL IN NO EVENT CONSTITUTE A WAIVER OF THE AGREEMENTS CONTAINED HEREIN WITH RESPECT TO THE LAWS OF THE STATE OF NEW YORK GOVERNING THE RIGHTS AND OBLIGATIONS OF THE**

24

Initials

CONFIDENTIAL

PARTIES HERETO OR THE AGREEMENT OF EACH GUARANTOR TO SUBMIT TO PERSONAL JURISDICTION WITHIN THE STATE OF NEW YORK AND COUNTY OF ERIE.

**Section 4.10     WAIVER OF JURY TRIAL. EACH GUARANTOR HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS HE, SHE OR IT MAY HAVE TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (A) ARISING UNDER THIS GUARANTY OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS GUARANTY OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE, AND EACH GUARANTOR HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND LENDER MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF EACH GUARANTOR'S CONSENT TO THE WAIVER OF HIS, HER OR ITS RIGHT TO TRIAL BY JURY. EACH GUARANTOR REPRESENTS AND WARRANTS THAT HE, SHE OR IT HAS REVIEWED THIS JURY WAIVER PROVISION WITH HIS, HER OR ITS LEGAL COUNSEL, AND HAVE MADE THIS WAIVER KNOWINGLY AND VOLUNTARILY.**

**Section 4.11     SERVICE OF PROCESS. PROCESS ON ANY GUARANTOR IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS GUARANTY WILL BE DEEMED TO HAVE BEEN GIVEN WHEN GIVEN IN ANY ONE OF THE FOLLOWING WAYS: (A) PERSONALLY DELIVERED, (B) TWO BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, ALL CHARGES PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (C) 4 BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO EACH GUARANTOR AT THE APPLICABLE ADDRESS FOR SUCH GUARANTOR SET FORTH AT THE BEGINNING OF THIS GUARANTY.** Such service on a Guarantor shall be deemed in every respect effective service of process upon such Guarantor and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon such Guarantor. Nothing in this Section shall affect Lender's right to serve process in any other manner permitted by law. Any Guarantor may add additional addresses or change an address for purposes of service of process by giving 10 days' prior written notice of such change to Lender.

**Section 4.12     Unlimited Guaranty.** This Guaranty is unlimited in amount.

**Section 4.13     Counterparts.** This Guaranty may be executed in two or more counterparts, each of which together shall be deemed an original, but all of which together shall constitute one and the same instrument. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a \".pdf\" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or \".pdf\" signature page were an original thereof.

**IN WITNESS WHEREOF**, each Guarantor has executed this Guaranty as of the day and year set forth.

_____        Dated:  July __, 2017
Thomas V. Girardi, Individually

25

Initials

CONFIDENTIAL

## ACKNOWLEDGEMENTS (FOR GUARANTY)

STATE OF CALIFORNIA
COUNTY OF

On the _11_ day of July in the year 2017 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.    _See attached Acknowledgment_

_____
Notary Public

26

Initials

196

## ACKNOWLEDGEMENT BY NOTARY PUBLIC

## ACKNOWLEDGEMENTS (FOR GUARANTY)

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA          )
                                       ) ss.
COUNTY OF LOS ANGELES     )

On July 11, 2017, before me Shirleen H. Fujimoto, Notary Public in and for said state, personally

appeared THOMAS V. GIRARDI, who proved to me on the basis of satisfactory evidence to be the

individual whose name is subscribed to the within instrument and acknowledged to me that he/she

executed the same, and that by his/her signature on the instrument, the individual, or other person upon

behalf of which the individual acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing

paragraph is true and correct.

WITNESS my hand and official seal.



[Signature of Officer]

197

CONFIDENTIAL

### THIRD AMENDED AND RESTATED
### SECURITY AGREEMENT
### CALIFORNIA ATTORNEY LENDING II, INC.

In consideration of **California Attorney Lending II, Inc.**, a New York corporation having its chief executive office at 6400 Main Street, Suite 120, Williamsville, NY 14221 ("Secured Party") heretofore or hereafter (1) extending or agreeing to extend any credit or other financial accommodation to or relying on any guaranty, endorsement or other assurance of payment of Girardi Keese, a California general partnership having an office at 1126 Wilshire Blvd., Los Angeles, CA 90017 ("Borrower") or (2) agreeing to any direct or indirect extension, renewal, refinancing or other modification or replacement of or waiving or forbearing from exercising any right or remedy relating to any obligation heretofore or hereafter arising or accruing as a result of any such credit or other financial accommodation to Borrower, and for other valuable consideration, the receipt and adequacy of which is acknowledged, **Borrower and Thomas V. Girardi, individually,** having his or her principal residence address at 100 Los Altos Drive, Pasadena, CA 91105 (Borrower and each such individual being, a "Debtor" and collectively the "Debtors"), agrees with Secured Party as follows:

Introductory Statement: Secured Party and some or each or all of the Debtors are parties to that certain Security Agreement dated July 5, 2011 as amended and/or restated on August 12, 2011 and August 1, 2013 (collectively, "Security Agreement") in reliance upon which Secured Party has made certain loans and financial accommodations available to Borrower. Borrower as of the date of this Third Amended and Restated Security Agreement has executed a Third Amended and Restated Revolving Promissory Note to Secured Party in the principal amount of $6,000,000. The parties now desire to consolidate, amend and restate the Security Agreement in all respects as hereinafter set forth.

**1.     DEFINITIONS.** In this Security Agreement (the "Agreement"):

**a.     Account Debtor.** "Account Debtor" means any person or entity with an obligation to pay or transfer cash, property or proceeds to any Debtor on an Account, Chattel Paper, General Intangible regardless whether such obligation arises from business or personal matters or assets of such Debtor.

**b.     Collateral.** "Collateral" means collectively the following:

All of each Debtor's right, title and interest in all Goods (including, Equipment, Fixtures and Inventory), Money, Instruments (including Promissory Notes), Accounts, Deposit Accounts, Chattel Paper, Investment Property, Letter-of-Credit Rights, Documents and General Intangibles (including payment intangibles), Commercial Tort Claims described in the Questionnaire, Insurance Proceeds and any other personal property (whether or not subject to the UCC), and all interest, dividends and other distributions thereon paid and payable in cash or in property; and all replacements and substitutions for, and all accessions and additions to, and all profits, offspring, Products and other Proceeds of, all of the foregoing. Each Debtor is prohibited from granting additional security interest in the Collateral or the Proceeds of the Collateral. (Notice to potential competing creditors under Official Note 5 of UCC Section 9-331).

The Collateral includes, without limitation, any right to payment of any Debtor for client representation or referral (whether such right to payment is on a contingent, hourly, fixed fee or other basis) and for Costs and Expenses (as defined in the Note), whether or not yet earned by performance, and the proceeds thereof, including Net Fees and Expenses (as defined in the Note).

**c.     Event of Default.** An "Event of Default" occurs or exists if:

(i)     there occurs or exists any event or condition of default under any Revolving Promissory Note or other instrument (A) now or hereafter evidencing any of the Obligations, hereinafter defined, or (B) the payment of which is now or hereinafter guaranteed by any Debtor (including, but not limited to, that certain Note, dated the date of this Agreement, issued by Borrower to Secured Party, or any direct or indirect extension, renewal, refinance or other modification or

27

Initials

CONFIDENTIAL

replacement of such Note); or

(ii)    there occurs or exists any event or condition of default under any guaranty of the Obligations; or

(iii)    Secured Party deems itself insecure with respect to the Obligations or is of the opinion that the Collateral is or may not be sufficient or has decreased or may decrease in value, whether or not Secured Party has sought any Other Collateral from any Debtor or any Guarantor.

d.      **Fiduciary Obligations.** "Fiduciary Obligations" means the fiduciary obligations of any Debtor, as set forth in the Note.

e.      **Guarantor.** "Guarantor" means any Person, including Thomas V. Girardi, who or that is now or hereafter liable, whether directly or indirectly or absolutely or contingently, for the payment of any of the Obligations.

f       **Loan Documents.** "Loan Documents" shall have the same meaning as set forth in the Note.

g.      **Note.** "Note" means the Third Amended and Restated Revolving Promissory Note, dated on or about the date hereof, from Borrower to Secured Party as amended, increased, extended, amended and restated or replaced from time to time.

h       **Obligations.** "Obligations" means collectively all obligations that are now owing or in the future owing by each Debtor (including, any direct or indirect successor of any Debtor or any direct or indirect assignee or other transferee of all or substantially all of the assets of any Debtor) to Secured Party for the payment of any money or the performance of any other obligation under the Loan Documents, regardless of type, class or form, whether direct or indirect, absolute or contingent (whether pursuant to any guaranty, endorsement or other assurance of payment or otherwise), whether for any business or commercial purpose or otherwise, including without limitation any such present and future obligations owing under the Loan Documents, (i) for the payment of any principal, interest, fee, charge, cost or expense, whether or not any such amounts arise or accrue after the commencement of any bankruptcy or other insolvency proceeding and whether or not allowed in any such proceeding, (ii) by such Debtor alone or with others, and (iii) whether owing from inception to Secured Party or acquired by assignment or other transfer to Secured Party.

i.      **Other Collateral.** "Other Collateral" means, other than the Collateral, any collateral, subordination, guaranty, endorsement or other security or assurance of payment, whether now existing or hereafter arising or accruing, that now or hereafter secures the payment of or is otherwise applicable to any of the Obligations.

j.      **Permitted Liens.** "Permitted Liens" means (i) any security interest in or other lien on any of the Collateral in favor of Secured Party or (ii) any security interest in or other lien on any of the Collateral existing on this date that is (A) fully and accurately described in the response to question 7 contained in the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement but only to the extent such security interest or other lien secures the indebtedness described in such response or (B) consented to in writing by Secured Party.

k.      **Person.** "Person" means (i) any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated association, government or political subdivision, (ii) any court, agency or other governmental body or (iii) any other entity, body, organization or group.

l.      **Record.** "Record" means any information that is now or hereafter (i) inscribed on a tangible medium or (ii) stored in an electronic or other medium and retrievable in perceivable form, except to the extent constituting confidential information (whether contained in any client file of any Debtor or otherwise) that any Debtor is not permitted to disclose to Secured Party by reason of any ethical or disciplinary rule, regulation or law governing such Debtor's conduct.

28

Initials

CONFIDENTIAL

**m.**     **Security Interest.** "Security Interest" means any security interest or other lien granted or otherwise created pursuant to the first sentence of Section 2 of this Agreement.

**n.**     **Uniform Commercial Code.** "Uniform Commercial Code" or "UCC" means the Uniform Commercial Code in effect at any time in the State of New York.

**o.**     **Other Terms.** All capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in the Uniform Commercial Code.

**2.**     **GRANT OF SECURITY INTEREST.** To secure the payment and performance of the Obligations, each Debtor grants to Secured Party a security interest in and assigns, pledges and hypothecates to Secured Party the Collateral. Each Security Interest is a continuing, absolute and unconditional security interest or other lien.

**3.**     **REINSTATEMENT OF OBLIGATIONS.** Each portion of the Obligations heretofore or hereafter paid or satisfied by any of the Collateral, or any money or Other Collateral, heretofore or hereafter received, applied or retained by Secured Party and later recovered from Secured Party as a result of any claim (including, but not limited to, any claim involving preference or fraudulent conveyance or any allegation that any money received by Secured Party constituted trust funds), however asserted and whether now existing or hereafter arising or accruing, shall be reinstated as part of the Obligations for purposes of this Agreement as of the date it originally arose or accrued.

**4.**     **COVENANTS.**

**a.**     **Affirmative Covenants.** Each Debtor shall (i) maintain complete and accurate Records relating to the Collateral, (ii) before the end of any applicable grace period, pay each tax, assessment, fee and charge imposed by any government or political subdivision upon any of the Collateral, this Agreement or any agreement, instrument or other Record evidencing any of the Collateral or any of the Obligations, (iii) defend the Collateral against each demand, claim, counterclaim, setoff and defense asserted by any Person (including, but not limited to, any Account Debtor) other than Secured Party and (iv) promptly notify Secured Party of (A) any threat or commencement of any action or other legal proceeding, any entry of any judgment or order of any court, agency or other governmental body, or any assertion by any Person (including, but not limited to, any Account Debtor) other than Secured Party of any demand, claim, counterclaim, setoff or defense, relating to any of the Collateral, (B) any occurrence or existence of any Event of Default, any event or condition that, after notice, lapse of time or both notice and lapse of time, would constitute any Event of Default or any event or condition that has or will or might have any material adverse effect on (I) any of the Collateral, (II) any Debtor, (III) any Guarantor or (IV) the business, operations, assets, affairs or condition (financial or other) of any Debtor or any Guarantor and (C) any change in the location of the chief executive office or principal place of business of any Debtor or the residence of any Debtor that is an individual.

**b.**     **Negative Covenants.** Without the prior written consent of Secured Party, no Debtor shall (i) sell or otherwise dispose of any of the Collateral or any interest or right in any of the Collateral except in the ordinary course of business and in compliance with any Fiduciary Obligations relating thereto, or (ii) provide to Secured Party or permit to be provided to Secured Party on his, her or its behalf any certificate, financial statement or other Record that contains any statement of fact that is incorrect or misleading in any material respect or omits to state any fact necessary to make any statement of fact contained therein not incorrect or misleading in any material respect, or (iii) permit to be filed or remain on file in any public office any financing statement or amendment of any financing statement relating to any of the Collateral and naming any Person other than Secured Party as a secured party, except for any financing statement or amendment of any financing statement heretofore consented to by Secured Party in writing or relating solely to any Permitted Liens, or (iv) upon or at any time after any occurrence or existence of any Event of Default, (A) enforce, extend, renew, refinance or otherwise modify or replace, request, demand, accept, collect or otherwise realize upon, compromise, cancel, discharge, subordinate, accelerate, give any receipt, release or discharge relating to, commence,

29

Initials

CONFIDENTIAL

prosecute or settle any action or other legal proceeding relating to, waive or forbear from exercising any right or remedy relating to or adversely affect any obligation of any Person (including, but not limited to, any Account Debtor obligated with respect to any of the Collateral) relating to any of the Collateral, or (B) agree or otherwise incur any obligation to do anything described in clause (iv)(A) of this sentence, or (v) without giving Secured Party at least 30 days' prior written notice (A) change its location for purposes of Article 9 of the Uniform Commercial Code (including, but not limited to, its jurisdiction of organization if it is a Registered Organization), (B) make any change in its name, identity or structure or (C) participate in any merger, consolidation or other absorption, or (vi) grant or otherwise create, permit to exist or agree or otherwise incur any obligation to grant or otherwise create or permit to exist any security interest in or other lien on any of the Collateral other than Permitted Liens, or (vii) use any money of Borrower, funds in any Deposit Account of Borrower or funds represented by any certificate of deposit of Borrower in partial or complete satisfaction of any obligation of Borrower except for obligations incurred in the ordinary course of the business of Borrower and in full compliance with the Fiduciary Obligations, or (viii) create, incur, assume or have any indebtedness or other obligation (A) arising from the borrowing of any money or (B) pursuant to any guaranty or other contingent obligation, except for indebtedness and other obligations (I) to Secured Party, (II) constituting unsecured normal trade debt incurred upon customary terms in the ordinary course of its business or for any Debtor that is an individual, ordinary consumer debt, (III) arising from the endorsement in the ordinary course of its business of any check or other negotiable instrument for deposit or collection or (IV) fully and accurately described in the response to question 7 contained in the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement.

**c.    Additional Covenants Triggered by Request of Secured Party.** Promptly upon the request of Secured Party, each Debtor shall (i) deliver to Secured Party each financing statement, amendment of any financing statement and other Record, and take each other action (including, but not limited to, making any endorsement), requested by Secured Party to perfect, maintain the validity, perfection or priority of, or enforce, any Security Interest, otherwise protect the interest of Secured Party in or collect, sell or otherwise dispose of or otherwise realize upon any of the Collateral, whether under applicable law or otherwise, verify any of the Collateral or otherwise accomplish any purpose of this Agreement, (ii) deliver to Secured Party each Record included in the Collateral, together with each endorsement, instrument of assignment and other Record that Secured Party requests to accomplish the assignment or other transfer of such Record to Secured Party, and, until such delivery, hold such Record in trust for Secured Party, (iii) cause each Instrument representing Proceeds or other proceeds of any of the Collateral to be made payable, as requested by Secured Party, to Secured Party alone or Secured Party and any one or more of Debtors jointly, (iv) provide to Secured Party all information requested by Secured Party and relating to (A) any of the Collateral, (B) any Person (including, but not limited to, any Account Debtor) obligated with respect to any of the Collateral, (C) any Debtor, (D) any Guarantor or (E) the business, operations, assets, affairs or condition (financial or other) of any Debtor or any Guarantor (including, but not limited to, financial statements prepared in a form satisfactory to Secured Party and, if requested by Secured Party, audited, reviewed or compiled by an independent certified public accountant satisfactory to Secured Party) and (v) permit each officer, employee, accountant, attorney and other agent of Secured Party to inspect the Collateral and audit, copy and extract each Record included in the Collateral.

**d.    Collateral Collections.** After an Event of Default shall have occurred, Secured Party shall have the right at any and all times to enforce any Debtor's rights against Account Debtors and other parties obligated on Collateral, including, but not limited to, the right to: (i) notify and/or require any Debtor to notify any or all Account Debtors and other parties obligated on Collateral to make payments directly to Secured Party or in the care of a post office lock box under the sole control of Secured Party established at Debtors' expense subject to Secured Party's customary arrangements and charges therefor, and to take any or all action with respect to Collateral as Secured Party shall determine in its sole discretion, including, without limitation, the right to demand, collect, sue for and receive any money or property at any time due, payable or receivable on account thereof, compromise and settle with any person liable thereon, and extend the time of payment or otherwise change the terms thereof, without incurring liability or responsibility to any Debtor; (ii) revoke any prior authorization given to any Debtor to use amounts held in trust by such Debtor pursuant to the Fiduciary Obligations and require any Debtor to also segregate and hold in trust for Secured Party any other Collateral not subject to the Fiduciary Obligations, and, on the day of such Debtor's receipt thereof,

30

Initials

CONFIDENTIAL

transmit to Secured Party in the exact form received by such Debtor (except for such assignments and endorsements as may be required by Secured Party), all cash, checks, drafts, money orders and other items of payments constituting Collateral or proceeds of Collateral; and/or (iii) establish and maintain at Secured Party a "Repayment Account," which shall be under the exclusive control and subject to the sole order of Secured Party and which shall be subject to the imposition of such customary charges as are imposed by Secured Party from time to time upon such accounts, for the deposit of cash, checks, drafts, money orders and other items of payments constituting Collateral or proceeds of Collateral from which Secured Party may, in its sole discretion, at any time and from time to time, withdraw all or any part. Secured Party's collection and enforcement of Collateral against Account Debtors and other persons obligated thereon shall be deemed to be commercially reasonable if Secured Party exercises due care and follows the procedures that Secured Party generally applies to the collection of obligations owed to Secured Party. All cash and non-cash proceeds of the Collateral may be applied by Secured Party upon Secured Party's actual receipt of cash proceeds against such of the Obligations, matured or unmatured, as Secured Party shall determine in its sole discretion. Secured Party may defer the application of non-cash proceeds of Collateral, including, but not limited to, non-cash proceeds collected from Account Debtors and other persons obligated on Collateral, to the Obligations until cash proceeds are actually received by Secured Party.

e.     **Care of Collateral.** Each Debtor shall have all risk of loss of the Collateral. Secured Party shall have no liability or duty, either before or after an Event of Default, to collect or enforce any of its rights against the Collateral, to collect any income accruing on the Collateral, or to preserve rights against Account Debtors or other parties with any prior interest in the Collateral. If Secured Party actually receives any notices requiring action with respect to Collateral of a Debtor in Secured Party's possession, Secured Party shall take reasonable steps to forward such notices to such Debtor. Each Debtor is responsible for responding to notices concerning the Collateral, voting the Collateral, and exercising rights and options, calls and conversions of the Collateral. Secured Party's sole responsibility is to take such action as is reasonably required by such Debtor in writing, provided, however, Secured Party is not required to take any action that, in Secured Party's sole judgment, would adversely affect the value of the Collateral as security for the Obligations. While Secured Party is not required to take certain actions, if action is needed, in Secured Party's sole discretion, to preserve and maintain the Collateral, each Debtor authorizes Secured Party to take such actions, but Secured Party is not obligated to do so.

5.     **POWER OF ATTORNEY.** Upon the occurrence or existence of any Event of Default, each Debtor irrevocably and unconditionally appoints Secured Party as the attorney-in-fact of such Debtor, with full power of substitution and revocation, to take, in the name and on behalf of such Debtor or otherwise, each action relating to any of the Collateral that such Debtor could take (subject to the limitations contained in Section 12(j) of this Agreement), provided such appointment and power does not violate any code of professional conduct and the ethical rules thereunder applicable to the legal profession. The power of attorney given pursuant to the preceding sentence is coupled with an interest in favor of Secured Party.

6.     **CERTAIN RIGHTS, REMEDIES AND DUTIES.**

a.     **Rights and Remedies Pursuant to Applicable Law.** With respect to the Collateral, Secured Party shall have each applicable right and remedy pursuant to applicable law (including, but not limited to, the Uniform Commercial Code) or this Agreement.

b.     **Additional Rights Without Event of Default.** Secured Party shall have the right to (i) file in any public office each financing statement or amendment of any financing statement relating to any of the Collateral that Secured Party desires to file (which may describe the collateral as "all assets" or "all personal property and fixtures" of a Debtor or using other supergeneric terms) and (ii) verify any of the Collateral in any manner or through any medium, whether directly with any Person (including, but not limited to, any Account Debtor) obligated with respect thereto or otherwise or in the name of any Debtor or otherwise.

31

Initials

CONFIDENTIAL

**c. Additional Rights Upon or After Event of Default.** Upon or at any time after any occurrence or existence of any Event of Default, Secured Party, for the purpose of preserving or enhancing the value of any of the Collateral or exercising any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement, shall have the right to (i) perform each obligation of any Debtor pursuant to this Agreement and (ii) revoke any prior authorization given to any Debtor to use amounts held in trust by such Debtor pursuant to the Fiduciary Obligations, require such Debtor to forthwith remit to Secured Party all such amounts and take control of all Proceeds and other proceeds thereof.

**d. Application of Proceeds.** Secured Party shall apply all proceeds received by Secured Party from any collection, sale or other disposition of or other recovery upon or otherwise on account of any of the Collateral (including, but not limited to, as money payable pursuant to any insurance on any of the Collateral) first to liabilities, costs and expenses described in Section 7 of this Agreement and then to the remainder of the Obligations, whether due or not due, in any order determined by Secured Party.

**e. Notice of Disposition.** Debtor agrees with Secured Party that commercial reasonableness and good faith require Secured Party to give each Debtor no more than ten days' prior written notice of the time and place of any public disposition of Collateral or of the time after which any private disposition or other intended disposition is to be made. Debtor also agrees with Secured Party that it is commercially reasonable for Secured Party to disclaim all warranties which arise with respect to the disposition of the Collateral.

**7. EXPENSES; INDEMNIFICATION.**

**a. Expenses.** Each Debtor shall pay to Secured Party on demand each cost and expense (including, but not limited to, if Secured Party retains counsel for advice, litigation or any other purpose, reasonable attorneys' fees and disbursements) heretofore or hereafter incurred by Secured Party in (i) searching for, filing or recording or obtaining any information relating to any financing statement, amendment of any financing statement or other Record relating to any of the Collateral or otherwise obtaining any information relating to any Debtor or any of the Collateral or (ii) endeavoring to (A) enforce any obligation of any Debtor pursuant to this Agreement or preserve or exercise any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement or (B) preserve or exercise any right or remedy relating to or collect, sell or otherwise dispose of or otherwise realize upon any of the Collateral. After such demand for the payment of any cost or expense incurred by Secured Party in performing any obligation of any Debtor pursuant to this Agreement, Debtors shall pay interest at an annual rate equal to the lesser of 24.9% or the highest rate permitted by applicable law on the portion of such cost or expense remaining unpaid.

**b. Indemnification.** Each Debtor shall indemnify and defend Secured Party and each officer, employee, accountant, attorney, banker or lender and other agent of Secured Party on demand, without any limitation as to amount, against each liability, cost and expense (including, but not limited to, if Secured Party retains counsel for advice, litigation or any other purpose, reasonable attorneys' fees and disbursements) heretofore or hereafter imposed on, incurred by or asserted against Secured Party or such officer, employee, accountant, attorney or other agent as a result of any claim (including, but not limited to, any claim involving any allegation of any violation of applicable law (including, but not limited to, any criminal statute)), however asserted and whether now existing or hereafter arising or accruing, arising out of any collection, sale or other disposition of any of the Collateral or any breach by any Debtor of any representation or warranty or any covenant or other agreement contained in, or any other fact or circumstance relating to, this Agreement, except to the extent any such liability, cost or expense is determined in a final, non-appealable judgment of a court of competent jurisdiction to have been caused by the gross negligence, bad faith or willful misconduct of Secured Party or such officer, employee, accountant, banker, lender, attorney or other agent.

**8. TERMINATION.** This Agreement shall remain in full force and effect until and shall terminate only upon the final and indefeasible payment in full of the Obligations and the termination of the Loan Documents, irrespective of any interruptions in the business relationships of any Debtor with Secured Party.

32

Initials

CONFIDENTIAL

**9.    REPRESENTATIONS, WARRANTIES AND ADDITIONAL COVENANTS.** Each Debtor represents, warrants and covenants with and to Secured Party as follows:

**a.    Authority.** The execution, delivery to Secured Party and performance of this Agreement and the grant or other creation of each Security Interest by such Debtor (i) do not and will not violate applicable law, any judgment or order of any court, agency or other governmental body by which such Debtor is bound or, if such Debtor is not an individual, any certificate or articles of incorporation or organization, by-laws, operating or partnership agreement or other charter, organizational or other governing document of such Debtor or any resolution or other action of record of any shareholders, members, partners, directors or managers of such Debtor, (ii) do not and will not violate or constitute any default under any agreement, instrument or other Record by which such Debtor is bound or to which such Debtor's property is subject, (iii) if such Debtor is not an individual, are and will be in furtherance of the purposes and within the power and authority of such Debtor and (iv) do not and will not require any authorization of, notice to or other act by or relating to any Person (including, but not limited to, any Account Debtor or, if any Debtor is not an individual, any shareholder, member, partner, director or manager of such Debtor) that has not been duly obtained, given or done and is not in full force and effect.

**b.    Enforceability.** This Agreement is enforceable in accordance with its terms against each Debtor. All of each Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, General Intangibles, Instruments, Investment Property, Letter-of-Credit Rights and other liens, contracts, leases and agreements constituting the Collateral are and shall be valid, genuine and legally enforceable obligations and rights belonging to such Debtor and not subject to any claim, defense, set-off, or counterclaim of any kind.

**c.    Ownership.** Debtors are and shall remain the owners of the Collateral.

**d.    Questionnaire.** Each answer contained in any questionnaire submitted by or on behalf of any Debtor to Secured Party in connection with this Agreement (including, but not limited to, the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement) is complete and accurate.

**e.    Rights and Obligations with Respect to Collateral.** Except as heretofore disclosed by any Debtor to Secured Party in writing, there exists (i) no security interest in or other lien on any of the Collateral other than Permitted Liens, (ii) no presently effective financing statement or amendment of any financing statement relating to any of the Collateral and naming any Person other than Secured Party as a secured party other than those relating solely to Permitted Liens, (iii) no contractual or other restriction on the grant or other creation of any security interest in or assignment, pledge or hypothecation of any of the Collateral, and (iv) no demand, claim, counterclaim, setoff or defense, no action or other legal proceeding, and no outstanding judgment or order of any court, agency or other governmental body, relating to any of the Collateral. Each Debtor (i) shall defend the Collateral against all claims and demands of all persons at any time claiming any interest therein; (ii) shall cooperate with Secured Party in obtaining and maintaining control with respect to all Deposit Accounts, Investment Property, Letter-of-Credit Rights and electronic chattel paper constituting the Collateral; (iii) shall not become a party to any restructuring of its form of business or participate in any consolidation, merger, liquidation or dissolution without Secured Party's prior written consent; (iv) shall not change its state of organization without first notifying Secured Party in writing; (v) shall immediately advise Lender in writing of any change in address of any Debtor or the Collateral; and (vi) shall provide Secured Party with possession of all Chattel Paper, Documents, Instruments and Investment Property constituting the Collateral that are embodied in a tangible document, instrument or certificate.

**f.    Actions with Respect to Collateral.** Except as heretofore disclosed by any Debtor to Secured Party in writing, no Debtor has (i) sold or otherwise disposed of any of the Collateral or any interest or right in any of the Collateral or (ii) extended, renewed, refinanced or otherwise modified or replaced, compromised, canceled, discharged, subordinated, accelerated, waived, forborne from exercising any right or remedy relating to or adversely affected any obligation of

33

Initials

CONFIDENTIAL

any Person (including, but not limited to, any Account Debtor) relating to any of the Collateral.

**g.    Accounts and General Intangibles.** Each Account and General Intangible included in the Collateral is or, if not now existing, will be genuine, in all respects what it purports to be and enforceable in accordance with its terms against each Person (including, but not limited to, any Account Debtor) obligated with respect thereto, subject to no demand, claim, counterclaim, setoff or defense.

**h.    Incorrect or Misleading Information.** Each Debtor has not provided to Secured Party or permitted to be provided to Secured Party on his, her or its behalf any certificate, financial statement or other Record that contains any statement of fact that is incorrect or misleading in any material respect or omits to state any fact necessary to make any statement of fact contained therein not incorrect or misleading in any material respect.

**i.    Taxes.** Each Debtor has duly filed all applicable income or other tax returns and has paid all income or other taxes when due, and there are no outstanding tax liens against the assets of any Debtor.

**10.    CERTAIN CONSENTS AND WAIVERS.**

**a.    Consents.** Except to the extent expressly provided in this Agreement, this Agreement shall not be modified or terminated, no Security Interest, no obligation of any Debtor pursuant to this Agreement and no right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement shall be impaired or otherwise adversely affected, and no such right or remedy shall be waived, by any act, omission or other thing, whether heretofore occurred or hereafter occurring. Each Debtor knowingly, voluntarily, intentionally and irrevocably consents, without any notice, to each act, omission and other thing, whether heretofore occurred or hereafter occurring, that would or might, but for such consent, modify or terminate this Agreement, impair or otherwise adversely affect any Security Interest or any such obligation, right or remedy or operate as a waiver of any such right or remedy.

**b.    Waivers.** Each Debtor knowingly, voluntarily, intentionally and irrevocably waives, without any notice, each act and other thing upon which, but for such waiver, any Security Interest, any obligation of such Debtor pursuant to this Agreement or any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement would or might be conditioned.

**11.    NOTICES.** Any notice required or permitted to be given hereunder must be in writing and must be delivered or transmitted to a party at the address or any fax number for such party set forth at the beginning of this Agreement or on the Signature Page to this Agreement, or to such other address or fax number as such party may designate in writing as provided herein for the purpose of receiving notices hereunder. Any such notice to a party is effective if by personal delivery, upon such delivery; if by nationally recognized overnight courier, on the next business day after delivery to such nationally recognized overnight courier; if by fax transmission, upon receipt by the sender of an electronic confirmation of a successful transmission; and otherwise upon receipt of such notice by such party. Each requirement under applicable law of reasonable notice of any event by Secured Party to any Debtor shall be deemed to have been met if a notice of such event is given by Secured Party to such Debtor at least 10 days before the date on or after which such event is to occur.

**12.    MISCELLANEOUS.**

**a.    Reliance by Other Persons.** Each Person (including, but not limited to, any Account Debtor) obligated with respect to any of the Collateral may accept without any question any exercise by Secured Party of any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement.

**b.    Limitation on Security Interest.** The payment of the Obligations shall not be secured by any Security Interest to the extent of any amount in excess of the maximum amount the payment of which can be so secured without rendering

34

Initials

CONFIDENTIAL

such Security Interest unenforceable under applicable law as a fraudulent conveyance or transfer.

**c.     Obligations Relating to Collateral.** The grant or other creation of any Security Interest shall not constitute an assignment by any Debtor to Secured Party of any obligation of such Debtor relating to any of the Collateral. Each Debtor shall remain obligated to perform each such obligation, and Secured Party shall not be obligated to perform any such obligation, whether or not Secured Party exercises any right or remedy pursuant to this Agreement or arising or accruing as a result of this Agreement. The only obligations of Secured Party relating to the Collateral shall be, to the extent required by applicable law, to act in a commercially reasonable manner in exercising with respect to any of the Collateral any right or remedy pursuant to this Agreement or arising or accruing as a result of this Agreement.

**d.     Liability.** If more than one Person executes this Agreement, (i) each of them shall be jointly and severally liable pursuant to this Agreement, and (ii) this Agreement shall be construed, interpreted and enforced, whether in any action or other legal proceeding or otherwise, as to each of them as though each of them had executed and delivered to Secured Party a separate agreement identical to this Agreement.

**e.     Assignment or Grant of Participation.** In conjunction with any assignment or other transfer of or grant of any participation in any of the Obligations by Secured Party, Secured Party shall have the right to assign or otherwise transfer or grant any participation in this Agreement, any Security Interest, any obligation of any Debtor pursuant to this Agreement or any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement.

**f.     Binding Effect.** This Agreement shall be binding upon each Debtor and each direct or indirect legal representative, successor and assignee of each Debtor and shall inure to the benefit of and be enforceable by Secured Party and each direct or indirect successor and assignee of Secured Party.

**g.     Entire Agreement, Modifications and Waivers.** This Agreement contains the entire agreement between Secured Party and each Debtor with respect to the subject matter of this Agreement and supersedes each action heretofore taken or not taken, each course of conduct heretofore pursued, accepted or acquiesced in, and each oral, written or other agreement and representation heretofore made, by or on behalf of Secured Party with respect thereto. No action heretofore or hereafter taken or not taken, no course of conduct heretofore or hereafter pursued, accepted or acquiesced in, no oral, written or other agreement or representation heretofore made, and no agreement or representation hereafter made other than in writing, by or on behalf of Secured Party shall modify or terminate this Agreement, impair or otherwise adversely affect any Security Interest, any obligation of any Debtor pursuant to this Agreement or any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement or operate as a waiver of any such right or remedy. No modification of this Agreement or waiver of any such right or remedy shall be effective unless made in a writing duly executed by Secured Party and specifically referring to such modification or waiver.

**h.     Rights and Remedies Cumulative.** All rights and remedies of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement shall be cumulative, and no such right or remedy shall be exclusive of any other such right or remedy.

**i.     Extent of Consents and Waivers.** Each consent and waiver of any Debtor contained in this Agreement shall be deemed to have been given to the extent permitted by applicable law.

**j.     Exercise of Rights; Requests.** Except as expressly provided in this Agreement, each right and remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement may be exercised (i) at any time and from time to time, (ii) in the sole discretion of Secured Party, (iii) without any notice or demand of any kind and (iv) whether or not any Event of Default or any other event or condition of default relating to any of the Obligations, any of the Collateral or any Other Collateral has occurred or existed, but Secured Party shall not be obligated to exercise

35

Initials

CONFIDENTIAL

any such right or remedy. Each such right and remedy may be exercised only to the extent that the exercise thereof does not (i) violate applicable law or (ii) if requiring any Debtor to take any action, require any Debtor to violate any ethical or disciplinary rule, regulation or law governing non-disclosure of confidential information by an attorney or prohibiting the unauthorized practice of law. Each request by Secured Party pursuant to this Agreement may be made (i) at any time and from time to time, (ii) in the sole discretion of Secured Party and (iii) whether or not any Event of Default or any other event or condition of default relating to any of the Obligations, any of the Collateral or any Other Collateral has occurred or existed.

**k.    Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law. If, however, any such provision shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law, or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

**l.    Governing Law.** This Agreement shall be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York, without regard to principles of conflicts of law or to the law of any other jurisdiction.

**m.    Headings.** In this Agreement, headings of sections are for convenience of reference only and have no substantive effect.

**n.    Counterparts.** This Agreement may be executed in two or more counterparts, each of which together shall be deemed an original, but all of which together shall constitute one and the same instrument. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a \".pdf\" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or \".pdf\" signature page were an original thereof.

**13.    CONSENTS AND WAIVERS RELATING TO LEGAL PROCEEDINGS.**

**a.    JURISDICTIONAL CONSENTS AND WAIVERS. EACH DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY CONSENTS AND AGREES THAT ANY ACTION OR OTHER LEGAL PROCEEDING COMMENCED BY SECURED PARTY SHALL BE BROUGHT ONLY IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF SUCH ACTION; PROVIDED, HOWEVER, SECURED PARTY MAY, AT ITS OPTION, COMMENCE ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION TO OBTAIN POSSESSION OR FORECLOSURE UPON ANY COLLATERAL, TO OBTAIN EQUITABLE RELIEF OR TO ENFORCE ANY JUDGMENT OR ORDER OBTAINED BY SECURED PARTY AGAINST DEBTOR OR WITH RESPECT TO ANY COLLATERAL, TO ENFORCE ANY OTHER RIGHT OR REMEDY UNDER THIS AGREEMENT OR TO OBTAIN ANY OTHER RELIEF DEEMED APPROPRIATE BY SECURED PARTY. DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO PERSONAL JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, AND DEBTOR HEREBY WAIVES ANY OBJECTIONS WHICH DEBTOR MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH NEW YORK COURT.**

**b.    WAIVER OF TRIAL BY JURY. EACH DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT SUCH DEBTOR MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION OR OTHER LEGAL PROCEEDING, WHETHER BASED ON ANY**

36

Initials

CONFIDENTIAL

**CONTRACT OR NEGLIGENT, INTENTIONAL OR OTHER TORT OR OTHERWISE, ARISING OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT, ANY OF THE OBLIGATIONS, ANY OF THE COLLATERAL OR ANY OTHER COLLATERAL.**

c.    **SERVICE OF PROCESS.** PROCESS ON DEBTORS IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT WILL BE DEEMED TO HAVE BEEN GIVEN TO A DEBTOR WHEN GIVEN IN ANY <u>ONE</u> OF THE FOLLOWING WAYS: (I) PERSONALLY DELIVERED, (II) TWO (2) BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, CHARGES PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (III) FOUR (4) BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH DEBTOR AT THE APPLICABLE ADDRESS SET FORTH IN THIS AGREEMENT. Such service on any Debtor shall be deemed in every respect effective service of process upon and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon such Debtor. Nothing in this Section shall affect Secured Party's right to serve process in any other manner permitted by law. Each Debtor may add additional addresses or change the address for purposes of service of process by giving 10 days' prior written notice of such change to Secured Party.

Dated:  July *11*, 2017

Girardi Keese

By:_____
Thomas V. Girardi, Partner
Facsimile No.

_____
Thomas V. Girardi, individually
Facsimile No.

37

Initials

CONFIDENTIAL

## EXHIBIT A

### QUESTIONNAIRE

1. What is Borrower's legal name?

   Girardi Keese

2. What is Borrower's jurisdiction of organization and business structure:

   General partnership under the laws of California

3. What is Borrower's Federal Employer Identification Number or Social Security Number?

   _____

4. What is the address (including state, county and zip code) of a business office of Borrower?

   1126 Wilshire Blvd., Los Angeles, CA 90017

5. What is the address (including state, county and zip code) of each location at which any Record included in the Collateral is or will be kept other than the locations the addresses of which are indicated in the answers to question 4?

   1126 Wilshire Blvd., Los Angeles, CA 90017
   100 Los Altos Drive, Pasadena, CA 91105

6. **Deposit Accounts owned by each Debtor**

   For each deposit account of each Debtor, what is the name and address of the bank maintaining such account, what type of account is such account (include each trust account but indicate its status as a trust account) and what is the account number of each such account?

| Debtor Name | Name & Address of Depository Bank | Type of Account | Account Number |
|---|---|---|---|
| | | | |
| | | | |

7. **Existing Liens**

   In the case of any security interest or other lien covering any of the Collateral and existing on the date of this Agreement in favor of any Person other than Secured Party, what are the complete name and address of each such Person in whose favor such security interest or other lien exists, and what is the nature of such security interest or other lien and the debt secured thereby?

38

Initials

CONFIDENTIAL

| Debtor Name | Name & Address of the Secured Party holding the Permitted Lien | Description of Collateral and Debt Secured Including Principal Amount of such Debt |
|---|---|---|
| Comerica Bank | 75 East Trimble Road San Jose, CA 95131 | blanket lien, as well as various specific security interests in certain accounts, contracts and deposits |
| Key Equipment Finance Inc. | 1000 So. McCaslin Blvd. Superior, CO 80027 | specific leased equipment |
| Ikon Financial Svcs. | 1738 Bass Rd. Macon, GA 31210 | specific leased equipment |
| Comerica Bank-California | 333 W. Santa Clara St. San Jose, CA 95113 | as to Thomas V. Girardi, certain specified shares of stock in Coast Resorts, Inc. |
| Torrey Pine Bank | 9295 Farnham Street, Suite 200 San Diego, CA 92123 | Real property located at 100 Los Altos Drive, in the City of Pasadena, County of Los Angeles, State of California and all furniture, fixtures, improvements, accounts and records related thereto |

8. What is the legal name and principal residence address of each Debtor other than Borrower?

   Thomas V. Girardi - 100 Los Altos Drive, Pasadena, CA 91105

9. Description of any Commercial Tort Claims owned by any Debtor

   In the case of any Commercial Tort Claim existing on the date of this Agreement, which Debtor is the owner of such claim and what is the description of such claim?

| Debtor Name | Description of Commercial Tort Claim |
|---|---|
|  |  |

39

Initials

210

CONFIDENTIAL

## ACKNOWLEDGEMENT (SECURITY AGREEMENT)

STATE OF CALIFORNIA
COUNTY OF

On the _____ day of July in the year 2017 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as Partner of Girardi Keese and that by his signature on the instrument, the entity upon behalf of which the individual acted, executed the instrument.

*See attached Acknowledgement*
_____
Notary Public

STATE OF CALIFORNIA
COUNTY OF

On the _____ day of July in the year 2017 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

*See attached Acknowledgement*
_____
Notary Public

40

_____
Initials

# ACKNOWLEDGEMENT BY NOTARY PUBLIC

## ACKNOWLEDGEMENT SECURITY AGREEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

On July 11, 2017, before me Shirleen H. Fujimoto, Notary Public in and for said state, personally

appeared THOMAS V. GIRARDI, who proved to me on the basis of satisfactory evidence to be the

individual whose name is subscribed to the within instrument and acknowledged to me that he

executed the same, and that by his signature on the instrument, the individual, or other person upon

behalf of which the individual acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing

paragraph is true and correct.

WITNESS my hand and official seal.



SHIRLEEN H. FUJIMOTO
COMM. # 2107442
NOTARY PUBLIC ● CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 15, 2019

_____
[Signature of Officer]

212

## ACKNOWLEDGEMENT BY NOTARY PUBLIC

## ACKNOWLEDGEMENT SECURITY AGREEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA                              )
                                                 ) ss.
COUNTY OF LOS ANGELES                            )

On July 11, 2017, before me Shirleen H. Fujimoto, Notary Public in and for said state, personally

appeared THOMAS V. GIRARDI, who proved to me on the basis of satisfactory evidence to be the

individual whose name is subscribed to the within instrument and acknowledged to me that he

executed the same, and that by his capacity as Partner of Girardi|Keese, and that by his signature on the

instrument, the individual, or other person upon behalf of which the individual acted, executed the

instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing

paragraph is true and correct.


WITNESS my hand and official seal.




SHIRLEEN H. FUJIMOTO
COMM. # 2107442
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 15, 2019

_[Signature of Officer]_

213

CONFIDENTIAL

## COMPANY CERTIFICATE

With respect to certain credit facilities (collectively the "Loan") to be extended by California Attorney Lending II, Inc., a New York corporation  (the "Lender"), the undersigned certifies and verifies to Lender, its successors and assigns as follows:

1.  I am [check applicable box:]
    [ the duly elected and qualified President or Secretary
    [ the duly appointed Manager or other authorized Member
    ☒ a duly authorized Partner

    **of Girardi Keese (the "Company"), organized under the laws of California**

2.  The resolutions attached to this Company Certificate as Schedule I (collectively the "Resolutions") were duly adopted (a) at a meeting of the partners of the Company duly called and held on **July __, 2017** at which meeting a quorum was present and participated, or (b) by unanimous written consent of all partners of the Company.

3   None of the Resolutions has been rescinded, revoked or modified in any way.

4.  All of the Resolutions are in full force and effect.

5.  Neither any of the Resolutions nor any action taken or to be taken pursuant to any of the Resolutions (a) violates or will violate applicable law, any judgment or order of any court, agency or other governmental body by which the Company is bound or any governing document of the Company or any resolution or other action of record of the partners of the Company, (b) violates, will violate or constitutes or will constitute any default under any agreement, instrument or other document by which the Company is bound or to which any of the Company's property is subject or (c) requires or will require any authorization of, notice to or other act by or relating to any individual, any court, agency or other governmental body or any other entity, body, organization or group (including, but not limited to, any shareholder, director, member, manager or partner of the Company) that has not been duly obtained, given or done and is not in full force and effect.

6.  Each of the following persons (individually a "Signer") (a) together constitute all of the partners of such partnership or (b) has been designated by the Company as a person authorized to transact financial transactions on behalf of the Company.  Each Signer is duly authorized to execute the documents between Lender and the Company and is also authorized, if applicable, to make a loan request to Lender (if the Company is the borrower with respect to the credit facilities obtained from Lender) on behalf of the Company:

| NAME | TITLE | SIGNATURE |
|---|---|---|
| Thomas V. Girardi | Partner |  |
|  |  |  |
|  |  |  |

7.  The signature set opposite each Signer's name listed above is a true specimen of such Signer's signature.

8.  With respect to the borrowing of $6,000,000 by Girardi Keese from Lender, and all related transactions (a) the terms of such borrowing and other transactions were negotiated in the State of New York, (b) the drafting of all documents and the funding of the Loan were in the State of New York (c) the laws of the State of New York are intended by the parties to apply with respect to the construction, interpretation and choice of law governing all documents executed by the

41

Initials

214

CONFIDENTIAL

Company to Lender and (d) Lender and its legal counsel are located within the State of New York. The Loan and any related transactions were intended by Lender and the Company as New York transactions to be construed under New York law regardless of any other location of any borrower or any guarantor.

9.      The Company has not granted any liens against its assets since the date of its application to Lender for the Loan.

10.     The undersigned certifies that the Company and each guarantor with respect to the Loan have duly filed all applicable income or other tax returns and have paid all income or other taxes when due, and that there are no outstanding tax liens against the assets of any of them.

IN WITNESS WHEREOF, I have executed this Company Certificate as of July __, 2017 and verify that all of the information contained herein is true and correct to the best of my knowledge being fully aware that Lender will rely on the accuracy of this Company Certificate in extending the Loan to the Company.

_____
Thomas V. Girardi

STATE OF NEW YORK
COUNTY OF

On the __11__ day of July in the year 2017 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument. *See attached acknowledgement*

_____
Notary Public

42

_____
Initials

# ACKNOWLEDGEMENT BY NOTARY PUBLIC

## COMPANY CERTIFICATE

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA                    )
                                       ) ss.
COUNTY OF LOS ANGELES                  )

On July 11, 2017, before me Shirleen H. Fujimoto, Notary Public in and for said state, personally appeared THOMAS V. GIRARDI, who proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same, and that by his signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



SHIRLEEN H. FUJIMOTO
COMM. # 2107442
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 15, 2019

_____
[*Signature of Officer*]

216

CONFIDENTIAL

## SCHEDULE I
### Resolutions

### Girardi Keese (the "Company")
A general partnership organized under the laws of California

RESOLVED, that, from time to time, the Company borrow from California Attorney Lending II, Inc. ("Lender") or enter into other financial transactions with Lender, or both, including guaranteeing repayment of borrowings obtained by any other party from Lender (any such borrowing and each such guaranty thereof and other transaction, collectively the "Transactions"); and be it further

RESOLVED that in connection with the Transactions, the Company grant a security interest or other lien in all of its present and future assets (collectively the "Property") to secure all of its present and future obligations to Lender; and be it further

RESOLVED, that the terms of each of the Transactions shall be on such terms as any officer, manager, member or partner or of the Company (individually an "Authorized Person") shall determine; and be it further

RESOLVED that any Authorized Person acting alone, is authorized to do all such acts and other things as he or she shall deem necessary or appropriate to effectuate the Transactions, in the name and on behalf of the Company or otherwise, including, but not limited to, signing, drawing, endorsing, executing and delivering notes, guaranties, assignments, pledges, security agreements, mortgages, powers of attorney, confessions of judgment, indemnifications, receipts, waivers, releases and other agreements, instruments and other documents; all on such terms as such Authorized Person shall determine (his or her approval to be evidenced by his or her execution thereof); and be it further

RESOLVED, that, without limiting the generality of the foregoing resolutions, any Authorized Person is authorized, directed and empowered, acting alone, in the name or on behalf of the Company, to obtain from Lender (or guarantee) revolving loans the total of the outstanding principal amounts of which shall not at any time exceed $6,000,000 and to grant a lien or security interest in any Property as security for the obligations owing to Lender with respect to the Transactions; and be it further

RESOLVED, that all actions heretofore taken by the Company with respect to any security interest in any Property or to effectuate the Transactions are ratified, approved and confirmed in all respects; and be it further

RESOLVED, that notwithstanding the dissolution or termination of existence of the Company or any change in the identity of or any modification or termination of any authority of any Authorized Person, Lender may rely upon and act in accordance with the foregoing resolutions until it shall receive and have a reasonable time to act on a written notice to the contrary from any Authorized Person, provided, further, that any such dissolution, termination, or modification shall be of no effect with respect to obligations of the Company with respect to the Transactions (a) arising or accrued before such receipt of such written notice and the expiration of such period of time, or (b) thereafter arising or accruing as a result of any credit or other financial accommodation theretofore committed or otherwise agreed to by Lender.

43

Initials

CONFIDENTIAL

## ACKNOWLEDGEMENT, WAIVER AND RELEASE

In consideration of the acceptance by California Attorney Lending II Inc. (the "Lender") of that certain Third Amended and Restated Revolving Promissory Note (the "Note") executed and delivered by Girardi Keese (the "Borrower"), for purposes of refinancing Borrower's outstanding obligations to the Lender, and of that certain Guaranty of Payment and Performance (the "Guaranty") executed and delivered by Thomas V. Girardi (the Guarantor") to Lender and that certain Third Amended and Restated Security Agreement (the "Security Agreement") executed and delivered by the Borrower and Guarantor to the Lender in connection with the Note, each of the Borrower and Guarantor hereby (i) acknowledges its or his or her lack of all defenses, claims, counterclaims and set-offs, rights and causes of action, whether sounding in contract, tort or otherwise (collectively, the "Claims") with respect to (A) the Note, the Guaranty, the Security Agreement, any other loan documentation executed or delivered by any of the Borrower or Guarantor in connection with the foregoing, or any document, instrument, or agreement which were amended and restated or otherwise replaced by the Note, the Guaranty, the Security Agreement or any such loan documentation, (B) the enforceability of the document, instrument, or agreement which were amended and restated or otherwise replaced by the Note, the Guaranty, the Security Agreement or any such loan documentation, (C) the actions of the Lender, together with its officers, directors, managers, shareholders, members, employees, agents and attorneys, with respect thereto, (ii) irrevocably and absolutely waives, as to the Lender together with its officers, directors, managers, shareholders, members, employees, agents and attorneys, all Claims and (iii) releases and forever discharges the Lender together with its officers, directors, managers, shareholders, members, employees, agents and attorneys, from all Claims.

Dated: July ___, 2017

Girardi Keese

By: _____
Thomas V. Girardi, Partner
Facsimile No.

_____
Thomas V. Girardi, individually
Facsimile No.

44

Initials

CONFIDENTIAL

<u>Key Loan Term Summary with Lender Forms</u>
**The following summary sets forth certain key terms in the loan documents between California Attorney Lending II, Inc. ("CAL" or "Lender") and Borrower and provides copies of forms required to be used by Lender. THIS IS NOT A LEGAL DOCUMENT, it is not a complete listing of all rights and obligations of the parties under the loan documents, and is intended solely for the purpose of assisting Borrower in its administration of its loan with CAL. In all events, the loan documents are controlling with respect to the parties' rights and remedies with respect to the loan.**

1.  <u>Draw Requests:</u> All loan requests are subject to the review and approval of CAL and must be submitted by e-mail or facsimile on the draw request form (attached).

2.  <u>Purpose:</u> The line of credit ("LOC") will be used solely by Borrower to (i) refinance Borrower's existing credit facilities (if any), (ii) pay the operating expenses of Borrower's legal practice, or (iii) fund interest payments on the LOC.

3.  <u>Payment Terms:</u> Months 1-24: Monthly interest only, except as described in "Mandatory Pre-Payments" below. Months 25-48: Monthly interest, plus 1/24 of the outstanding principal balance each month. No borrowings are allowed during months 25-48.

4.  <u>Mandatory Pre-Payments:</u> To the extent of outstanding interest and principal, proceeds received by Borrower in connection with the sale of Spectrum to Repligen in an amount sufficient to reduce the LOC to $5,000,000.

5.  <u>Interest:</u> On the first $5,000,000 of LOC availability, interest will accrue at the rate of 14.5% per annum, subject to increase by the amount that the LIBOR Rate exceeds 0.5% and on the remaining $1,000,000 of LOC availability, interest will accrue at the rate of 12% per annum, subject to increase by the amount that the LIBOR Rate exceeds 0.5%, payable on the 10th day of every month. Invoices are issued on the 1st day of every month. We will require Borrower to authorize CAL to initiate preauthorized electronic funds transfers from a specified bank account to pay the interest on the 10th of every month. Default interest rate is 24.9%.

6.  <u>Advance Interest Payment.</u> If requested by Lender, Borrower must maintain on account with CAL at all times one month's advance payment of interest. The required amount of such advance payment will initially be determined at the time of the first loan but will be adjusted from time to time based on the then outstanding principal. CAL may apply any such advance payment in such manner as it determines to any amount owing to CAL that is not paid when due or to the final payment to be made to CAL with respect to the loan.

7   <u>Availability Block for Interest /Interest Reserve.</u> In addition, Borrower must maintain unused availability on the line of credit at all times to cover interest for at least 60 days. During months 25-48, when no borrowings are allowed, CAL may require Borrower to fund a reserve or make an additional advance payment of interest to cover such 60 days' interest.

8.  <u>Financial Covenants:</u> The loan documentation will include requirements for:

    a.  The estimated future, aggregate legal fees collectible from Borrower's case files must exceed eight times the outstanding principal amount of the loan at all times.
    b.  Each principal Guarantor must maintain a net worth of at least three times the maximum credit facility.
    c.  No future third party loans, liens (including tax liens) or security interests other than purchase money equipment financing.

9.  <u>Information Updates:</u> Borrower will be required to provide copies of annual tax returns, malpractice insurance renewals, quarterly financial statements for Borrower, annual financial statements for each Guarantor, quarterly case and status lists, fee sharing and referral agreements, monthly bank statements, default and cancellation notices, and other updates as may be required by CAL.

45

Initials

CONFIDENTIAL

10. <u>Fees and Charges</u>: Borrower will be charged a closing fee equal to 1.0% of $5,000,000 per year, provided that the initial closing fee shall be paid from proceeds received by Borrower in connection with the sale of Spectrum to Repligen. If the LOC is not reduced to $5,000,000, on or before August 31, 2017, then the Borrower will be charged the 1% of the maximum LOC amount. The Lender's attorneys' fees as invoiced (**estimated at $2,750**), Lender's attorneys' costs as invoiced (estimated at $400 for one Borrower and one Guarantor and an additional $100 for each additional party), and a wire fee of $30. Borrower may be assessed a 5% per month fee for late payments (including Mandatory Pre-Payments), a $250 per month fee for late information updates, a $500 or cost charge for cancelled or incomplete audit reviews, and reimbursement charges for CAL costs associated with actions undertaken by CAL to enforce, collect or protect its rights under the loan documents.

46

Initials

220

CONFIDENTIAL

*California Attorney Lending II, Inc.*
*Specialized Lending Exclusively For the Legal Community*

## AUTHORIZATION FOR LOAN PAYMENT
## AUTOMATIC WITHDRAWAL FORM

**Borrower's Information**

Full Name: _____("Borrower")

SS# or EIN#: _____

Email Address: _____

**Borrower's Bank Information**

Bank Name: _____("Bank")

Bank ABA (Routing) No. _____

Bank Telephone No. _____

Bank Address: _____

Borrower's Bank Account No. _____("Account")

The undersigned on behalf of Borrower, (a) authorizes California Attorney Lending II, Inc. to initiate preauthorized electronic funds transfers from the Account indicated and (b) authorizes Bank to debit the Account for such transfers.

This authorization may not be revoked, modified, or in any other way altered without the express prior written consent of both the undersigned and California Attorney Lending II, Inc.

Borrower: _____

Authorized Signature: _____ Date: _____

Name and Title of Signer: _____

Return this Form and a Voided Check to California Attorney Lending II, Inc.

47

Initials

221

CONFIDENTIAL

**GIRARDI KEESE**
**1126 Wilshire Blvd.**
**Los Angeles, CA 90017**

**DRAW REQUEST**

Ms. Megan Payne
Chief Operating Officer
California Attorney Lending II, Inc.
6400 Main St.
Suite 120
Williamsville, NY 14221

Re: <u>Revolving Line of Credit (the "Line")</u>

Dear Ms. Payne:

      Girardi Keese hereby requests the additional sum of _____ Dollars ($_____)
<u>as a draw on the Line.</u> Please deposit such amount so requested into the bank account you have on file for our firm
on or before the later of one (1) business day from your receipt of this Draw Request (duly completed) or
_____.

      The draw will be used as follows:

| | |
|---|---|
| Operating Expenses: | $_____ |
| Client/Case Expenses: | $_____ |
| Advertising: | $_____ |
| Partner draws/salary: | $_____ |
| Payroll: | $_____ |
| Other_____: | $_____ |

      Very truly yours,
      Girardi Keese

      By:_____
      Partner

48

Initials

CONFIDENTIAL

## WIRE INSTRUCTION STATEMENT INFORMATION

**TO:** ACCOUNTING
**FROM:** MEGAN PAYNE, CHIEF OPERATING OFFICER
**SUBJECT:** CLOSING – $6,000,000 REVOLVING LINE OF CREDIT – GIRARDI KEESE
**DATED:** JULY __, 2017

WIRE INSTRUCTIONS FOR GIRARDI KEESE

**NAME OF ACCOUNT DEBTOR:** _____

**NAME OF FINANCIAL INSTITUTION:** _____

**ADDRESS OF FINANCIAL INSTITUTION:** _____

_____

**ABA NUMBER:** _____

**ACCOUNT NUMBER:** _____

GIRARDI KEESE

By: _____
Name: _____
Title: _____

49

Initials

# EXHIBIT H

### ALLONGE

The Third Amended and Restated Revolving Promissory Note ("Note") to which this Allonge is to be attached and hereby made a part thereof are dated as of July 11, 2017 and made by **GIRARDI KEESE** a general partnership organized under California law ("Borrower"), having its principal office located at 1126 Wilshire Blvd, Los Angeles, CA 90017 in favor of **CALIFORNIA ATTORNEY LENDING II INC.**, a New York corporation ("Lender"), with an office at 6400 Main Street, Suite 120, Williamsville, NY 14221, a copy of which is attached hereto as Exhibit A. Capitalized terms used but not otherwise defined herein shall have their meaning as set forth in the Note.

For due consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. The first paragraph of the Note is hereby deleted in its entirety and replaced with the following:

"For value received, **GIRARDI KEESE**, a general partnership organized under California law ("Borrower"), having its principal office located at 1126 Wilshire Blvd, Los Angeles, CA 90017, promises to pay to the order of **CALIFORNIA ATTORNEY LENDING II, INC.**, a New York corporation ("Lender"), in lawful money of the United States and immediately available funds, any of the offices of Lender at 6400 Main Street, Suite 120, Williamsville, NY 14221 the principal amount of $6,500,000 or the Outstanding Principal Amount (as defined below) if less, together with all interest, fees, charges and costs and expenses payable under this Note, all at the times and in the manner provided in Section 2 below."

2. The definition of "Maximum Amount" in the Note is hereby deleted in its entirety and replaced with the following:

"**Maximum Amount**" means $6,500,000 US currency, as reduced in accordance with Section 2 (b) (ii) of this Note."

3. Any references in the Note and/or Existing Loan Documents to "$6,000,000" are hereby deleted and replaced with $6,500,000.

4. In the event of any conflict or inconsistency between the Note or the Loan Documents and this Allonge, this Allonge shall control.

5. This Allonge may not be changed or terminated except by an agreement in writing signed by the Borrower and the Lender.

6. This Allonge shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the Lender, and it successors and assigns.

7. If any term, covenant or condition of this Allonge shall be held to be invalid, illegal or unenforceable in any respect, this Allonge shall be construed without such provision.

8. This Allonge and the acts and obligations of the parties hereunder shall be construed and interpreted in accordance with the laws of the State of New York without regard to the principles of conflicts of laws.

9. Except as amended hereby, the terms and provisions and covenants of the Note and the Loan Documents are in all other respects hereby reaffirmed, ratified and confirmed and shall remain in full force and effect, including without limitation Sections 7, 9 and 16 of the Note, Sections 2.3, 3.3, 4.9 and 4.10 of the Guaranty and Sections 10 and 13 of the Security Agreement.

10. This Allonge shall be effective as of July 1, 2018 regardless of the date on which it is actually signed.

Except as set forth herein, the provisions of the Note shall remain unaffected, unchanged and unimpaired.

Date: As of August 16, 2018

**CALIFORNIA ATTORNEY LENDING II INC.**

By: _____
Name:
Title:

**GIRARDI KEESE**

By: _____
Name:  Thomas V. Girardi
Title:  Partner

_____
Thomas V. Girardi

## ACKNOWLEDGEMENT BY NOTARY PUBLIC

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA            )

                                    ) ss.

COUNTY OF LOS ANGELES      )

On August 10, 2018, before me Shirleen H. Fujimoto, Notary Public, personally appeared Thomas V. Girardi, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

SHIRLEEN H. FUJIMOTO
COMM. # 2107442
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 16, 2019

_____
[Signature of Officer]

[Officer's Seal]

CORRIE GOLLER
NOTARY PUBLIC, STATE OF NEW YORK
No. 01GO6245530
Qualified in Erie County
My Commission Expires July 25, _2019_

STATE OF NEW YORK
COUNTY OF
On the _10th_ day of August in the year 2018 before me, the undersigned, a notary public in and for said state, personally appeared _Megan Payne_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity as _COO_ of **California Attorney Lending II Inc.**, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

_Corrie Goller_
Notary Public

STATE OF CALIFORNIA
COUNTY OF
On the _____ day of August in the year 2018 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity as a Partner of Girardi Keese and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

Notary Public

STATE OF CALIFORNIA
COUNTY OF
On the _____ day of August in the year 2018 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

Notary Public

EXHIBIT A
Note
(Attached)

# EXHIBIT I



GIRARDI | KEESE
LAWYERS

Via E-Mail: JDinardo@counselfinancial.com

October 25, 2019

Joe DiNardo
Counsel Financial
6400 Main Street, Suite 120
Williamsville, NY 14221
(800) 820-4430; (716) 568-0070

### Re:    *Loan - PERSONAL & CONFIDENTIAL – Attorney-Client Privilege*

Dear Joe:

This will confirm that we have paid Law Finance Group the entire obligation. It maybe take a day or two for the wire transfers. I did this by putting in a large sum of my own money.

We would request from Counsel Financial that our current loan be extended. A new loan for $2.5 million be paid to compensate my personal out-of-pocket expense (in part). It is also requested that Counsel Financial pay the $4 million obligation or perhaps one-half of it, if that is agreeable, provided Counsel Financial has a first lien ahead of everyone. Maybe, it may become easier to simply borrow the $4 million and pay them off totally.

This letter also confirms that the law firm currently has more than four thousand individual cases. These cases came from more than 150 lawyers across the country.

Clearly, the largest case we have is the Porter Ranch litigation. Our law firm has approximately 8,000 individual cases and 1700 homes.

There's no question that the homes have been devalued due to the massive Porter Ranch problems, which still remain. They have still not replaced the ancient pipes that have blown up. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The property damage cases alone of our clients are in the ▮▮▮▮▮▮▮▮ We also have personal injury cases. Some of which are very serious.

1126 WILSHIRE BOULEVARD • LOS ANGELES, CALIFORNIA • 90017-1904
TELEPHONE: 213-977-0211 • FACSIMILE: 213-481-1554
WWW.GIRARDIKEESE.COM

October 25, 2019
Page 2

A very reasonable settlement would be in the $900 million area.  Trial is scheduled for
June 2020.  There's no way the defendant will let the case go to trial since the punitive
damages undoubted would be awarded.  This letter also confirms that I will sign the
stipulation for judgment in favor of Counsel Financial.

With kind regards,

THOMAS V. GIRARDI
TVG:kc

# EXHIBIT J



GIRARDI | KEESE

LAWYERS

November 8, 2019

Mack Schultz
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
(206) 359-6724
(MShultz@PerkinsCoie.com)

      Re:    Legal Fees and Cost Reimbursement

Dear Mr. Schultz:

    With respect to any distribution of proceeds to Girardi | Keese, a general partnership organized under California law, with respect to any and all Lion Air Crash cases which have already been settled, we hereby direct you that such payments (the "Payments") must be paid directly to California Attorney Lending II Inc. ("CAL") in accordance with that certain Fourth Amended and Restated Promissory Note executed and delivered by Girardi | Keese in favor of CAL dated November 8, 2019, until CAL has received Payments in the total aggregate amount of $3,500,000 or CAL advises you that such payments should no longer be made directly to CAL. All payments shall be made as follows:

**By wire transfer to:**

Bank:              **Bank of America**
                      767 5th Avenue, Floor 12A
                      New York, NY 10153

**ABA Number:**              **9593**

**Name of Account:**       **California Attorney Lending II, Inc.**
                      6400 Main Street, Suite 120
                      Williamsville, NY 14221

**Checking Account No.**    **707**

    This Letter of Authorization may not be revoked without the prior written consent of CAL.

    Please direct all inquiries with respect to transfers of funds to Megan Payne, Chief Operating Officer, California Attorney Lending II Inc., 6400 Main Street, Suite 120, Williamsville, NY 14221 (716) 568-0070.

                        Sincerely yours,

                        Thomas V. Girardi

Agreed to and acknowledged as of the
date first written above.

By _____

Name:   Thomas V. Girardi

Title:

# EXHIBIT K

CONFIDENTIAL

**CLOSING CHECKLIST
CALIFORNIA ATTORNEY LENDING II INC.
$8,000,000 FOURTH AMENDED AND TERM LOAN TO
GIRARDI KEESE, A GENERAL PARTNERSHIP
ORGANIZED UNDER CALIFORNIA LAW**

**Key:**

| | | |
|---|---|---|
| Lender | = | California Attorney Lending II, Inc., a New York corporation |
| Borrower | = | Girardi Keese, a general partnership organized under California law |
| Individual Guarantor | = | Thomas V. Girardi |

## LOAN DOCUMENTS

1. Fourth Amended and Restated Term Note for maximum principal amount of $8,000,000 signed by Borrower

2. Guaranty of Individual Guarantor

3. Fourth Amended and Restated Security Agreement signed by Borrower and Individual Guarantor, as debtors

    Exhibit A – Questionnaire

4. Girardi Keese Certificate, together with the following attachments:

    Schedule I – Articles of Incorporation/Organization

    Schedule II – Bylaws /Operating Agreement/Partnership Agreement

    Schedule III – Resolutions

5. Collateral Assignment of Life Insurance Policies insuring the life of Thomas V. Girardi in the aggregate face amount of $5,000,000 (Borrower to provide executed forms as prescribed by insurance company)

6. Life Insurance Agreement for Thomas V. Girardi

7. Post Closing Agreement

8. Acknowledgement, Waiver and Release

9. UCC-1 Financing Statement
   Borrower: Girardi Keese, Filing Office:  California
   Guarantor: Thomas V. Girardi, Filing Office:  California

## SUPPLEMENTAL DOCUMENTS

10. Uniform Commercial Code Search for Borrower and Individual Guarantor

11. Key Loan Term Summary with Lender Forms

1

Initials

CONFIDENTIAL

# FOURTH AMENDED AND RESTATED PROMISSORY NOTE
## California Attorney Lending II Inc.

Delivered in Buffalo, New York

$8,000,000
November 8, 2019

     For value received, Girardi Keese a general partnership organized under California law ("**Borrower**"), having its principal office located at 1126 Wilshire Blvd, Los Angeles, CA 90017, promises to pay to the order of **CALIFORNIA ATTORNEY LENDING II, INC.**, a New York corporation ("**Lender**"), in lawful money of the United States and immediately available funds, any of the offices of Lender at 6400 Main Street, Suite 120, Williamsville, NY 14221 the principal amount of $8,000,000 or the Outstanding Principal Amount (as defined below) if less, together with all interest, fees, charges and costs and expenses payable under this Note, all at the times and in the manner provided in Section 2 below.

1. **DEFINITIONS.** For purposes of this Note:

    a. **"Advance Period"** means the period starting on the date of this Note and ending on November 30, 2021.

    b. **"Amortizing Period"** means the period starting immediately following the end of the Advance Period and ending on the Maturity Date.

    c. **"Base Rate"** means the one-month London Interbank Offered Rate, as fixed by the British Bankers Association for United States dollar deposits in the London interbank market at approximately 11:00 a.m. London, England time (or as soon thereafter as practicable) each day, as determined by Lender from any broker, quoting service or commonly available source utilized by Lender. If no such London Interbank Offered Rate exists, such rate will be the greater of (a) the rate of interest per annum, as Lender, in its sole discretion, shall determine by (i) selecting an alternate service that quotes, or an alternate interest rate that reasonably approximates, the rate of interest per annum, as of the last Business Day of each calendar month, at which deposits of Dollars in immediately available funds are offered by major financial institutions reasonably satisfactory to the Lender in the London interbank market for a period of one month for the applicable principal amount on such date of determination, or (ii) selecting, in consultation with (but without requiring the consent of) the Borrower, a replacement rate which is generally accepted in market practice with respect to transactions similar to the Loan.

    d. **"Budget"** means the budget attached hereto as **Exhibit A** or a budget for any subsequent year approved by Holder in its sole discretion.

    e. **"Collateral"** means the "Collateral" as defined in the Security Agreement or any other collateral securing from time to time the obligations of Borrower or any Guarantor to Holder.

    f. **"Credit"** means a credit facility made available by Lender to Borrower in the maximum principal amount equal to the Maximum Amount.

    g. **"Event of Default"** means "Event of Default" as defined in Section 5 hereof.

    h. **"Guarantor"** means, other than Borrower, any Person (i) who or that is now or hereafter liable, whether directly or indirectly or absolutely or contingently, for the payment of any of the Outstanding Principal Amount or any interest or other amount payable pursuant to this Note or (ii) any asset of whom or which now or hereafter directly or indirectly secures the payment of any of the Outstanding Principal Amount or any

2

Initials

CONFIDENTIAL

such interest or other amount.

i. **"Holder"** means Lender or any transferee of this Note.

j. **"LIBOR Rate"** means the one-month London Interbank Offered Rate, as fixed by the British Bankers Association for United States dollar deposits in the London interbank market at approximately 11:00 a.m. London, England time (or as soon thereafter as practicable) each day, as determined by Lender from any broker, quoting service or commonly available source utilized by Lender or a comparable rate or index selected by Lender should such London Interbank Offered Rate cease to be determined in such manner, cease to exist or otherwise become unavailable.

k. **"Loan"** means any loan by Holder pursuant to the Credit.

l. **"Loan Documents"** means collectively (a) this Note, (b) the Security Agreement, (c) each other security agreement, assignment, mortgage, document, instrument, letter and certificate that has been or is hereafter executed and delivered in connection with any of the foregoing and (d) each amendment, increase, extension, amendment and restatement or replacement of any of the foregoing.

m. **"Loan Request"** means any oral (including, but not limited to, telephonic), written or other (including, but not limited to, facsimile or email) request for a Loan.

n. **"Maturity Date"** has the meaning set forth in Section 2(a)(ii) of this Note.

o. **"Maximum Amount"** means $8,000,000 US currency.

p. **"Net Fees and Expenses"** means all legal fees and any other amounts paid or reimbursed to Borrower for Costs, and Expenses (as defined in the next sentence), resulting from any client representation or referral (whether contingent, hourly, fixed fee or other) after payment of all amounts owing to third party lawyers (other than employees or partners of Borrower) for assistance or referral with respect to such client representation. **"Costs and Expenses"** as used in the preceding sentence means all costs, disbursements, advances and other expenses, however denominated, of any type or character, whether an out-of-pocket expense or an internal cost or expense that is allocated by Borrower to specific clients, including without limitation, all court and filing fees, witness, expert and private investigators fees and expenses, search and research charges, and reproduction, meal, travel, mailing, fax, overtime, secretarial and delivery and courier charges, that are reimbursable or payable to Borrower.

q. **"Outstanding Principal Amount"** means the outstanding principal amount of this Note from time to time.

r. **"Person"** means (i) any individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated association, (ii) any court or other governmental authority or (iii) any other entity, body, organization or group.

s. **"Security Agreement"** means the Fourth Amended and Restated Security Agreement by Borrower and by Thomas V. Girardi to Lender dated on or about the date hereof.

t. **"Uniform Commercial Code"** means the Uniform Commercial Code as in effect from time to time in the State of New York.

2. **Payments.** The payment of principal, interest, fees and costs and expenses under this Note shall be subject to the

3

Initials

CONFIDENTIAL

following terms and conditions:

a. **Regularly Scheduled Payments of Interest and Principal.**

    (i) *Monthly Interest.* Borrower shall pay monthly all interest that has accrued on the Outstanding Principal Amount through the last day of each calendar month (beginning with the calendar month containing the date of this Note), no later than the 10th day following the end of such calendar month, calculated at the rate and in the manner set forth in Section 2(d) below.

    (ii) *Principal Payment Schedule During Amortization Period.* In addition to the mandatory prepayments required under Section 2(b) below, Borrower shall pay the Outstanding Principal Amount during the Amortization Period in twenty-four (24) consecutive monthly installments commencing on December 1, 2021 and continuing on the same day of each month thereafter with the final payment due and payable on November 1, 2023 (the "Maturity Date"). Borrower shall pay each monthly installment payable for a calendar month no later than the 10th day following the end of such calendar month.

    (iii) *Monthly Principal Amount; Effect of Prepayment on Monthly Principal Amount.* Each such monthly principal installment payable during the Amortization Period shall be in an equal amount, sufficient to amortize in full in 24 installments the Outstanding Principal Amount determined as of the last day of the Advance Period. In the event of a mandatory prepayment or optional prepayment of this Note during the Amortization Period, the amount of each remaining monthly principal installment shall be recalculated so as to equal the level monthly amount sufficient to amortize the then Outstanding Principal Amount after giving effect to such mandatory or optional prepayment over the then remaining Amortization Period (and the term of this Note shall not be shortened).

b. **Mandatory Prepayments Based on Net Fees and Expenses.**

    (i) *Payments Based on Net Fees and Expenses.* During the entire term of this Note and subject to the last sentence of this paragraph, Borrower shall pay to Holder, an amount equal to (1) 50% of Net Fees and Expenses, to be applied in the manner set forth below, as received from the Lion Air Crash, Porter Ranch, FTR and Abikzer litigations (limited to the Outstanding Principal Amount, interest and fees due at the time of receipt) and (2) on all other matters, 25% of Net Fees and Expenses, to be applied in the manner set forth below, in excess of $7,500,000 received on a quarterly basis (based on calendar quarters ending March 31, June 30, September 30 and December 31), provided that when Net Fees and Expenses in any quarter exceed $10,000,000 Borrower shall pay 50% of Net Fees and Expenses in excess of $10,000,000 in addition to the required 25% of Net Fees and Expenses between $7,500,000 and $10,000,000. Borrower shall continue to hold in Borrower's trust account any Net Fees and Expenses received until the applicable amount of such Net Fees and Expenses is transmitted to Holder. Borrower, and each Guarantor acting on behalf of Borrower, holds all Net Fees and Expenses received by Borrower subject to an express trust as further described in Section 16 and is required to remit 100% of Net Fees and Expenses to Lender under the circumstances described in Section 16. Notwithstanding the foregoing, Borrower will execute an irrevocable letter of instruction authorizing payment directly to Lender from the defendant and/or its insurer(s) of $3,500,000 from the Net Fees and Expenses due to Borrower on the Lion Air Crash cases.

    (ii) *Application during the Advance Period.* During the Advance Period, any payments based on Net Fees and Expenses received by Holder will be applied as a mandatory prepayment, first to prepay accrued and unpaid interest and fees and then to prepay the Outstanding Principal Amount. Each such payment based on Net Fees and Expenses may not be re-borrowed.

4

Initials

CONFIDENTIAL

(iii) *Application during the Amortization Period.* During the Amortization Period, each such payment received by Holder based on Net Fees and Expenses shall be applied first to pay accrued and unpaid interest and fees and then to offset Borrower's obligation to make the regularly scheduled monthly principal installment payable for the month in which Holder receives such payment (but such offset shall only be to the extent of such payment received by Holder and shall not affect Borrower's obligation to pay the balance of such regularly scheduled monthly principal installment). If Net Fees and Expenses in any month exceeds the monthly principal installment for such month, the excess will be applied as a mandatory prepayment of the Outstanding Principal Amount and shall not be applied to satisfy all or any portion of Borrower's obligation to make any monthly interest payment. Any such mandatory prepayment shall have the effect set forth in Section 2(a)(iii) on the remaining monthly principal installments payable during the Amortization period.

c. **Optional Prepayments.** Borrower shall have the option of prepaying, without penalty or premium, the Outstanding Principal Amount to Holder in full or part at any time and from time to time provided, that upon prepaying the Outstanding Principal Amount in full, Borrower shall pay to Holder all interest and other amounts payable pursuant to this Note and remaining unpaid. Any such optional prepayment made during the Amortization Period shall have the effect set forth in Section 2(a)(iii) on the remaining monthly principal installments payable during the Amortization Period.

d. **Interest Rates and Calculation.**

(i) *Calculation of Interest.* Interest shall be calculated on the basis of a 360 day year for the actual number of days of each year (365 or 366, as applicable), on the Outstanding Principal Amount for each day from and including the date of this Note to but not including the date the Outstanding Principal Amount is paid in full. Notwithstanding the foregoing, at Lender's option without further consent by the Borrower, Lender may compound interest on a monthly or annual basis as determined by the Lender in its sole discretion.

(ii) *Interest Rate.* Interest will accrue (A) on the first $5,000,000 of Credit at the rate of 16% per annum, except as set forth below, (B) on the next $2,000,000 of Credit at the rate of 19% per annum, except as set forth below and and (C) on the remaining $1,000,000 of Credit at the rate of 2% per month, for a minimum of six (6) months, except as set forth below.

(iii) *Increase In Interest Rate; LIBOR Unavailable.* If on the first business day of any calendar month, the LIBOR Rate equals more than 2.0% per annum, the interest rate applicable on each day during such calendar month will equal (A) the applicable rate set forth above, plus (B) the excess of the LIBOR Rate on such first business day of such calendar month over 2.0%. Notwithstanding anything to the contrary set forth herein, if the LIBOR Rate shall for any reason be unavailable, then any reference hereto to LIBOR Rate shall be deemed to mean the Base Rate.

(iv) *Default Interest.* On and after the occurrence of an Event of Default, the interest rate applicable to this Note shall equal the rate per year that is the lesser of (i) 24.9% or (ii) the maximum rate permitted by applicable law ("Default Interest"). Default Interest shall be payable during any period of default and up to and including the date of the next payment made after such period of default. Default Interest, and not any rate set by statute, shall be computed in any entry of judgment pertaining to this Note, and further, shall be paid subsequent to the entry of such judgment, and until actual satisfaction of said judgment. The judgment shall include both the action and the obligation itself. In such event, the Default Interest rate shall continue up through and including all foreclosure proceedings and proceedings for payment of monies, including but not limited to surplus money proceedings and shall be computed in the entry of any judgment, and further, subsequent to the entry of any judgment, and

5

Initials

CONFIDENTIAL

until actual satisfaction of this Note and said judgment.

(v) *Maximum Applicable Rate.* In no event shall such interest be payable at a rate in excess of the maximum rate permitted by applicable law. Any amount payable under this Note that is interest, or that is treated as interest, and that would cause such maximum rate to be so exceeded shall be deemed to have been a mistake and automatically canceled. If any such amount that causes the maximum rate to be exceeded is received by Holder, such amount shall be refunded to Borrower or applied to the Outstanding Principal Amount, as determined by Holder. It is the intention of Lender and Borrower that interest not be payable at a rate in excess of such maximum rate.

(vi) *One Month's Advance Interest.* If requested by the Lender, Borrower must maintain on account with Holder at all times one month's advance payment of interest. The required amount of such advance payment will initially be determined based on the Outstanding Principal Amount on the date of the first Loan under this Note. Thereafter, the amount of the required advance payment to be held by Lender will be adjusted so that it equals one month's advance interest on the Outstanding Principal Amount determined as of the later of the date of the most recent Loan under this Note or the last day of the most recently ended calendar month, and Borrower will be required to pay any increase in the required amount to Holder (or if there is a reduction in the required amount, Holder will apply any excess held by Holder against other amounts then or thereafter payable by Borrower to Holder). Holder does not pay any interest on such advance payment amount or provide any discount in consideration of such advance payment. Any such advance payment will be commingled with Holder's other funds. Holder will hold such advance payment on account, and may apply any such advance payment in such manner as it determines to any amount owing to Holder that is not paid when due or to the final payment to be made to Holder under this Note.

(vii) *Availability Block/Interest Reserve.* At all times during the Advance Period, Borrower shall maintain unused borrowing availability with Holder equal to 60 days' interest based on the Outstanding Principal Amount determined as of the later of the date of the most recent Loan under this Note or the last day of the most recently ended calendar month during the term of this Note. Holder may, but shall not be obligated to, make a Loan (without any express authorization from Borrower), to pay interest that is due and payable on the Outstanding Principal Sum. On or after conclusion of the Advance Period, Lender may require Borrower to fund from time to time, an amount sufficient to establish and replenish as necessary a reserve for the payment of interest for such 60 day period (a "Reserve"). Lender may commingle any Reserve with its other funds and shall have no obligation to pay any interest on any Reserve. Lender shall be entitled to set off against any Reserve any amount that is not paid to Holder when due and payable under this Note. Borrower's obligation under this paragraph to maintain unused availability or a Reserve to cover 60 days' interest is in addition to the required one months' advance payment of interest contemplated by (vi) above.

e. **Electronic Funds Transfer.** At all times during the Advance Period and thereafter until all amounts payable under this Note have been irrevocably paid in full, Borrower shall maintain an authorization for electronic funds transfer by Holder at a bank and from an account designated by Borrower and reasonably acceptable to Holder for payments under this Note. Lender may authorize an electronic funds transfer from such designated account of Borrower for any amount that is not paid to Holder when due and payable under this Note.

f. **Late Payment Charges.** If any principal, interest or other amount (including mandatory prepayments), payable pursuant to this Note is not paid by the date it becomes due, Borrower shall pay on demand by Holder, a monthly late charge for each month or part thereof that such overdue payment remains unpaid of

6

Initials

CONFIDENTIAL

the greater of (i) 5% of the overdue payment or (ii) $50.

g. **Special Delinquency Charges.** If any document or information required to be provided to Holder under this Note is not delivered when due or within 10 business days following request from Holder, Borrower shall pay a late charge of $250 per month until such documentation has been provided to Holder. If after the scheduling of an audit, Borrower (i) cancels the audit within five (5) business days prior to the scheduled date or (ii) fails at the audit to provide Holder's representative with the necessary books and records to permit Holder's representative to complete the audit, Borrower shall promptly reimburse Holder for the costs associated with such cancelled or failed audit, including all costs incurred by Holder with respect to its representative such as compensation and travel expenses, in an amount equal to the greater of $500 or actual costs.

h. **Expenses.** On demand by Holder, Borrower shall pay each cost and expense (including, but not limited to, the reasonable fees and disbursements of counsel, whether retained for advice, litigation or any other purpose) incurred by Holder in endeavoring to (i) collect any of the Outstanding Principal Amount or any interest or other amount payable pursuant to this Note, (ii) preserve or exercise any right or remedy of Holder pursuant to this Note or (iii) preserve or exercise any right or remedy of Holder relating to any Collateral including the payment of unpaid insurance premiums, taxes, assessments or other obligations.

3. **LOANS.**

a. **Timing and Procedure.** The Loan shall be fully advanced on the date hereof.

b. **Purpose of Loans.** All Loan Requests shall be for the sole purpose of funding the operating expenses of Borrower or interest payments under this Note, not to exceed the amount set forth in the Budget for any calendar month without the written consent of Holder. Borrower shall not obtain or use the proceeds of any Loan for any purpose other than for law firm purposes, that is, for working capital of Borrower including payments to any Guarantor, but only to the extent any such payment to any Guarantor or other use of the loan proceeds  would not violate the covenant concerning the Budget set forth in Section 4 hereof. Borrower covenants that no Loan proceeds shall be used by Borrower for other than a business or commercial purpose of Borrower. No Loan Requests may be made to fund the activities or operations of any Guarantor or any third party entity. The Borrower further acknowledges, warrants and represents to, and agrees with, the Lender that the Lender has made no representation to the Borrower regarding the adequacy of the Budget or of any loans or advances made to the Borrower pursuant to this Note for purposes of conducting the Borrower's legal practice or other business operations.

c. **Minimum Unused Credit Availability.** Borrower shall maintain unused credit availability at all times under this Note in an amount equal to not less than 60 days' interest based on the Outstanding Principal Amount on the later of the date of the most recent Loan under this Note or the last day of the most recently ended calendar month during the term of this Note as contemplated by Section 2(d)(vii) of this Note.

d. **Holder's Discretion.** The decision whether to honor such Loan Request and make such Loan shall be in the sole discretion of Holder. Without limiting Lender's discretion to fund or not fund any Loan, no Loan shall be made with respect to any principal amount prepaid until at least one (1) business day after the date of such prepayment.

e. **Reliance by Holder.** Holder may treat as made by Borrower and rely upon, and Borrower shall be bound by, any Loan Request that Holder in good faith believes to be valid and to have been made in the name or on behalf of Borrower by any officer, manager, member, partner or other individual authorized to act on behalf of Borrower, and Holder shall not incur any liability to Borrower or any other Person as a direct or indirect

7

Initials

CONFIDENTIAL

result of honoring such Loan Request and making such Loan.

f. **Limitation on Outstanding Principal Amount.** Borrower shall not at any time permit, and Holder shall not at any time be obligated to permit, the Outstanding Principal Amount to exceed the Maximum Amount. If the Maximum Amount is exceeded at any time, Borrower shall forthwith repay to Lender the amount of any such excess.

g. **Schedule of Advances or Loan Account.** There shall be payable as principal pursuant to this Note only so much of the Maximum Amount as shall have been advanced by Holder as a Loan or Loans and is outstanding. Holder shall set forth on a schedule or loan account (including, but not limited to, any schedule or loan account maintained in computerized records) annotations evidencing (a) the date and principal amount of each Loan, (b) the date and amount of each payment applied to the Outstanding Principal Amount and (c) the Outstanding Principal Amount after each Loan and each such payment. Each such annotation shall, in the absence of manifest error, be conclusive and binding upon Borrower. No failure by Holder to make and no error by Holder in making any annotation on such schedule or loan account shall affect Borrower's obligation to repay the principal amount of each Loan, Borrower's obligation to pay interest on the outstanding principal amount of each Loan or any other obligation of Borrower to Holder pursuant to this Note or otherwise.

4. **COVENANTS.** So long as any obligations are owing to Holder under this Note, Borrower and each Guarantor, to the extent applicable to such Guarantor, shall comply with the following covenants:

a. **Reporting Obligations:** Borrower shall provide or cause to be provided to Holder, and each Guarantor shall provide to Holder to the extent relating to such Guarantor, within the time periods indicated below each of the following:

   (i) *Tax Returns.* Copies of Borrower's and each Guarantor's annual federal tax returns no later than the earlier of (A) three days after filing or (B) the 15th day of the tenth month of each fiscal year for the immediately preceding fiscal year;

   (ii) *Case Status Report; Fee Sharing and Referral Agreements.* Updated complete and accurate case and status list with respect to the clients and cases of Borrower and a copy of each fee sharing agreement or referral agreement and any amendments thereto, with any law firm or lawyer (including a lawyer that may be a shareholder, member or employee of the Borrower) with respect to any case or matter described in such list, at least once each calendar quarter;

   (iii) *Bank Statements.* Copies of monthly bank statements of Borrower from each of its bank accounts (operating and trust) and monthly settlement report no later than the 10th day of each month;

   (iv) *Financial Statements.* Current updated financial statements of Borrower, compiled by an independent third party accountant, not later than the 15th day of each calendar quarter in the same form delivered to Holder on or before execution of this Note;

   (v) *Personal Financial Statements.* A current updated personal financial statement for each Guarantor to be delivered on or before April 15th of each year in the form completed by such Guarantor and delivered to Holder on or before execution of this Note;

   (vi) *Malpractice and Life Insurance.* Evidence of coverage under a current malpractice insurance policy for Borrower, and of continuing coverage under any life insurance policy that has been assigned as part of the Collateral, on each anniversary date of coverage, and copy of any notice of cancellation,

8

*Initials*

CONFIDENTIAL

revocation or non-renewal of any malpractice insurance or any such life insurance policy within five (5) business days after receipt thereof by Borrower or any Guarantor;

(vii) *Notice of Certain Material Events or Material Change.* Notice of any tax audit with respect to Borrower or any Guarantor, any investigation by any governmental agency or regulatory body affecting Borrower or any Guarantor, any litigation commenced against Borrower or any Guarantor, or any material change in the business, clients or prospects of Borrower, in each case as soon as Borrower or any Guarantor is aware, or should be aware, of such audit, investigation, litigation or change;

(viii) *Default Notices.* A copy of any default notice or other notice of the existence of facts or circumstances that with the passage of time will constitute such a default, under any obligation of Borrower to any party, in each case immediately following receipt by Borrower; and

(ix) *Other Information.* Any documentation or information reasonably requested by Holder that relates to the business or assets of Borrower or such Guarantor, in each case promptly following each request by Holder.

b. **Accuracy and Access to Books and Records.** Borrower shall maintain accurate books and records regarding its financial condition, including, but not limited to, aged listings of accounts payable and accounts receivable, all expenses and disbursements, business operations, and the status and condition of the Collateral; and shall grant Holder access thereto at any time upon reasonable notice to inspect and audit such books, records, and accounts, and to make copies thereof.

c. **Life Insurance.** Borrower shall cause to be maintained in effect life insurance on the life of Thomas V. Girardi in a minimum amount equal to $5,000,000 that is subject to an effective collateral assignment to Holder at all times while this Note is outstanding.

d. **Minimum Collateral Coverage.** Borrower shall not permit legal fees collectible by Borrower from the Collateral as estimated by Holder at any time to be less than **EIGHT TIMES** the Outstanding Principal Amount plus interest on this Note. In making such estimate, Holder may take into consideration, among other matters, Holder's assessment of the actual client files of Borrower from time to time and any law, judicial decision, administrative order, or professional ethics opinion that may affect the rights of law firms to sue clients for the collection of legal fees or expenses, and will reduce such estimate by the amount of any indebtedness or obligation of Borrower having priority over the collection rights of Holder.

e. **Minimum Net Worth Requirement.** Thomas V. Girardi shall refrain from selling, gifting, transferring or otherwise disposing of assets or incurring indebtedness that reduces the personal net worth (including his or her indirect interest in Borrower's assets and his or her interest in joint assets) of such Guarantor to less than $24,000,000

f. **Restriction on Additional Indebtedness.** Borrower and each Guarantor shall not incur or assume, on or after the date of this Note, any indebtedness or liability (including any indebtedness or liability to any member or shareholder of Borrower or any Guarantor or any affiliate of any Guarantor) other than indebtedness that is:

(i) owing to Lender;

(ii) constituting unsecured normal trade debt incurred upon customary terms in the ordinary course of Borrower's or any Guarantor's business or in the case of any Guarantor that is an individual, ordinary

9

Initials

CONFIDENTIAL

consumer debt;

(iii) arising from the endorsement in the ordinary course of Borrower's or any Guarantor's business of any check or other negotiable instrument for deposit or collection;

(iv) secured by a Permitted Lien as defined in the Security Agreement; or

(v) incurred with the prior written consent of Holder which consent may require that the proceeds of such financing be used to repay this Note in whole or in part and that repayment of such financing be subordinated to repayment of the indebtedness due to Holder on terms acceptable to Holder.

g. **Restriction on Liens**. Borrower and each Guarantor shall refrain from creating, assuming or suffering to exist any mortgage, security interest, judgment or lien (including tax liens) on any of its assets now or hereafter acquired, other than a Permitted Lien or a security interest relating to consumer debt.

h. **No Other Law Practice**. Borrower and each Guarantor shall not own or hereafter acquire, without the prior written consent of Holder, an ownership interest, either direct or indirect, in any entity engaged in the practice of law other than Borrower.

i. **License to Practice Law**. Borrower and each Guarantor shall not permit any license to practice law held by Borrower or such Guarantor, as the case may be, to be suspended or revoked.

j. **No Payments Beyond Budget**. Borrower shall not pay any operating expense, including but not limited to salary, draws, bonuses etc. made to Thomas V. Girardi or any family member, related party or other affiliate, which exceeds the amount set forth for such expense in the Budget.

k. **Fee Sharing and Referral Agreements**. Without the prior written approval of Lender, Borrower shall not enter into a fee sharing or referral agreement unless such agreement is entered into in the ordinary course of business and on an arms-length basis and shall not modify any fee sharing or referral agreement in any way that would reduce the fees or other amounts payable to Borrower thereunder or that would otherwise prejudice Lender.

5. **EVENTS OF DEFAULT AND REMEDIES.**

a. **Events of Default**. The existence or occurrence of any of the following events or circumstances shall each constitute an "Event of Default" under this Note:

(i) *Failure to Pay Amounts due Under this Note*. Borrower defaults in the payment when due, whether by acceleration or otherwise, of any of the Outstanding Principal Amount or any interest or other amount payable pursuant to this Note; or

(ii) *Breach of Covenants or Other Obligations to Holder*. Borrower or any Guarantor fails to comply with any of the covenants in Section 4 of this Note or defaults in the payment or performance when due of any other obligation to Holder, whether now existing or hereafter arising or accruing and whether under this Note or any other present or future agreement with Holder; or

(iii) *Obligations Owing to Third Parties*. Borrower or any Guarantor defaults in the payment or performance of any obligation owing by Borrower or any Guarantor to any third party or there exists a default or event of default under any agreement evidencing such obligation owing to such third party;

10

Initials

CONFIDENTIAL

or

(iv) *Obligations Owing to the Government.* Borrower or any Guarantor defaults in the payment of any taxes or other charges owing to any governmental entity; or

(v) *Cessation of Business and Other Material Events.* Borrower or any Guarantor is dissolved, ceases to exist, participates or agrees to participate in any merger, consolidation or other absorption, assigns or otherwise transfers or disposes of a majority of his, her or its assets, makes or permits what might be a fraudulent transfer or fraudulent conveyance of any of his, her or its assets, becomes insolvent (however such insolvency is evidenced), generally fails to pay his, her or its debts as they become due, fails to pay, withhold or collect any tax as required by applicable law, suspends or ceases its business or has served, filed or recorded against him, her or it or any of his, her or its assets any judgment, order or award of any court, other governmental authority or arbitrator or any lien; or

(vi) *Death or Incompetency.* Borrower or any Guarantor dies or becomes incompetent; or

(vii) *Termination or Revocation.* Borrower or any Guarantor purports to terminate his, her or its obligations pursuant to any guaranty or other agreement with or for the benefit of Holder; or

(viii) *Insolvency.* Borrower or any Guarantor has any receiver, trustee, custodian or similar Person for him, her or it or any of his, her or its assets appointed (whether with or without his, her or its consent), makes any assignment for the benefit of creditors, admits in writing his, her or its inability to pay debts generally as they become due, or commences or has commenced against him, her or it any bankruptcy or insolvency proceeding or any formal or informal proceeding for the dissolution, liquidation or winding up of the affairs of or the settlement of claims against him, her or it; or

(ix) *Representations and Warranties.* Any representation or warranty heretofore made to Lender or hereafter made to Holder, or any financial statement heretofore provided to Lender or hereafter provided to Holder, by or on behalf of Borrower or any Guarantor, proves, as of the date thereof, to have been incorrect or misleading in any material respect, or before the execution and delivery to Lender by Borrower of this Note, there occurred and was not disclosed to Lender any material adverse change in any information disclosed in any such representation or warranty or in any such financial statement so provided; or

(x) *Change in Management or Control.* There occurs any change in the management of, or the beneficial ownership of any stock of or other ownership interest in, Borrower that is, in the opinion of Holder, adverse to its interest and is not corrected to its full satisfaction within 30 days after it gives to Borrower a notice that it considers such change adverse to its interest; or

(xi) *Collateral Value.* There occurs any change in the value of the Collateral or Borrower's or any Guarantor's ownership interest in the Collateral, that is, in the opinion of Holder, adverse to its interest and is not corrected to its full satisfaction within 10 days after Holder gives to Borrower a notice that Holder considers such change adverse to its interest; or

(xii) *Other Loan Document Default.* There occurs or exists any event or condition of default under any guaranty or any security agreement or other writing evidencing or relating to any Collateral or the Credit.

b. **Acceleration.** Upon or at any time or from time to time after the occurrence or existence of any Event of Default other than, with respect to Borrower, an Event of Default described in clause (viii) above (an

11

Initials

CONFIDENTIAL

"Insolvency Event"), the Outstanding Principal Amount and all interest and other amounts payable pursuant to this Note and remaining unpaid shall, at the sole option of Holder and without any notice, demand, presentment or protest of any kind (each of which is knowingly, voluntarily, intentionally and irrevocably waived by Borrower), become immediately due. Upon the occurrence or existence of, with respect to Borrower, any Insolvency Event, the Outstanding Principal Amount and all such interest and other amounts shall, without any notice, demand, presentment or protest of any kind (each of which is knowingly, voluntarily, intentionally and irrevocably waived by Borrower), automatically become immediately due.

6. **CHANGES AND WAIVERS; PARTIALLY INVALIDITY.** No course of conduct pursued, accepted or acquiesced in, and no oral, written or other agreement or representation made, by or on behalf of Holder in the future will change this Note or waive any right or remedy of Holder under or arising as a result of this Note. Any change in this Note or waiver of any right or remedy of Holder under or arising as a result of this Note must be made in a writing signed by or on behalf of Holder. Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law. If, however, any such provision shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law, or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

7. **DISCLAIMER. WITH RESPECT TO ANY INVESTMENT OF BORROWER IN ANY LAW FIRM RELATED TO LENDER'S "ENTER MASS TORTS" PROGRAM, LENDER HAS NOT MADE, NOR HAS BORROWER RELIED UPON, ANY TERM, PROMISE, REPRESENTATION, GUARANTEE OR WARRANTY OF ANY KIND (ORAL, EXPRESS, STATUTORY OR IMPLIED), DIRECTLY OR THROUGH ANY THIRD-PARTY (EACH, AN "EXTRINSIC TERM"), INCLUDING, WITHOUT LIMITATION, ANY EXTRINSIC TERM WITH RESPECT TO BORROWING OR ANY LOAN PRODUCT, ANY PARTICULAR CLAIM OR LITIGATION, ANY PAST OR PRESENT BORROWERS OF LENDER, ANY ATTORNEY OR LAW FIRM OR ANY AGREEMENT OR ARRANGEMENT THEREWITH, OR PARTICIPATION IN ANY PROGRAM ADMINISTERED, IN WHOLE OR IN PART, BY LENDER RELATING TO (A) PAST PERFORMANCE, RETURNS OR RESULTS THEREOF, (B) THE QUALITY, CHARACTER, NUMBER OR VALUE OF OPPORTUNITIES OR OUTCOMES THEREFROM, OR (C) THE FINANCIAL OR LEGAL BENEFITS, REQUIREMENTS, IMPLICATIONS OR ADVISABILITY (INCLUDING ANY RELEVANT TAX OR PROFESSIONAL RESPONSIBILITY MATTERS) THEREWITH, AND THE EXISTENCE OF ANY SUCH EXTRINSIC TERM (INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF FITNESS FOR PARTICULAR PURPOSE OR ANY WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING, OR USAGE OF TRADE), AND RELIANCE THEREUPON BY BORROWER, IS EXPRESSLY DISCLAIMED TO THE FULLEST EXTENT PERMITTED BY LAW.**

8. **ENTIRE AGREEMENT.** This Note and the Loan Documents contain the entire agreement between Borrower and Lender and supersede each action heretofore taken or not taken, each course of conduct heretofore pursued, accepted or acquiesced in, and each oral, written or other agreement and representation heretofore made, by or on behalf of Lender with respect thereto.

9. **GOVERNING LAW.** This Note shall be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York, without regard to principles of conflicts of law or to the law of any other jurisdiction.

10. **CONSENT TO JURISDICTION.** AS PART OF THE CONSIDERATION FOR NEW VALUE RECEIVED

12

Initials

CONFIDENTIAL

AND REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF BORROWER OR HOLDER, BORROWER HEREBY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN BORROWER AND HOLDER PERTAINING TO THIS NOTE OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS NOTE SHALL BE BROUGHT ONLY IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN THE COUNTY OF ERIE WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF ANY LEGAL OR EQUITABLE ACTION; PROVIDED, HOWEVER, HOLDER MAY AT ITS OPTION, COMMENCE ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION TO OBTAIN EQUITABLE RELIEF OR TO ENFORCE ANY JUDGMENT OR ORDER OBTAINED BY HOLDER AGAINST BORROWER, TO ENFORCE ANY OTHER RIGHT OR REMEDY UNDER THIS NOTE, OR TO OBTAIN ANY OTHER RELIEF DEEMED APPROPRIATE BY HOLDER. BORROWER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, AND BORROWER HEREBY WAIVES ANY OBJECTION WHICH BORROWER MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH NEW YORK COURT. BORROWER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS CONSENT TO JURISDICTION PROVISION WITH ITS LEGAL COUNSEL, AND HAS MADE THIS WAIVER KNOWINGLY AND VOLUNTARILY.

11. WAIVER OF TRIAL BY JURY. BORROWER KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT BORROWER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO (A) THE CREDIT, ANY LOAN OR COLLATERAL, THIS NOTE OR ANY OTHER WRITING HERETOFORE OR HEREAFTER EXECUTED IN CONNECTION WITH THE CREDIT OR ANY LOAN OR COLLATERAL, (B) ANY TRANSACTION ARISING OUT OF OR OTHERWISE RELATING TO THE CREDIT, ANY LOAN OR COLLATERAL, THIS NOTE OR ANY SUCH OTHER WRITING OR (C) ANY NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT OF THE CREDIT, ANY LOAN OR COLLATERAL, THIS NOTE OR ANY SUCH OTHER WRITING.

12. SERVICE OF PROCESS. PROCESS ON BORROWER IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS NOTE WILL BE DEEMED TO HAVE BEEN GIVEN WHEN GIVEN IN ANY ONE OF THE FOLLOWING WAYS: (A) PERSONALLY DELIVERED, (B) TWO (2) BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, CHARGES PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (C) FOUR (4) BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER AT THE ADDRESS SET FORTH AT THE BEGINNING OF THIS NOTE. Such service shall be deemed in every respect effective service of process upon Borrower and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon Borrower. Nothing in this Section shall affect Holder's right to serve process in any other manner permitted by law. Borrower may add additional addresses or change its address for purposes of service of process by giving 10 days' prior written notice of such change to Holder in accordance with the notice provisions of the Security Agreement.

13. SECURITY AGREEMENT. Repayment of this Note is secured by the Collateral in accordance with the terms of the Security Agreement and any other agreements relating to the Collateral.

14. SOLVENCY. On the date hereof, and immediately prior to and after giving effect to the borrowing represented by this Note and the use of the proceeds thereof, Borrower's assets will exceed its liabilities and Borrower will be solvent,

13

Initials

CONFIDENTIAL

will be able to pay its debts as they mature and will have capital sufficient to carry on its business as then constituted.

15. **SIGNATURES.** In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a \".pdf\" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or \".pdf\" signature page were an original thereof.

16. **BORROWER'S FIDUCIARY OBLIGATION TO LENDER/EXPRESS TRUST.** All Net Fees and Expenses received by Borrower are subject to an express trust in favor of Lender. Borrower and any Guarantor that acts on behalf of Borrower, holds all Net Fees and Expenses as a fiduciary for the benefit of Lender and any use of any Net Fees and Expenses that is not authorized by Lender is a defalcation by Borrower and any such Guarantor so acting on Borrower's behalf. Before maturity of this Note (by acceleration or otherwise), and only after Borrower has timely remitted to Lender Net Fees and Expenses as required by Section 2(b) hereof, Lender authorizes Borrower to use any such Net Fees and Expenses for its operations in the ordinary course of business and in a manner consistent with the Budget unless Lender has notified Borrower after the occurence and during the continuation of an Event of Default that Lender is revoking such authorization. **After maturity of this Note (whether by acceleration or otherwise) or if Lender so revokes the foregoing authorization following the occurrence and during the continuance of an Event of Default, Borrower shall remit to Lender 100% of Net Fees and Expenses for application to Borrower's obligations under this Note in such manner as Lender shall determine.**

17. **CONFIDENTIALITY AND NON-DISCLOSURE.** Borrower and each Guarantor agrees that by execution of this Note, Borrower and such Guarantor becomes bound by and agrees to keep this Note, any other Loan Document, and any facts of and details surrounding the relationship between the parties hereto reflected by the Loan Documents, confidential and not to disclose the existence of this Note or any other Loan Document, or its terms, except as required by law or as otherwise necessary to implement the terms of the Loan Documents. Borrower and each Guarantor agrees that in the event that he, she or it is required by law, regulation or becomes legally compelled to disclose this Note, any other Loan Document, or any facts of or details surrounding the relationship between the parties hereto (by statute, oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process), then he, she or it shall, as promptly as possible and in any event prior to such disclosure, provide Holder written notice of any such requirement, including a copy of the request or pertinent law, so that Holder may seek a protective order or other appropriate remedy. If, upon such notice, Holder elects to contest the required disclosure, then no party shall make a disclosure until such time as a final, non-appealable or non-stayed order has been entered compelling such disclosure. In the event that such protective order or other remedy is not obtained, or that Holder waives compliance with the provisions hereof, the Borrower and each Guarantor agrees to (a) disclose only that portion of information for which Holder has waived compliance or for which he, she or it is advised by written opinion of counsel, reasonably satisfactory to Holder, is legally required to be disclosed and (b) exercise his, her or its best efforts to obtain assurance that such information will be accorded confidential treatment. Nothing in this Note, any other Loan Document, or otherwise shall prevent Holder from disclosing the existence of this Note, any Loan Document, and its terms, to Holder's respective affiliates, officers, directors, agents, partners, members, employees, investors, lenders, attorneys, auditors, affiliates (including investment managers) and any other similarly situated persons where Holders have a reasonable business purpose for such disclosure. The Borrower and each Guarantor agrees that the Loan Documents may not be used in connection with, or as the basis of documents for, any other transaction by Borrower (other than a transaction with Holder), except as consented to in writing by Holder.

18. **RIGHT OF FIRST REFUSAL AND PARTICIPATIONS.** In the event that the Borrower elects to refinance this Note with a different lender, the Borrower will provide the Lender with the terms of such refinancing and the Lender shall have the right, but not the obligation, to refinance this Note on such terms; provided it gives notice to the Borrower within fifteen (15) days after receipt of such terms. Lender, at its option, may at any time and from time to time, grant to one or more lenders (each a "Participant") participating interests in Lender's rights with respect to

14

Initials

CONFIDENTIAL

this Note and the other Loan Documents. In the event of such a grant by Lender of a participating interest to a Participant, Borrower shall continue to deal solely and directly with Lender in connection with Lender's rights hereunder, and Lender shall retain the sole right to approve, without the consent of any Participant, any amendment, modification or waiver of any provision of the Loan Documents which Lender is entitled to approve pursuant to this Note. Lender may furnish any information concerning Borrower in its possession from time to time to prospective Participants, provided that Lender shall require any prospective Participant to agree in writing to maintain the confidentiality of such information.

19. **RENEWAL NOTE.** This Note evidences but does not extinguish or satisfy, and is not a novation of, a preexisting indebtedness evidenced by that certain Revolving Promissory Note executed by Borrower to Lender in the maximum principal amount of $3,500,000 dated July 5, 2011 as amended and restated by First Amended and Restated Revolving Promissory Note executed by Borrower to Lender in the maximum principal amount of $5,000,000 dated August 12, 2011, as amended and restated by Second Amended and Restated Revolving Promissory Note executed by Borrower to Lender in the maximum principal amount of $5,000,000 dated August 1, 2013 ("Prior Notes") as amended and restated by Third Amended and Restated Revolving Promissory Note executed by Borrower to Lender in the maximum principal amount of $6,000,000 dated July 11, 2017. Borrower hereby acknowledges that the outstanding principal balance under the Prior Notes immediately prior to the funding of this Note was $_____.

Dated: November ___, 2019

Girardi Keese

By: _____
     Thomas V. Girardi, Partner

## BORROWER ACKNOWLEDGEMENT FOR NOTE

STATE OF CALIFORNIA
                              : SS.
COUNTY OF

        On the ____ day of November in the year 2019 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity as Partner of Girardi Keese, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

                                        _____
                                        Notary Public

*See Attached Notary Acknowledgment*

15

Initials

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California              )
County of Los Angeles            )

On November 8, 2019, before me, Maria L. Carlos, a Notary Public, personally appeared Thomas V. Girardi, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature  _Maria L Carlos_____
          Maria L. Carlos


(SEAL)

MARIA L. CARLOS
Notary Public – California
Los Angeles County
Commission # 2229856
My Comm. Expires Feb 26, 2022

252

CONFIDENTIAL

## GUARANTOR AGREEMENT TO FOURTH AMENDED AND RESTATED PROMISSORY NOTE COVENANTS

Each of the undersigned individually agree(s) to those covenants set forth in Section 4 of this Note that are applicable to the undersigned as Guarantor and agrees to be bound by the provisions of Sections 16 and 17 of this Note.

Date: November 8, 2019

_____
Thomas V. Girardi

GUARANTOR ACKNOWLEDGEMENT FOR PROMISSORY NOTE

STATE OF CALIFORNIA
                                          : SS.
COUNTY OF

On the ____ day of November in the year 2019 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

_____
                                          Notary Public

*See Attached Notary Acknowledgment*

16

Initials

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California              )
County of Los Angeles            )

      On November 8, 2019, before me, Maria L. Carlos, a Notary Public, personally appeared Thomas V. Girardi, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

      I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

      WITNESS my hand and official seal.

Signature _____
      Maria L. Carlos

(S E A L)

MARIA L. CARLOS
Notary Public – California
Los Angeles County
Commission # 2229856
My Comm. Expires Feb 26, 2022

CONFIDENTIAL

## ALLONGE TO FOURTH AMENDED AND RESTATED PROMISSORY NOTE, DATED <u>NOVEMBER</u> , <u>2019</u> ISSUED BY GIRARDI KEESE
## TO CALIFORNIA ATTORNEY LENDING II INC.

NOTICE: THIS NOTE IS SUBJECT TO A SECURITY INTEREST GRANTED BY CALIFORNIA ATTORNEY LENDING HOLDINGS LLC AND ITS WHOLLY-OWNED SUBSIDIARY, CALIFORNIA ATTORNEY LENDING II INC., TO BANK OF AMERICA, N.A. PURSUANT TO A SECURITY AGREEMENT SUPPLEMENT, DATED MARCH 31, 2010, BY WHICH CALIFORNIA ATTORNEY LENDING HOLDINGS LLC AND CALIFORNIA ATTORNEY LENDING II INC. AGREED TO BE BOUND BY A SECURITY AGREEMENT, DATED SEPTEMBER 17, 2009, IN FAVOR OF BANK OF AMERICA, N.A., AS SUCH SECURITY AGREEMENT HAS BEEN OR IS HEREAFTER AMENDED, SUPPLEMENTED, REPLACED, RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME.

17


Initials

255

CONFIDENTIAL

## GUARANTY OF PAYMENT AND PERFORMANCE

**THIS GUARANTY** ("Guaranty") from **THOMAS V. GIRARDI**, individually, with a principal address at 100 Los Altos Drive, Pasadena, CA 91105 (the "Guarantor") to **CALIFORNIA ATTORNEY LENDING II, INC.**, a New York corporation with a place of business at 6400 Main Street, Suite 120, Williamsville, NY 14221 ("Lender").

### W I T N E S S E T H:

**WHEREAS**, Girardi Keese ("Borrower") on the date hereof, has executed and delivered to Lender that certain Fourth Amended and Restated Promissory Note in the principal amount of $8,000,000 as the same may be amended, renewed, increased or replaced from time to time ("Note") pursuant to which Lender is extending certain credit facilities (collectively the "Credit Facilities") to Borrower; and

**WHEREAS**, Lender is unwilling to extend the Credit Facilities to Borrower unless it receives this Guaranty; and

**WHEREAS**, each Guarantor is willing to execute and deliver this Guaranty to Lender in order to induce Lender to extend the Credit Facilities and each Guarantor has approved the form and substance of each and all of the documents relating to the Credit Facilities including the Note, the Security Agreement (as defined in the Note) and all certifications, agreements, letters and other documents executed with respect to the Credit Facilities.

**NOW, THEREFORE**, in order to induce Lender to extend the Credit Facilities to Borrower and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, each Guarantor agrees as follows with Lender:

### ARTICLE 1
### REPRESENTATIONS AND WARRANTIES OF GUARANTORS

Each Guarantor hereby represents and warrants to Lender (with respect to himself, herself or itself and not any other Guarantor) that:

**Section 1.1** **Capacity of Guarantors**. Such Guarantor:

(A) has the capacity to enter into this Guaranty; and

(B) has his or her principal residence or its primary office at the address set forth in the first paragraph of this Guaranty.

**Section 1.2** **No Violation of Restrictions**. Neither the execution and delivery of this Guaranty, the consummation of the transactions contemplated hereby nor the fulfillment of or compliance with the provisions of this Guaranty will conflict with or result in a breach of any of the terms, covenants, conditions or provisions of any agreement, judgment or order to which such Guarantor is a party or by which such Guarantor is bound, or will constitute a default under any of the foregoing, or result in the creation or imposition of any lien of any nature whatsoever.

**Section 1.3** **Compliance with Law**. Such Guarantor is not in violation of any law, ordinance, governmental rule, regulation, order or judgment to which such Guarantor may be subject which is likely to materially affect the financial condition of such Guarantor.

**Section 1.4** **Financial Statements and Other Information**. The financial statements and any other information submitted by such Guarantor to Lender fairly represent the financial condition as of the date of each statement and

18

Initials

CONFIDENTIAL

there has been no material adverse change in the financial condition of such Guarantor since the date of the respective statements submitted to Lender.

**Section 1.5**  **Solvency of Guarantors and Borrower**. Such Guarantor's assets exceed his, her or its liabilities (without in any way limiting any obligation that any Guarantor may have to maintain a specified minimum net worth). Such Guarantor has made an appropriate financial investigation of Borrower and has determined that Borrower is solvent at the time of execution of this Guaranty.

## ARTICLE 2
## COVENANTS AND AGREEMENTS

**Section 2.1**  **Guaranty of Payment and Performance**. Each Guarantor irrevocably, absolutely and unconditionally (and jointly and severally if there is more than one Guarantor) guarantees to Lender, the punctual payment and performance of the Obligations as hereafter defined.

"Obligations" means all the present and future monetary and other obligations of Borrower to Lender, of whatever nature or character, and whether absolute or contingent, arising under the Note and all of the other Loan Documents, including, without limitation any obligation of Borrower to pay any principal, interest, fee, charge, cost or expense under the Loan Documents, whether or not any such amounts arise or are accrued after the commencement of any bankruptcy or other insolvency proceeding and whether or not allowed as a claim in any such proceeding.

"Loan Documents" shall have the same meaning as defined in that certain Fourth Amended and Restated Promissory Note by and between Lender and Borrower dated November __, 2019.

**Section 2.2**  **Obligations Unconditional**. This Guaranty shall remain in full force and effect until the Obligations are irrevocably paid in full and the Loan Documents are terminated, irrespective of any interruptions in the business relationships of Borrower or any Guarantor with Lender. No Guarantor's obligation hereunder shall be affected, modified or impaired by any state of facts or the happening from time to time of any event, including, without limitation, any of the following, whether or not with notice to or the consent of such Guarantor or any other Guarantor:

(A)  The invalidity, irregularity, illegality or unenforceability of, or any defect in, any Loan Document or any collateral security for the Credit Facilities or any Guaranty (collectively, the "Collateral"), including, without limitation, the Collateral under the Security Agreement, or the failure to perfect any security interest in or assignment of any of the Collateral, or the amendment, release or termination of any such security interest or assignment.

(B)  Any present or future law or order of any government (de jure or de facto) or of any agency thereof purporting to reduce the Obligations or amend or otherwise affect any Loan Document or any other obligation of Borrower or any other obligor under the Loan Documents or any other terms of payment.

(C)  The waiver, compromise, settlement, release or termination of any or all of the obligations, covenants or agreements of Borrower under any Loan Document, of any Guarantor under any Loan Document, of any other guarantor of the Credit Facilities or any part thereof, or of any other party who has given collateral as security for the payment of the Credit Facilities or any part thereof.

(D)  The failure to give notice to any Guarantor of the occurrence of an event of default under any Loan Document.

(E)  The loss, release, sale, exchange, surrender or other change in any Collateral.

(F)  The extension of the time for payment or performance or renewal of any of the Obligations.

19

Initials

CONFIDENTIAL

(G)     The modification or amendment (whether material or otherwise) of any obligation, covenant or agreement set forth in any Loan Document.

(H)     The performance of, or the omission to perform, any of the actions referred to in any Loan Document.

(I)     Any failure, omission or delay on the part of Lender to enforce, assert or exercise any right, power or remedy conferred on Lender in any Loan Document.

(J)     The voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets, marshaling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition with creditors or readjustment of, or other similar proceedings affecting, any Guarantor or Borrower or any of their respective assets, or any allegation or contest of the validity of any Loan Document.

(K)     The default or failure of any Guarantor to fully perform any obligation set forth in this Guaranty.

(L)     Any event or action that would, in the absence of this paragraph, result in the release or discharge of any Guarantor from the performance or observance of any obligation, covenant or agreement contained in this Guaranty (other than the irrevocable payment in full of the Obligations or a written release provided by Lender to such Guarantor).

(M)     Any other circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or a guarantor.

### Section 2.3    Waivers by Guarantors.

(A) Each Guarantor waives any and all rights that are or may become available to such Guarantor by statute or otherwise to require Lender to (i) proceed against Borrower; (ii) proceed against or exhaust any security held from Borrower; or (iii) pursue any other remedy in Lender's power whatsoever.  Lender may, at its election, exercise any right or remedy it may have against each Guarantor or any Collateral now or hereafter held by or for the benefit of Lender including, without limitation, the right to foreclose upon any such Collateral by judicial or nonjudicial sale, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Obligations may thereby be paid and performed, even though any rights which any Guarantor may have or otherwise might obtain by subrogation against others might be diminished or destroyed. Each Guarantor acknowledges that any such exercise of a right or remedy with respect to Collateral may result in a loss, in part or whole, of Lender's right to collect from Borrower any deficiency that may remain after any such exercise of such a right or remedy and that, where such a loss occurs, each Guarantor will also suffer a loss of any rights and remedies, arising in law or equity, which such Guarantor may have to collect any amount from Borrower; and each Guarantor agrees to remain bound notwithstanding any such loss. Each Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to any Collateral, has destroyed each Guarantor's right of subrogation and reimbursement against Borrower by the operation of law or otherwise. Only the net proceeds from any such foreclosure, after deduction of all costs and expenses authorized to be deducted pursuant to the documents under which such Collateral is held or by law, shall be applied against the Obligations. Lender may at its discretion purchase all or any part of such Collateral so sold or offered for sale for its own account and may apply against the amount bid therefor all or any part of the Obligations for which such Collateral is held; and in such case, only that portion of the Obligations so applied, after deduction of all costs and expenses authorized to be deducted by law or pursuant to the documents under which such Collateral is held, shall be applied against the Obligations. Each Guarantor waives any defense arising out of the absence, impairment or loss of any right to reimbursement or subrogation or other right or remedy of such Guarantor against Borrower or any such Collateral, whether resulting from the election by Lender to exercise any right or remedy it may have against any person, any defect in, failure of, or loss or absence of priority with respect to Lender's interest in such Collateral, or

20

Initials

CONFIDENTIAL

otherwise. In the event that any foreclosure sale is deemed to be not commercially reasonable, each Guarantor waives any right that he, she or it may have to have any portion of the Obligations discharged except to the extent of the amount actually bid and received by Lender at any such sale. Lender shall not be required to institute or prosecute proceedings to recover any deficiency as a condition of payment or performance hereunder or enforcement hereof.

(B) **Waiver of Notices and Demands.** Each Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of default, and notices of acceptance of this Guaranty and of the existence, creation or incurring of new or additional Obligations. At the option of Lender, each Guarantor may be joined in any action or proceeding commenced by Lender against Borrower in connection with or based upon the Obligations or any Collateral and recovery may be had against such Guarantor in such action or proceeding, without any requirement that Lender first assert, prosecute or exhaust any remedy or claim against Borrower. Without limiting the foregoing, each Guarantor acknowledges that repeated and successive demands may be made and payments or performance made hereunder in response to such demands as and when, from time to time, Borrower may default in payments or performance of the Obligations.  Notwithstanding any such performance hereunder, this Guaranty shall remain in full force and effect and shall apply to any and all subsequent defaults by Borrower in payment or performance of the Obligations.

(C) **Waiver of Defenses.** Each Guarantor waives any defense arising by reason of any disability or defense of Borrower or by reason of the cessation from any cause whatsoever of the liability of Borrower.  Each Guarantor waives any setoff, defense or counterclaim which Borrower or such Guarantor may have or claim to have against Lender.

(D) **Real Property and Other Surety Waivers.** Each Guarantor waives all rights and defenses that such Guarantor may have because Borrower's debt, or any guaranty thereof, is secured by real property, including but not limited to any life insurance.  This means, among other things: (i) that Lender may collect from any Guarantor without first foreclosing on any real property Collateral; and (ii) if Lender forecloses on any real property Collateral: (A) the amount of the debt may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the Collateral is worth more than the sale price, and (B) Lender may collect from each Guarantor even if Lender, by foreclosing on the real property Collateral, has destroyed any right such Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses that any Guarantor may have because Borrower's debt or any guaranty is secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based on Section 580a, 580b, 580d , or 726 of the California Code of Civil Procedure.

Each Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed such Guarantor's rights of subrogation and reimbursement against Borrower by the operation of Section 580d of the California Code of Civil Procedure or otherwise.

Without limiting any waiver, consent or agreement in this Guaranty, each Guarantor further expressly waives to the extent not prohibited by applicable law any and all rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to a Guarantor under California Civil Code Sections 2787 to 2855, inclusive, 2899 and 3433, including any revision or replacement of such statutes or rules hereafter enacted.

Any reference to California law does not in any way affect or impair Guarantor's choice of New York law pursuant to Section 4.2 of this Guaranty  or constitute Lender's acknowledgement  or agreement that California law will apply in any respect to this Guaranty.  Such references to California law are for the sole  purpose of providing Lender the broadest waivers of defenses and rights by a guarantor that are enforceable under California law in case California law is applied for matters of procedure or otherwise in any action or proceeding initiated by Lender in California relating to this Guaranty.

21

Initials

CONFIDENTIAL

(E) **No Waiver; Remedies.** In addition to, and not in limitation of the waivers, no failure on the part of Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right thereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

(F) **Guarantors' Understanding With Respect To Waivers.** Each Guarantor warrants and agrees that each of the waivers set forth above is made with such Guarantor's full knowledge of its significance and consequences, and that under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any of such waivers is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law.

**Section 2.4      Nature of Guaranty.** This Guaranty is a guaranty of payment and not of collection and each Guarantor hereby waive the right to require that any action be brought first against Borrower, any other Guarantor or any other party, or to require any security, or to require that resort be made to any security or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or of any Guarantor.

**Section 2.5      Continuation of Guaranty.** Each Guarantor further agrees that the obligations hereunder shall continue to be effective or reinstated, as the case may be, if at any time payment of all or any part thereof of the Credit Facilities is rescinded or must otherwise be restored by Lender upon the bankruptcy or reorganization of Borrower, any Guarantor or otherwise.

**Section 2.6      Subordination of Debt.** Each Guarantor hereby subordinates any and all indebtedness of Borrower now or hereafter owed to such Guarantor to all indebtedness of Borrower to Lender and agree with Lender that, from and after the date whereon Lender notifies such Guarantor that an event of default under one or more of the Loan Documents has occurred and is continuing, such Guarantor shall not demand or accept any payment from Borrower of any such indebtedness, shall not claim any offset or other reduction of such Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any interest in any of the security described in and encumbered by the Loan Documents; provided, however, that, if Lender so requests, such indebtedness shall be collected, enforced and received by such Guarantor as trustee for Lender and paid over to Lender on account of the indebtedness of the Borrower to Lender, but without reducing or affecting in any manner the liability of any Guarantor under the other provisions of this Guaranty except to the extent the principal amount of such outstanding indebtedness shall have been reduced by such payment.

**Section 2.7      Financial Statements and Other Information.** Each Guarantor agrees to deliver to Lender (A) on or before April 15 of each year, personal financial statements and information applicable to such Guarantor on Lender's standard form or other form acceptable to Lender and (B) copies of such Guarantor's annual federal tax return to be delivered on the sooner of (i) three days after filing or (ii) October 15 of each year for, as applicable, the immediately preceding fiscal or calendar year. Each Guarantor agrees to promptly deliver to Lender from time to time any additional documentation or information reasonable requested by Lender that relates to the business or assets of such Guarantor.

**Section 2.8      Transfer of Interest.** Except as expressly permitted pursuant to the Loan Documents, each Guarantor agree not to make or permit to be made, by voluntary or involuntary means, any transfer of the interest of such Guarantor in Borrower, without first obtaining the prior written consent of Lender.

**Section 2.9      Compliance with Note Covenants.** Each Guarantor shall comply with all covenants applicable to such Guarantor that are set forth in the Note. Any Guarantor that acts on behalf of Borrower has the fiduciary obligations described in the Note with respect to Net Fees and Expenses as defined in the Note.

**ARTICLE 3**
**EVENTS OF DEFAULT**
22

Initials

CONFIDENTIAL

**Section 3.1**     **Events of Default Defined**. An "Event of Default" shall exist if any of the following events occurs and is continuing:

(A)     Any Guarantor fails to perform or observe any covenant contained herein.

(B)     Any warranty, representation or other statement by or on behalf of any Guarantor contained in this Guaranty or in any Loan Document is false or misleading in any material respect when made.

(C)     A receiver, liquidator or trustee of any Guarantor or any of his, her or its property is appointed by court order, or any party named as a Guarantor is adjudicated bankrupt or insolvent or any of his, her or its property is sequestered by court order and such order remains in effect for more than sixty (60) days, or a petition is filed against any Guarantor under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, and is not dismissed within ninety (90) days of such filing.

(D)     Any Guarantor files a bankruptcy petition or seeks relief under any provision of any reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, or consents to the filing of any petition against it under any such law.

(E)     Any Guarantor makes an assignment for the benefit of creditors or admits in writing inability to pay debts generally as they become due, or consents to the appointment of a receiver, trustee or liquidator of all or any part of his, her or its property.

(F)     The occurrence of an Event of Default under the Note or any other Loan Document.

**Section 3.2**     **Remedies on Default**. If an Event of Default exists, Lender may proceed to enforce the provisions hereof and to exercise any other rights, powers and remedies available to Lender without prior written notice to any Guarantor.

**Section 3.3**     **Waiver and Notice**.

(A)     No remedy herein conferred upon or reserved to Lender is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Guaranty now or hereafter existing at law or in equity or by statute.

(B)     No delay or omission to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right or power may be exercised from time to time and as often as may be deemed expedient.

(C)     In order to entitle Lender to exercise any remedy reserved to it in this Guaranty, it shall not be necessary to give any notice, other than such notice as may be expressly required in this Guaranty.

(D)     No waiver, amendment, release or modification of this Guaranty shall be established by conduct, custom or course of dealing.

**ARTICLE 4**
**MISCELLANEOUS**

**Section 4.1**     **Construction**. If this Guaranty is executed by two or more parties, they shall be jointly and severally liable hereunder and the term "Guarantors" whenever used herein shall be construed to refer to each of the parties in

23

Initials

CONFIDENTIAL

the same manner and with the same effect as if each party had signed a separate guaranty.

**Section 4.2**     **Governing Law**. This Guaranty shall be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York, without regard to principles of conflicts of law or to the laws of any other jurisdiction.

**Section 4.3**     **Successors and Assigns**. This Guaranty shall inure to the benefit of and be binding upon the successors and assigns of each of the parties hereto.

**Section 4.4**     **Notices**. Any notice required or permitted to be given hereunder must be in writing and delivered or transmitted to a party at the address or any fax number for such party set forth at the head of this Guaranty, or to such other address or fax number as such party may designate in writing as provided herein for the purpose of receiving notices hereunder. Any such notice to a party is effective if by personal delivery, upon such delivery; if, by nationally recognized overnight courier, on the next business day after delivery to such courier; if by fax transmission, upon receipt by the sender of an electronic confirmation of a successful transmission; and otherwise upon receipt of such notice by such party.

**Section 4.5**     **Entire Agreement**. This Guaranty and the Loan Documents constitute the entire understanding between Borrower, each Guarantor and Lender and to the extent that any writings not signed by Lender or oral statements or conversations at any time made or had are inconsistent with the provisions of this Guaranty or the other Loan Documents, the same shall be null and void.

**Section 4.6**     **Amendments**. No amendment, change, modification, alteration or termination of this Guaranty shall be made except upon the written consent of Lender and any Guarantor to be bound thereby.

**Section 4.7**     **Assignment**. This Guaranty is assignable by Lender in whole or in part in conjunction with an assignment of the Loan Documents and any assignment hereof or any transfer or assignment of the Loan Documents or portions thereof shall operate to vest in any such assignee the rights and powers, in whole or in part, as appropriate, herein conferred upon and granted to Lender.

**Section 4.8**     **Partial Invalidity**. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law. If, however, any such provision shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law, or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

**Section 4.9**     **SUBMISSION TO JURISDICTION**. EACH GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY SHALL BE BROUGHT ONLY IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN THE COUNTY OF ERIE, WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF ANY LEGAL ACTION, AND EACH GUARANTOR WAIVES ANY RIGHT TO OBJECT TO JURISDICTION WITHIN THE FOREGOING FORUM BY LENDER. NOTHING CONTAINED HEREIN SHALL PREVENT LENDER FROM BRINGING ANY SUIT, ACTION OR PROCEEDING OR EXERCISING ANY RIGHTS AGAINST ANY COLLATERAL, AGAINST ANY GUARANTOR PERSONALLY OR AGAINST ANY PROPERTY OF ANY GUARANTOR, WITHIN ANY OTHER JURISDICTION, AND THE INITIATION OF SUCH SUIT, ACTION OR PROCEEDING OR TAKING OF SUCH ACTION IN ANY SUCH OTHER JURISDICTION SHALL IN NO EVENT CONSTITUTE A WAIVER OF THE AGREEMENTS CONTAINED HEREIN WITH RESPECT TO THE LAWS OF THE STATE OF NEW YORK GOVERNING THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO OR THE AGREEMENT OF EACH GUARANTOR TO SUBMIT TO PERSONAL JURISDICTION WITHIN THE STATE OF NEW YORK

24


Initials

CONFIDENTIAL

AND COUNTY OF ERIE.

Section 4.10    WAIVER OF JURY TRIAL. EACH GUARANTOR HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS HE, SHE OR IT MAY HAVE TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (A) ARISING UNDER THIS GUARANTY OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS GUARANTY OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE, AND EACH GUARANTOR HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND LENDER MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF EACH GUARANTOR'S CONSENT TO THE WAIVER OF HIS, HER OR ITS RIGHT TO TRIAL BY JURY. EACH GUARANTOR REPRESENTS AND WARRANTS THAT HE, SHE OR IT HAS REVIEWED THIS JURY WAIVER PROVISION WITH HIS, HER OR ITS LEGAL COUNSEL, AND HAVE MADE THIS WAIVER KNOWINGLY AND VOLUNTARILY.

Section 4.11    SERVICE OF PROCESS. PROCESS ON ANY GUARANTOR IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS GUARANTY WILL BE DEEMED TO HAVE BEEN GIVEN WHEN GIVEN IN ANY ONE OF THE FOLLOWING WAYS: (A) PERSONALLY DELIVERED, (B) TWO BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, ALL CHARGES PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (C) 4 BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO EACH GUARANTOR AT THE APPLICABLE ADDRESS FOR SUCH GUARANTOR SET FORTH AT THE BEGINNING OF THIS GUARANTY. Such service on a Guarantor shall be deemed in every respect effective service of process upon such Guarantor and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon such Guarantor. Nothing in this Section shall affect Lender's right to serve process in any other manner permitted by law. Any Guarantor may add additional addresses or change an address for purposes of service of process by giving 10 days' prior written notice of such change to Lender.

Section 4.12    Unlimited Guaranty.    This Guaranty is unlimited in amount.

Section 4.13    Counterparts. This Guaranty may be executed in two or more counterparts, each of which together shall be deemed an original, but all of which together shall constitute one and the same instrument. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a \".pdf\" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or \".pdf\" signature page were an original thereof.

25

Initials

CONFIDENTIAL

**IN WITNESS WHEREOF,** each Guarantor has executed this Guaranty as of the day and year set forth.

_____     Dated: November ___, 2019

Thomas V. Girardi, Individually

**ACKNOWLEDGEMENTS (FOR GUARANTY)**

STATE OF CALIFORNIA
COUNTY OF

On the ____ day of November in the year 2019 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

*See attached Notary Acknowledgment*

26

Initials

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the
document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                          )
County of Los Angeles                        )

On November 8, 2019, before me, Maria L. Carlos, a Notary Public, personally appeared
Thomas V. Girardi, who proved to me on the basis of satisfactory evidence to be the person
whose name is subscribed to the within instrument and acknowledged to me that he executed the
same in his authorized capacity, and that by his signature on the instrument the person, or the
entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that
the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature _Maria L Carlos_
             Maria L. Carlos


(S E A L)

MARIA L. CARLOS
Notary Public – California
Los Angeles County
Commission # 2229856
My Comm. Expires Feb 26, 2022

CONFIDENTIAL

### FOURTH AMENDED AND RESTATED
### SECURITY AGREEMENT
### CALIFORNIA ATTORNEY LENDING II, INC.

In consideration of **California Attorney Lending II Inc.**, a New York corporation having its chief executive office at 6400 Main Street, Suite 120, Williamsville, NY 14221 ("Secured Party") heretofore or hereafter (1) extending or agreeing to extend any credit or other financial accommodation to or relying on any guaranty, endorsement or other assurance of payment of **Girardi Keese**, a California general partnership having an office at 1126 Wilshire Blvd., Los Angeles, CA 90017 ("Borrower") or (2) agreeing to any direct or indirect extension, renewal, refinancing or other modification or replacement of or waiving or forbearing from exercising any right or remedy relating to any obligation heretofore or hereafter arising or accruing as a result of any such credit or other financial accommodation to Borrower, and for other valuable consideration, the receipt and adequacy of which is acknowledged, **Borrower and Thomas V. Girardi, individually,** having his or her principal residence address at 100 Los Altos Drive, Pasadena, CA 91105 (Borrower and each such individual being, a "Debtor" and collectively the "Debtors"), agrees with Secured Party as follows:

Introductory Statement: Secured Party and some or each or all of the Debtors are parties to that certain Security Agreement dated July 5, 2011 as amended and/or restated on Angut 12, 2011, August 1, 2013 and July 11, 2017 (collectively, "Security Agreement") in reliance upon which Secured Party has made certain loans and financial accommodations available to Borrower.  Borrower as of the date of this Fourth Amended and Restated Security Agreement has executed a Fourth Amended and Restated Promissory Note to Secured Party in the principal amount of $8,000,000. The parties now desire to consolidate, amend and restate the Security Agreement in all respects as hereinafter set forth.

1.   **DEFINITIONS.** In this Fourth Amended and Restated Security Agreement (the "Agreement"):

a.    **Account Debtor.** "Account Debtor" means any person or entity with an obligation to pay or transfer cash, property or proceeds to any Debtor on an Account, Chattel Paper, General Intangible regardless whether such obligation arises from business or personal matters or assets of such Debtor.

b.    **Collateral.** "Collateral" means collectively the following:

All of each Debtor's right, title and interest in all Goods (including, Equipment, Fixtures and Inventory), Money, Instruments (including Promissory Notes), Accounts, Deposit Accounts, Chattel Paper, Investment Property, Letter-of-Credit Rights, Documents and General Intangibles (including payment intangibles), Commercial Tort Claims described in the Questionnaire, Insurance Proceeds and any other personal property (whether or not subject to the UCC), and all interest, dividends and other distributions thereon paid and payable in cash or in property; and all replacements and substitutions for, and all accessions and additions to, and all profits, offspring, Products and other Proceeds of, all of the foregoing. Each Debtor is prohibited from granting additional security interest in the Collateral or the Proceeds of the Collateral. (Notice to potential competing creditors under Official Note 5 of UCC Section 9-331).

The Collateral includes, without limitation, any right to payment of any Debtor for client representation or referral (whether such right to payment is on a contingent, hourly, fixed fee or other basis) and for Costs and Expenses (as defined in the Note), whether or not yet earned by performance, and the proceeds thereof, including Net Fees and Expenses (as defined in the Note).

c.    **Event of Default.** An "Event of Default" occurs or exists if:

(i)    there occurs or exists any event or condition of default under any Promissory Note or other instrument (A) now

27

Initials

CONFIDENTIAL

or hereafter evidencing any of the Obligations, hereinafter defined, or (B) the payment of which is now or hereinafter guaranteed by any Debtor (including, but not limited to, that certain Note, dated the date of this Agreement, issued by Borrower to Secured Party, or any direct or indirect extension, renewal, refinance or other modification or replacement of such Note); or

(ii)     there occurs or exists any event or condition of default under any guaranty of the Obligations; or

(iii)     Secured Party deems itself insecure with respect to the Obligations or is of the opinion that the Collateral is or may not be sufficient or has decreased or may decrease in value, whether or not Secured Party has sought any Other Collateral from any Debtor or any Guarantor.

d.     **Fiduciary Obligations.** "Fiduciary Obligations" means the fiduciary obligations of any Debtor, as set forth in the Note, relating to Net Fees and Expenses as defined in the Note.

e.     **Guarantor.** "Guarantor" means any Person, including Thomas V. Girardi, who or that is now or hereafter liable, whether directly or indirectly or absolutely or contingently, for the payment of any of the Obligations.

f.     **Loan Documents.** "Loan Documents" shall have the same meaning as set forth in the Note.

g.     **Note.** "Note" means the Fourth Amended and Restated Promissory Note, dated on or about the date hereof, from Borrower to Secured Party as amended, increased, extended, amended and restated or replaced from time to time.

h     **Obligations.** "Obligations" means collectively all obligations that are now owing or in the future owing by each Debtor (including, any direct or indirect successor of any Debtor or any direct or indirect assignee or other transferee of all or substantially all of the assets of any Debtor) to Secured Party for the payment of any money or the performance of any other obligation under the Loan Documents, regardless of type, class or form, whether direct or indirect, absolute or contingent (whether pursuant to any guaranty, endorsement or other assurance of payment or otherwise), whether for any business or commercial purpose or otherwise, including without limitation any such present and future obligations owing under the Loan Documents, (i) for the payment of any principal, interest, fee, charge, cost or expense, whether or not any such amounts arise or accrue after the commencement of any bankruptcy or other insolvency proceeding and whether or not allowed in any such proceeding, (ii) by such Debtor alone or with others, and (iii) whether owing from inception to Secured Party or acquired by assignment or other transfer to Secured Party.

i.     **Other Collateral.** "Other Collateral" means, other than the Collateral, any collateral, subordination, guaranty, endorsement or other security or assurance of payment, whether now existing or hereafter arising or accruing, that now or hereafter secures the payment of or is otherwise applicable to any of the Obligations.

j.     **Permitted Liens.** "Permitted Liens" means (i) any security interest in or other lien on any of the Collateral in favor of Secured Party or (ii) any security interest in or other lien on any of the Collateral existing on this date that is (A) fully and accurately described in the response to question 7 contained in the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement but only to the extent such security interest or other lien secures the indebtedness described in such response or (B) consented to in writing by Secured Party.

k.     **Person.** "Person" means (i) any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated association, government or political subdivision, (ii) any court, agency or other governmental body or (iii) any other entity, body, organization or group.

l.     **Record.** "Record" means any information that is now or hereafter (i) inscribed on a tangible medium or (ii)

28

Initials

CONFIDENTIAL

stored in an electronic or other medium and retrievable in perceivable form, except to the extent constituting confidential information (whether contained in any client file of any Debtor or otherwise) that any Debtor is not permitted to disclose to Secured Party by reason of any ethical or disciplinary rule, regulation or law governing such Debtor's conduct.

**m.    Security Interest.** "Security Interest" means any security interest or other lien granted or otherwise created pursuant to the first sentence of Section 2 of this Agreement.

**n.    Uniform Commercial Code.** "Uniform Commercial Code" or "UCC" means the Uniform Commercial Code in effect at any time in the State of New York.

**o.    Other Terms.** All capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in the Uniform Commercial Code.

**2.    GRANT OF SECURITY INTEREST.** To secure the payment and performance of the Obligations, each Debtor grants to Secured Party a security interest in and assigns, pledges and hypothecates to Secured Party the Collateral. Each Security Interest is a continuing, absolute and unconditional security interest or other lien.

**3.    REINSTATEMENT OF OBLIGATIONS.** Each portion of the Obligations heretofore or hereafter paid or satisfied by any of the Collateral, or any money or Other Collateral, heretofore or hereafter received, applied or retained by Secured Party and later recovered from Secured Party as a result of any claim (including, but not limited to, any claim involving preference or fraudulent conveyance or any allegation that any money received by Secured Party constituted trust funds), however asserted and whether now existing or hereafter arising or accruing, shall be reinstated as part of the Obligations for purposes of this Agreement as of the date it originally arose or accrued.

**4.    COVENANTS.**

**a.    Affirmative Covenants.** Each Debtor shall (i) maintain complete and accurate Records relating to the Collateral, (ii) before the end of any applicable grace period, pay each tax, assessment, fee and charge imposed by any government or political subdivision upon any of the Collateral, this Agreement or any agreement, instrument or other Record evidencing any of the Collateral or any of the Obligations, (iii) defend the Collateral against each demand, claim, counterclaim, setoff and defense asserted by any Person (including, but not limited to, any Account Debtor) other than Secured Party and (iv) promptly notify Secured Party of (A) any threat or commencement of any action or other legal proceeding, any entry of any judgment or order of any court, agency or other governmental body, or any assertion by any Person (including, but not limited to, any Account Debtor) other than Secured Party of any demand, claim, counterclaim, setoff or defense, relating to any of the Collateral, (B) any occurrence or existence of any Event of Default, any event or condition that, after notice, lapse of time or both notice and lapse of time, would constitute any Event of Default or any event or condition that has or will or might have any material adverse effect on (I) any of the Collateral, (II) any Debtor, (III) any Guarantor or (IV) the business, operations, assets, affairs or condition (financial or other) of any Debtor or any Guarantor and (C) any change in the location of the chief executive office or principal place of business of any Debtor or the residence of any Debtor that is an individual.

**b.    Negative Covenants.** Without the prior written consent of Secured Party, no Debtor shall (i) sell or otherwise dispose of any of the Collateral or any interest or right in any of the Collateral except in the ordinary course of business and in compliance with any Fiduciary Obligations relating thereto, or (ii) provide to Secured Party or permit to be provided to Secured Party on his, her or its behalf any certificate, financial statement or other Record that contains any statement of fact that is incorrect or misleading in any material respect or omits to state any fact necessary to make any statement of fact contained therein not incorrect or misleading in any material respect, or (iii) permit to be filed or remain on file in any public office any financing statement or amendment of any financing statement relating to any of the Collateral and naming any Person other than Secured Party as a secured party, except for any

29

Initials

CONFIDENTIAL

financing statement or amendment of any financing statement heretofore consented to by Secured Party in writing or relating solely to any Permitted Liens, or (iv) upon or at any time after any occurrence or existence of any Event of Default, (A) enforce, extend, renew, refinance or otherwise modify or replace, request, demand, accept, collect or otherwise realize upon, compromise, cancel, discharge, subordinate, accelerate, give any receipt, release or discharge relating to, commence, prosecute or settle any action or other legal proceeding relating to, waive or forbear from exercising any right or remedy relating to or adversely affect any obligation of any Person (including, but not limited to, any Account Debtor obligated with respect to any of the Collateral) relating to any of the Collateral, or (B) agree or otherwise incur any obligation to do anything described in clause (iv)(A) of this sentence, or (v) without giving Secured Party at least 30 days' prior written notice (A) change its location for purposes of Article 9 of the Uniform Commercial Code (including, but not limited to, its jurisdiction of organization if it is a Registered Organization), (B) make any change in its name, identity or structure or (C) participate in any merger, consolidation or other absorption, or (vi) grant or otherwise create, permit to exist or agree or otherwise incur any obligation to grant or otherwise create or permit to exist any security interest in or other lien on any of the Collateral other than Permitted Liens, or (vii) use any money of Borrower, funds in any Deposit Account of Borrower or funds represented by any certificate of deposit of Borrower in partial or complete satisfaction of any obligation of Borrower except for obligations incurred in the ordinary course of the business of Borrower and in full compliance with the Fiduciary Obligations, or (viii) create, incur, assume or have any indebtedness or other obligation (A) arising from the borrowing of any money or (B) pursuant to any guaranty or other contingent obligation, except for indebtedness and other obligations (I) to Secured Party, (II) constituting unsecured normal trade debt incurred upon customary terms in the ordinary course of its business or for any Debtor that is an individual, ordinary consumer debt, (III) arising from the endorsement in the ordinary course of its business of any check or other negotiable instrument for deposit or collection or (IV) fully and accurately described in the response to question 7 contained in the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement.

c.   **Additional Covenants Triggered by Request of Secured Party.** Promptly upon the request of Secured Party, each Debtor shall (i) deliver to Secured Party each financing statement, amendment of any financing statement and other Record, and take each other action (including, but not limited to, making any endorsement), requested by Secured Party to perfect, maintain the validity, perfection or priority of, or enforce, any Security Interest, otherwise protect the interest of Secured Party in or collect, sell or otherwise dispose of or otherwise realize upon any of the Collateral, whether under applicable law or otherwise, verify any of the Collateral or otherwise accomplish any purpose of this Agreement, (ii) deliver to Secured Party each Record included in the Collateral, together with each endorsement, instrument of assignment and other Record that Secured Party requests to accomplish the assignment or other transfer of such Record to Secured Party, and, until such delivery, hold such Record in trust for Secured Party, (iii) cause each Instrument representing Proceeds or other proceeds of any of the Collateral to be made payable, as requested by Secured Party, to Secured Party alone or Secured Party and any one or more of Debtors jointly, (iv) provide to Secured Party all information requested by Secured Party and relating to (A) any of the Collateral, (B) any Person (including, but not limited to, any Account Debtor) obligated with respect to any of the Collateral, (C) any Debtor, (D) any Guarantor or (E) the business, operations, assets, affairs or condition (financial or other) of any Debtor or any Guarantor (including, but not limited to, financial statements prepared in a form satisfactory to Secured Party and, if requested by Secured Party, audited, reviewed or compiled by an independent certified public accountant satisfactory to Secured Party) and (v) permit each officer, employee, accountant, attorney and other agent of Secured Party to inspect the Collateral and audit, copy and extract each Record included in the Collateral.

d.   **Collateral Collections.** After an Event of Default shall have occurred, Secured Party shall have the right at any and all times to enforce any Debtor's rights against Account Debtors and other parties obligated on Collateral, including, but not limited to, the right to: (i) notify and/or require any Debtor to notify any or all Account Debtors and other parties obligated on Collateral to make payments directly to Secured Party or in the care of a post office lock box under the sole control of Secured Party established at Debtors' expense subject to Secured Party's customary arrangements and charges therefor, and to take any or all action with respect to Collateral as Secured Party shall determine in its sole discretion, including, without limitation, the right to demand, collect, sue for and receive any

30

Initials

CONFIDENTIAL

money or property at any time due, payable or receivable on account thereof, compromise and settle with any person liable thereon, and extend the time of payment or otherwise change the terms thereof, without incurring liability or responsibility to any Debtor; (ii) revoke any prior authorization given to any Debtor to use Net Fees and Expenses held in trust by such Debtor pursuant to the Fiduciary Obligations and require any Debtor to also segregate and hold in trust for Secured Party any other Collateral not subject to the Fiduciary Obligations and, on the day of such Debtor's receipt thereof, transmit to Secured Party in the exact form received by such Debtor (except for such assignments and endorsements as may be required by Secured Party), all cash, checks, drafts, money orders and other items of payments constituting Collateral or proceeds of Collateral; and/or (iii) establish and maintain at Secured Party a "Repayment Account," which shall be under the exclusive control and subject to the sole order of Secured Party and which shall be subject to the imposition of such customary charges as are imposed by Secured Party from time to time upon such accounts, for the deposit of cash, checks, drafts, money orders and other items of payments constituting Collateral or proceeds of Collateral from which Secured Party may, in its sole discretion, at any time and from time to time withdraw all or any part. Secured Party's collection and enforcement of Collateral against Account Debtors and other persons obligated thereon shall be deemed to be commercially reasonable if Secured Party exercises due care and follows the procedures that Secured Party generally applies to the collection of obligations owed to Secured Party. All cash and non-cash proceeds of the Collateral may be applied by Secured Party upon Secured Party's actual receipt of cash proceeds against such of the Obligations, matured or unmatured, as Secured Party shall determine in its sole discretion. Secured Party may defer the application of non-cash proceeds of Collateral, including, but not limited to, non-cash proceeds collected from Account Debtors and other persons obligated on Collateral, to the Obligations until cash proceeds are actually received by Secured Party.

e.     **Care of Collateral.** Each Debtor shall have all risk of loss of the Collateral. Secured Party shall have no liability or duty, either before or after an Event of Default, to collect or enforce any of its rights against the Collateral, to collect any income accruing on the Collateral, or to preserve rights against Account Debtors or other parties with any prior interest in the Collateral. If Secured Party actually receives any notices requiring action with respect to Collateral of a Debtor in Secured Party's possession, Secured Party shall take reasonable steps to forward such notices to such Debtor. Each Debtor is responsible for responding to notices concerning the Collateral, voting the Collateral, and exercising rights and options, calls and conversions of the Collateral. Secured Party's sole responsibility is to take such action as is reasonably required by such Debtor in writing, provided, however, Secured Party is not required to take any action that, in Secured Party's sole judgment, would adversely affect the value of the Collateral as security for the Obligations. While Secured Party is not required to take certain actions, if action is needed, in Secured Party's sole discretion, to preserve and maintain the Collateral, each Debtor authorizes Secured Party to take such actions, but Secured Party is not obligated to do so.

5.     **POWER OF ATTORNEY.** Upon the occurrence or existence of any Event of Default, each Debtor irrevocably and unconditionally appoints Secured Party as the attorney-in-fact of such Debtor, with full power of substitution and revocation, to take, in the name and on behalf of such Debtor or otherwise, each action relating to any of the Collateral that such Debtor could take (subject to the limitations contained in Section 12(j) of this Agreement), provided such appointment and power does not violate any code of professional conduct and the ethical rules thereunder applicable to the legal profession. The power of attorney given pursuant to the preceding sentence is coupled with an interest in favor of Secured Party.

6.     **CERTAIN RIGHTS, REMEDIES AND DUTIES.**

a.     **Rights and Remedies Pursuant to Applicable Law.** With respect to the Collateral, Secured Party shall have each applicable right and remedy pursuant to applicable law (including, but not limited to, the Uniform Commercial Code) or this Agreement.

b.     **Additional Rights Without Event of Default.** Secured Party shall have the right to (i) file in any public office each financing statement or amendment of any financing statement relating to any of the Collateral that Secured Party

31

Initials

CONFIDENTIAL

desires to file (which may describe the collateral as "all assets" or "all personal property and fixtures" of a Debtor or using other supergeneric terms) and (ii) verify any of the Collateral in any manner or through any medium, whether directly with any Person (including, but not limited to, any Account Debtor) obligated with respect thereto or otherwise or in the name of any Debtor or otherwise.

c.    **Additional Rights Upon or After Event of Default.** Upon or at any time after any occurrence or existence of any Event of Default, Secured Party, for the purpose of preserving or enhancing the value of any of the Collateral or exercising any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement, shall have the right to (i) perform each obligation of any Debtor pursuant to this Agreement and (ii) revoke any prior authorization given to any Debtor to use Net Fees and Expenses held in trust by such Debtor pursuant to the Fiduciary Obligations, require such Debtor to forthwith remit to Secured Party all Net Fees and Expenses and take control of all Proceeds and other proceeds thereof.

d.    **Application of Proceeds.** Secured Party shall apply all proceeds received by Secured Party from any collection, sale or other disposition of or other recovery upon or otherwise on account of any of the Collateral (including, but not limited to, as money payable pursuant to any insurance on any of the Collateral) first to liabilities, costs and expenses described in Section 7 of this Agreement and then to the remainder of the Obligations, whether due or not due, in any order determined by Secured Party.

e.    **Notice of Disposition.** Debtor agrees with Secured Party that commercial reasonableness and good faith require Secured Party to give each Debtor no more than ten days' prior written notice of the time and place of any public disposition of Collateral or of the time after which any private disposition or other intended disposition is to be made. Debtor also agrees with Secured Party that it is commercially reasonable for Secured Party to disclaim all warranties which arise with respect to the disposition of the Collateral.

7.    **EXPENSES; INDEMNIFICATION.**

a.    **Expenses.** Each Debtor shall pay to Secured Party on demand each cost and expense (including, but not limited to, if Secured Party retains counsel for advice, litigation or any other purpose, reasonable attorneys' fees and disbursements) heretofore or hereafter incurred by Secured Party in (i) searching for, filing or recording or obtaining any information relating to any financing statement, amendment of any financing statement or other Record relating to any of the Collateral or otherwise obtaining any information relating to any Debtor or any of the Collateral or (ii) endeavoring to (A) enforce any obligation of any Debtor pursuant to this Agreement or preserve or exercise any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement or (B) preserve or exercise any right or remedy relating to or collect, sell or otherwise dispose of or otherwise realize upon any of the Collateral. After such demand for the payment of any cost or expense incurred by Secured Party in performing any obligation of any Debtor pursuant to this Agreement, Debtors shall pay interest at an annual rate equal to the lesser of 24.9% or the highest rate permitted by applicable law on the portion of such cost or expense remaining unpaid.

b.    **Indemnification.** Each Debtor shall indemnify and defend Secured Party and each officer, employee, accountant, attorney, banker or lender and other agent of Secured Party on demand, without any limitation as to amount, against each liability, cost and expense (including, but not limited to, if Secured Party retains counsel for advice, litigation or any other purpose, reasonable attorneys' fees and disbursements) heretofore or hereafter imposed on, incurred by or asserted against Secured Party or such officer, employee, accountant, attorney or other agent as a result of any claim (including, but not limited to, any claim involving any allegation of any violation of applicable law (including, but not limited to, any criminal statute)), however asserted and whether now existing or hereafter arising or accruing, arising out of any collection, sale or other disposition of any of the Collateral or any breach by any Debtor of any representation or warranty or any covenant or other agreement contained in, or any other fact or circumstance relating to, this Agreement, except to the extent any such liability, cost or expense is determined in a

32

Initials

CONFIDENTIAL

final, non-appealable judgment of a court of competent jurisdiction to have been caused by the gross negligence, bad faith or willful misconduct of Secured Party or such officer, employee, accountant, banker, lender, attorney or other agent.

**8.    TERMINATION.** This Agreement shall remain in full force and effect until and shall terminate only upon the final and indefeasible payment in full of the Obligations and the termination of the Loan Documents, irrespective of any interruptions in the business relationships of any Debtor with Secured Party.

**9.    REPRESENTATIONS, WARRANTIES AND ADDITIONAL COVENANTS.** Each Debtor represents, warrants and covenants with and to Secured Party as follows:

**a.    Authority.** The execution, delivery to Secured Party and performance of this Agreement and the grant or other creation of each Security Interest by such Debtor (i) do not and will not violate applicable law, any judgment or order of any court, agency or other governmental body by which such Debtor is bound or, if such Debtor is not an individual, any certificate or articles of incorporation or organization, by-laws, operating or partnership agreement or other charter, organizational or other governing document of such Debtor or any resolution or other action of record of any shareholders, members, partners, directors or managers of such Debtor, (ii) do not and will not violate or constitute any default under any agreement, instrument or other Record by which such Debtor is bound or to which such Debtor's property is subject, (iii) if such Debtor is not an individual, are and will be in furtherance of the purposes and within the power and authority of such Debtor and (iv) do not and will not require any authorization of, notice to or other act by or relating to any Person (including, but not limited to, any Account Debtor or, if any Debtor is not an individual, any shareholder, member, partner, director or manager of such Debtor) that has not been duly obtained, given or done and is not in full force and effect.

**b.    Enforceability.** This Agreement is enforceable in accordance with its terms against each Debtor. All of each Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, General Intangibles, Instruments, Investment Property, Letter-of-Credit Rights and other liens, contracts, leases and agreements constituting the Collateral are and shall be valid, genuine and legally enforceable obligations and rights belonging to such Debtor and not subject to any claim, defense, set-off, or counterclaim of any kind.

**c.    Ownership.** Debtors are and shall remain the owners of the Collateral.

**d.    Questionnaire.** Each answer contained in any questionnaire submitted by or on behalf of any Debtor to Secured Party in connection with this Agreement (including, but not limited to, the Questionnaire set forth in Exhibit A attached to and made a part of this Agreement) is complete and accurate.

**e.    Rights and Obligations with Respect to Collateral.** Except as heretofore disclosed by any Debtor to Secured Party in writing, there exists (i) no security interest in or other lien on any of the Collateral other than Permitted Liens, (ii) no presently effective financing statement or amendment of any financing statement relating to any of the Collateral and naming any Person other than Secured Party as a secured party other than those relating solely to Permitted Liens, (iii) no contractual or other restriction on the grant or other creation of any security interest in or assignment, pledge or hypothecation of any of the Collateral, and (iv) no demand, claim, counterclaim, setoff or defense, no action or other legal proceeding, and no outstanding judgment or order of any court, agency or other governmental body, relating to any of the Collateral. Each Debtor (i) shall defend the Collateral against all claims and demands of all persons at any time claiming any interest therein; (ii) shall cooperate with Secured Party in obtaining and maintaining control with respect to all Deposit Accounts, Investment Property, Letter-of-Credit Rights and electronic chattel paper constituting the Collateral; (iii) shall not become a party to any restructuring of its form of business or participate in any consolidation, merger, liquidation or dissolution without Secured Party's prior written consent; (iv) shall not change its state of organization without first notifying Secured Party in writing; (v) shall immediately advise Lender in writing of any change in address of any Debtor or the Collateral; and (vi) shall provide

33

Initials

CONFIDENTIAL

Secured Party with possession of all Chattel Paper, Documents, Instruments and Investment Property constituting the Collateral that are embodied in a tangible document, instrument or certificate.

**f.    Actions with Respect to Collateral.** Except as heretofore disclosed by any Debtor to Secured Party in writing, no Debtor has (i) sold or otherwise disposed of any of the Collateral or any interest or right in any of the Collateral or (ii) extended, renewed, refinanced or otherwise modified or replaced, compromised, canceled, discharged, subordinated, accelerated, waived, forborne from exercising any right or remedy relating to or adversely affected any obligation of any Person (including, but not limited to, any Account Debtor) relating to any of the Collateral.

**g.    Accounts and General Intangibles.** Each Account and General Intangible included in the Collateral is or, if not now existing, will be genuine, in all respects what it purports to be and enforceable in accordance with its terms against each Person (including, but not limited to, any Account Debtor) obligated with respect thereto, subject to no demand, claim, counterclaim, setoff or defense.

**h.    Incorrect or Misleading Information.** Each Debtor has not provided to Secured Party or permitted to be provided to Secured Party on his, her or its behalf any certificate, financial statement or other Record that contains any statement of fact that is incorrect or misleading in any material respect or omits to state any fact necessary to make any statement of fact contained therein not incorrect or misleading in any material respect.

**i.    Taxes.** Each Debtor has duly filed all applicable income or other tax returns and has paid all income or other taxes when due, and there are no outstanding tax liens against the assets of any Debtor.

**10.    CERTAIN CONSENTS AND WAIVERS.**

**a.    Consents.** Except to the extent expressly provided in this Agreement, this Agreement shall not be modified or terminated, no Security Interest, no obligation of any Debtor pursuant to this Agreement and no right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement shall be impaired or otherwise adversely affected, and no such right or remedy shall be waived, by any act, omission or other thing, whether heretofore occurred or hereafter occurring.   Each Debtor knowingly, voluntarily, intentionally and irrevocably consents, without any notice, to each act, omission and other thing, whether heretofore occurred or hereafter occurring, that would or might, but for such consent, modify or terminate this Agreement, impair or otherwise adversely affect any Security Interest or any such obligation, right or remedy or operate as a waiver of any such right or remedy.

**b.    Waivers.** Each Debtor knowingly, voluntarily, intentionally and irrevocably waives, without any notice, each act and other thing upon which, but for such waiver, any Security Interest, any obligation of such Debtor pursuant to this Agreement or any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement would or might be conditioned.

**11.    NOTICES.** Any notice required or permitted to be given hereunder must be in writing and must be delivered or transmitted to a party at the address or any fax number for such party set forth at the beginning of this Agreement or on the Signature Page to this Agreement, or to such other address or fax number as such party may designate in writing as provided herein for the purpose of receiving notices hereunder. Any such notice to a party is effective if by personal delivery, upon such delivery; if by nationally recognized overnight courier, on the next business day after delivery to such nationally recognized overnight courier; if by fax transmission, upon receipt by the sender of an electronic confirmation of a successful transmission; and otherwise upon receipt of such notice by such party. Each requirement under applicable law of reasonable notice of any event by Secured Party to any Debtor shall be deemed to have been met if a notice of such event is given by Secured Party to such Debtor at least 10 days before the date on or after which such event is to occur.

34

Initials

CONFIDENTIAL

## 12.   MISCELLANEOUS.

**a.   Reliance by Other Persons.** Each Person (including, but not limited to, any Account Debtor) obligated with respect to any of the Collateral may accept without any question any exercise by Secured Party of any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement.

**b.   Limitation on Security Interest.** The payment of the Obligations shall not be secured by any Security Interest to the extent of any amount in excess of the maximum amount the payment of which can be so secured without rendering such Security Interest unenforceable under applicable law as a fraudulent conveyance or transfer.

**c.   Obligations Relating to Collateral.** The grant or other creation of any Security Interest shall not constitute an assignment by any Debtor to Secured Party of any obligation of such Debtor relating to any of the Collateral. Each Debtor shall remain obligated to perform each such obligation, and Secured Party shall not be obligated to perform any such obligation, whether or not Secured Party exercises any right or remedy pursuant to this Agreement or arising or accruing as a result of this Agreement. The only obligations of Secured Party relating to the Collateral shall be, to the extent required by applicable law, to act in a commercially reasonable manner in exercising with respect to any of the Collateral any right or remedy pursuant to this Agreement or arising or accruing as a result of this Agreement.

**d.   Liability.** If more than one Person executes this Agreement, (i) each of them shall be jointly and severally liable pursuant to this Agreement, and (ii) this Agreement shall be construed, interpreted and enforced, whether in any action or other legal proceeding or otherwise, as to each of them as though each of them had executed and delivered to Secured Party a separate agreement identical to this Agreement.

**e.   Assignment or Grant of Participation.** In conjunction with any assignment or other transfer of or grant of any participation in any of the Obligations by Secured Party, Secured Party shall have the right to assign or otherwise transfer or grant any participation in this Agreement, any Security Interest, any obligation of any Debtor pursuant to this Agreement or any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement.

**f.   Binding Effect.** This Agreement shall be binding upon each Debtor and each direct or indirect legal representative, successor and assignee of each Debtor and shall inure to the benefit of and be enforceable by Secured Party and each direct or indirect successor and assignee of Secured Party.

**g.   Entire Agreement, Modifications and Waivers.** This Agreement contains the entire agreement between Secured Party and each Debtor with respect to the subject matter of this Agreement and supersedes each action heretofore taken or not taken, each course of conduct heretofore pursued, accepted or acquiesced in, and each oral, written or other agreement and representation heretofore made, by or on behalf of Secured Party with respect thereto. No action heretofore or hereafter taken or not taken, no course of conduct heretofore or hereafter pursued, accepted or acquiesced in, no oral, written or other agreement or representation heretofore made, and no agreement or representation hereafter made other than in writing, by or on behalf of Secured Party shall modify or terminate this Agreement, impair or otherwise adversely affect any Security Interest, any obligation of any Debtor pursuant to this Agreement or any right or remedy of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement or operate as a waiver of any such right or remedy. No modification of this Agreement or waiver of any such right or remedy shall be effective unless made in a writing duly executed by Secured Party and specifically referring to such modification or waiver.

**h.   Rights and Remedies Cumulative.** All rights and remedies of Secured Party pursuant to this Agreement or arising or accruing as a result of this Agreement shall be cumulative, and no such right or remedy shall be exclusive

35

Initials

CONFIDENTIAL

of any other such right or remedy.

**i.** **Extent of Consents and Waivers.** Each consent and waiver of any Debtor contained in this Agreement shall be deemed to have been given to the extent permitted by applicable law.

**j.** **Exercise of Rights; Requests.** Except as expressly provided in this Agreement, each right and remedy of Secured Party pursuant to this Agreement or arising as a result of this Agreement may be exercised (i) at any time and from time to time, (ii) in the sole discretion of Secured Party, (iii) without any notice or demand of any kind and (iv) whether or not any Event of Default or any other event or condition of default relating to any of the Obligations, any of the Collateral or any Other Collateral has occurred or existed, but Secured Party shall not be obligated to exercise any such right or remedy. Each such right and remedy may be exercised only to the extent that the exercise thereof does not (i) violate applicable law or (ii) if requiring any Debtor to take any action, require any Debtor to violate any ethical or disciplinary rule, regulation or law governing non-disclosure of confidential information by an attorney or prohibiting the unauthorized practice of law. Each request by Secured Party pursuant to this Agreement may be made (i) at any time and from time to time, (ii) in the sole discretion of Secured Party and (iii) whether or not any Event of Default or any other event or condition of default relating to any of the Obligations, any of the Collateral or any Other Collateral has occurred or existed.

**k.** **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law. If, however, any such provision shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law, or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

**l.** **Governing Law.** This Agreement shall be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York, without regard to principles of conflicts of law or to the law of any other jurisdiction.

**m.** **Headings.** In this Agreement, headings of sections are for convenience of reference only and have no substantive effect.

**n.** **Counterparts.** This Agreement may be executed in two or more counterparts, each of which together shall be deemed an original, but all of which together shall constitute one and the same instrument. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a \".pdf\" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or \".pdf\" signature page were an original thereof.

**13.   CONSENTS AND WAIVERS RELATING TO LEGAL PROCEEDINGS.**

**a.   JURISDICTIONAL CONSENTS AND WAIVERS. EACH DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY CONSENTS AND AGREES THAT ANY ACTION OR OTHER LEGAL PROCEEDING COMMENCED BY SECURED PARTY SHALL BE BROUGHT ONLY IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, WHICH SHALL BE DEEMED TO BE THE COURT OF SOLE AND EXCLUSIVE VENUE FOR THE BRINGING OF SUCH ACTION; PROVIDED, HOWEVER, SECURED PARTY MAY, AT ITS OPTION, COMMENCE ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION TO OBTAIN POSSESSION OR FORECLOSURE UPON ANY COLLATERAL, TO OBTAIN EQUITABLE RELIEF OR TO ENFORCE ANY JUDGMENT OR ORDER OBTAINED BY SECURED PARTY AGAINST DEBTOR OR WITH RESPECT TO ANY COLLATERAL, TO ENFORCE ANY OTHER RIGHT OR REMEDY UNDER THIS AGREEMENT OR TO OBTAIN ANY OTHER RELIEF DEEMED**

36

Initials

CONFIDENTIAL

APPROPRIATE BY SECURED PARTY.   DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO PERSONAL JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN THE SUPREME COURT OF THE STATE OF NEW YORK LOCATED IN ERIE COUNTY, AND DEBTOR HEREBY WAIVES ANY OBJECTIONS WHICH DEBTOR MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH NEW YORK COURT.

b.   WAIVER OF TRIAL BY JURY.  EACH DEBTOR KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES EACH RIGHT SUCH DEBTOR MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION OR OTHER LEGAL PROCEEDING, WHETHER BASED ON ANY CONTRACT OR NEGLIGENT, INTENTIONAL OR OTHER TORT OR OTHERWISE, ARISING OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT, ANY OF THE OBLIGATIONS, ANY OF THE COLLATERAL OR ANY OTHER COLLATERAL.

c.   SERVICE OF PROCESS. PROCESS ON DEBTORS IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT WILL BE DEEMED TO HAVE BEEN GIVEN TO A DEBTOR WHEN GIVEN IN ANY ONE OF THE FOLLOWING WAYS: (I) PERSONALLY DELIVERED, (II) TWO (2) BUSINESS DAYS AFTER DEPOSITED WITH A NATIONALLY RECOGNIZED OVERNIGHT COURIER, CHARGES PREPAID, THAT ROUTINELY ISSUES RECEIPTS, OR (III) FOUR (4) BUSINESS DAYS AFTER SENT BY CERTIFIED MAIL BY THE UNITED STATES POSTAL SERVICE, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH DEBTOR AT THE APPLICABLE ADDRESS SET FORTH IN THIS AGREEMENT.  Such service on any Debtor shall be deemed in every respect effective service of process upon and shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon such Debtor.  Nothing in this Section shall affect Secured Party's right to serve process in any other manner permitted by law.  Each Debtor may add additional addresses or change the address for purposes of service of process by giving 10 days' prior written notice of such change to Secured Party.

Dated: November _1_, 2019

**Girardi Keese**

By: _____
Thomas V. Girardi, Partner
Facsimile No.

_____
Thomas V. Girardi, individually
Facsimile No.

37

Initials

CONFIDENTIAL

## EXHIBIT A

## QUESTIONNAIRE

1.  What is Borrower's legal name?

    Girardi Keese

2.  What is Borrower's jurisdiction of organization and business structure:

    General partnership under the laws of California

3.  What is Borrower's Federal Employer Identification Number or Social Security Number?

    _____

4.  What is the address (including state, county and zip code) of a business office of Borrower?

    1126 Wilshire Blvd., Los Angeles, CA 90017

5.  What is the address (including state, county and zip code) of each location at which any Record included in the Collateral is or will be kept other than the locations the addresses of which are indicated in the answers to question 4?

    1126 Wilshire Blvd., Los Angeles, CA 90017
    100 Los Altos Drive, Pasadena, CA 91105

6.  **Deposit Accounts owned by each Debtor**

    For each deposit account of each Debtor, what is the name and address of the bank maintaining such account, what type of account is such account (include each trust account but indicate its status as a trust account) and what is the account number of each such account?

| Debtor Name | Name & Address of Depository Bank | Type of Account | Account Number |
|---|---|---|---|
| GK | Mo/ | Checking | |
| | | Trust | |

7.  **Existing Liens**

    In the case of any security interest or other lien covering any of the Collateral and existing on the date of this Agreement in favor of any Person other than Secured Party, what are the complete name and address of each such Person in whose favor such security interest or other lien exists, and what is the nature of such security interest or other lien and the debt secured thereby?

| Debtor Name | Name & Address of the Secured Party | Description of Collateral and Debt Secured Including Principal Amount of such Debt |
|---|---|---|

38

Initials _____

CONFIDENTIAL.

| | holding the Permitted Lien | |
|---|---|---|
| Comerica Bank | 75 East Trimble Road San Jose, CA 95131 | blanket lien, as well as various specific security interests in certain accounts, contracts and deposits |
| Key Equipment Finance Inc. | 1000 So. McCaslin Blvd. Superior, CO 80027 | specific leased equipment |
| Ikon Financial Svcs. | 1738 Bass Rd. Macon, GA 31210 | specific leased equipment |
| Comerica Bank- California | 333 W. Santa Clara St. San Jose, CA 95113 | as to Thomas V. Girardi, certain specified shares of stock in Coast Resorts, Inc. |
| Torrey Pine Bank | 9295 Farnham Street, Suite 200 San Diego, CA 92123 | Real property located at 100 Los Altos Drive, in the City of Pasadena, County of Los Angeles, State of California and all furniture, fixtures, improvements, accounts and records related thereto |

8.    What is the legal name and principal residence address of each Debtor other than Borrower?

Thomas V. Girardi - 100 Los Altos Drive, Pasadena, CA 91105

9.    Description of any Commercial Tort Claims owned by any Debtor

In the case of any Commercial Tort Claim existing on the date of this Agreement, which Debtor is the owner of such claim and what is the description of such claim?

| Debtor Name | Description of Commercial Tort Claim |
|---|---|
| | |

39

Initials

CONFIDENTIAL

ACKNOWLEDGEMENT (SECURITY AGREEMENT)

STATE OF CALIFORNIA
COUNTY OF
On the _____ day of November in the year 2019 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as Partner of Girardi Keese and that by his signature on the instrument, the entity upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

STATE OF CALIFORNIA
COUNTY OF
On the _____ day of November in the year 2019 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

40

_____
Initials

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                    )
County of Los Angeles                  )

On November 8, 2019, before me, Maria L. Carlos, a Notary Public, personally appeared Thomas V. Girardi, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature    _Maria L. Carlos_
             Maria L. Carlos


(S E A L)


MARIA L. CARLOS
Notary Public – California
Los Angeles County
Commission # 2229856
My Comm. Expires Feb 26, 2022

CONFIDENTIAL

## COMPANY CERTIFICATE

With respect to certain credit facilities (collectively the "Loan") to be extended by California Attorney Lending II Inc., a New York corporation (the "Lender"), the undersigned certifies and verifies to Lender, its successors and assigns as follows:

1.    I am [check applicable box:]
    ☐ the duly elected and qualified President or Secretary
    ☐ the duly appointed Manager or other authorized Member
    ☑ a duly authorized Partner

**of Girardi Keese (the "Company"), organized under the laws of California**

2.    If the Company is a corporation or limited liability company, attached to this Company Certificate as Schedule I is a correct and complete copy of, as applicable, the Certificate of Incorporation or Articles of Organization of the Company. If the Company is a limited liability partnership, attached to this Company Certificate as Schedule I is a correct and complete copy of the Certificate of Registration or other publicly filed organizational document of the Company.

3.    If the Company is a corporation or limited liability company, attached to this Company Certificate as Schedule II is a correct and complete copy of, as applicable, the By-Laws or Operating Agreement of the Company.

4.    If the Company is a general or limited liability partnership, attached to this Company Certificate as Schedule II is a correct and complete copy of the Partnership Agreement of the Company.

5.    The resolutions attached to this Company Certificate as Schedule III (collectively the "Resolutions") were duly adopted either (a) at a meeting of the board of directors and shareholders, or of the members and managers, or partners of the Company duly called and held on November __, 2019 at which meeting a quorum was present and participated, or (b) by unanimous written consent of all directors and shareholders, members and managers, or partners of the Company.

6.    None of the Resolutions has been rescinded, revoked or modified in any way.

7.    All of the Resolutions are in full force and effect.

8.    Neither any of the Resolutions nor any action taken or to be taken pursuant to any of the Resolutions (a) violates or will violate applicable law, any judgment or order of any court, agency or other governmental body by which the Company is bound, the Certificate of Incorporation, Articles of Organization, Certificate of Registration, By-Laws, Operating Agreement, Partnership Agreement or other governing document of the Company or any resolution or other action of record of the shareholders, directors, members, managers or partners of the Company, (b) violates, will violate or constitutes or will constitute any default under any agreement, instrument or other document by which the Company is bound or to which any of the Company's property is subject or (c) requires or will require any authorization of, notice to or other act by or relating to any individual, any court, agency or other governmental body or any other entity, body, organization or group (including, but not limited to, any shareholder, director, member, manager or partner of the Company) that has not been duly obtained, given or done and is not in full force and effect.

9.    Each of the following persons (individually a "Signer") (a) if the Company is a corporation or a limited liability company, has been duly elected to and qualified for and holds the office of the Company set opposite

41

_/L/_
Initials

CONFIDENTIAL

his or her name thereon, or (b) if the Company is a partnership, together constitute all of the partners of such partnership or (c) has been designated by the Company as a person authorized to transact financial transactions on behalf of the Company. Each Signer is duly authorized to execute the documents between Lender and the Company and is also authorized, if applicable, to make a loan request to Lender (if the Company is the borrower with respect to the credit facilities obtained from Lender) on behalf of the Company:

| NAME | TITLE | SIGNATURE |
| --- | --- | --- |
| Thomas V. Girardi | Partner | |
| | | |
| | | |

10.    The signature set opposite each Signer's name listed above is a true specimen of such Signer's signature.

11.    With respect to the borrowing of $8,000,000 by Girardi Keese from Lender, and all related transactions (a) the terms of such borrowing and other transactions were negotiated in the State of New York, (b) the drafting of all documents and the funding of the Loan were in the State of New York (c) the laws of the State of New York are intended by the parties to apply with respect to the construction, interpretation and choice of law governing all documents executed by the Company to Lender and (d) Lender and its legal counsel are located within the State of New York. The Loan and any related transactions were intended by Lender and the Company as New York transactions to be construed under New York law regardless of any other location of any borrower or any guarantor.

12.    **The Company has not granted any liens against its assets since the date of its application to Lender for the Loan.**

13.    **The undersigned certifies that the Company and each guarantor with respect to the Loan have duly filed all applicable income or other tax returns and have paid all income or other taxes when due, and that there are no outstanding tax liens against the assets of any of them.**

IN WITNESS WHEREOF, I have executed this Company Certificate as of November __, 2019 and verify that all of the information contained herein is true and correct to the best of my knowledge being fully aware that Lender will rely on the accuracy of this Company Certificate in extending the Loan to the Company.

Thomas V. Girardi

STATE OF CALIFORNIA
COUNTY OF

On the_____ day of November in the year 2019 before me, the undersigned, a notary public in and for said state, personally appeared Thomas V. Girardi personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he (she) executed the same in his (her) capacity, and that by his (her) signature on the instrument, the individual, or other person upon behalf of which the individual acted, executed the instrument.

Notary Public

*See Attached Notary Acknowledgment*

42

Initials

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California          )
County of Los Angeles     )

     On November 8, 2019, before me, Maria L. Carlos, a Notary Public, personally appeared Thomas V. Girardi, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

     I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

     WITNESS my hand and official seal.

Signature *Maria L. Carlos*
       Maria L. Carlos

(S E A L)

MARIA L. CARLOS
Notary Public - California
Los Angeles County
Commission # 2229856
My Comm. Expires Feb 26, 2022

CONFIDENTIAL

## SCHEDULE I

### ARTICLES OF INCORPORATION/ORGANIZATION/CERTIFICATE OF REGISTRATION

43

Initials

CONFIDENTIAL

## SCHEDULE II

### BY-LAWS/OPERATING AGREEMENT/PARTNERSHIP AGREEMENT

44

Initials

CONFIDENTIAL

## SCHEDULE III

### Resolutions

Girardi Keese (the "**Company**")
A general partnership organized under the laws of California

RESOLVED, that, from time to time, the Company borrow from California Attorney Lending II Inc. ("**Lender**") or enter into other financial transactions with Lender, or both, including guaranteeing repayment of borrowings obtained by any other party from Lender (any such borrowing and each such guaranty thereof and other transaction, collectively the "**Transactions**"); and be it further

RESOLVED that in connection with the Transactions, the Company grant a security interest or other lien in all of its present and future assets (collectively the "**Property**") to secure all of its present and future obligations to Lender; and be it further

RESOLVED, that the terms of each of the Transactions shall be on such terms as any officer, manager, member or partner or of the Company (individually an "**Authorized Person**") shall determine; and be it further

RESOLVED that any Authorized Person acting alone, is authorized to do all such acts and other things as he or she shall deem necessary or appropriate to effectuate the Transactions, in the name and on behalf of the Company or otherwise, including, but not limited to, signing, drawing, endorsing, executing and delivering notes, guaranties, assignments, pledges, security agreements, mortgages, powers of attorney, confessions of judgment, indemnifications, receipts, waivers, releases and other agreements, instruments and other documents; all on such terms as such Authorized Person shall determine (his or her approval to be evidenced by his or her execution thereof); and be it further

RESOLVED, that, without limiting the generality of the foregoing resolutions, any Authorized Person is authorized, directed and empowered, acting alone, in the name or on behalf of the Company, to obtain from Lender (or guarantee) loans the total of the outstanding principal amounts of which shall not at any time exceed $8,000,000 and to grant a lien or security interest in any Property as security for the obligations owing to Lender with respect to the Transactions; and be it further

RESOLVED, that all actions heretofore taken by the Company with respect to any security interest in any Property or to effectuate the Transactions are ratified, approved and confirmed in all respects; and be it further

RESOLVED, that notwithstanding the dissolution or termination of existence of the Company or any change in the identity of or any modification or termination of any authority of any Authorized Person, Lender may rely upon and act in accordance with the foregoing resolutions until it shall receive and have a reasonable time to act on a written notice to the contrary from any Authorized Person, provided, further, that any such dissolution, termination, or modification shall be of no effect with respect to obligations of the Company with respect to the Transactions (a) arising or accrued before such receipt of such written notice and the expiration of such period of time, or (b) thereafter arising or accruing as a result of any credit or other financial accommodation theretofore committed or otherwise agreed to by Lender.

45

Initials

CONFIDENTIAL

**LETTER TO CALIFORNIA ATTORNEY LENDING II INC.
REGARDING $8,000,000 PROMISSORY NOTE
AND POST CLOSING ITEMS TO BE COMPLETED**

November __, 2019

California Attorney Lending II, Inc.
6400 Main Street, Suite 120
Williamsville, NY 14221

Ladies and Gentlemen:

Re: Closing of $8,000,000 Term Loan

Reference is made to the Fourth Amended and Restated Promissory Note (the "Note"), dated as of November __, 2019 delivered to you and various agreements, instruments and other writings being executed and delivered by us in connection with such Note (collectively, as hereafter modified at any time, the "Transaction Documents").

As a further condition of closing, and for other valuable consideration the receipt and sufficiency of which are acknowledged, we have agreed with you that, notwithstanding anything in the Transaction Documents to the contrary, and with respect to certain documentation and other requirements to have been satisfied by us by closing but that have not been satisfied (collectively the "Post Closing Requirements");

- We will cause Thomas V. Girardi to deliver to you within one hundred twenty (120) days of the date of this letter the assignment to you of one or more life insurance policies covering Thomas V. Girardi having an aggregate face value of $5,000,000.

We hereby agree that any failure by us to satisfy the above within the agreed upon time frames shall be deemed an Event of Default under the Note.

We further understand that nothing in this letter is intended to nor does it change or modify in any respect the fact that the decision whether to honor any Loan Request and make any Loan shall be in your sole discretion.

This letter shall be governed by and construed, interperted and enforced in accordance with the law of the State of New York and the federal law of the United States without regard to the law of any other jurisdiction. This letter shall be binding upon us and our respective successors and assigns, and inure to the benefit of you and your successors and assigns.

Girardi Keese

By: _____
Thomas V. Girardi, Partner

46

Initials

CONFIDENTIAL

## ACKNOWLEDGEMENT, WAIVER AND RELEASE

In consideration of the acceptance by California Attorney Lending II Inc. (the "Lender") of that certain Fourth Amended and Restated Promissory Note (the "Note") executed and delivered by Girardi Keese (the "Borrower"), for purposes of refinancing Borrower's outstanding obligations to the Lender, and of that certain Guaranty of Payment and Performance (the "Guaranty") executed and delivered by Thomas V. Girardi (together, the Guarantors") to Lender and that certain Fourth Amended and Restated Security Agreement (the "Security Agreement") executed and delivered by the Borrower and Guarantors to the Lender in connection with the Note, each of the Borrower and Guarantors hereby (i) acknowledges its or his or her lack of all defenses, claims, counterclaims and set-offs, rights and causes of action, whether sounding in contract, tort or otherwise (collectively, the "Claims") with respect to (A) the Note, the Guaranty, the Security Agreement, any other loan documentation executed or delivered by any of the Borrower or Guarantors in connection with the foregoing, or any document, instrument, or agreement which were amended and restated or otherwise replaced by the Note, the Guaranty, the Security Agreement or any such loan documentation, (B) the enforceability of the document, instrument, or agreement which were amended and restated or otherwise replaced by the Note, the Guaranty, the Security Agreement or any such loan documentation, (C) the actions of the Lender, together with its officers, directors, managers, shareholders, members, employees, agents and attorneys, with respect thereto, (ii) irrevocably and absolutely waives, as to the Lender together with its officers, directors, managers, shareholders, members, employees, agents and attorneys, all Claims and (iii) releases and forever discharges the Lender together with its officers, directors, managers, shareholders, members, employees, agents and attorneys, from all Claims.

Dated: November 2, 2019

Girardi Keese

By: _____
Thomas V. Girardi, Partner
Facsimile No.

_____
Thomas V. Girardi, individually
Facsimile No.

47

Initials

CONFIDENTIAL

### Key Loan Term Summary with Lender Forms

**The following summary sets forth certain key terms in the loan documents between California Attorney Lending II Inc. ("CAL" or "Lender") and Borrower and provides copies of forms required to be used by Lender. THIS IS NOT A LEGAL DOCUMENT, it is not a complete listing of all rights and obligations of the parties under the loan documents, and is intended solely for the purpose of assisting Borrower in its administration of its loan with CAL. In all events, the loan documents are controlling with respect to the parties' rights and remedies with respect to the loan.**

1.  <u>Draw Requests:</u> All loan requests are subject to the review and approval of CAL and must be submitted by e-mail or facsimile on the draw request form (attached). Draw requests may not exceed the approved budget without CAL's prior written consent.

2.  <u>Purpose:</u> The line of credit ("LOC") will be used solely by Borrower to (i) refinance Borrower's existing credit facilities (if any), (ii) pay the operating expenses of Borrower's legal practice, or (iii) fund interest payments on the LOC.

3.  <u>Payment Terms:</u> <u>Months 1-24</u>: Monthly interest only, except as described in "Mandatory Pre-Payments" below. <u>Months 25-48</u>: Monthly interest, plus 1/24 of the outstanding principal balance each month. No borrowings are allowed during months 25-48.

4.  <u>Mandatory Pre-Payments:</u>

    a.  <u>Months 1-24</u>: (1) 50% of all fees and reimbursed expenses (includes hourly practice), as received from the Lion Air Crash, Porter Ranch, FTR and Abikzer litigations (limited to the Outstanding Principal Amount, interest and fees due at the time of receipt), which may not be re-borrowed, and (2) on all other matters, 25% of all fees and reimbursed expenses (includes hourly practice), as received in excess of $7,500,000 received on a quarterly basis (based on calendar quarters ending March 31, June 30, September 30 and December 31), provided that when fees and reimbursed expenses in any quarter exceed $10,000,000 Borrower shall pay 50% of fees and reimbursed expenses in excess of $10,000,000 in addition to the required 25% of fees and reimbursed expenses between $7,500,000 and $10,000,000, which may be re-borrowed. Notwithstanding the foregoing, Lender will require an irrevocable letter of instruction to be paid directly $3,500,000 from the Net Fees and Expenses due to Borrower on the Lion Air Crash cases which have already been settled.

    b.  <u>Months 25-48</u>: The greater of 1/24 of the outstanding principal or (1) 50% of all fees and reimbursed expenses (includes hourly practice), as received from the Lion Air Crash, Porter Ranch, FTR and Abikzer litigations (limited to the Outstanding Principal Amount, interest and fees due at the time of receipt) and (2) on all other matters, 25% of all fees and reimbursed expenses (includes hourly practice), as received in excess of $7,500,000 received on a quarterly basis (based on calendar quarters ending March 31, June 30, September 30 and December 31), provided that when fees and reimbursed expenses in any quarter exceed $10,000,000 Borrower shall pay 50% of fees and reimbursed expenses in excess of $10,000,000 in addition to the required 25% of fees and reimbursed expenses between $7,500,000 and $10,000,000, no further borrowings permitted.

5.  <u>Interest:</u> 16% per annum, subject to increase by the amount that the LIBOR Rate exceeds 2.0% on the first $5,000,000, 19% per annum, subject to increase by the amount that the LIBOR Rate exceeds 2.0% on the next $2,000,000 and 2% per month for a minimum of six (6) months on the remaining $1,000,000, each payable on the 10th day of every month. Invoices are issued on the 1st day of every month. We will require Borrower to authorize CAL to initiate preauthorized electronic funds transfers from a specified bank account to pay the interest on the 10th of every month. Default interest rate is 24.9%.

48

Initials

CONFIDENTIAL

6.  Advance Interest Payment. If requested by Lender, Borrower must maintain on account with CAL at all times one month's advance payment of interest. The required amount of such advance payment will initially be determined at the time of the first loan but will be adjusted from time to time based on the then outstanding principal. CAL may apply any such advance payment in such manner as it determines to any amount owing to CAL that is not paid when due or to the final payment to be made to CAL with respect to the loan.

7.  Availability Block for Interest/Interest Reserve. In addition, Borrower must maintain unused availability on the line of credit at all times to cover interest for at least 60 days. During months 25-48, CAL may require Borrower to fund a reserve or make an additional advance payment of interest to cover such 60 days' interest.

8.  Financial Covenants: The loan documentation will include requirements for:

    a.  The estimated future, aggregate legal fees collectible from Borrower's case files must exceed eight times the outstanding principal amount of the loan at all times.
    b.  Each principal Guarantor must maintain a net worth of at least three times the maximum credit facility.
    c.  All operating expenses and related line advances made pursuant to the approved budget; this includes but is not limited to salary, draws, bonuses etc. made to a Guarantor.
    d.  No future third party loans, liens (including tax liens) or security interests other than purchase money equipment financing.

9.  Information Updates: Borrower will be required to provide copies of annual tax returns, malpractice insurance renewals, quarterly financial statements for Borrower, annual financial statements for each Guarantor, quarterly case and status lists, fee sharing and referral agreements, monthly bank statements, default and cancellation notices, and other updates as may be required by CAL.

10.  Fees and Charges: Borrower will be charged a closing fee equal to 1% of the loan amount ($80,000) on the date hereof and a fee equal to 1% of the loan amount on the each anniversary of the date hereof on the LOC's outstanding indebtedness, Lender's attorneys' fees as invoiced (**estimated at $2,750**), Lender's attorneys' costs as invoiced (estimated at $400 for one Borrower and one Guarantor and an additional $100 for each additional party), and a wire fee of $30. Borrower may be assessed a 5% per month fee for late payments (including Mandatory Pre-Payments), a $250 per month fee for late information updates, a $500 or cost charge for cancelled or incomplete audit reviews, and reimbursement charges for CAL costs associated with actions undertaken by CAL to enforce, collect or protect its rights under the loan documents.

49

Initials

CONFIDENTIAL

*California Attorney Lending II Inc.*
*Specialized Lending Exclusively For the Legal Community*

## AUTHORIZATION FOR LOAN PAYMENT
## AUTOMATIC WITHDRAWAL FORM

**Borrower's Information**

Full Name: __Thomas V. Girardi__ ("Borrower")

SS# or EIN#: ▆▆▆▆▆▆▆▆▆

Email Address: __tgirardi@girardikeese.com__

**Borrower's Bank Information**

Bank Name: __Nano Banc__ ("Bank")

Bank ABA (Routing) No. __122245251__

Bank Telephone No. __(844) 626-0262__

Bank Address: __7700 Irvine Center Drive, Suite 700, Irvine, CA 92618__

Borrower's Bank Account No. __▆▆▆▆096__ ("Account")

The undersigned on behalf of Borrower, (a) authorizes California Attorney Lending II Inc. to initiate preauthorized electronic funds transfers from the Account and (b) authorizes Bank to debit the Account for such transfers.

This authorization may not be revoked, modified, or in any other way altered without the express prior written consent of both the undersigned and California Attorney Lending II Inc.

Borrower: __Thomas V. Girardi__

Authorized Signature: _____ Date: __11/11/19__

Name and Title of Signer: __Borrower__

Return this Form and a Voided Check to California Attorney Lending II Inc.

51

Initials
_____

GIRARDI | KEESE

9699

GIRARDI | KEESE
1126 WILSHIRE BOULEVARD
LOS ANGELES, CALIFORNIA  90017

NANO BANC
7700 Irvine Center Drive, Suite 700
Irvine, California 92618

9699

NUMBER

90-4525/1222

DATE                    AMOUNT

PAY
TO THE
ORDER
OF

VOID

⑈009699⑈ ⑆      251⑈ ⑆00200009⑈

GIRARDI | KEESE

9699

REORDER FROM YOUR LOCAL SAFEGUARD DISTRIBUTOR. IF UNKNOWN, CALL 800-523-3422

CONFIDENTIAL

## WIRE INSTRUCTION STATEMENT INFORMATION

**TO:**       ACCOUNTING
**FROM:**     MEGAN PAYNE, CHIEF OPERATING OFFICER
**SUBJECT:**  CLOSING – **8,000,000** TERM LOAN – **GIRARDI KEESE**
**DATED:**    NOVEMBER __, 2019

### WIRE INSTRUCTIONS FOR GIRARDI KEESE

**NAME OF ACCOUNT DEBTOR:**                    _____

**NAME OF FINANCIAL INSTITUTION:**             _____

**ADDRESS OF FINANCIAL INSTITUTION:**          _____

                                               _____

**ABA NUMBER:**                                _____

**ACCOUNT NUMBER:**                            _____

GIRARDI KEESE

By:_____
Name: _____
Title: _____

51



## WIRE INSTRUCTIONS: BUSINESS ACCOUNT

**ACCOUNT NAME:**

**GIRARDI | KEESE**
**1126 Wilshire Blvd**
**Los Angeles, CA 90017**


**ACCOUNT NUMBER:**
█████096

**ROUTING NUMBER (ABA):**
122245251


**BANK ADDRESS**
**Nano Banc**
**7700 Irvine Center Drive, Ste 700**
**Irvine, CA 92618**

1126 WILSHIRE BOULEVARD • LOS ANGELES, CALIFORNIA • 90017-1904
TELEPHONE: 213-977-0211 • FACSIMILE: 213-481-1554
WWW.GIRARDIKEESE.COM

294

# EXHIBIT L

# Snell & Wilmer

ONE CENTERPOINTE DRIVE, SUITE 170
LAKE OSWEGO, OR  97035
503.624.6800 P
503.624.6800 F

Clifford S. Davidson
(503) 443-6099
csdavidson@swlaw.com

October 17, 2020

**BY E-MAIL**

Thomas V. Girardi, Esq.
Girardi | Keese
1126 Wilshire Blvd.
Los Angeles, CA 90017
tgirardi@girardikeese.com

**Re:    DEFAULT UNDER LOAN DOCUMENTS;
            SEVEN-DAY NOTICE RE CONFESSION OF JUDGMENT**

Dear Mr. Girardi:

California Attorney Lending II, Inc. ("Lender") has retained us in connection with that certain: (a) Fourth Amended and Restated Revolving Promissory Note dated November 8, 2019, by Girardi & Keese (a/k/a Girardi Keese), a California general partnership ("Borrower") for the benefit of Lender ("Note"), (b) Guaranty of Payment and Performance dated November 8, 2019 ("Guaranty") executed by Thomas V. Girardi ("Guarantor" and, together with Borrower, "Debtors"), (c) Fourth Amended and Restated Security Agreement dated November 8, 2019 ("Security Agreement") executed by the Debtors, and (d) all other documents, instruments, or certificates entered into or delivered in connection therewith (collectively, with all modifications, amendments and addenda thereto and thereof, the "Loan Documents"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Note.

This letter constitutes written notice to Debtors that Events of Default have occurred and are continuing under the Loan Documents. Enumerated below are some, but not necessarily all, Events of Default. We reserve all rights to assert other conduct and events not otherwise identified herein, as an Event of Default at a later time.

1.   Borrower failed to pay monthly interest that is due and owing to Lender under the Note on September 10, 2020 and October 10, 2020 (*See Note §§ 2.a.(i) and 5.a.(i)*);

2.   Borrower failed to comply with certain covenants to which it was bound and defaulted in the payment or performance when due of other obligations to Lender under the Loan Documents (*See Note § 5.a.(iii)*), including, but not limited to:

ALBUQUERQUE   BOISE   DENVER   LAS VEGAS   LOS ANGELES   LOS CABOS   ORANGE COUNTY
PHOENIX   PORTLAND   RENO   SALT LAKE CITY   SAN DIEGO   SEATTLE   TUCSON   WASHINGTON, D.C.

296

# Snell & Wilmer

Thomas V. Girardi, Esq.
October 17, 2020
Page 2

    a. Failure to provide copies of Borrower's and Guarantor's annual federal tax returns no later than the earlier of (A) three days after filing or (B) the 15th day of the tenth month of each fiscal year for the immediately preceding fiscal year (*See Note § 4.a.(i)*);

    b. Failure to provide updated, complete and accurate case and status lists and a copy of each fee sharing agreement or referral agreement and any amendments thereto, with any law firm or lawyer, with respect to any case or matter described in such list, at least once each calendar quarter (*See Note § 4.a.(ii)*);

    c. Failure to provide copies of monthly bank statements from each of Borrower's bank accounts (operating and trust) no later than the 10th of each month (*See Note § 4.a.(iii)*);

    d. Failure to provide current updated financial statements of Borrower not later than the 15th day of each calendar quarter (*See Note § 4.a.(iv)*);

    e. Failure to provide current updated personal financial statements of Guarantor on or before April 15th of each calendar year (*See Note § 4.a.(v)*);

    f. Failure to provide evidence of coverage under a current malpractice insurance policy for Borrower, on each anniversary date of coverage (*See Note § 4.a.(vi)*);

    g. Failure to provide notice of any litigation commenced against Borrower or any Guarantor, or any material change in the business, clients or prospects of Borrower, in each case as soon as Borrower or any Guarantor is aware, or should be aware, of such litigation or change (*See Note § 4.a.(vii)*); and

    h. Failure to maintain in effect life insurance on the life of Guarantor in an amount equal to, at minimum, $5,000,000, that is subject to an effective collateral assignment to Lender at all times while the Note is outstanding (*See Note § 4.c.*);

3. Borrower and Guarantor defaulted in the payment or performance of obligations owing by Borrower and Guarantor to third parties and there exists a default or event of default under agreements evidencing such obligations to such third party (*See Note § 5.a.(iii)*);

4. Borrower and Guarantor have purportedly failed to pay its or his debts generally as they become due (*See Note § 5.a.(v)*);

5. Certain representations and warranties made to Lender and financial statements provided to Lender, by or on behalf of Borrower or Guarantor, have proven as the date thereof to have been incorrect or misleading in a material respect (*See Note § 5.a.(ix)*);

6. By virtue of the Borrower's inability to pay its debts as they have become due, there occurred a change in the value of the Collateral, that is, in the opinion of Lender, adverse to its interest (*See Note § 5.a.(xi)*);

# Snell & Wilmer

Thomas V. Girardi, Esq.
October 17, 2020
Page 3

7. By virtue of the Borrower's inability to pay its debts as they have become due, Lender has deemed itself insecure with respect to the Obligations and is of the opinion that the Collateral is or may not be sufficient and has decreased or may decrease in value (*See Security Agreement § 1.c.(iii)*); and

8. An Event of Default has occurred and exists under the Note and under other Loan Documents (*See Security Agreement § 1(c); Guaranty §3.1(F)*.

Based upon the foregoing defaults, Lender is now exercising its right to demand *full and immediate* repayment of the Outstanding Principal Amount plus all interest and other amounts payable pursuant to the Note that remain unpaid. In addition, under the Terms of the Loan Documents, such Events of Default, permit the Lender to: (a) declare the entire unpaid balance of principal of and accrued, unpaid interest upon the Note to be immediately due and payable, (b) reduce any claim to judgment, (c) foreclose all liens and security interests securing payment thereof of any part thereof, and/or (d) without notice of default or demand, pursue and enforce any of Lender's other rights and remedies provided under any applicable laws or agreement.

In addition, under Cal. U. Com. Code § 9607(a) and U.C.C. §9-607(a), upon a default by the Borrower or Guarantor, Lender is entitled to exercise all rights of a secured creditor, including, but not limited to, notifying each person or entity (including, but not limited to, any account debtor) obligated with respect to any of the accounts or accounts receivable of Borrower or Guarantor subject to its security interest and direct such person or entity to make each payment with respect thereto directly and solely to Lender.

Be advised that Lender has instructed my firm to pursue Lender's rights and remedies under the Loan Documents, including seeking expedited enforcement of the Debtors' obligations through the filing of the Confession of Judgment in Lender's possession, unless an authorized representative of Borrower contacts the undersigned **on or before Saturday, October 24, 2020**, to arrange for the immediate payment of all amounts currently due and outstanding.

Thank you for your anticipated cooperation in this matter. Please contact me if you have any questions concerning this notice. This letter is sent without prejudice to, or waiver of, any of Lender's rights or remedies—all of which are reserved.

Very truly yours,

Snell & Wilmer

Clifford S. Davidson

Cc: Leslie A. Cohen, Esq. (fax to 310-394-9280; leslie@lesliecohenlaw.com)
     Robert C. Baker, Esq. (fax to 213-241-0990; rbaker@bknlawyers.com)

# Snell & Wilmer

Thomas V. Girardi, Esq.
October 17, 2020
Page 4

      Keith Gregory, Esq. (by email)
      William Savino, Esq. (by email)